## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EUGENE H. KIM,

  12 Autumn Drive
  Moorestown, NJ 08057

      Plaintiff,

        v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.,

1735 K Street, N.W.
Washington, D.C. 20006

      Defendant.

Case No. 1:23-cv-2420

JURY TRIAL DEMANDED

### CORRECTED COMPLAINT

Through undersigned counsel, Plaintiff Eugene H. Kim files this "**Complaint**" against Defendant Financial Industry Regulatory Authority, Inc. ("**FINRA**").

1.     This is a constitutional challenge to FINRA's enforcement structure and the pending "**Enforcement Action**" against Mr. Kim.

2.     While FINRA claims to be a private corporation with no constitutional responsibilities, it acts as a Congressionally-authorized bounty hunter with statutory authority to enforce federal securities laws against hundreds of thousands of Americans.

3.     Incorporated as a not-for-profit, FINRA is the nation's only remaining securities "self-regulatory organization," empowered by Congress to regulate, discipline,

and enforce federal securities law against the American securities industry and its professionals.

4.     In practice, FINRA is nothing more than the federal government's private, outsourced mall cop that metes and doles arbitrary "discipline" unto securities professionals while escaping actual supervision and control by the Executive (let alone the Legislative or Judicial) branch.

5.     FINRA is violating the Constitution's separation-of-powers provisions by empowering its salaried personnel to unlawfully wield Executive power that the Constitution has granted solely to the President and officers under his supervision.

6.     Moreover, FINRA's disciplinary process and the Enforcement Action's evidentiary rules (or lack thereof) violate the Fifth Amendment.

7.     FINRA's disciplinary process and the Enforcement Action further violate the Constitution by stripping respondents of their Seventh Amendment right to an impartial jury of their peers.

8.     Moreover, FINRA invokes its supposed "private not-for-profit" status to strip witnesses of their Fifth Amendment rights, presenting a Hobson's choice of either testifying against themselves or accepting the automatic industry death sentence of a lifetime bar from the securities industry.

9.     At the same time, FINRA continually (and successfully) argues that sovereign immunity protects it from money damages suits alleging that FINRA broke federal law.

10.     Finally, FINRA's monopolization of all securities SRO power violates the First Amendment and the Sherman Act, 15 U.S.C. § 2.

11.     In this case, FINRA has filed an Enforcement Action alleging that Mr. Kim made material misstatements and omissions in connection with the sale of securities.

12.     In other words, FINRA is trying to enforce federal securities laws against Mr. Kim—despite the fact that FINRA's own Complaint recognizes that all of the allegedly-defrauded customers actually profited handsomely from the investments that Mr. Kim sourced for them.

13.     Instead of referring Mr. Kim's case to the SEC or federal prosecutors, FINRA is acting as the investigator, prosecutor, judge, and jury in the Enforcement Action.

14.     FINRA also is the executioner: it seeks to bar Mr. Kim from working in the American securities industry.

15.     In demanding to have it both ways, FINRA—with the blind-eye approval of the Executive and Legislative branches—is violating the "long term, structural protections against abuse of power [that are] critical to preserving liberty." Cf. Free Enterprise Fund v. PCAOB, 561 U.S. 477, 501 (2010) (quoting Bowsher v. Synar, 478 U.S. 714, 730 (1986)).

16.     But convenience never trumps the Constitution.

17.     Therefore, Mr. Kim seeks declaratory judgment that FINRA is violating the Constitution and the Sherman Act, and preliminary and permanent injunctions

prohibiting the unlawful Enforcement Action and prohibiting FINRA from pursuing further action against him unless and until FINRA complies with the law.

### The Parties, Jurisdiction, and Venue

18.     This Court has subject-matter jurisdiction over this Complaint pursuant to 5 U.S.C. § 78aa, 15 U.S.C. § 4, 28 U.S.C. § 1331, and 28 U.S.C. § 2201.

19.     Mr. Kim is a private individual and a citizen of New Jersey who holds FINRA Series 7, 24, 63, 66, 79, and SIE licenses. See Exhibit B, BrokerCheck Report for Eugene H. Kim (Aug. 17, 2023).

20.     From 1996 through 1998, Mr. Kim was a securities professional registered with the National Association of Securities Dealers ("**NASD**"), one of FINRA's predecessor firms.

21.     In 2015, Mr. Kim associated with a FINRA member firm and registered with FINRA.

22.     Mr. Kim currently is associated with a FINRA member firm and re-registered with FINRA.

23.     Mr. Kim's Central Registration Depository ("**CRD**") number is 2264940.

24.     Defendant FINRA holds itself out as the "government-authorized not-for-profit organization that oversees U.S. broker–dealers," "authorized by Congress to protect America's investors" and "oversee more than 624,000 brokers across the country[] and analyze billions of daily market events."

25.     FINRA is incorporated in Delaware and headquartered at 1735 K Street Northwest, Washington, District of Columbia.

26.     FINRA's Office of Hearing Officers ("**OHO**"), which is the entity designated to adjudicate FINRA's complaint against Mr. Kim, is headquartered in Washington, D.C.

27.     FINRA's Board of Governors, which purports to supervise and create the FINRA rules and regulations, regularly meets in Washington, D.C.

28.     Accordingly, this Court may exercise personal jurisdiction over FINRA, and this Complaint is properly venued in this District.

29.     While FINRA is organized as a not-for-profit corporation, the political branches have vested FINRA with so much responsibility that FINRA is a federal actor and instrumentality bound to adhere to the Constitution.

30.     Most relevant here, the Exchange Act authorizes and orders FINRA's hearing officers to police federal securities laws. 15 U.S.C. § 78s(g)(1).

31.     FINRA's sanctions carry the force of federal law. 15 U.S.C. § 78o-3(b)(7).

32.     FINRA's hearing officers demand testimony, rule on motions, preside over hearings, decide the admissibility of evidence, enforce compliance with discovery orders, and punish contempt. See, e.g., FINRA Rules 8210 (Provision of Information and testimony), 9252 (Requests for Information), 9235 (Hearing Officer Authority), 9263 (Evidence Admissibility), 9280 (Contemptuous Conduct).

33.     The United States Securities and Exchange Commission ("**SEC**") is supposed to oversee FINRA, including by reviewing and modifying FINRA's rules and orders. 15 U.S.C. §§ 78s(b)(1), 78s(h)(4), 78o-3(b)(7).

34.     This Complaint challenges the constitutionality of FINRA's structure and operations, as well as FINRA's compliance with the Sherman Act.

35.     Mr. Kim has standing to assert these claims because he is a regulated individual who is experiencing the direct impact of FINRA's unconstitutional and otherwise unlawful structure and operations, and who has suffered and will continue to suffer resulting injuries unless and until FINRA complies with the Constitution and the Sherman Act.

36.     Accordingly, this Complaint presents claims that are beyond FINRA's and the SEC's expertise, collateral to any administrative proceeding against Mr. Kim, and properly heard by this District Court.

### After The Great Depression, Congress Authorized the Creation of "Self-Regulatory Organizations" to Assist the Executive Branch in Supervising Securities Professionals

37.     Before the Great Depression, the federal government treated stock exchanges and other securities associations as "private clubs" with "great latitude [ . . . ] to discipline errant members." Silver v. New York Stock Exch., 373 U.S. 341 (1963).

38.     The crash of 1929 caused the federal government to reconsider its previously-lax oversight of the American securities industry and enact the "**Securities Act**" of 1933 and Securities "**Exchange Act**" of 1934.

39.     In 1938, Congress passed the Maloney Act, which amended the Exchange Act and established the statutory scheme of "supervised self-regulation" that requires securities self-regulatory organizations ("**SRO**") to adopt and enforce rules governing "the business conduct of their members." Axelrod & Co. v. Kordich, Victor & Neufeld,

451 F.2d 838, 840 (2d Cir. 1971) (quoting SEC, Report of Special Study of Securities Markets, H.R. Doc. No. 95, 88th Cong., 1st Session., pt. 1 (1963) ("**Senate Report**")).

40.     Shortly thereafter, the SEC explained that the Maloney Act embodied "the principle of conferring upon regulatory groups from business a primary responsibility for enforcing high standards of business conduct upon their members [ . .. . ] through the formation of **voluntary** associations of investment bankers, dealers, and brokers doing business in these markets under appropriate Governmental supervision." SEC, Fourth Annual Report of the SEC: Fiscal Year Ended June 30, 1938 at 33 (Washington, D.C., SEC 1983) (emphasis added).

41.     In the Securities Acts Amendments of 1975, Congress  explicitly authorized SROs to police their members' compliance with federal securities laws. NASD v. SEC, 431 F.3d 803, 808 (D.C. Cir. 2005).

42.     In doing so, Congress explained that its intention was for SROs to "exercise government power" when "imposing a disciplinary sanction[] on a member or person affiliated with a member." Senate Report at 202.

43.     For decades, the Exchange Act has required all individuals who work as securities professionals to register with SROs.

44.     For most of the Exchange Act's history, there were many different SROs authorized to oversee securities professionals' compliance with federal securities laws.

45.     But by the early 2000s, two primary SROs remained: the NASD and the New York Stock Exchange ("**NYSE**").

46.     Around 2000, leading securities trade groups, including the Securities Industry and Financial Markets Association ("**SIFMA**"), began lobbying for the remaining SROs to merge.

47.     At the time, the NASD largely focused its enforcement efforts on retail investors and smaller brokerage firms.

48.     The NYSE disciplinary arm, meanwhile, had focused on larger broker–dealers' operations, financial health, and protections.

49.     In 2007, NASD and NYSE members voted to consolidate the NASD and NYSE's regulatory function into what would become FINRA.

50.     Approximately eight months later, the SEC approved the merger, allowing FINRA to "exercise comprehensive oversight over 'all securities firms that do business with the public.'" UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir. 2011) (quoting 72 Fed. Reg. 42169 (Aug. 1, 2007)).

## FINRA Acts Under Color of Law

51.     Since FINRA emerged as the securities industry's sole SRO, federal law has required all individuals who work as securities professionals to associate with FINRA member firms, register as "associated persons" with FINRA, and consent to FINRA's arbitral and disciplinary jurisdiction.

52.     While "[t]he SEC is the federal agency charged with the regulation of the securities industry," it "lacks the resources to police the entire industry," and therefore "relies on industry members to promote compliance with the securities laws and

regulations and to pursue enforcement actions." Gold v. SEC, 48 F.3d 987, 990 (7th Cir.

1995).

53.     Accordingly, the Exchange Act contemplates that SROs—today, just

FINRA—will bring actions and impose sanctions to enforce its members' compliance

with federal securities laws and regulations, as well as SEC's and FINRA's own rules and

regulations. See, e.g., Otto v. SEC, 253 F.3d 960, 964 (7th Cir. 2001).

54.     In fact, federal law requires FINRA to enforce securities laws over its

members and associated persons.

55.     For example, 15 U.S.C. § 78s(d)(3) requires FINRA to impose a "final

disciplinary sanction for a violation of the federal securities laws or the rules or

regulations thereunder."

56.     The federal securities laws authorize the SEC and FINRA to adopt their

own rules and regulations to regulate the American securities industry.

57.     But FINRA cannot adopt rules without the SEC's approval. See, e.g.,

McDaniel v. Wells Fargo Invs., LLC, 717 F.3d 668, 673 (9th Cir. 2013).

58.     The SEC also retains the authority to "abrogate, add to, and delete from all

FINRA rules as it deems necessary." Aslin v. FINRA, 704 F.3d 475, 476 (7th Cir. 2013).

59.     However, the SEC may only remove FINRA Governors if, after notice and

opportunity for a hearing, the SEC finds that the Governors have "willfully violated"

federal law, "willfully abused" their authority, or "failed to enforce compliance" with the

law "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4).

## Abusing Its Power as the Only Remaining Securities SRO,
## FINRA Exists Only to Feed Itself

60.     Despite Congress's careful statutory structure, FINRA has snowballed into little more than a rent-seeking, unaccountable "fourth branch" of the federal government.

61.     At its inception, FINRA included 2,400 NASD organizations and 470 NYSE regulation, arbitration, and enforcement personnel.

62.     Today, FINRA purports to police over 3,400 brokerage firms, 150,000 branch offices, and 624,000 associated persons.

63.     FINRA's operations include 19 offices, 69 hearing venues, and approximately 3,600 employees.

64.     Every year, FINRA collects hundreds of millions of dollars from its members and associated persons through mandatory fees for simply existing and doing business, as well as through punitive sanctions.

65.     For example, in 2022, FINRA collected $680.6 million in "regulatory fees" from its members, $327.7 million in "user fees," and $280.2 million in "contract services fees"—plus another $54.5 million in fines.

66.     Just ten years prior, FINRA's revenue was significantly lower: $406.9 million in regulatory revenue, $164.9 million in user fees, $128.2 million in contract services, and $69 million in fines.

67.     There is no legitimate market reason why FINRA should have been able to increase its revenues so dramatically in an era of financial services consolidation—

particularly since the Second Circuit closed off FINRA's access to district court collection cases in 2011.

68.     Instead, FINRA has obtained this revenue through brute force, abusing its quasi-governmental status to make its members pay up or lose their livelihoods forever.

69.     The statutory scheme not only granted FINRA a *de facto* monopoly in private securities enforcement; it also has given FINRA unfettered authority to compensate itself.

70.     In 2021, FINRA reported approximately $1.288 billion in operating revenue.

71.     FINRA spent over 60% — or $800 million — on compensation and benefits for FINRA employees, including a $3 million salary for its CEO and over $1 million each to FINRA's Chief Financial Officer, Chief Legal Officer, Head of Member Supervision, and Chief of Exams.

72.     Meanwhile, salaries offered by SEC — the federal agency that is supposed to supervise and control FINRA — are just a fraction of their supposed subordinates.'

73.     Federal law caps SEC Senior Officers' salaries at $295,093.

74.     Today, "far from being 'members' of FINRA comparable to the former owners of seats in the NYSE and their associates, securities firms are today the functional equivalent of regulated entities with little or no input into FINRA's regulatory policy or corporate governance." Joseph McLaughlin, Is FINRA Constitutional?, 43 SRLR 681 (Mar. 28, 2011).

75.     FINRA's Bylaws prohibit a majority of Governors from working in the securities industry.

76.     All FINRA trials, which FINRA calls "hearings," are chaired by a salaried FINRA employee, not a securities professional.

77.     Even SEC Commissioners know that "FINRA is not a self-regulator. Its members are not regulating themselves; they are being regulated by FINRA, just as they are regulated by the SEC:"

> Although commonly perceived to be a self-regulator, FINRA is not accountable to the industry in the way a self-regulator would be. Nor is it accountable to the public, Congress, the president, or the courts. FINRA's structure and monopoly status shield it from close oversight. Consequently, an important part of the securities markets is under the control of a regulator with limited accountability.

Comm'r Hester Peirce, The Financial Industry Regulatory Authority: Not Self-Regulation After All, Mercatus Center of George Mason University at 27 (Jan. 2015).

78.     Similarly, former SEC Commissioner Daniel M. Gallagher has observed:

> This decrease in the "self" aspect of FINRA's self-regulatory function has been accompanied by an exponential increase in its regulatory output. As FINRA acts more and more like a deputy SEC, concerns about its accountability are more pronounced.

Burton, Reforming FINRA, Backgrounder No. 3181 at note 55.

79.     FINRA simply is not acting as a "self-regulatory organization."

**Cloaking Itself in the Exchange Act's Legitimacy, FINRA Arbitrarily Acts as Securities Law Investigator, Prosecutor, Judge, Jury, and Executioner**

80.     FINRA claims that its "Enforcement Priorities" are "(1) obtaining restitution for harmed customers; (2) ridding the industry of brokers engaged in fraud or other egregious misconduct—especially brokers with a history of violations; (3)

protecting seniors and vulnerable investors; and (4) ensuring the integrity of the markets." FINRA, Enforcement, https://www.finra.org/rules-guidance/enforcement.

81.     FINRA also claims that it "believes in a fair and transparent process." Id.

82.     In reality, the process by which FINRA purports to enforce federal securities laws is beyond Kafka's wildest tales.

83.     FINRA deploys its broad powers to impose burdensome, arbitrary, and ill-defined standards.

84.     Moreover, FINRA enforces those "standards" in a discriminatory manner, without consultation with or oversight by any duly-appointed constitutional officer.

85.     FINRA decides who it will investigate, the tools it will deploy, and the scope of its discovery demands.

86.     Furthermore, FINRA purports to hold this power regardless of whether any authority will ever file enforcement charges.

87.     The SEC only involves itself in this arbitrary enforcement process if and when and FINRA's target survives eleven stages of FINRA's internal investigation, prosecution, and appeals.

88.     **First**, FINRA begins an investigation into alleged violations of federal securities laws and issues demands for testimony and evidence pursuant to that specific investigation.

89.     Private FINRA employees determine what facts to investigate and how to investigate them.

90.     Those private FINRA employees are supervised by other private employees, and on and on up the chain until someday, eventually, the SEC supposedly supervises FINRA's conduct.

91.     While the federal government refused to grant FINRA subpoena authority, FINRA gifted itself the power to issue expansive and unlimited discovery requests, without any restriction on their scope, via FINRA Rule 8210.

92.     FINRA has not provided any mechanism by which the 8210 demand's target may challenge the discovery demand or its scope.

93.     FINRA also provides no guidance on exactly how much compliance or non-compliance with the 8210 demand will save the target's career.

94.     Furthermore, if a FINRA member or associated person refuses to comply with the 8210 demand, FINRA may bar and suspend that target from the securities industry, severing them from their chosen profession.

95.     Indeed, FINRA's form discovery demands warn their recipients that they have no Fifth Amendment rights vis-à-vis FINRA — they must either do whatever FINRA asks, or face a FINRA suspension and bar, recognized by our courts as "the securities industry equivalent of capital punishment." See, e.g., PAZ Sec., Inc. v. SEC, 494 F.3d 1059, 1065 (D.C. Cir. 2007).

96.     Despite its explicit disavowal of its Fifth Amendment duties, FINRA's typical practice is to share its findings with the SEC, Federal Bureau of Investigation ("**FBI**"), United States Attorneys' Offices, and state and local prosecutors and law enforcement agencies.

97.     FINRA provides no public information explaining how or why it investigates or escalates any given matter.

98.     **Second**, FINRA's investigation team recommends—to other supposedly-private FINRA employees—whether FINRA should act against the target.

99.     Again, all FINRA personnel involved at this stage are private citizens and full-time, salaried FINRA employees, not public officials sworn to uphold the Constitution.

100.    **Third**, FINRA issues a disposition of either (a) formal disciplinary action, (b) informal action, or (c) no action.

101.    If and only if FINRA institutes a formal disciplinary action, the **fourth** step is review by FINRA's Office of the Counsel to the Head of Enforcement ("**OHCE**").

102.    **Fifth**, FINRA's Office of Disciplinary Affairs ("**ODA**") reviews and approves the disposition.

103.    **Sixth**, FINRA Enforcement either issues a complaint or reaches a settlement with the target via a Letter of Acceptance, Waiver and Consent ("**AWC**").

104.    Mr. Kim is currently facing this sixth step of FINRA's Enforcement process.

105.    FINRA is requiring Mr. Kim to answer the Complaint and submit himself to the Enforcement Action no later than August 22, 2023.

106.    **Seventh**, FINRA's Office of Hearing Officers ("**OHO**") holds a hearing to adjudicate the complaint.

107.    FINRA advertises that its OHO "is an office of impartial adjudicators [that] serves as FINRA's 'courthouse' for disciplinary and expedited proceedings." FINRA, Office of Hearing Officers.

108.    FINRA represents that "OHO is located in FINRA's Washington, D.C. office[,] is physically separated from other FINRA departments[, and] maintains strict independence from FINRA's regulatory and enforcement programs." Id.

109.    FINRA explains how it "supervises" the OHO and FINRA Hearing Officers:

> Hearing Officers are not involved in the investigative and examination processes of FINRA. OHO reports directly to FINRA's Chief Executive Officer. Furthermore, employment protections exist for Hearing Officers to further ensure their independence. Only FINRA's Chief Executive Officer can terminate a Hearing Officer, and the termination can be appealed to the Audit Committee of FINRA's Board of Governors.

Id.

110.    However, there is no public record of FINRA's Chief Executive Officer ("**CEO**") terminating a hearing officer.

111.    FINRA's Board of Governors—composed primarily of "non-industry members"—elects FINRA's CEO and Audit Committee members.

112.    FINRA's website purports to explain the OHO hearing process:

> OHO arranges a three-person hearing panel to hear the case. The panel is chaired by a Hearing Officer, an independent adjudicator who is an employee of OHO. The Chief Hearing Officer appoints two industry panelists, drawn from a pool of current and former securities industry members of FINRA's District and Regional Committees, current and former industry members of its Market Regulation Committee, former industry members of FINRA's National Adjudicatory Council (NAC), former

FINRA Governors, and current and former members of FINRA's Board advisory committees. [ . . . ]

A Hearing Officer administers each case by conducting pre-hearing conferences, ruling on motions and the admissibility of evidence, and issuing decisions in accordance with FINRA's Code of Procedure. [ . . . ]

At the conclusion of each hearing or shortly thereafter, the Hearing Panel (in cases before a Hearing Panel) deliberates, and the Hearing Officer prepares a draft Hearing Panel decision. The Hearing Panel or Hearing Officer decision includes factual findings, legal conclusions, and when appropriate, sanctions. [ . . . ]

[A] Hearing Panel or Hearing Officer [ . . . ] may impose a variety of sanctions, including the suspension or expulsion of a broker–dealer from FINRA members, the suspension or bar of an associated person from association with any FINRA member, a fine, an order to pay restitution, an order to disgorge ill-gotten gains, a censure, and a case-and-desist order.

Id.

113.    FINRA neglects to mention that its Hearing Officers do not even apply the most basic rules of evidence in OHO hearings.

114.    For example, nearly every enforcement hearing includes testimony of paid FINRA employees that is nothing but hearsay within hearsay within hearsay regarding supposed conversations with investors, other FINRA employees, and other regulators.

115.    OHO hearings never include juries.

116.    Instead, hearing officers act as the fact-finders.

117.    Furthermore, while district judges and juries are randomly selected with various procedural protections (including Batson), FINRA provides no standard or guidance explaining how it appoints hearing officers to any given case.

118.    Unlike in both civil and criminal trials, FINRA-licensed OHO hearing witnesses cannot invoke their Fifth Amendment rights.

119.    And FINRA pursues these deficient procedures even when Enforcement charges someone with making "material misstatements and omissions in the sale of securities.

120.    This is FINRA's charge against Mr. Kim—and the exact same securities fraud theory that the SEC could pursue in a civil district court action or the U.S. Attorneys' Office could prosecute in a criminal district court action, where defendants would receive the benefits of the Federal Rules of Evidence and their jury trial rights.

121.    **Eighth**, the OHO issues either an "Order Accepting Offer of Settlement" or a Decision.

122.    This Decision becomes effective as soon as it is issued, regardless of whether the respondent appeals.

123.    **Ninth**, the FINRA member or associated person can appeal an adverse OHO Decision to FINRA's National Adjudicatory Council ("**NAC**").

124.    The NAC has 15 members: seven "industry members" and eight "non-industry members."

125.    The seven "industry members" include two "at-large" industry members, and five people who are elected: two from small firms, one from mid-size firms, and two from large firms.

126.    At least three of the non-industry members are "public members," i.e. those who have "no material business relationship with a broker or dealer or a [SRO] registered

under the [Exchange] Act." FINRA Regulation, Inc. Bylaws Art. I(gg); see also id. I(w) ("Industry Member"); id. I(dd) ("Non-Industry Member").

127.    The NAC members elect a Chair and Vice Chair, but the FINRA Board may remove either "at any time for refusal, failure, neglect, or inability to discharge his or her duties." Id. § 5.2(b).

128.    Any NAC member "may be removed from office at any time for refusal, failure, neglect, or inability to discharge the duties of such office, or for any cause affecting the best interest of the [NAC] the sufficiency of which the FINRA Board shall be the sole judge, by majority vote of the FINRA Board." Id. § 5.8.

129.    The NAC appeal process is even more opaque than the OHO hearing process.

130.    Again, all NAC adjudicators are chosen and compensated by FINRA.

131.    In practice, NAC is little more than a rubber stamp.

132.    FINRA, itself, advises the public that "grounds for revision on appeal are very limited."

133.    In fact, NAC's appellate "review" is so adverse to respondents that the SEC requires firms to book adverse OHO awards as an accounting liability even when appeals are pending.

134.    **Tenth**, the respondent can ask FINRA's Board of Governors to review NAC's appellate decision.

135.    FINRA's Board of Governors is "the governing body" of FINRA and "vested with all powers necessary for the management and administration of the affairs

of [FINRA] and the promotion of [FINRA's] welfare, objects, and purposes," including adopting bylaws, rules, regulations, orders, resolutions, exemptions, interpretations, directions, and decisions. FINRA Corp. Bylaws Art. VII § 1(a).

136.    FINRA's Board of Governors "shall consist of" 16 to 25 Governors, with more "Public Governors" than "Industry Governors." Id. Art. VII(4)(a).

137.    However, the respondent has no right to Board review; the Board of Governors can simply refuse to do so.

138.    There is no law that governs when the Board of Governors will deign to review a NAC decision.

139.    In these first FINRA ten enforcement steps, FINRA acts as investigator, prosecutor, judge, jury, and executioner.

140.    After staggering through ten layers of FINRA's internal process, respondents like Mr. Kim finally have the opportunity to speak to the SEC.

141.    FINRA refuses to stay bars or expulsions while respondents appeal to the SEC. FINRA Rule 9370(a).

142.    If—and only if—the SEC issues a final order against the respondent at this **eleventh** stage, that person finally has the option of appealing the "final SEC order" to the Court of Appeals.

143.    In other words, a respondent like Mr. Kim must persevere through **eleven** layers of administrative process before he can ever be heard by a presidentially-appointed, Senate-approved decisionmaker.

144.    FINRA boasts that in 2020, it brought 808 disciplinary actions, levied $57 million in fines, ordered $25.2 million in restitution, and referred more than 970 fraud cases to the SEC "and other agencies."

145.    But not a single one of the FINRA Governors, officers, executives, or employees—not one single person—involved in FINRA's enforcement process is appointed or removable by the President or by the head of any Executive Branch department answerable to the president.

**There Are No Constitutionally-Mandated Checks and Balances on FINRA**

146.    FINRA's Governors, executives, and officers are appointed and generally removable only by the Board.

147.    The SEC provides the only check on FINRA's power, and that check is severely limited: the SEC may only remove FINRA Governors who have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce compliance" with applicable laws and regulations "without reasonable justification or excuse."

148.    The SEC has never removed a FINRA Governor.

149.    Moreover, the SEC Commissioners, themselves, cannot be removed by the President except under similarly-limited circumstances.

150.    In short, the President cannot remove SEC Commissioners without cause, and the SEC cannot remove FINRA Governors without cause.

151.    This double-layered removal structure is unconstitutional.

152.    In 2018, the Supreme Court rejected the SEC's longtime reliance on improperly-appointed administrative law judges ("**ALJ**"), holding that SEC's ALJs are constitutional officers within the meaning of the Appointments Clause and reversing and remanding the SEC's final order finding that the petitioners had committed securities fraud and imposing lifetime bars from working in the securities industry. See generally Lucia v. SEC, 138 S.Ct. 2044 (2018).

153.    Accordingly, FINRA's Board, executives, and officers—including the hearing officers entrusted with adjudicating Mr. Kim's Enforcement Action—are unconstitutionally insulated from Presidential control and oversight.

**FINRA's Unlawful Structure and Enforcement Action are Injuring Mr. Kim**

154.    FINRA's Enforcement Action against Mr. Kim epitomizes FINRA's arbitrary approach to securities enforcement.

155.    FINRA's Complaint alleges that between December 2017 and June 2019, Mr. Kim violated the securities laws while managing a FINRA-registered brokerage firm's and investment adviser's (the "**Firms**") sale of a special purpose vehicle that offered its members participation in "**Funds**" whose business was to buy pre-Initial Public Offering ("**IPO**" and "**Pre-IPO**") securities. See generally Exhibit A, FINRA Enforcement Action Notice and Complaint, Dep't of Enforcement v. Kim, FINRA Disciplinary Proceeding No. 2019064508802 (July 11, 2023).

156.    FINRA's Complaint acknowledges that Mr. Kim did not have authority to execute documents for the Pre-IPO funds on behalf of the Firms.

157.     In fact, Mr. Kim was never an officer or director of either Firm, nor a member of the Commitment Committee, which made all Pre-IPO investment decisions.

158.     The Firms' senior management told Mr. Kim he was no more than a "processor" empowered only to prepare paperwork for management's review and execution.

159.     In fact, Mr. Kim never even spoke to one of the customers.

160.     FINRA's Complaint also claims that Mr. Kim failed to identify specific shares of securities that the Firms would sell to their customers before the Firms solicited those customers' investments.

161.     FINRA also alleges that the Firms advertised that they would acquire the securities at $9.75 per share, but the Fund purchased the securities at an average price of $20.22 per share.

162.     Mr. Kim had no authority to make the Funds' purchase determinations, and did not do so.

163.     FINRA further alleges that one Fund was not able to locate enough shares to meet its customers' demand, and held approximately $1 million more of customer money than had been spent to purchase the security.

164.     However, the Firms' historical and established practice for the Funds was never to contract for specific shares before soliciting customers' investments in pre-IPO fund offerings.

165.     Moreover, these offerings' solicitation materials explicitly disclosed that the offerings might not close and the share might not ever be purchased.

166.    FINRA admits that each and every one of the participating customers were Accredited and Qualified Investors.

167.    FINRA also pleads that the investment adviser notified all of the customers of the "change in material investment terms" and gave the customers the opportunity to receive full refunds or accept the pricing change.

168.    Only two of the approximately 38 customers accepted the refund.

169.    The customers who accepted the refund offer also were paid interest on their refunded cash.

170.    Customers who refused the refund profited handsomely from their investments, receiving returns of either "approximate[ly] 40 percent" or "in excess of 200 percent" once the issuer went public.

171.    FINRA alleges that Mr. Kim's entire compensation for these transactions was a $16,220 commission.

172.    Meanwhile, Mr. Kim and his wife reported nearly $1 million of taxable income in 2017.

173.    In comparison, the Firms received $405,500 from the offerings.

174.    Furthermore, the Firms always controlled the offerings' and funds' finances and had full transparency into Mr. Kim's communications.

175.    Furthermore, only senior management controlled investors' cash.

176.    Mr. Kim had no authority to move investors' money.

177.    FINRA's prosecution of Mr. Kim violates not only the Constitution and Sherman Act, but also FINRA's own purported standards.

178. FINRA advertises its "Enforcement Priorities" as "(1) obtaining restitution for harmed customers; (2) ridding the industry of brokers engaged in fraud or other egregious misconduct—especially brokers with a history of violations; (3) protecting seniors and vulnerable investors; and (4) ensuring the integrity of the markets."

179. But in Mr. Kim's case, there were no harmed investors.

180. All of the customers either received refunds and interest payments or reaped profits of 40 to 200 percent.

181. In Mr. Kim's case, there was no "egregious misconduct."

182. While Mr. Kim first became registered with FINRA's predecessors in 1996, this Enforcement Action is the very first blemish on his otherwise-unblemished BrokerCheck record.

183. The Firms' senior management made all material decisions about the offerings, instructing Mr. Kim to act as a mere "processor."

184. All of the involved customers received two years of audited financial statements and personal capital account statements showing that the Firms had not yet located the shares.

185. Here, there were no "vulnerable investors:" all of the impacted customers are wealthy investors who made handsome profits.

186. Considering that the brokerage maintained ultimate authority (and even signature power) for all relevant contracts; are large, sophisticated organizations; and made $405,500 from the customers' investments—**twenty-five times** Mr. Kim's

commissions—FINRA's claimed priority of "ensuring the integrity of the markets" is highly questionable.

187.    Moreover, FINRA already sanctioned the brokerage for that conduct, obtaining $300,000 in fines, plus other remedial sanctions.

188.    Yet FINRA has filed the Enforcement Action against Mr. Kim, accusing him of making "omissions and misrepresentations" that "repeatedly hid the status of the [] offering from [brokerage firm] representatives and principals, knowingly causing at least one [brokerage] representative to falsely inform at least one [] offering investor that [Company A] shares had been acquired at $9.754 per share."

189.    "Misstatements and omissions" in the purchase and sale of securities are the exact same fraudulent conduct that the SEC or federal prosecutors can charge in civil or criminal district court actions.

190.    The SEC has not filed an administrative action against Mr. Kim in its own forum, nor has it filed a civil action in federal district court.

191.    Upon information and belief, the U.S. Attorney's Office is not investigating Mr. Kim for alleged criminal violations.

192.    No customer has sued Mr. Kim.

193.    But years before it filed the Complaint, FINRA issued 8210 demands that forced Mr. Kim to provide documents and testify to FINRA's investigators.

194.    FINRA then used Mr. Kim's own documents and testimony to bring this Enforcement Action against him.

195.    FINRA's prosecution of Mr. Kim will likely cost many times more than the $16,220 in commissions he was paid from these investments.

196.    In doing so, FINRA also will force Mr. Kim to either abandon his decades-long career or spend hundreds of thousands, if not millions, of dollars defending himself against FINRA's interminable, arbitrary, opaque enforcement process.

197.    Mr. Kim simply does not have the resources to fight FINRA's unconstitutional prosecution.

198.    By working in concert to strip Mr. Kim of his Fifth and Seventh Amendment rights—power amassed only through monopolizing the SRO market and stripping securities professionals of their First Amendment rights—FINRA's unconstitutional investigation and prosecution processes and the Enforcement Department have forced Mr. Kim to file this district court suit seeking a declaratory judgment and preliminary and permanent relief enjoining FNIRA's unconstitutional proceedings against Mr. Kim.

## CAUSES OF ACTION

### Count I - Separation of Powers

199.    Mr. Kim incorporates his foregoing allegations.

200.    FINRA's current structure and operations violate the Constitution's separation of powers provisions, including the appointments, removal, and non-delegation clauses.

201.    The Appointments Clause provides that the President "**shall** nominate, and by and with the Advice and Consent of the Senate, **shall** appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers

of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II § 2.2 (emphasis added).

202.    FINRA's Governors, executives, and officers, including hearing officers, are principal officers whose appointments must be made by the President with the advice and consent of the Senate.

203.    In the alternative, Governors, executives, and officers, including hearing officers, are inferior officers whose appointments must be made by the President, a court of law, or the head of a department.

204.    In particular, FINRA hearing officers and NAC members unlawfully exercise power in a manner identical to the SEC ALJ power that the Supreme Court held unconstitutional in <u>Lucia</u>.

205.    Like SEC ALJs and federal district judges, OHO and NAC decisions can become final and effective without any further consideration or review.

206.    But unlike federal judges, FINRA hearing officers are not appointed by the President, not approved by the Senate, and need not take any oath.

207.    Moreover, as detailed throughout this Complaint, FINRA hearing officers follow no procedural law, and run roughshod over fundamental Constitutional protections.

208.    Because the President cannot remove SEC Commissioners without cause, and the SEC cannot remove a Board member without cause, FINRA unconstitutionally evades Presidential control and oversight.

209.    FINRA's many layers of private, opaque appointment and "supervision" violate the Constitution's key separation-of-powers protections, including the appointment and removal clauses and the non-delegation doctrine.

210.    FINRA does not answer to the President or any federal executive officer in connection with its discharge of its powers.

211.    FINRA's Governors, executives, and officers are neither appointed nor removable by the President.

212.    FINRA's Officers are appointed by the Board and not removable or answerable to the President and can only be removed by the Board.

213.    While the SEC is responsible for the oversight of FINRA, the SEC cannot remove FINRA Board members or Officers unless narrow circumstances exist, as set forth in 15 U.S.C. §78s(h)(4)(B).

214.    The SEC only reviews a disciplinary decision issued by FINRA's hearing officers if an aggrieved party files an appeal after appealing to FINRA's NAC.

215.    The SEC Commissioners cannot be removed by the President except in limited circumstances.

216.    Based on this structure, FINRA's Board members and officers receive a multi-layered insulation from removal.

217.    This prevents the President from executing his duties to oversee the officers executing the laws of the U.S. which violates the Constitution's separation of powers.

218.    Furthermore, the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

219.    The SEC's grant of wide-ranging authority to FINRA was an unconstitutional delegation of legislative power by the SEC to an entity that is not part of the Legislative Branch.

220.    FINRA's violation of the appointments, removal, and non-delegation clauses entitles Mr. Kim to declaratory judgment that FINRA is violating the Constitution's separation-of-powers provisions and to obtain preliminary and permanent injunctions prohibiting FINRA from pursuing the Enforcement Action or any other enforcement proceeding against him until FINRA complies with the Constitution.

### Count II - Constitution Articles II, III; Amendments V, VII

221.    Mr. Kim incorporates his foregoing allegations.

222.    FINRA's internal judicial procedures violate Article III and the Fifth and Seventh Amendments.

223.    Not a single one of FINRA's employees--let alone its Governors or hearing officers--is selected in accordance with the Appointments clause.

224.    At the same time, FINRA exercises unfettered discretion to investigate, charge, prosecute, convict, and sanction people for violating the federal securities laws.

225.    When FINRA does so, it denies witnesses and targets even the most basic Constitutional protections.

226.    For example, its form Rule 8210 discovery demands expressly warn their targets that they have no Fifth Amendment rights vis-à-vis FINRA.

227.     Neither witnesses nor respondents may invoke their Fifth Amendment protections.

228.    FINRA's internal judicial procedures do not adhere to evidence or procedural rules that comply with the Constitution.

229.    For example, FINRA disciplinary hearings, adjudicated by hearing officers who are FINRA employees, apply no formal rules of evidence.

230.    In FINRA's internal judicial proceedings, FINRA's own employees testify to layers of hearsay that would never be admissible in court.

231.    FINRA's witnesses also abuse the work product protection as both a shield and a sword, with no pushback from the OHO or NAC.

232.    Moreover, FINRA's adjudicators, i.e. hearing officers and NAC members, are not Article III judges.

233.    Instead, they are merely salaried FINRA employees who are not accountable to the President or Congress, have taken no oath, and yet are empowered to determine violations of federal securities law.

234.    Moreover, while judges and juries are randomly selected for any given civil or criminal action, FINRA decides who adjudicates any given hearing, including that of Mr. Kim's Enforcement Action.

235.     FINRA strips respondents of their right to a jury trial.

236.     FINRA's internal appellate procedure is little more than a rubber stamp.

237.     Therefore, Mr. Kim seeks declaratory judgment that FINRA and the Enforcement Action are violating Article III and the Fifth and Seventh Amendments, and preliminary and permanent injunctions prohibiting FINRA from pursuing the Enforcement Action or any other enforcement proceeding against him until FINRA complies with the Constitution.

## Count III – First Amendment

238.     Mr. Kim incorporates his foregoing allegations.

239.     The First Amendment protects individuals' associational.

240.     For SROs' first seventy years, American securities professionals could engage in their chosen profession by choosing their self-regulator among a variety of securities exchanges and associations.

241.     Once FINRA has assumed total control of all securities SROs, securities professionals lost any right to self-appoint and self-govern their business, as intended by Congress and reinforced by decades of practice.

242.     FINRA has abused its sole authority to impose increasingly arbitrary and unconstitutional requirements upon any and all people who choose to work in the American securities industry.

243.     In fact, FINRA's power is so expansive that it has even required securities customers—the "investors" FINRA supposedly exists to protect—to forfeit their Fifth Amendment rights or face FINRA sanctions.

244. Besides abusing its legal authority, FINRA also is forcing its members and associated persons to pay higher and more arbitrary fees.

245. FINRA's financial records, standing alone, show that FINRA has morphed into a closed-loop organism whose primary goal is to expand its own power and payroll.

246. FINRA derives nearly all its revenue from fees and fines.

247. When FINRA suffered investment losses, it simply increased members' mandatory fees to make up the shortfall!

248. FINRA's "not-for-profit" status makes no sense: its CEO's base salary is ten times higher than the maximum SEC salary.

249. By forcing securities professionals to join, fund, and support an SRO, FINRA abuses its last-man-standing status to deprive members and associated persons of their First Amendment rights.

250. Therefore, Mr. Kim seeks declaratory judgment that FINRA is violating the First Amendment, and preliminary and permanent injunctions prohibiting FINRA from pursuing the Enforcement Action or any other enforcement proceeding against him until FINRA complies with the Constitution.

### Count IV - Sherman Act, 15 U.S.C. § 2

251. Mr. Kim incorporates his foregoing allegations.

252. The Sherman Act prohibits monopolization of, attempted monopolization of, and conspiracy to monopolize "any part of trade or commerce."

253. FINRA has monopolized the SRO market.

254.     When Congress enacted the SRO laws, it intended for a robust marketplace of different securities associations and exchanges that would serve and ensure their respective members' compliance with the federal securities laws.

255.     Since FINRA became the nation's only securities SRO, free from any market competition, it has continuously expanded its own power and payroll.

256.     FINRA's ineluctable self-aggrandizement is perpetrating the exact harm that our nation's antitrust laws are designed to combat.

257.     Unchecked by any other SRO, FINRA has continuously increased its budgets, fees, and fines.

258.     Although irrelevant to the monopolization analysis, it is notable that FINRA's ballooning budget has failed to correspond with any meaningful increase in investor protection or securities market stability.

259.     FINRA's abuses of power prevent securities professionals from running their businesses in accordance with basic pricing principles, and are continuing to create barriers to entry completely divorced from SROs' statutory mission of promoting American securities markets and protecting investors.

260.     It is the height of irony that an entity purportedly deriving its power from a Congressional mandate to ensure orderly markets is, itself, an abusive monopolist.

261.     FINRA's Sherman Act violations have damaged Mr. Kim in an amount to be revealed during discovery and proven at trial, including treble damages, injunctive relief, and reasonable costs and fees.

**RELIEF REQUESTED**

Mr. Kim respectfully requests the following relief:

(a) Declaratory Judgment that FINRA is a state actor obligated to act in accordance with the Constitution;

(b) Declaratory Judgment that FINRA is constituted in a manner that violates Articles II, III, and / or Amendments I, V, and VII of the United States Constitution;

(c) Declaratory Judgment that FINRA's disciplinary and enforcement structure violates Articles II, III, and / or Amendments I, V, and VII of the United States Constitution;

(d) Declaratory Judgment that FINRA's Enforcement Action against Mr. Kim is violating Articles II, III, and / or Amendments I, V, and VII of the United States Constitution;

(e) Treble damages, permanent injunction, and reasonable attorneys' fees and costs for violation of the Sherman Act;

(f) Preliminary and permanent injunctions prohibiting FINRA from pursuing the Enforcement Action or any other proceeding against Mr. Kim until FINRA complies with the Constitution;

(g) Preliminary and permanent injunctions prohibiting FINRA from pursuing the Enforcement Action or any other proceeding against Mr. Kim until FINRA complies with the Sherman Act;

(h) Pre- and post-judgment interest;

(i)  Reasonable costs and attorneys' fees; and

(j)  All other relief that the Court finds just and proper.

## JURY DEMAND

Mr. Kim demands a jury trial.

Dated: August 21, 2023              Respectfully submitted,

_____
Philip Andonian (Bar No. 490792)
CALEBANDONIAN PLLC
1100 H Street, N.W. – Ste. 315
Washington, D.C. 20005
Tel: (202) 953-9850
Email:  phil@calebandonian.com

Martin H. Kaplan (NY Bar No. 1053701)*
Kari Parks (NY Bar No. 5379003)*
GUSRAE KAPLAN NUSBAUM PLLC
120 Wall Street – 25th Floor
New York, NY 10005
Tel: (212) 269-1400
Email:  mkaplan@gusraekaplan.com
            kparks@gusraekaplan.com

*Counsel for Plaintiff Eugene H. Kim*

* - Application for admission *pro hac vice* forthcoming