UNITED STATES DISTRICT COURT
DISTRICT OF DISTRICT COLUMBIA

EUGENE H. KIM,

Plaintiff,

v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.,

Defendant.

Case No. 1:23-cv-2420 (TSC)

**MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS                                                                                    2
TABLE OF AUTHORITIES                                                                               3
PRELIMINARY STATEMENT                                                                         5
BACKGROUND                                                                                              7

I.  Until the Enforcement Action, Mr. Kim Had a Spotless Regulatory Record        7
II.  FINRA's Last-Man-Standing Status has Transformed It from a Truly Self-Regulatory Private Organization Into a *De Facto* Government Agent        7

    A.  Responding to the Crash of 1929, Congress Authorized Members-Only "Self-Regulatory Organizations" to Assist the Executive Branch in Supervising Securities Professionals        8
    B.  FINRA's Enforcement Procedures Evade Executive Oversight        11
        1.  FINRA's Governors Appoint Themselves to The Board        11
        2.  FINRA's Trial-Level Hearing Officers are FINRA Employees Who Answer to Nobody But FINRA's CEO        12
        3.  FINRA's National Adjudicatory Council Reports Only to FINRA's Board        13
        4.  FINRA's Board Can Refuse to Hear an Appeal        14
    C.  FINRA's Trials and Appeals Provide No Procedural Protections        14

III.  Monopolizing the Securities SRO Market, FINRA Abuses Its Power Over American Securities Professionals        16
IV.  FINRA's Unlawful Structure and Enforcement Action are Injuring Mr. Kim   18
LEGAL STANDARD                                                                                         21
ARGUMENT                                                                                                   22

I.  Mr. Kim Should Succeed on the Merits        23

    A.  In Concurring with the Circuit Court's Decision to Enjoin FINRA's Expedited Enforcement Proceeding Against Alpine, Judge Walker Observed that FINRA's Enforcement Structure Likely Violates the Appointments and Nondelegation Doctrines        23
    B.  The Enforcement Action Violates Mr. Kim's Due Process Rights        27
    C.  FINRA's Monopolization of the Securities SRO Market Violates the First Amendment and the Sherman Act        29

II.  FINRA's Likely Violations of the Constitution and Sherman Act Comprise Irreparable Harm *Per Se*, Tip the Balance of the Equities in Mr. Kim's Favor, and Ensure that the TRO and Preliminary Injunction Would Serve the Public Interest        31

CONCLUSION                                                                                               32

## TABLE OF AUTHORITIES

**Cases**

Alpine Sec. Corp v. FINRA, No. 23-5129, 2023 WL 4703307 (D.C. Cir. July 5, 2023) (Walker, J., concurring)* ... passim

Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838 (2d Cir. 1971) ... 8

Axon Enters., Inc. v. FTC, 598 U.S. 175, 191 (2023)* ... 21, 29, 30

Blum v. Yaretsky, 457 U.S. 991 (1982) ... 24

Bowsher v. Synar, 478 U.S. 714 (1986) ... 29

Buckley v. Valeo, 424 U.S. 1 (1976) ... 22

Collins v. Yellen, 141 S.Ct. 1761 (Gorsuch, J., concurring) ... 30

Dep't of Transp. v. Assoc. of Am. R.R., 575 U.S. 43 (2015) (Alito, J., concurring) ... 24

Fiero v. FINRA, 660 F.3d 569 (2d Cir. 2011) ... 15

Free Enterprise Fund v. PCAOB, 561 U.S. 477 (2010) ... 29

FTC v. Ruberoid Co., 343 U.S. 470 (1952) (Jackson, J., dissenting) ... 30

Jackson v. Met. Edison Co., 419 U.S. 345 (1974) ... 24

John Doe Co. v. CFPB, 849 F.3d 1129 (D.C. Cir. 2017) ... 20

Lucia v. SEC, 138 S.Ct. 2044 (2018) ... 21, 22, 23, 24

Lugar v. Edmonson Oil Co., 457 U.S. 922 (1982) ... 24

Manhattan Community Access Corp. v. Halleck, 139 S.Ct. 1921 (2019) ... 24

NASD v. SEC, 431 F.3d 803 (D.C. Cir. 2005) ... 9

Nken v. Holder, 556 U.S. 418 (2009) ... 20, 21, 30

PAZ Sec., Inc. v. SEC, 494 F.3d 1059 (D.C. Cir. 2007) ... 14

Scottsdale Cap. Advs. Corp. v. FINRA, Civ. No. 23-1506 (BAH), --- F. Supp. 3d. ---, 2023 WL 3864557 (D.D.C. June 7, 2023) (Howell, J.) ... 21

Seila Law LLC v. CFPB, 140 S.Ct. 2183 (2020) ... 22

Silver v. New York Stock Exch., 373 U.S. 341 (1963) ... 8

Tilton v. SEC, 824 F.3d 276 (2d Cir. 2016) (Droney, J., dissenting) ... 29

Turbeville v. FINRA, 874 F.3d 1268 (11th Cir. 2017) ... 23

UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643 (2d Cir. 2011) ... 9

**Statutes**

15 U.S.C. § 2 ... 27

15 U.S.C. § 26 ... 20

15 U.S.C. § 78o-3(b)(7) ... 7, 8, 24

15 U.S.C. § 78s(b)(1) ... 7, 24

15 U.S.C. § 78s(d)(3) ... 9

15 U.S.C. § 78s(g)(1) ... 7, 23

15 U.S.C. § 78s(h)(4) ... 7, 10, 24

**Other Authorities**

72 Fed. Reg. 42169 (Aug. 1, 2007) ... 9

Commissioner Hester Peirce, The Financial Industry Regulatory Authority: Not Self-Regulation After All, Mercatus Center of George Mason University at 27 (Jan. 2015) ... 16

David R. Burton, Reforming FINRA, Backgrounder No. 3181 (Feb. 1, 2017)  16
FINRA Regulation, Inc. Bylaws Art. I(dd)  12
FINRA Regulation, Inc. Bylaws Art. I(gg)  12
FINRA Regulation, Inc. Bylaws Art. I(w)  12
FINRA, Office of Hearing Officers  11
Joseph McLaughlin, Is FINRA Constitutional?, 43 SRLR 681 (Mar. 28, 2011)  16
SEC, Fourth Annual Report of the SEC: Fiscal Year Ended June 30, 1938 at 33 (Washington, D.C., SEC 1938)  9, 27
SEC, Report of Special Study of Securities Markets, H.R. Doc. No. 95, 88th Cong., 1st Session., pt. 1 (1963)  8

**Rules**

Federal Rule of Civil Procedure 65  20
FINRA Rule 8210  8, 23
FINRA Rule 9235  8, 23
FINRA Rule 9252  8, 23
FINRA Rule 9263  8, 23
FINRA Rule 9280  8, 23
Local Rule 65.1  20

**Regulations**

17 C.F.R. § 240.10b-5  15

**Constitutional Provisions**

U.S. Const. amend. I  27
U.S. Const. art. II, § 1  22
U.S. Const. art. II, § 2, cl. 2  22

Through undersigned counsel, Plaintiff Eugene H. Kim respectfully moves this court for a temporary restraining order ("**TRO**") and preliminary injunction restraining Defendant Financial Industry Regulatory Authority, Inc. ("**FINRA**") from pursuing its "**Enforcement Action**" against him unless and until this Court issues final judgment in this case.

## PRELIMINARY STATEMENT

"[G]overnmental action[] taken by someone erroneously claiming the mantle of executive power [is] taken with no authority at all." Collins v. Yellen, 141 S.Ct. 1761, 1797 (Gorsuch, J., concurring). Yet self-described "private not-for-profit" FINRA is running roughshod over its members' Constitutional rights, abusing its status as America's only remaining securities self-regulatory organization ("**SRO**"). Dkt. 1, Complaint ¶¶ 2, 60–145 (Aug. 18, 2023) ("**Compl.**" or the "**Complaint**").

While FINRA claims to be a private corporation with no Constitutional responsibilities, in practice, FINRA is nothing more than the federal government's private, outsourced mall cop that metes and doles arbitrary "discipline" unto securities professionals while escaping actual supervision and control by the Executive (let alone the Legislative or Judicial) branch. Id. ¶¶ 2, 4.

In this case, FINRA has initiated an "**Enforcement Action**" against Mr. Kim, effectively claiming that he committed securities fraud. Id. ¶¶ 11, 12, 120. Nobody else— not customers, who all profited by 40 to 200% percent, nor the SEC, nor federal prosecutors—have accused Mr. Kim of misconduct. Id. ¶¶ 170, 190, 191. Yet FINRA is

5

ordering Mr. Kim to submit himself to FINRA's kangaroo court or face his profession's death penalty. Id. ¶ 95.

FINRA is violating the Constitution's separation-of-powers provisions by empowering its salaried personnel to unlawfully wield Executive power that the Constitution has granted solely to the President and officers under his supervision. Id. ¶¶ 199–220. FINRA also invokes its supposed "private not-for-profit" status to strip individuals of their Fifth Amendment rights, presenting a Hobson's choice of either testifying against themselves or accepting the automatic industry death sentence of a lifetime bar from the securities industry. Id. ¶¶ 221–37. FINRA's disciplinary process and the Enforcement Action further violate the Constitution by stripping respondents of their Seventh Amendment right to an impartial jury of their peers. Id.

At the same time, FINRA continually (and successfully) argues that sovereign immunity protects it from money damages suits alleging that FINRA broke federal law. Id. ¶ 9. Yet FINRA abuses its Congressional mandate, extracting ever-higher fees and fines from its members while straying farther and farther away from the American securities industry's needs. Id. ¶¶ 64–79.

Therefore, Mr. Kim respectfully requests that the Court issue a TRO and preliminary injunction prohibiting FINRA from proceeding with the Enforcement Action against Mr. Kim unless and until this Court rules, on the merits, that FINRA is not violating the Constitution and Sherman Act.

## BACKGROUND

### I.     Until the Enforcement Action, Mr. Kim Had a Spotless Regulatory Record

Mr. Kim is a private individual and a citizen of New Jersey who holds FINRA Series 7, 24, 63, 66, 79, and SIE licenses. Id. ¶ 19. From 1996 through 1998, Mr. Kim was a securities professional registered with the National Association of Securities Dealers ("**NASD**"), one of FINRA's predecessor firms. Id. ¶ 20. In 2015, Mr. Kim associated with a FINRA member firm and re-registered with FINRA. Id. ¶ 21. FINRA's Enforcement Action against Mr. Kim is the only blemish on his otherwise-spotless, 27-year-long BrokerCheck record. Id. ¶ 182 ; see also id. Exhibit B, BrokerCheck Report for Eugene H. Kim (Aug. 21, 2023) ("**Kim BrokerCheck**").

### II.    FINRA's Last-Man-Standing Status has Transformed It from a Truly Self-Regulatory Private Organization Into a *De Facto* Government Agent

Defendant FINRA holds itself out as the "government-authorized not-for-profit organization that oversees U.S. broker–dealers," "authorized by Congress to protect America's investors" and "oversee more than 624,000 brokers across the country[] and analyze billions of daily market events." Id. ¶ 24. The United States Securities and Exchange Commission ("**SEC**") is supposed to oversee FINRA, including by reviewing and modifying FINRA's rules and orders. 15 U.S.C. §§ 78s(b)(1), 78s(h)(4), 78o-3(b)(7). Id. ¶ 33.

While FINRA is organized as a not-for-profit corporation, the political branches have vested FINRA with so much responsibility that FINRA is a federal actor and instrumentality bound to adhere to the Constitution. Id. ¶ 29. The Exchange Act orders

FINRA to police federal securities laws. Id. ¶ 30 (citing 15 U.S.C. § 78s(g)(1)). FINRA's hearing officers demand testimony, rule on motions, preside over hearings, decide the admissibility of evidence, enforce compliance with discovery orders, and punish contempt. See, e.g., Compl. ¶ 32 (citing FINRA Rules 8210 (Provision of Information and testimony), 9252 (Requests for Information), 9235 (Hearing Officer Authority), 9263 (Evidence Admissibility), FINRA Rule 9280 (Contemptuous Conduct)). And FINRA's sanctions carry the force of federal law. Id. ¶ 31 (citing 15 U.S.C. § 78o-3(b)(7)).

### A. Responding to the Crash of 1929, Congress Authorized Members-Only "Self-Regulatory Organizations" to Assist the Executive Branch in Supervising Securities Professionals

Before 1930, the federal government treated stock exchanges and other securities associations as "private clubs" with "great latitude [ . . . ] to discipline errant members." Id. ¶ 37 (quoting Silver v. New York Stock Exch., 373 U.S. 341 (1963)). The Crash of 1929 caused the federal government to reconsider its previously-lax oversight of the American securities industry and enact the "**Securities Act**" of 1933 and Securities "**Exchange Act**" of 1934. Id. ¶ 38.

In 1938, Congress established the statutory scheme of "supervised self-regulation" that requires individuals who work in the securities industry to associate with  self-regulatory organizations and requires SROs to adopt and enforce rules governing "the business conduct of their members." Id. ¶ 39; Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838, 840 (2d Cir. 1971) (quoting SEC, Report of Special Study of Securities Markets, H.R. Doc. No. 95, 88th Cong., 1st Session., pt. 1 (1963) ("**Senate Report**")).

The SEC explained that the Maloney Act embodied "the principle of conferring upon regulatory groups from business a primary responsibility for enforcing high standards of business conduct upon their members [ . . . ] through the formation of **voluntary** associations of investment bankers, dealers, and brokers doing business in these markets under appropriate Governmental supervision." Id. ¶ 40; SEC, Fourth Annual Report of the SEC: Fiscal Year Ended June 30, 1938 at 33 (Washington, D.C., SEC 1938) (emphasis added). In the Securities Acts Amendments of 1975, Congress explicitly authorized SROs to police their members' compliance with federal securities laws. Id. ¶ 41 (citing NASD v. SEC, 431 F.3d 803, 808 (D.C. Cir. 2005)).

For most of the Exchange Act's history, there were many different SROs authorized to oversee securities professionals' compliance with federal securities laws. Compl. ¶ 44. But by the early 2000s, two primary SROs remained: the NASD and the New York Stock Exchange ("**NYSE**"). Id. ¶ 45. At the time, the NASD largely focused its enforcement efforts on retail investors and smaller brokerage firms. Id. ¶ 47. The NYSE disciplinary arm, meanwhile, had focused on larger broker–dealers' operations, financial health, and protections. Id. ¶ 48.

In 2007, the SEC approved the merger of the NASD and NYSE's regulatory functions into FINRA, allowing the new, last remaining securities SRO to "exercise comprehensive oversight over 'all securities firms that do business with the public.'" Id. ¶¶ 49–50; UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir. 2011) (quoting 72 Fed. Reg. 42169 (Aug. 1, 2007)). Federal law requires FINRA to enforce

securities laws over its members and associated persons. <u>See</u> 15 U.S.C. § 78s(d)(3). Compl.

¶ 54.

### B.  FINRA's Enforcement Procedures Evade Executive Oversight

Since FINRA emerged as the securities industry's sole SRO, federal law has required all individuals who work as securities professionals to associate with FINRA member firms, register as "associated persons" with FINRA, and consent to FINRA's arbitral and disciplinary jurisdiction. Id. ¶ 51. Not a single one of the FINRA Governors, officers, executives, or employees involved in FINRA's ten-step enforcement process is appointed or removable by the President or by the head of any Executive Branch department who is answerable to the president. Id. ¶ 145.

### 1.  FINRA's Governors Appoint Themselves to The Board

FINRA's "**Board**" of Governors is FINRA's "governing body;" currently is composed primarily of "non-industry members;" and, among other responsibilities, appoints FINRA's CEO and Audit Committee members. Id. ¶¶ 111, 135–36. FINRA's Governors, executives, and officers are appointed and generally removable only by the Board. Id. ¶ 146. While the SEC nominally has the power to remove FINRA Governors who have "willfully violated" federal law, "willfully abused" their authority, or "failed to enforce compliance" with the law "without reasonable justification or excuse," the SEC has never removed a FINRA Governor. Id. ¶¶ 147–48; see also 15 U.S.C. § 78s(h)(4).

11

### 2. FINRA's Trial-Level Hearing Officers are FINRA Employees Who Answer to Nobody But FINRA's CEO

FINRA's self-described first-level "'courthouse' for disciplinary and expedited proceedings" is its Office of Hearing Officers ("**OHO**"). Compl. ¶ 107; see also FINRA, Office of Hearing Officers. OHO's presiding judges, which FINRA calls "Hearing Officers," report directly to and can by terminated by FINRA's Chief Executive Officer ("**CEO**"). Id. ¶ 109. Undersigned counsel has found no public record of FINRA's CEO ever terminating a Hearing Officer. Id. ¶ 110.

The Hearing Officer "administers each case by conducting pre-hearing conferences, ruling on motions and the admissibility of evidence, and issuing decisions in accordance with FINRA's Code of Procedure" and "may impose a variety of sanctions, including the suspension or expulsion of a broker–dealer from FINRA members, the suspension or bar of an associated person from association with any FINRA member, a fine, an order to pay restitution, an order to disgorge ill-gotten gains, a censure, and a cease-and-desist order." FINRA, Office of Hearing Officers. OHO decisions become effective as soon as they are issued, regardless of whether the respondent appeals. Compl. ¶¶ 122, 205.

### 3. FINRA's National Adjudicatory Council Reports Only to FINRA's Board

Respondents like Mr. Kim may appeal adverse OHO decisions to FINRA's National Adjudicatory Council ("**NAC**"). Id. ¶ 123. The NAC has 15 members: seven "industry members" and eight "non-industry members." Id. ¶ 124. At least three of the non-industry members are "public members," i.e. those who have "no material business relationship with a broker or dealer or a [SRO] registered under the [Exchange] Act." Id. ¶ 126; see also FINRA Regulation, Inc. Bylaws Art. I(gg); see also id. I(w) ("Industry Member"); id. Art. I(dd) ("Non-Industry Member"). The FINRA Board may remove any NAC member "at any time for refusal, failure, neglect, or inability to discharge the duties of such office, or for any cause affecting the best interest of the [NAC] the sufficiency of which the FINRA Board shall be the sole judge, by majority vote of the FINRA Board." Compl. ¶¶ 127–28.

In practice, NAC is little more than a rubber stamp of OHO. Id. ¶ 131. All adjudicators are chosen and compensated by FINRA. Id. ¶ 130. FINRA, itself, advertises that NAC's authority to reverse OHO is "very limited." Id. ¶ 132. In fact, NAC's review is so narrow that the SEC requires firms to book adverse OHO awards as an accounting liability even when appeals are pending. Id. ¶ 133.

### 4.  FINRA's Board Can Refuse to Hear an Appeal

The last step of FINRA's internal review process is appeal of the NAC decision to the FINRA Board. Id. ¶ 134. However, respondents like Mr. Kim have no right to Board review. Id. ¶ 137. The Board can simply refuse to review the NAC decision, and FINRA has provided no guidance explaining when the Board will exercise its discretion to review an appeal. Id. ¶¶ 137–38.

The SEC only involves itself in this arbitrary enforcement process if and when and FINRA's target survives eleven stages of FINRA's internal investigation, prosecution, and appeals. Id. ¶ 140. Respondents who remain aggrieved by the SEC's decision may appeal to a federal circuit court of appeals. Id. ¶ 142.

### C.  FINRA's Trials and Appeals Provide No Procedural Protections

In these first FINRA ten enforcement steps, private FINRA employees act as investigators, prosecutors, judges, juries, and executioners. Id. ¶¶ 80–139. FINRA decides who it will investigate, the tools it will deploy, and the scope of its discovery demands. Id. ¶ 85. No evidence rules exist, and witnesses and targets cannot invoke their Fifth Amendment rights. Id. ¶ 113–14, 118.

First, FINRA fails to follow any discovery laws. Id. ¶ 91. While Congress refused to grant FINRA subpoena authority, FINRA gifted itself the power to issue expansive and unlimited discovery requests, without any restriction on their scope, via FINRA Rule 8210. Id. ¶¶ 92–97. FINRA has not provided any mechanism by which the 8210 demand's target may challenge the discovery demand or its scope, and provides no guidance on

exactly how much compliance or non-compliance with the demand will save the target's securities career. Id. ¶ 93.

Indeed, FINRA's form discovery demands warn their recipients that they have no Fifth Amendment rights vis-à-vis FINRA—they must either do whatever FINRA asks, or face a FINRA suspension and bar, "the securities industry equivalent of capital punishment." Id. ¶ 95 (quoting PAZ Sec., Inc. v. SEC, 494 F.3d 1059, 1065 (D.C. Cir. 2007)).

And despite its explicit disavowal of Fifth Amendment responsibilities, FINRA's typical practice is to share its findings with the SEC, Federal Bureau of Investigation ("**FBI**"), United States Attorneys' Offices, and state and local prosecutors and law enforcement agencies. Id. ¶ 96.

FINRA's OHO trials—the stage that Mr. Kim currently is facing—also deny litigants even the most basic procedural protections. See generally id. ¶¶ 112–19. For example, nearly every enforcement hearing includes testimony of paid FINRA employees that is nothing but hearsay within hearsay within hearsay regarding supposed conversations with investors, other FINRA employees, and other regulators. Id. ¶ 114. OHO hearings never include juries; instead, Hearing Officers, hired and paid by FINRA, act as the fact-finders. Id. ¶ 115–16. Furthermore, while district judges and juries are randomly selected with various procedural protections (including Batson), FINRA provides no standard or guidance explaining how it appoints Hearing Officers to any given case. Id. ¶ 117.

FINRA follows these unlawful procedures even when it charges a respondent with making "material misstatements and omissions in the sale of securities:" the charge that

FINRA has leveled against Mr. Kim, and the exact conduct prohibited by Section 10(b) and Rule 10b-5, which the SEC or the U.S. Attorney's Office could pursue in federal district court. Id. ¶¶ 119–20; see also 17 C.F.R. § 240.10b-5.

If the SEC filed a civil action or the U.S. Attorney's Office initiated a criminal prosecution, the Constitution would entitle Mr. Kim to an Article III judge, a jury of his peers, and fundamental procedural protections, including robust discovery and evidence laws and an adversary accountable to the Executive branch. Id. ¶¶ 221–37. But because nominally "private not-for-profit" FINRA is raising the issue in an internal "disciplinary" proceeding—and despite FINRA's ability to share all of its information with the SEC and USAO—FINRA disavows its Constitutional responsibilities and rejects Mr. Kim's attempts to assert his Constitutional rights. Id.

### III.    Monopolizing the Securities SRO Market, FINRA Abuses Its Power Over American Securities Professionals

FINRA became the last remaining securities SRO in 2007. Id. ¶¶ 49–50. Since losing the ability to enforce its fines in public courts, see Fiero v. FINRA, 660 F.3d 569 (2d Cir. 2011), "not-for-profit" FINRA has made money through nothing but brute force, abusing its quasi-governmental status to make its members pay up or lose their livelihoods forever. Compl. ¶ 68. For example, in 2012, FINRA collected $406.9 million in "regulatory revenue" from its members and associated persons, $164.9 million in "user fees," $128.2 million in "contract services fees," and $69 million in fines. Id. ¶ 66. Within a decade, FINRA's revenue ballooned to $680.6 in regulatory fees, $327.7 million in user fees, $280.2 million in contract services fees, and $54.5 million in fines. Id. ¶ 65.

Today, "far from being 'members' of FINRA comparable to the former owners of seats in the NYSE and their associates, securities firms are today the functional equivalent of regulated entities with little or no input into FINRA's regulatory policy or corporate governance." Joseph McLaughlin, Is FINRA Constitutional?, 43 SRLR 681 (Mar. 28, 2011). FINRA's Bylaws prohibit a majority of Governors from working in the securities industry. Compl. ¶ 111. All FINRA trials, which FINRA calls "hearings," are chaired by salaried FINRA employees, not securities professionals. Id. ¶¶ 232–33.

Even SEC Commissioners recognize that "FINRA is not a self-regulator. Its members are not regulating themselves; they are being regulated by FINRA, just as they are regulated by the SEC:"

> Although commonly perceived to be a self-regulator, FINRA is not accountable to the industry in the way a self-regulator would be. Nor is it accountable to the public, Congress, the president, or the courts. FINRA's structure and monopoly status shield it from close oversight. Consequently, an important part of the securities markets is under the control of a regulator with limited accountability.

Id. ¶ 77 (quoting Commissioner Hester Peirce, The Financial Industry Regulatory Authority: Not Self-Regulation After All, Mercatus Center of George Mason University at 27 (Jan. 2015)). Another former SEC Commissioner has observed, "[t]his decrease in the "self" aspect of FINRA's self-regulatory function has been accompanied by an exponential increase in its regulatory output." David R. Burton, Reforming FINRA, Backgrounder No. 3181 n. 55 (Feb. 1, 2017).

FINRA's spending patterns belie its non-profit claims. See generally Compl. ¶¶ 69–74. In 2021, FINRA reported approximately $1.288 billion in operating revenue. Id. ¶

17

70. FINRA spent over 60%—or $800 million—on compensation and benefits for FINRA employees, including a $3 million salary for its CEO and over $1 million each to FINRA's Chief Financial Officer, Chief Legal Officer, Head of Member Supervision, and Chief of Exams. Id. ¶ 71. Meanwhile, federal law caps SEC Senior Officers'—FINRA's supposed supervisors'—salaries at $295,093. Id. ¶ 72–73.

## IV.    FINRA's Unlawful Structure and Enforcement Action are Injuring Mr. Kim

FINRA's Enforcement Action against Mr. Kim is just another unconstitutional power grab. Years before it filed the Complaint, FINRA issued 8210 demands that forced Mr. Kim to provide documents and testify to FINRA's investigators. Id. ¶ 193. FINRA then used Mr. Kim's own documents and testimony to bring this Enforcement Action against him. Id. ¶ 194.

FINRA's Complaint alleges that between December 2017 and June 2019, Mr. Kim violated the securities laws while managing a FINRA-registered brokerage firm's and investment adviser's (the "**Firms**") sale of a special purpose vehicle that offered its members participation in "**Funds**" whose business was to buy pre-Initial Public Offering ("**IPO**" and "**Pre-IPO**") securities. See generally Compl. Exhibit A, FINRA Enforcement Action Notice and Complaint, Dep't of Enforcement v. Kim, FINRA Disciplinary Proceeding No. 2019064508802 (July 11, 2023).

However, FINRA acknowledges that Mr. Kim did not have authority to execute documents for the Pre-IPO funds on behalf of the Firms. Id. ¶ 11. While FINRA claims that Mr. Kim failed to identify specific shares of securities that the Firms would sell to their customers before the Firms solicited those customers' investments, FINRA also alleges that:

- Each and every one of the participating customers were Accredited and Qualified Investors, id. ¶ 7;
- The investment adviser Firm notified all of the customers of the "change in material investment terms" and gave the customers the opportunity to receive full refunds or accept the pricing change, id. ¶¶ 52–53;
- Only two of the approximately 38 customers accepted the refund, id. ¶ 53;
- Customers who refused the refund profited handsomely from their investments, receiving returns of either "approximate[ly] 40 percent" or "in excess of 200 percent" once the issuer went public, id. ¶ 54; and
- Mr. Kim's entire compensation for these transactions was $16,220 in commissions, id. ¶ 32.

However, Mr. Kim lacked the ability or authority to move investors' money or make any material decisions about the Firms or Funds, and the Funds' offering documents disclosed that the offerings might not close and the shares might not ever be purchased. Id. ¶¶ 164–65, 175–76, 183. The customers who accepted the refund offer also received interest on their refunded cash. Id. ¶ 180. In other words, all investors profited. Id. ¶¶ 179–80.

Moreover, the Enforcement Action's allegations are the only blemish on Mr. Kim's multi-decade BrokerCheck record; Mr. Kim and his wife reported nearly $1 million in taxable income for 2017, when Mr. Kim supposedly made material misrepresentations in order to earn a five-figure commission; and all of the involved customers are wealthy

19

investors who made handsome profits. Id. ¶¶ 172, 182, 185; but see id. ¶ 178 ("FINRA advertises its 'Enforcement Priorities' as '(1) obtaining restitution for harmed customers; (2) ridding the industry of brokers engaged in fraud or other egregious misconduct—especially brokers with a history of violations; (3) protecting seniors and vulnerable investors; and (4) ensuring the integrity of the markets.'"). Mr. Kim never even personally communicated with any of the customers. Id. ¶ 159.

Yet FINRA has filed the Enforcement Action against Mr. Kim, accusing him of making "omissions and misrepresentations" that "repeatedly hid the status of the [] offering from [brokerage firm] representatives and principals, knowingly causing at least one [brokerage] representative to falsely inform at least one [] offering investor that [Company A] shares had been acquired at $9.754 per share." Id. ¶ 188. However, no customer has sued Mr. Kim. Id. ¶ 192. The SEC has not filed an administrative action against Mr. Kim in its own forum, nor has it filed a civil action in federal district court. Id. ¶ 190. And undersigned counsel is unaware of any reason to believe that the U.S. Attorney's Office is investigating Mr. Kim for alleged criminal violations. Id. ¶ 191.

FINRA's prosecution of Mr. Kim will likely cost many times more than the $16,220 in commissions he was paid from these investments. Id. ¶ 195. By pursuing the Enforcement Action, FINRA already has damaged Mr. Kim's public record; and in continuing to prosecute Mr. Kim, FINRA will force him to either abandon his decades-long career or spend hundreds of thousands, if not millions, of dollars defending himself against FINRA's interminable, arbitrary, opaque enforcement process. Id. ¶ 196. Mr. Kim

simply does not have the resources to fight FINRA's unconstitutional prosecution, and this Court should not let FINRA bully him into draining his life's savings. Id. ¶ 197.

By stripping Mr. Kim of his Fifth and Seventh Amendment rights—power amassed only through monopolizing the SRO market and stripping securities professionals of their First Amendment rights—FINRA's unconstitutional investigation and prosecution processes and the Enforcement Department have forced Mr. Kim to file this district court suit seeking a declaratory judgment and preliminary and permanent relief enjoining FINRA's unconstitutional proceedings. Id. ¶¶ 198–261.

## LEGAL STANDARD

Mr. Kim moves for a TRO and preliminary injunction pursuant to Federal Rule of Civil Procedure 65, Local Rule 65.1, and 15 U.S.C. § 26.

This Court should enjoin FINRA's Enforcement Action if it finds that Mr. Kim "is likely to win on the merits," he "will suffer irreparable harm without an injunction," and "the equities and public interest favor [judicial] intervention." Alpine Sec. Corp v. FINRA, No. 23-5129, 2023 WL 4703307, at *1 (D.C. Cir. July 5, 2023) (Walker, J., concurring) (citing Nken v. Holder, 556 U.S. 418, 426, 435 (2009); John Doe Co. v. CFPB, 849 F.3d 1129, 1131 (D.C. Cir. 2017)).

Once the Court determines that Mr. Kim "is likely to succeed on the merits, the other boxes are easily checked:"

> [Mr. Kim] would suffer an irreparable harm without an injunction because the ongoing FINRA enforcement proceedings would put [him] out of business. Plus, the resolution of claims by an unconstitutionally structured adjudicator is a "here-and-now injury" that cannot later be remedied.

21

> An injunction would also be equitable and in the public interest. The public interest favors preventing the deprivation of individual rights and abuses of government power. If [Mr. Kim's] constitutional challenge has merit, that is the case here: It will be "subject[] to an illegitimate proceeding, led by an illegitimate decisionmaker."
>
> The interests cutting the other way are not as strong. The public has an interest in timely enforcement against those who violate the law. But here the only evidence that [Mr. Kim] **has** violated the law is FINRA's say so. And if Alpine is correct on the merits, then FINRA is an illegitimate decisionmaker.

Alpine, 2023 WL 470337, at *2 (citing Axon Enters., Inc. v. FTC, 598 U.S. 175, 191 (2023);

Nken, 556 U.S. at 436).

## ARGUMENT

For the exact same reasons outlined in Justice Walker's concurring Alpine opinion, this Court should grant Mr. Kim's "**Motion**" for TRO and preliminary injunction: "FINRA's hearing officers are near carbon copies of th[e SEC] ALJs" "who must be appointed in accordance with the Appointments Clause." Alpine, 2023 WL 4703307, at *2 (citing Lucia v. SEC, 138 S.Ct. 2044, 2051 (2018)*).

In fact, Mr. Kim presents even more reasons why this Court should enjoin FINRA: besides his Appointments Clause arguments, the Complaint also alleges serious nondelegation, First Amendment, Due Process, and Sherman Act claims. See Compl. ¶¶ 198–261.

And unlike the Alpine plaintiffs, Mr. Kim is a first-time alleged offender, with zero customer complaints, and who has never run afoul of securities law or regulation, yet alone haled FINRA into countless arbitrations and litigations across the country. Compare Kim BrokerCheck and Scottsdale Cap. Advs. Corp. v. FINRA, Civ. No. 23-1506

(BAH), --- F. Supp. 3d. ---, 2023 WL 3864557, at *3–4 (D.D.C. June 7, 2023) (Howell, J.) (in

Alpine's underlying district court decision, observing, inter alia, that FINRA received

customer complaints about plaintiffs "[a]s early as 2019;" plaintiffs lost a previous

enforcement action against FINRA; FINRA brought a new, expedited enforcement action

alleging that the plaintiffs had violated a cease-and-desist order 'more than 35,000 times

by charging customers millions of dollars in unreasonable, unfair, and unlawful fees and

commissions,'" and that the plaintiffs "do[] not contest that position").

Because Mr. Kim "has raised a serious argument" that FINRA is violating the

Constitution and Sherman Act, this Court should grant this Motion. Accord Alpine, 2023

WL 4703307, at *2 (concurring that Alpine's "serious argument that FINRA

impermissibly exercises significant executive power" merits "an injunction preserving

Alpine's business while it litigates its constitutional challenge" on the merits).

I.      **Mr. Kim Should Succeed on the Merits**

   A. **In Concurring with the Circuit Court's Decision to Enjoin FINRA's Expedited Enforcement Proceeding Against Alpine, Judge Walker Observed that FINRA's Enforcement Structure Likely Violates the Appointments and Nondelegation Doctrines**

The Constitution vests the United States President—and only the President—with

"executive Power." U.S. Const. art. II, § 1. Accordingly, anyone who "wield[s] significant

executive power" must be an Officer of the United States; generally must be removable

either by the President or an officer subordinate to the President; and must be appointed

in accordance with the Constitution. U.S. Const. art. II, § 2, cl. 2; Seila Law LLC v. CFPB,

140 S.Ct. 2183, 2211 (2020); Lucia, 138 S.Ct. at 2051; Buckley v. Valeo, 424 U.S. 1, 126 (1976).

23

Therefore, in 2018, the Supreme Court rejected the SEC's longstanding practice of self-selecting Administrative Law Judges ("**ALJs**") who presided over the SEC's own in-house administrative proceedings. Lucia, 138 S.Ct. at 2049. To hold that the SEC ALJs were "Officers of the United States" who must be chosen in accordance with the Appointments Clause, the Court observed that the ALJs "exercised significant authority" because they had "discretion" to exercise an "important" government function: "enforc[ing] the nation's securities laws." Id. at 2049, 2051, 2053 (citations omitted). Among other government functions, the ALJs had the power to demand testimony, rule on motions, regulate the course of hearings, decide the admissibility of evidence, enforce compliance with discovery orders, and issues sanctions. Id. at 2053.

Just last month, Judge Walker applied the same Lucia reasoning to enjoin FINRA from proceeding with an enforcement proceeding, reversing the district court's rejection of the plaintiff's merits and preliminary injunction arguments. See generally Alpine, 2023 WL 4703307. In concurring with the three-judge panel's *per curiam* decision that the plaintiff–appellant had met the "stringent requirements for an injunction pending appeal," Judge Walker observed that "FINRA's [H]earing [O]fficers are near carbon copies of those [unconstitutional SEC] ALJs:"

> They are tasked by statute with enforcing the nation's securities laws. They can "levy sanctions that carry the force of federal law." And like Lucia's ALJs, [H]earing [O]fficers demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt.

24

Id. at *1–2 (citing 15 U.S.C. § 78o-3(b)(7); 15 U.S.C. § 78s(g)(1); Turbeville v. FINRA, 874 F.3d 1268, 1270 (11th Cir. 2017); FINRA Rule 8210; FINRA Rule 9252; FINRA Rule 9235; FINRA Rule 9263; FINRA Rule 9280)).

Justice Walker further observed that FINRA's purportedly private status did not immunize it from Constitutional claims, since "its enforcement activities are controlled by the government," with its rules, standards, and executives supervised by the SEC. Id. at *3; accord id. (citing Manhattan Community Access Corp. v. Halleck, 139 S.Ct. 1921, 1928 (2019) ("From start to finish, FINRA hearing officers execute government laws subject to a government plan, with little to no room for private control.").[1]

For similar reasons, it is likely that FINRA's enforcement structure and the Enforcement Proceeding violate the removal and nondelegation doctrines. Accord Alpine, 2023 WL 4703307, at *3 (citing Lucia, 138 S.Ct. at 2051; Dep't of Transp. v. Assoc. of Am. R.R., 575 U.S. 43, 57 (2015) (Alito, J., concurring)) ("It would be odd if the Constitution **prohibits** Congress from vesting significant executive power in an unappointed and unremovable government administrator but **allows** Congress to vest

---

[1] "[A] private entity can qualify as a state actor in a few limited circumstances—including, for example, (i)when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." Halleck, 139 S.Ct. at 1928 (cleaned up and citing Jackson v. Met. Edison Co., 419 U.S. 345, 352–54 (1974); Blum v. Yaretsky, 457 U.S. 991, 1004–05 (1982); Lugar v. Edmonson Oil Co., 457 U.S. 922, 941–42 (1982)). For Constitutional purposes, FINRA is a state actor under any and all of these examples: Congress authorized the creation of securities SROs and ordered them to self-police their members, and the SEC retains the authority to approve, deny, and amend all FINRA Rules and orders. See, e.g., 15 U.S.C. § 78o-3(b)(7); 15 U.S.C. §§ 78s(b)(1), 78s(h)(4), 78o-3(b)(7); 15 U.S.C. § 78s(g)(1).

such power in an unappointed and unremovable private hearing officer.") (emphasis in original).

FINRA does not answer to the President or any federal executive officer in connection with its discharge of its powers. Like SEC ALJs and federal district judges, FINRA enforcement decisions can become final and effective without any further consideration or review. Compl. ¶ 205. But unlike federal judges, FINRA hearing officers are not appointed by the President, not approved by the Senate, and need not take any oath. Id. ¶ 206.

FINRA's Governors, executives, and officers are neither appointed nor removable by the President. Id. ¶¶ 221–22. FINRA's NAC members are appointed by the Board and not removable or answerable to the President and can only be removed by the Board. Id. ¶¶ 127–28, 204, 232. FINRA's Hearing Officers answer only to FINRA's CEO, who can only be removed by the Board. Id. ¶ 109. While the SEC nominally has the power to remove a FINRA Governor, it has never done so—and while FINRA's CEO nominally has the power to remove a Hearing Officer, that has never happened, either. Id. ¶¶ 110, 148.

The SEC provides the only check on FINRA's power, and that check is severely limited: the SEC may only remove FINRA Governors who have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce compliance" with applicable laws and regulations "without reasonable justification or excuse." Id. ¶ 147. The SEC has never removed a FINRA Governor. Id. ¶ 148.

26

Furthermore, SEC Commissioners cannot be removed by the President except under similarly-limited circumstances. Id. ¶ 149.

In short, the President cannot remove SEC Commissioners without cause, and the SEC cannot remove FINRA Governors without cause, and FINRA Governors cannot remove NAC members without cause, and FINRA's CEO cannot remove Hearing Officers without cause. Id. ¶ 153. FINRA's total control over the selection of its CEO, Governors, NAC members, and Hearing Officers violates the Constitution's Separation-of-Powers provisions. Accord Alpine, 2023 WL 4703307, at *3 (citing Lucia, 138 S.Ct. at 2051) ("[I]f the ALJs in Lucia exercised 'significant' executive power, then FINRA officers probably do too.").

### B. The Enforcement Action Violates Mr. Kim's Due Process Rights

While FINRA's staffing processes violate the Constitution's Separation-of-Powers provisions, FINRA's enforcement procedures (or lack thereof) violate Mr. Kim's Due Process rights. See generally Compl. ¶¶ 221–37. FINRA's form Rule 8210 discovery demands expressly warn their targets that they have no Fifth Amendment rights vis-à-vis FINRA, regardless of whether they are an investigation's target or mere witness. Id. ¶¶ 95, 226. FINRA Enforcement regularly calls other FINRA employees to testify to layers upon layers of hearsay that would never be admissible in court. Id. ¶¶ 114, 230. FINRA's witnesses also routinely abuse the work product doctrine, with no pushback from the OHO or NAC. Id. ¶ 231.

By charging Mr. Kim with securities fraud in its internal forum, FINRA also is stripping Mr. Kim of his rights to a jury trial and Article III judge. Id. ¶ 232. Finally,

FINRA's appellate procedures provide NAC and the FINRA Board with significantly fewer reversal grounds than the *de novo* legal review typical of public courts. Id. ¶¶ 132–38.

FINRA's unfettered power to investigate, charge, prosecute, convict, and sanction people for violating the federal securities laws violates Mr. Kim's Due Process rights.

### C.  FINRA's Monopolization of the Securities SRO Market Violates the First Amendment and the Sherman Act

The First Amendment prohibits Congress from compelling how or with whom people associate. U.S. Const. amend. I. The Sherman Act, meanwhile, prohibits monopolies or attempts to monopolize "any part of the trade or commerce among the several States." 15 U.S.C. § 2. By monopolizing the Congressionally-created market for securities SROs, FINRA is violating the First Amendment and the Sherman Act.

When Congress enacted the SRO laws, it intended for a robust marketplace of different securities associations and exchanges that would serve and ensure their respective members' compliance with the federal securities laws. Compl. ¶¶ 40–41 (citing SEC, Fourth Annual Report of the SEC: Fiscal Year Ended June 30, 1938 at 33 (Washington, D.C., SEC 1938). For decades, American securities professionals could choose among a variety of SROS that fit their business models and served their interests. Id. ¶ 44. As late as the early 2000s, NASD and the NYSE still served different constituencies. Id. ¶¶ 47–48.

But since FINRA became the nation's only securities SRO, free from any market competition, it has continuously expanded its own power and payroll, becoming increasingly unresponsive to its members' interests and requests. Id. ¶¶ 60–79. Once FINRA assumed total control of all securities SROs, securities professionals lost any right to self-appoint and self-govern their business, as intended by Congress and reinforced by decades of practice. Id. FINRA has abused its sole authority to impose increasingly arbitrary and unconstitutional requirements upon any and all people who choose to work

29

in the American securities industry. Id. ¶¶ 83–87. In fact, FINRA's power is so expansive that it has even required securities customers—the "investors" FINRA supposedly exists to protect—to forfeit their Fifth Amendment rights or face FINRA sanctions. Id. ¶ 243.

Besides abusing its legal authority, FINRA also is forcing its members and associated persons to pay higher and more arbitrary fees. Id. ¶¶ 244–49. FINRA's financial records, standing alone, show that FINRA has morphed into a closed-loop organism whose primary goal is to expand its own power and payroll. Id. When FINRA suffered investment losses, it simply increased members' mandatory fees to make up the shortfall! Id. ¶ 247.

FINRA's abuses of power prevent securities professionals from running their businesses in accordance with basic pricing principles, and are continuing to create barriers to entry completely divorced from SROs' statutory mission of promoting American securities markets and protecting investors. Id. ¶ 259.

It is the height of irony that an entity purportedly deriving its power from a Congressional mandate to ensure orderly markets is, itself, an abusive monopolist. Id. ¶ 260. By forcing securities professionals to join, fund, and support an SRO, FINRA abuses its last-man-standing status to deprive its members and associated persons of their First Amendment rights and subject them to arbitrary conditions that are unchecked by any functioning SRO market. Id. ¶¶ 238–61.

## II.   FINRA's Likely Violations of the Constitution and Sherman Act Comprise Irreparable Harm *Per Se*, Tip the Balance of the Equities in Mr. Kim's Favor, and Ensure that the TRO and Preliminary Injunction Would Serve the Public Interest

Because Mr. Kim is likely to prove, at bare minimum, that FINRA is violating the Constitution's Separation-of-Powers provisions—let alone the Constitution's Due Process protections and First Amendment, and the Sherman Act—he "easily" meets his burden to show irreparable harm and that the equities and public interest favor judicial intervention. Accord Alpine, 2023 WL 4703307, at *2 ("If Alpine is likely to succeed on the merits, the other boxes are easily checked.").

Unless this Court enjoins the Enforcement Action, Mr. Kim will suffer irreparable injury: his BrokerCheck already tells the whole world that FINRA has accused him of securities fraud, and he will lose his chosen profession on FINRA's whim, with immediate effect and limited appellate review. Accord id. (finding irreparable harm " because the ongoing FINRA enforcement proceedings would put [plaintiff] out of business.").

Furthermore, being forced into an unconstitutional forum is a "here-and-now injury" that cannot be reversed or remedied after the fact. Axon, 598 U.S. at 191. Unless this Court exercises its power to enjoin the Enforcement Action, most of the harm that FINRA inflicts upon him will be complete long before he can obtain a merits decision. Cf. Bowsher v. Synar, 478 U.S. 714, 727 n.5 (1986) (concluding that a separation-of-powers violation may create a "here-and-now" injury that must be remedied by a court instead of an agency); Tilton v. SEC, 824 F.3d 276, 299 (2d Cir. 2016) (Droney, J., dissenting) (citing

31

Free Enterprise Fund v. PCAOB, 561 U.S. 477, 513 (2010)) ("[T]he Supreme Court considers the very **process** of enforcement by an unconstitutional body to be an injury that can be relevant to the determination of whether post-proceeding review is 'meaningful.'") (emphasis in Tilton).

Finally, enjoining the Enforcement Action would honor the equities and public interest, which favor "preventing the deprivation of individual rights and abuses of government power." Alpine, 2023 WL 2703307, at *2 (citing Nken, 445 U.S. at 436). "Few things could be more perilous to liberty than some 'fourth branch' that does not answer even to the one executive official who **is** accountable to the body politic." Collins v. Yellen, 141 S.Ct. 1761, 1797 (Gorsuch, J., concurring) (quoting FTC v. Ruberoid Co., 343 U.S. 470, 487 (1952) (Jackson, J., dissenting)). The public interest and equities prohibit Mr. Kim from being "subjected to an illegitimate proceeding, led by an illegitimate decisionmaker," unless and until this Court finds that FINRA's Enforcement Action is not violating the Constitution or Sherman Act. Accord Axon, 598 U.S. at 191.

## CONCLUSION

As in Alpine, Mr. Kim "has raised a serious argument that FINRA impermissibly exercises significant executive power," which alone would be enough enjoin FINRA from proceeding with the Enforcement Action until this Court issues final judgment. Accord Alpine, 2023 WL 4703307, at *2.

In fact, Mr. Kim's Complaint presents an even better case for temporary and preliminary injunctive relief than in <u>Alpine</u>: unlike Alpine's decades-long fight that involves countless separate litigations and disciplinary actions—which already had resulted in sanctions against Alpine, and which may bar Alpine's pending complaint through *res judicata*—here, Mr. Kim has a spotless regulatory record and the Enforcement Action is barely getting off the ground.

Therefore, Mr. Kim respectfully requests that the Court grant his Motion.

Dated: August 21, 2023                    Respectfully submitted,

_____
Philip Andonian (Bar No. 490792)
CALEBANDONIAN PLLC
1100 H Street, N.W. – Ste. 315
Washington, D.C. 20005
Tel: (202) 953-9850
Email:  phil@calebandonian.com

Martin H. Kaplan (NY Bar No. 1053701)*
Kari Parks (NY Bar No. 5379003)*
GUSRAE KAPLAN NUSBAUM PLLC
120 Wall Street – 25th Floor
New York, NY 10005
Tel: (212) 269-1400
Email:  mkaplan@gusraekaplan.com
        kparks@gusraekaplan.com

*Counsel for Plaintiff Eugene H. Kim*

**Pro hac vice* applications forthcoming

**CERTIFICATE OF SERVICE**

This certifies that undersigned counsel served a true and correct copy of the foregoing to all parties of record through the Court's ECF system and upon FINRA's counsel via email at:

Roger Kiley
Senior Counsel
FINRA Department of Enforcement
55 W. Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 899-4353
Roger.Kiley@finra.org


Dated: August 21, 2023                    /s/ Martin H. Kaplan
                                          Martin H. Kaplan