**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EUGENE H. KIM, )
)
          Plaintiff )
)
    v. )
)   Civil Action No. 23-cv-2420 (ACR)
)
FINANCIAL INDUSTRY REGULATORY )
AUTHORITY, INC., )
)
         Defendant )

**MEMORANDUM OF LAW OF THE UNITED STATES IN DEFENSE OF THE**
**CHALLENGED PROVISIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT..............................................................................................1

BACKGROUND ..............................................................................................................2

    I.      Legal background....................................................................................2

    II.     Proceedings in this case ........................................................................6

    III.    Proceedings in *Scottsdale Capital Advisors Corp. v. FINRA, Inc.* and *Alpine Securities Corp. v. FINRA*..........................................................................7

ARGUMENT.....................................................................................................................8

    I.      The statutory scheme in which FINRA operates is consistent with longstanding Supreme Court precedent under which private actors may aid federal agencies in implementing federal law.........................................................................8

    II.     The statutory scheme does not violate the Appointments Clause because FINRA officials are not officers of the United States.........................................................12

    III.    For similar reasons, FINRA officers are not subject to the same removal conditions that Article II would require for Executive Branch officers................18

    IV.    FINRA does not violate the public-nondelegation doctrine because Congress did not confer legislative power on FINRA and provided an intelligible principle....19

    V.     The statutory scheme in which FINRA operates does not undermine the authority of Article III courts.......................................................................22

    VI.    The statutory requirement to join an SRO does not violate the First Amendment. ............................................................................................25

CONCLUSION..................................................................................................................27

## TABLE OF AUTHORITIES

**CASES**

*Alpine Sec. Corp. v. FINRA*,
No. 23-5129, 2023 WL 4703307 (D.C. Cir. July 5, 2023)................................ 7, 15

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946)................................................................. 20, 21, 22

*Arizona v. United States*,
567 U.S. 387 (2012)..................................................................... 16

*Aslin v. FINRA*,
704 F.3d 475 (7th Cir. 2013) ............................................................ 9

*Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*,
721 F.3d 666 (D.C. Cir. 2013)..........................................................11

*Auffmordt v. Hedden*,
137 U.S. 310 (1890)..................................................................... 16

\* *Big Time Vapes, Inc. v. FDA,*
963 F.3d 436 (5th Cir. 2020)...........................................................20

*CalPERS v. NYSE, Inc.* (*In re NYSE Specialists Sec. Litig.*),
503 F.3d 89 (2d Cir. 2007) ............................................................. 9

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)..................................................................... 8

\* *Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986)..................................................................23, 24

*Corr v. Metro. Wash. Airports Auth.*,
702 F.3d 1334 (Fed. Cir. 2012) ....................................................... 14

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
575 U.S. 43 (2015)................................................................. 14, 17

*Desiderio v. NASD, Inc.*,
191 F.3d 198 (2d Cir. 1999) ................................................. 3, 14, 17, 25

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944)..................................................................... 21

*Fiero v. FINRA, Inc.*,
660 F.3d 569 (2d Cir. 2011) ............................................................. 5

*File v. Martin*,
33 F.4th 385 (7th Cir. 2022) ................................................................................................. 26

\* *Fin. Oversight & Mgmt. Bd. v. Aurelius Inv., LLC*,
140 S. Ct. 1649 (2020) ....................................................................................12, 13, 16, 17

*First Jersey Sec., Inc. v. Bergen*,
605 F.2d 690 (3d Cir. 1979) ...........................................................................................11, 24

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ................................................................................................. 14, 15, 18

*Graman v. NASD, Inc.*,
No. Civ.A. 97-1556-JR, 1998 WL 294022 (D.D.C. Apr. 27, 1998) ...................... 13

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) ................................................................................................................. 25

*Gundy v. United States*,
139 S. Ct. 2116 (2019) .......................................................................................................... 20

*Janus v. AFSCME, Council 31*,
138 S. Ct. 2448 (2018) .................................................................................................... 25, 26

*Kaimowitz v. Fla. Bar*,
996 F.2d 1151 (11th Cir. 1993) ........................................................................................ 26

*Keller v. State Bar*,
496 U.S. 1 (1990) .................................................................................................................... 26

*Kerpen v. Metro. Wash. Airports Auth.*,
907 F.3d 152 (4th Cir. 2018) ............................................................................................ 14

*Lathrop v. Donohue*,
367 U.S. 820 (1961) ............................................................................................................... 26

\* *Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ...........................................................................................13, 15, 17

*Lichter v. United States*,
334 U.S. 742 (1948) ............................................................................................................... 21

*Loving v. United States*,
517 U.S. 748 (1996) ............................................................................................................... 19

*Lucia v. SEC*,
138 S. Ct. 2044 (2018) .......................................................................................................... 15

iii

*Metcalf & Eddy v. Mitchell*,
　　269 U.S. 514 (1926).......................................................................... 12

*Mistretta v. United States*,
　　488 U.S. 361 (1989).......................................................................... 20

*Mohlman v. FINRA, Inc.*,
　　Case No. 3:19-cv-154, 2020 WL 905269 (S.D. Ohio Feb. 25, 2020)............. 17, 25

*NASD, Inc. v. SEC*,
　　431 F.3d 803 (D.C. Cir. 2005)................................................................ 5

*Nat'l Broad. Co. v. United States*,
　　319 U.S. 190 (1943).......................................................................... 21

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
　　53 F.4th 869 (5th Cir. 2022).................................................................. 10

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
　　No. 5:21-CV-071-H, 2023 WL 3293298 (N.D. Tex. May 4, 2023).....11, 12, 13, 14

* *Oklahoma v. United States*,
　　62 F.4th 221 (6th Cir. 2023)............................................................ passim

*Otto v. SEC*,
　　253 F.3d 960 (7th Cir. 2001) ................................................................ 24

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
　　475 U.S. 1 (1986)............................................................................ 25

*R.H. Johnson & Co. v. SEC*,
　　198 F.2d 690 (2d Cir. 1952) ................................................................ 11

*Rayburn v. Hogue*,
　　241 F.3d 1341 (11th Cir. 2001) ............................................................ 17

*Riley v. St. Luke's Episcopal Hosp.*,
　　252 F.3d 749 (5th Cir. 2001) (en banc) .............................................. 12, 18

*Saad v. SEC*,
　　980 F.3d 103 (D.C Cir. 2020)............................................................. 1, 2

*Scottsdale Cap. Advisors Corp. v. FINRA, Inc.*,
　　Civil Action No. 23-1506 (BAH), 2023 WL 3864557 (D.D.C. June 7, 2023)
　　.................................................................................... passim

*Sorrell v. SEC*,
　　679 F.2d 1323 (9th Cir. 1982) .............................................................. 11

*Sparta Surgical Corp. v. NASD, Inc.*,
  159 F.3d 1209 (9th Cir. 1998) ................................................................ 2, 3

*Stern v. Marshall*,
  564 U.S. 462 (2011) .................................................................................. 23

* *Sunshine Anthracite Coal Co. v. Adkins*,
  310 U.S. 381 (1940) ........................................................................... passim

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985) .................................................................................. 24

*Todd & Co. v. SEC*,
  557 F.2d 1008 (3d Cir. 1977) ....................................................................11

*Turbeville v. FINRA*,
  874 F.3d 1268 (11th Cir. 2017) ........................................................... passim

*U.S. ex rel. Stone v. Rockwell Int'l Corp.*,
  282 F.3d 787 (10th Cir. 2002) .................................................................. 18

*U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
  41 F.3d 1032 (6th Cir. 1994) .................................................................... 18

*U.S. ex. rel. Kelly v. Boeing Co.*,
  9 F.3d 743 (9th Cir. 1993) ........................................................................ 18

*United States v. Germaine*,
  99 U.S. 508 (1879) .................................................................................... 16

*United States v. Halifax Hosp. Med. Ctr.*,
  997 F. Supp. 2d 1272 (M.D. Fla. 2014) .................................................... 18

*United States v. Hartwell*,
  73 U.S. 385 (1868) .................................................................................... 12

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ............................................................................ 20, 21

*Yakus v. United States*,
  321 U.S. 414 (1944) .................................................................................. 21

## CONSTITUTIONAL PROVISIONS

Appointments Clause, U.S. Const. art. II, § 2, cl. 2 ................................. 6, 12, 15

U.S. Const. amend. I ............................................................................... passim

U.S. Const. amend. V ............................................................................... 6, 25

U.S. Const. amend. VII ................................................................................ 6, 25

U.S. Const. art. III ........................................................................................ passim

    U.S. Const. art. III, § 1 ........................................................................ 23

**FEDERAL STATUTES**

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.* ..................... 2

    15 U.S.C. § 78b ............................................................................... 22

    15 U.S.C. § 78j ............................................................................... 22

    15 U.S.C. § 78o(a)(1) ....................................................................... 3

    15 U.S.C. § 78o(b)(1) ....................................................................... 3

    15 U.S.C. § 78o-3(a) ....................................................................... 22

    15 U.S.C. § 78o-3(b)(8) ..................................................................... 4

    15 U.S.C. § 78o-3(h)(1) ..................................................................... 4

    15 U.S.C. § 78s(b) ........................................................................... 4

    15 U.S.C. § 78s(b)(1) .................................................................. 1, 4, 19

    15 U.S.C. § 78s(b)(2)(C) ................................................................... 21

    15 U.S.C. § 78s(b)(2)(D) .................................................................... 4

    15 U.S.C. § 78s(b)(3)(A) .................................................................... 4

    15 U.S.C. § 78s(b)(3)(B) .................................................................... 4

    15 U.S.C. § 78s(b)(3)(C) .................................................................... 4

    15 U.S.C. § 78s(c) ........................................................................ 4, 22

    15 U.S.C. § 78s(d)(1) ...................................................................... 10

    15 U.S.C. § 78s(d)(2) ..................................................................... 5, 10

    15 U.S.C. § 78s(h)(1) ..................................................................... 3, 10

    15 U.S.C. § 78s(h)(2) ....................................................................... 3

    15 U.S.C. § 78s(h)(4) ....................................................................... 4

15 U.S.C. § 78y ........................................................................................................... 5

Sherman Act, 15 U.S.C. § 2 ........................................................................................... 6

**FEDERAL REGULATIONS**

17 C.F.R. § 201.401(d) .................................................................................................. 5

**OTHER AUTHORITIES**

FINRA By-Laws ............................................................................................................. 3

FINRA Rules .................................................................................................................. 5

SEC, *Concept Release Concerning Self-Regulation*, Exchange Act Release No. 50700, 2004 WL 2648179 (Nov. 18, 2004) ....................................................................... 2

SEC, Self-Regulatory Organizations, 72 Fed. Reg. 42,169 (Aug. 1, 2007) ............. 2, 3, 13

## PRELIMINARY STATEMENT

The Financial Industry Regulatory Authority (FINRA) is a private corporation incorporated in Delaware, Compl. ¶ 25, ECF No. 1.  It is "a private self-regulatory organization," *Saad v. SEC*, 980 F.3d 103, 104 (D.C. Cir. 2020), that "function[s] subordinately," *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940), to the Securities and Exchange Commission (SEC) in overseeing securities markets.  "In case after case, the courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement" is sufficient to satisfy constitutional requirements.  *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (Sutton, C.J.); *see also id.* at 243 (Cole, J., concurring) (calling the Maloney Act "unquestionably constitutional").  There is no basis for this Court to depart from that long-settled nationwide consensus.

Plaintiff Eugene H. Kim's structural constitutional arguments fail to take account of FINRA's status as a private entity.  Longstanding Supreme Court precedent establishes that Congress may enlist the aid of private actors in the administration of federal law as long as those private actors "function subordinately" to a government agency that retains ultimate control, as the SEC does here.  Because FINRA is a private entity acting subject to the supervision and control of the SEC, FINRA's officers and personnel are not subject to the same appointment and removal conditions that apply to federal government officers.

The statutory scheme in which FINRA operates also does not entail any impermissible delegation of legislative power.  FINRA wields no independent lawmaking power, *see, e.g.*, 15 U.S.C. § 78s(b)(1), and it may propose regulations for the SEC's consideration and approval only pursuant to detailed statutory constraints.

The statutory scheme also does not delegate judicial power in violation of Article III.  Disciplinary actions by FINRA do not undermine the constitutional role of Article III courts.

FINRA decides only a limited range of issues within a narrow sphere, often pertaining only to FINRA's own rules and regulations. And its decisions are subject to review by the SEC as well as review by Article III courts.

Finally, the statutory condition that securities brokers and dealers join a self-regulatory organization (SRO) like FINRA to participate in the industry does not implicate any First Amendment right because FINRA does not engage in political or ideological expression.

The Court should reject the plaintiff's constitutional challenges to FINRA's structure and operation.

## BACKGROUND

### I.    Legal background

Self-regulation in the securities industry dates to the founding era. *See* SEC, *Concept Release Concerning Self-Regulation*, Exchange Act Release No. 50700, 2004 WL 2648179, at *3 (Nov. 18, 2004) (discussing this history). As the D.C. Circuit has described it more than once, "FINRA is a private self-regulatory organization," *Saad*, 980 F.3d at 104, and a non-profit corporation that is incorporated in Delaware and headquartered in the District of Columbia. Compl. ¶ 25. FINRA was created in 2007, when its predecessor organization, the National Association of Securities Dealers (NASD), consolidated its member-firm regulation and enforcement functions with the regulatory and enforcement functions of the New York Stock Exchange (another SRO). *See* SEC, Self-Regulatory Organizations, 72 Fed. Reg. 42,169 (Aug. 1, 2007).

NASD, which was formed as part of a comprehensive statutory regime for "cooperative regulation" in securities markets, registered as an SRO pursuant to the Maloney Act of 1938, which amended the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq*. *Sparta Surgical Corp. v. NASD, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998). Under this statutory

scheme, SROs exercise "a primary supervisory role subject to ultimate SEC control." *Id.* at

1213–14.  In 1975, Congress again amended the Exchange Act to strengthen the SEC's

oversight, underscoring that SROs "are intended to be subject to the SEC's control and have no

governmentally derived authority to act independently of SEC oversight." *Id.* at 1214 (quoting

H.R. Rep. No. 94-123, at 48–49 (1975)).

FINRA is a private corporation; the government does not appoint any of its officers,

employees, or Board of Governors members.  72 Fed. Reg. at 42,170–72.  FINRA receives no

government funding; rather, it is funded by fees, dues, and assessments from its members.  *See*

FINRA By-Laws art. VI, sec. 1, https://perma.cc/4A97-2RU5; *Desiderio v. NASD, Inc.*, 191 F.3d

198, 206–07 (2d Cir. 1999).

The Exchange Act generally makes it unlawful for brokers and dealers to effect securities

transactions without registering with the SEC and joining a national securities association.  *See*

15 U.S.C. § 78o(a)(1), (b)(1).  As the only national securities association that is currently

registered with the SEC, FINRA exercises supervisory authority over the broker-dealer industry,

subject to the SEC's oversight and control.  *See Turbeville v. FINRA*, 874 F.3d 1268, 1270 & n.2

(11th Cir. 2017).

The SEC may limit FINRA's activities and operations or suspend FINRA's registration if

FINRA violates the applicable statutory provisions or SEC regulations.  15 U.S.C. § 78s(h)(1).

The SEC may also suspend or revoke FINRA's registration "if in [the SEC's] opinion such action

is necessary or appropriate in the public interest, for the protection of investors, or otherwise in

furtherance of the purposes of [the statute]." *Id.* § 78s(h)(2).  And the SEC may "remove from

office or censure" an "officer or director of [FINRA]" if that person "has willfully violated

[applicable statutory provisions], the rules or regulations thereunder, or the rules of [FINRA],

3

willfully abused his authority, or without reasonable justification or excuse has failed to enforce compliance" with the securities laws. *Id.* § 78s(h)(4).

FINRA administers broker qualifications examinations; proposes and promulgates rules, regulations, and standards of professional conduct; and disciplines member firms and individuals for violating its rules. *See Turbeville*, 874 F.3d at 1271 (citing 15 U.S.C. §§ 78o-3(b), 78s). Before any rules proposed by FINRA may be promulgated, after public notice and comment, the SEC reviews and approves them only if it finds the proposal "consistent with the requirements" of the Exchange Act and its implementing regulations. 15 U.S.C. § 78s(b), (c). Generally, rules proposed by FINRA do not take effect unless and until they are approved by the SEC.[1] *Id.* § 78s(b)(1). The SEC can also "amend" any FINRA rule, at any time, "to insure the fair administration of the self-regulatory organization," or "to conform its rules to requirements of this chapter." *Id.* § 78s(c); *see also id.* (the SEC "may abrogate, add to, and delete from" any FINRA rule).

Congress requires SROs to "provide a fair procedure" in disciplinary actions. *Id.* § 78o-3(b)(8); *see also id.* § 78o-3(h)(1) (SROs must "bring specific charges, notify such

---

[1] There are minor exceptions: A FINRA rule may take effect immediately if it constitutes "a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing [FINRA] rule"; addresses FINRA dues or fees; or is "concerned solely with the administration of [FINRA]" or related matters. 15 U.S.C. § 78s(b)(3)(A). The SEC may also immediately put a proposed FINRA rule into effect if it determines that it is "necessary for the protection of investors, the maintenance of fair and orderly markets, or the safeguarding of securities or funds." *Id.* § 78s(b)(3)(B). Within a 60-day period thereafter, the SEC may "summarily" suspend any such rule that immediately went into effect if it determines that suspension "is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter." *Id.* § 78s(b)(3)(C). During the suspension period, the SEC approves or disapproves the rule according to the usual process described above. *Id.* Finally, in some circumstances, proposed rule changes "shall be deemed to have been approved" if the SEC does not act on the proposal within a specified time. *Id.* § 78s(b)(2)(D).

4

member or person of, and give him an opportunity to defend against, such charges, and keep a record"). FINRA's disciplinary proceedings and appeals are thus governed by a set of SEC-approved internal rules known as the FINRA Code of Procedure and in accordance with the disciplinary process set out in the Exchange Act. *See Fiero v. FINRA, Inc.*, 660 F.3d 569, 571–72 (2d Cir. 2011). FINRA may initiate a disciplinary proceeding against a member for violating a FINRA rule, SEC regulation, or statutory provision. *Id.* After FINRA files a complaint, a hearing panel conducts a hearing and issues a written decision and explanation. *Id.*; *see* FINRA Rules §§ 9211, 9231, 9268, https://perma.cc/5PTH-PYSJ. The panel's decision may be appealed to FINRA's National Adjudicatory Council, which "may affirm, dismiss, modify, or reverse with respect to each finding." FINRA Rules § 9348. Decisions of FINRA's National Adjudicatory Council may then be appealed to the SEC, *see* 15 U.S.C. § 78s(d)(2), where they are subject to "*de novo* review," *Turbeville*, 874 F.3d at 1271. The SEC thus "oversees both the rulemaking and the enforcement" functions of FINRA, always retaining "ultimate control over the rules and their enforcement." *Oklahoma*, 62 F.4th at 229.[2]

Any person aggrieved by an SEC decision may petition a federal court of appeals for review. 15 U.S.C. § 78y. FINRA itself, however, may not seek judicial review of an SEC decision that overturns a FINRA disciplinary order. *See NASD, Inc. v. SEC*, 431 F.3d 803, 812 (D.C. Cir. 2005). Also, while the SEC can bring enforcement actions against broker-dealers in court and petition for judicial enforcement of its orders, FINRA lacks authority to seek judicial enforcement of its orders. *See Fiero*, 660 F.3d at 574–77.

---

[2] If necessary, an aggrieved party may seek a stay pending further administrative or appellate review of a FINRA disciplinary order (first from FINRA, then from the SEC, then from the relevant court of appeals). *See* 15 U.S.C. § 78s(d)(2); 17 C.F.R. § 201.401(d).

## II.    Proceedings in this case

Plaintiff Eugene H. Kim is a New Jersey citizen who is registered with FINRA and associated with a FINRA member firm.  Compl. ¶¶ 19, 22.  He is the subject of a pending FINRA disciplinary action alleging that he made material misstatements and omissions in connection with the sale of securities.  Compl. ¶¶ 104–105.

Kim filed his complaint in this action on August 18, 2023.  He asserts several claims challenging the validity of the legal framework in which FINRA operates: (1) that FINRA's structure violates the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, because FINRA's Governors, executives, and officers are either principal officers who must be appointed by the President with the advice and consent of the Senate or inferior officers who must be appointed by the President, a court of law, or the head of a department, Compl. ¶¶ 201–207; (2) that FINRA's Governors and officers are improperly insulated from removal by the President, Compl. ¶¶ 208–217; (3) that the SEC's grant of authority to FINRA amounts to an unconstitutional delegation of legislative power, Compl. ¶¶ 218–219; (4) that FINRA's adjudication procedures violate Article III, the Fifth Amendment privilege against self-incrimination, and the Seventh Amendment right to jury trial, Compl. ¶¶ 222–237; (5) that FINRA's operation effects compelled association in violation of the First Amendment, Compl. ¶¶ 239–250; and (6) that FINRA has monopolized the market for SROs in violation of the Sherman Act, 15 U.S.C. § 2, Compl. ¶¶ 252–261.  Kim seeks declaratory relief, injunctive relief against any FINRA proceeding against him, and damages and injunctive relief under the Sherman Act.  Compl. 35.

Alongside his complaint, Kim filed a motion seeking a temporary restraining order and preliminary injunction to restrain the pending FINRA enforcement action during the pendency of this case.  Mot. for TRO and Prelim. Inj., ECF No. 4.

6

**III.    Proceedings in *Scottsdale Capital Advisors Corp. v. FINRA, Inc.* and *Alpine Securities Corp. v. FINRA***

The arguments that Plaintiff Kim has presented in this case closely overlap with arguments that have been raised in another case pending in this district, *Scottsdale Capital Advisors Corp. v. FINRA, Inc.*, 23-cv-1506 (D.D.C.), assigned to Judge Howell.

One of the plaintiffs in *Scottsdale*, Alpine Securities Corporation, filed a motion seeking a preliminary injunction to block FINRA enforcement proceedings.  In a June 2023 ruling, Judge Howell denied the motion for a preliminary injunction, concluding in part that Alpine failed to establish a likelihood of success on its constitutional claims.  *Scottsdale Cap. Advisors Corp. v. FINRA, Inc.*, Civil Action No. 23-1506 (BAH), 2023 WL 3864557, at *12 (D.D.C. June 7, 2023), *appeal docketed sub nom. Alpine Sec. Corp. v. FINRA*, No. 23-5129 (D.C. Cir. June 8, 2023).  Alpine appealed the denial of the preliminary injunction and sought an injunction pending appeal.  On July 5, 2023, the D.C. Circuit entered a per curiam order granting an injunction pending appeal. *Alpine Sec. Corp. v. FINRA*, No. 23-5129, 2023 WL 4703307 (D.C. Cir. July 5, 2023).  The order did not explain its reasoning, stating only that "Appellant has satisfied the stringent requirements for an injunction pending appeal."  *Id.* at *1.  The order also indicated that Judge Garcia would have denied the request.  In a concurring opinion (joined by no other member of the panel), Judge Walker expressed his tentative view at that stage of the proceedings that the scheme in which FINRA operates is likely unconstitutional because it vests significant executive power in a private organization whose officers are not subject to the same appointment and removal conditions that the Constitution would require for federal officers wielding comparable power.  *See id.* at *2–4 (Walker, J., concurring).  Judge Walker emphasized that "further briefing and argument might convince" him that this tentative view "is unfounded."  *Id.* at *2.

7

Merits briefing in the D.C. Circuit is currently scheduled to close November 17, 2023. Meanwhile, Judge Howell of this Court has granted (by minute order on July 26, 2023) a request by the plaintiffs to hold the district court proceedings in abeyance pending a ruling from the D.C. Circuit in the *Alpine* appeal.

## ARGUMENT

I.    **The statutory scheme in which FINRA operates is consistent with longstanding Supreme Court precedent under which private actors may aid federal agencies in implementing federal law.**

The statutory scheme in which FINRA operates is consistent with longstanding Supreme Court precedent regarding the participation of private actors in the implementation of federal law. That body of precedent permits Congress to enlist the aid of private actors in a federal regulatory scheme as long as those private actors "function subordinately," *Adkins*, 310 U.S. at 399, to a government agency that retains ultimate control. Every court to consider the question has concluded that FINRA "function[s] subordinately" to the SEC. FINRA's structure is thus "unquestionably constitutional." *Oklahoma*, 62 F.4th at 243 (Cole, J., concurring).

In the absence of federal government oversight, a delegation of authority to a private entity may be impermissible under what is known as the "private nondelegation doctrine." Thus, in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), the Supreme Court held unlawful a federal statute that allowed the producers of more than two-thirds of the coal in any given district to set wages and hours for all the producers in that district, unconstrained by any public agency review. *Id.* at 281–83. That "obnoxious" delegation "to private persons whose interests may be and often are adverse to the interests of others in the same business," the Court held, was "clearly arbitrary" and "clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment." *Id.* at 311.

8

In *Sunshine Anthracite Coal Co. v. Adkins*, by contrast, the Supreme Court upheld a revised statutory scheme under which local boards consisting of private coal producers would be organized under the Bituminous Coal Code and would "operate as an aid to the [National Bituminous Coal] Commission but subject to its pervasive surveillance and authority." *Adkins*, 310 U.S. at 388.  The new statute "specifie[d] in detail the methods of [the boards'] organization and operation, the scope of their functions, and the jurisdiction of the Commission over them." *Id.*  The Coal Commission was "empowered to fix minimum prices . . . in accordance with stated standards" following a procedure in which the code boards would "propose minimum prices pursuant to prescribed statutory standards," which "may be approved, disapproved, or modified by the Commission." *Id.*

The Supreme Court determined in *Adkins* that no constitutional problem arose from involving private industry in the regulatory scheme because "members of the code function subordinately to the Commission." *Id.* at 399.  "It, not the code authorities, determines the prices.  And it has authority and surveillance over the activities of these authorities.  Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid." *Id.*

Under *Adkins*, plaintiff Kim's structural constitutional challenge fails because FINRA "function[s] subordinately" to the SEC, which wields "authority and surveillance over" FINRA's activities. *Id.*; *see Scottsdale*, 2023 WL 3864557, at \*10 ("SROs' authority is subordinate to the SEC's ultimate control and oversight.").  "The SEC . . . retains formidable oversight power[s] to supervise, investigate, and discipline [FINRA] for any possible wrongdoing or regulatory missteps." *CalPERS v. NYSE, Inc.* (*In re NYSE Specialists Sec. Litig.*), 503 F.3d 89, 101 (2d Cir. 2007).  "[T]he SEC may abrogate, add to, and delete from all FINRA rules as it deems necessary." *Aslin v. FINRA, Inc.*, 704 F.3d 475, 476 (7th Cir. 2013) (citations omitted) (citing 15

9

U.S.C. § 78s(b)(1), (c)).  Moreover, FINRA must notify the SEC of any final disciplinary action

it takes against a member, which is thereafter subject to de novo review by the SEC, acting sua

sponte or in response to a petition from the aggrieved party.  *See* 15 U.S.C. § 78s(d)(1)–(2).  As a

final backstop, the SEC may always suspend or revoke FINRA's registration (and thus its ability

to exercise the functions of an SRO under the statute) "if in [the SEC's] opinion such action is

necessary or appropriate in the public interest, for the protection of investors, or otherwise in

furtherance of the purposes of this chapter."  *Id.* § 78s(h)(1).

Several decisions of courts of appeals have held up the statutory framework in which

FINRA operates as a textbook example of permissible collaboration between government and

private entities.  One such decision is the Sixth Circuit's recent ruling in *Oklahoma v. United*

*States*, 62 F.4th 221 (6th Cir. 2023), in which the Sixth Circuit upheld the Horseracing Integrity

and Safety Act, which provides for a private nonprofit corporation to aid the Federal Trade

Commission (FTC) in regulating horseracing.  The Sixth Circuit upheld the statutory scheme,

reasoning that the authority granted under the Horseracing Act "parallels similar authority

exercised by the SEC under the Maloney Act," *id.* at 231–32.  "In case after case," the Sixth

Circuit observed, "the courts have upheld this arrangement, reasoning that the SEC's ultimate

control over the rules and their enforcement makes the SROs permissible aides and advisors."

*Id.* at 229.

The Fifth Circuit had invalidated an earlier version of the Horseracing Integrity and

Safety Act.  *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 890 (5th

Cir. 2022).  But the Sixth Circuit concluded that statutory amendments in 2022 had changed the

respective roles of the FTC and the private corporation to more closely parallel the relationship

between the SEC and FINRA, and thereby had remedied the constitutional defects found by the

10

Fifth Circuit.  The Sixth Circuit noted that the amended statute granted the FTC "new discretion to adopt and modify" rules, and similar modification power wielded by the SEC had led "every court of appeals to address the validity of such delegations under the Maloney Act" to uphold them.  *Oklahoma*, 62 F.4th at 232; *see Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-CV-071-H, 2023 WL 3293298, at *19 (N.D. Tex. May 4, 2023) (on remand) (concluding that, under the amended statute, "the Authority is now on equal footing to FINRA in its role 'in aid of' the federal agency that retains ultimate rulemaking authority"), *appeal docketed*, No. 23-10520 (5th Cir. May 19, 2023).

Indeed, every court of appeals to consider the scheme in which FINRA operates has agreed: under *Adkins*, the federal securities laws do not "unconstitutionally delegate[] power to" FINRA (or its predecessor, the NASD) because the statute gives the SEC the power (1) "to approve or disapprove of [its] Rules," and (2) to conduct *de novo* review of "any disciplinary action" that FINRA takes.  *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *see Todd & Co. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982).  The D.C. Circuit has approvingly discussed these cases about the constitutional status of NASD and FINRA, describing them as "resembl[ing] *Adkins*."  *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 n.5 (D.C. Cir. 2013), *vacated and remanded on other grounds*, 575 U.S. 43 (2015).

In sum, because FINRA "function[s] subordinately" to the SEC, *Adkins*, 310 U.S. at 399, it does not violate the private-nondelegation doctrine.  *See Scottsdale*, 2023 WL 3864557, at *10 (concluding that the statutory scheme does not violate the private nondelegation doctrine).

11

**II.     The statutory scheme does not violate the Appointments Clause because FINRA officials are not officers of the United States.**

Plaintiff Kim alleges that FINRA's structure is unconstitutional because FINRA's Governors and officers, including its hearing officers, are not appointed in accordance with the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. These claims fail because FINRA is a private entity acting under the supervision and control of the SEC. FINRA's officials are not "Officers of the United States," and their selection is not governed by the Appointments Clause.

The Appointments Clause requires that all "Officers of the United States" be appointed by the President subject to "the Advice and Consent of the Senate," although "Congress may by Law vest the Appointment of . . . inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments." *Id*. "An office is a public station conferred by the appointment of government." *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 520 (1926). Accordingly, in light of the constitutional text "of the United States," U.S. Const. art. II, § 2, cl. 2, "Supreme Court precedent has established that the constitutional definition of an 'officer' encompasses, at a minimum, a continuing and formalized relationship of employment *with the United States Government*," *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757–58 (5th Cir. 2001) (en banc) (emphasis added) (citing *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890), and *United States v. Germaine*, 99 U.S. 508, 511–12 (1879)); *see also United States v. Hartwell*, 73 U.S. 385, 393–94 (1868) ("A government office is different from a government contract.").

The Appointments Clause thus applies only to the appointment of "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. It does not apply to the officers of a private corporation any more than it applies to the officers of a State or the officers of a territory. *See Black*, 2023 WL 3293298, at *15 (rejecting the argument that "a private entity should be considered part of the government for purposes of the Appointments Clause"); *cf. Fin. Oversight & Mgmt. Bd. v.*

12

*Aurelius Inv., LLC*, 140 S. Ct. 1649, 1661 (2020) (Appointments Clause inapplicable to officers of the territorial government of Puerto Rico). And as discussed above, FINRA is "a private, non-profit Delaware corporation," *Turbeville*, 874 F.3d at 1270, rather than a component of the federal government. The Appointments Clause therefore has no bearing on the hiring of FINRA officials. *See, e.g.*, *Aurelius*, 140 S. Ct. at 1658 ("If they are not officers of the United States, but instead are some other type of officer, the Appointments Clause says nothing about them.").

In rare circumstances, a corporation created by the federal government can be regarded as part of the federal government for certain constitutional purposes, even though Congress has nominally designated it a private corporation. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 394 (1995) (treating Amtrak as part of the federal government for purposes of the First Amendment). But that principle applies only when (among other requirements) "the Government creates [the] corporation." *Id.* at 399; *see Black*, 2023 WL 3293298, at *13 ("[T]o be considered a government entity for constitutional purposes, a corporation must be created by the government."). Congress did not create FINRA; rather, FINRA was incorporated under Delaware law. *See generally* 72 Fed. Reg. at 42,169; *see also Black*, 2023 WL 3293298, at *14 ("To be sure, FINRA . . . [was] created in anticipation of aiding a federal agency, but that alone is insufficient to render it part of the government."); *Graman v. NASD, Inc.*, No. Civ.A. 97-1556-JR, 1998 WL 294022, at *3 (D.D.C. Apr. 27, 1998) ("The fact that the Maloney Act of 1938 welcomed and anticipated the creation of NASD does not make it a governmental actor[.]").

Nor is it the case here that the federal government "retains for itself permanent authority to appoint a majority of the directors of" FINRA. *Lebron*, 513 U.S. at 399. To the contrary, FINRA's "creation was not mandated by statute, nor does the government appoint its members or

13

serve on any [FINRA] board or committee." *Desiderio*, 191 F.3d at 206 (discussing FINRA's predecessor, NASD); *cf., e.g.*, *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 51 (2015) (treating Amtrak as a governmental entity under the Constitution, in part because "[t]he Secretary of Transportation holds all of Amtrak's preferred stock and most of its common stock" and the President selects eight of its nine board members); *Scottsdale*, 2023 WL 3864557, at *8 (finding that the *Lebron* analysis favored treating FINRA as a private actor).

Applying those principles, courts have rejected Appointments Clause claims against government-affiliated corporations in which a minority of board members are selected by the federal government. *See, e.g.*, *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 159 (4th Cir. 2018) ("Because these appointees are a distinct minority of the Board, they alone cannot 'control' MWAA. Through the process of deliberation and negotiation, these appointees could influence MWAA's operations, but influence is not sufficient."); *Corr v. Metro. Wash. Airports Auth.*, 702 F.3d 1334, 1337 (Fed. Cir. 2012) (same). A fortiori, the Appointments Clause has nothing to say here, about a privately created corporation with no government appointees.

This conclusion finds further support in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010). There, the Supreme Court contrasted the Public Company Accounting Oversight Board (PCAOB) with the "private self-regulatory organizations in the securities industry," "such as the New York Stock Exchange." *Id.* at 484. FINRA is just such an organization. Like the New York Stock Exchange (and unlike the PCAOB and Amtrak), FINRA is not a "Government-created, Government-appointed entity." *Id.* at 484–85. So FINRA's status as a private corporation is dispositive here, and the Appointments Clause is categorically inapplicable to the selection of its officers and employees. *See Black*, 2023 WL 3293298, at *14 ("Like FINRA, the Authority is a private entity" because it "is a private

14

corporation that receives no federal or state funding," its "creation was not mandated by statute," and its officers "are not 'government appoint[ed]'").

Judge Walker's concurrence in the D.C. Circuit's stay order in *Alpine* reached the preliminary conclusion that FINRA officials may be subject to the Appointments Clause, analogizing FINRA hearing officers to the SEC administrative law judges (ALJs) at issue in *Lucia v. SEC*, 138 S. Ct. 2044 (2018). There, the Supreme Court concluded that the SEC's ALJs—who are unquestionably employed by the government—were officers of the United States. *Id.* at 2049.

Judge Walker's opinion does not address the applicable test from *Lebron* or the Supreme Court's statements in *Free Enterprise Fund*. And the opinion concludes that it "[p]robably" does not "make a difference that FINRA hearing officers are employees of a nominally private corporation," because FINRA's "enforcement activities are controlled by the government." *Alpine*, 2023 WL 4703307, at *3 (Walker, J. concurring). Respectfully, Judge Walker's preliminary view that FINRA hearing officers' "subject[ion] to a government plan," *id.*, may be enough to render them officers of the United States is inconsistent with the doctrine articulated in *Adkins* that the federal government may enlist the aid of private regulatory entities that "function subordinately" to a government agency that retains ultimate control, 310 U.S. at 399.

*Lucia* drew on the principle that, if Congress chooses to invest a federal government office with a certain type and degree of power, then persons may be installed to that office only in the manner prescribed by the Appointments Clause. But *Lucia* does not dictate when Congress is required to lodge power in a standing federal government office instead of providing for the relevant functions to be performed through some other means, such as cooperation with private actors. Indeed, the Supreme Court has cautioned against treating *Lucia* as supplying a

guidepost for all Appointments Clause analysis.  *See Aurelius*, 140 S. Ct. at 1663 (noting that *Lucia* had focused narrowly on whether the relevant duties in that case were of sufficient "importance and significance" to trigger the Appointments Clause, and finding that the Appointments Clause was inapplicable to the dispute at hand for reasons not discussed in *Lucia*).

It has never been the law that functions that may be exercised by permanent Executive Branch officers may *only* be exercised by permanent Executive Branch officers, and, indeed, that proposition is refuted by Supreme Court precedent and historical practice.  For example, the Supreme Court has long recognized that executive functions may be performed by persons who are directly authorized by the government, but who do not occupy "continuing and permanent" offices and therefore do not qualify as officers of the United States.  *United States v. Germaine*, 99 U.S. 508, 511–12 (1879); *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890).  Likewise, Congress may authorize State government authorities to exercise functions that might otherwise be performed by federal executive officers.  *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 408 (2012) ("Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer.").  Enlisting the aid of private actors within the constraints of *Adkins* is just one more mechanism available to Congress under the Constitution for arranging for the performance of government functions.  The public accountability goals that the Appointments Clause serves are amply met by the fact that under the private nondelegation doctrine embodied in *Adkins*, any such private actors must be subject to supervision by a government agency that itself is subject to the Appointments Clause.  *Cf., e.g.*, *Oklahoma*, 62 F.4th at 228 (explaining that the constraints of the private nondelegation doctrine serve to address concerns that "transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable" might "undercut[] representative government").

16

Whether FINRA qualifies as a "state actor" for purposes of individual constitutional rights is distinct from the issue of whether FINRA's officials are "Officers of the United States" within the meaning of the Appointments Clause. Various courts in fact have concluded that FINRA is *not* a state actor for purposes of other constitutional provisions, *e.g.*, *Desiderio*, 191 F.3d at 206 ("The NASD is a private actor, not a state actor."); *Mohlman v. FINRA, Inc.*, Case No. 3:19-cv-154, 2020 WL 905269, at *6 (S.D. Ohio Feb. 25, 2020) (collecting cases) ("Courts have held without exception that FINRA is a private entity and not a state actor."), *aff'd*, 977 F.3d 556 (6th Cir. 2020). But even if FINRA were a state actor for some purposes, that would not mean that its officers are Officers of the United States under the Appointments Clause. *Cf., e.g.*, *Aurelius*, 140 S. Ct. at 1661 (holding that federally appointed government officers whose duties are primarily local to the District of Columbia or the Territories are not Officers of the United States under the Appointments Clause). Rather, FINRA would be subject to the Appointments Clause only if FINRA qualified as "part of the Government" under *Lebron*, 513 U.S. at 397. *See Ass'n of Am. R.Rs.*, 575 U.S. 43, 55 (2015) (relying on *Lebron* in the context of an Appointments Clause challenge). For the reasons above, *see supra* pp. 13–14, FINRA is not an arm of the government under that analysis.

The fact that FINRA sometimes argues that it has some form of immunity, *see* Compl. ¶ 9, does not make it a state actor or an arm of the government. Whether and when FINRA is entitled to immunity from private tort suits is complicated and case-specific, and it ultimately has no bearing on this case. *Cf. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) ("[T]he act

of extending governmental tort liability and immunity rules to foster parents does not transform

the Hogues into State actors.").[3]

### III.    For similar reasons, FINRA officers are not subject to the same removal conditions that Article II would require for Executive Branch officers.

Plaintiff Kim also alleges that FINRA's structure is unconstitutional because FINRA's

Governors and officers are improperly insulated from removal by the President. *See* Compl.

¶¶ 208–217.

This claim fails for largely the same reasons as the plaintiff's Appointments Clause claim.

FINRA's Board members and hearing officers are employees of a private entity, not officers of

the United States. And again, in *Free Enterprise Fund*, the Court expressly distinguished the

"removal standard" applicable to "private bodies" from the removal standard applicable to

"officers wielding the executive power of the United States"—even contrasting the PCAOB with

"private organizations like the New York Stock Exchange." 561 U.S. at 503. FINRA and the

New York Stock Exchange are identically situated on this issue: both are privately incorporated

SROs that function subordinately to the SEC in overseeing securities markets. Tenure

protections at FINRA thus raise no constitutional concern.

---

[3] This result is likewise consistent with decisions from multiple courts of appeals holding that, despite their important role in assisting with enforcement of the False Claims Act, "qui tam relators do not serve in any office of the United States" and thus are not subject to the Appointments Clause. *E.g.*, *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804–05 (10th Cir. 2002). As those cases have explained, because "[t]here is no legislatively created office of informer or relator under the [False Claims Act]," and "[r]elators are not entitled to the benefits of officeholders, such as drawing a government salary," they are not officers of the United States within the meaning of the Appointments Clause. *Id.*; *accord Riley*, 252 F.3d at 757–58; *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *U.S. ex. rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278–79 (M.D. Fla. 2014). The same is true of FINRA officials.

18

**IV.    FINRA does not violate the public-nondelegation doctrine because Congress did not confer legislative power on FINRA and provided an intelligible principle.**

Plaintiff Kim alternatively argues that the statutory scheme governing FINRA's operation entails an unconstitutional delegation of legislative power, Compl. ¶¶ 218–221.  But the statutory scheme does not in fact confer any legislative power on FINRA, and in any event the governing statutes establish intelligible principles to guide rulemaking, which dooms any nondelegation claim.

A claim of an unlawful delegation of legislative power is governed by the "public nondelegation doctrine" (as distinct from the *private* nondelegation doctrine discussed in Argument section I above, *see supra* pp. 8–11).  Even assuming that the typical public-nondelegation standard applies to a delegation of authority to a private entity like FINRA, plaintiff Kim does not come close to meeting the very high standard for this sort of nondelegation claim.

As a threshold matter, Congress did not grant FINRA "lawmaking" power at all—that is, FINRA lacks the authority to promulgate general "rule[s] of prospective force." *Loving v. United States*, 517 U.S. 748, 758 (1996); *see also Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting) (the framers understood "legislative power . . . to mean the power to adopt generally applicable rules of conduct governing future actions by private persons").  Those powers remain firmly vested in the SEC, because no rule proposed by FINRA "shall take effect unless approved by the Commission."  15 U.S.C. § 78s(b)(1); *see also supra* note 1 (discussing minor statutory exceptions).

Even if a court were to conclude that FINRA does exercise some delegated authority (either in the context of its rulemaking or disciplinary functions), a challenge under the public nondelegation doctrine would fail because the pertinent statutes supply intelligible principles to

19

guide the exercise of that authority.  "Delegations are constitutional so long as Congress 'lays down by legislative act an intelligible principle to which the person or body authorized to exercise the authority is directed to conform.'"  *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 441–42 (5th Cir. 2020) (brackets omitted) (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)), *cert. denied*, 141 S. Ct. 2746 (2021).  It is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority.'"  *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946).

"Those standards . . . are not demanding."  *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.).  Although Congress has delegated authority since "the beginning of the government," the Supreme Court "has found only two delegations to be unconstitutional."  *Big Time Vapes*, 963 F.3d at 442, 446 (citation omitted).  One "provided literally no guidance for the exercise of discretion," and the other "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'"  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (citing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).  By contrast, in the almost 90 years since those two decisions—both from 1935, and both about the same statute—the Supreme Court has consistently upheld "Congress' ability to delegate power under broad standards," *Mistretta v. United States*, 488 U.S. 361, 373 (1989), and "ha[s] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law,'" *Am. Trucking Ass'ns*, 531 U.S. at 474–75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

20

Applying those principles, the Supreme Court has upheld nearly every delegation it has confronted, including delegations:

- to the Federal Communication Commission to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943);

- to the Federal Power Commission to determine "just and reasonable" rates for wholesale sales of natural gas, *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944);

- to the Price Administrator to fix commodity prices that would be "fair and equitable" and would "effectuate the purposes of th[e] [Emergency Price Control Act of 1942]," *Yakus v. United States*, 321 U.S. 414, 420 (1944) (citation omitted);

- to the SEC to prevent unfair or inequitable distribution of voting power among security holders, *Am. Power & Light*, 329 U.S. at 104–05;

- to the Secretary of War to determine and recover "excessive profits" from military contractors, *Lichter v. United States*, 334 U.S. 742, 785–86 (1948) (citation omitted); and

- to the Environmental Protection Agency to set nationwide air-quality standards limiting pollution to the level required "to protect the public health." *Am. Trucking Ass'ns*, 531 U.S. at 472 (quoting 42 U.S.C. § 7409(b)(1)).

The provisions challenged here fit comfortably within this precedent. FINRA's activities are subject to statutory standards and criteria that easily satisfy the forgiving "intelligible principle" test. Indeed, plaintiff Kim does not allege the absence of an intelligible principle, nor does he identify the supposedly problematic delegating language.

Nor could he: both FINRA and the SEC are constrained by detailed provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Maloney Act of 1938. FINRA may propose rules, but the SEC approves FINRA rules only "if it finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations issued under this chapter that are applicable to such organization." 15 U.S.C. § 78s(b)(2)(C). And the SEC can also "amend" any FINRA rule, at any time, "to insure the fair

21

administration of the self-regulatory organization" or "to conform its rules to requirements of this chapter." *Id.* § 78s(c). Those cross-references incorporate a long list of specific, detailed delegations—and restrictions on those delegations—governing the SEC's authority "to insure the maintenance of fair and honest markets" in securities, *id.* § 78b, to prohibit "[m]anipulative and deceptive devices" in financial markets, *id.* § 78j, to ensure "the protection of investors," *id.* § 78o-3(a), and so on.

Under binding precedent, these delegations—either in isolation, or when considered in the context of the statutory scheme as a whole—are "constitutionally sufficient," because "Congress clearly delineate[d] the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority." *Am. Power & Light*, 329 U.S. at 105; *see also id.* (the "veritable code of rules" for the SEC to follow in enforcing certain provisions of the securities laws "are certainly no less definite in nature than those speaking in other contexts in terms of 'public interest,' 'just and reasonable rates,' 'unfair methods of competition' or 'relevant factors'" that the Supreme Court has already approved); *Scottsdale*, 2023 WL 3864557, at *10 n.9 ("Congress delineated specific objectives that SROs should strive to accomplish, providing an 'intelligible principle' under the public nondelegation doctrine."). No more is required.

## V. The statutory scheme in which FINRA operates does not undermine the authority of Article III courts.

The statutory scheme in which FINRA operates also does not entail any impermissible delegation of judicial power in violation of Article III of the Constitution. FINRA decides issues within a specialized sphere of regulation, and its decisions are subject to review by the SEC as well as review by Article III courts.

Article III provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and

22

establish." U.S. Const. art. III, § 1.  This vesting language sometimes limits the ability of Congress to provide for adjudication of disputes by bodies other than Article III courts.  *See Stern v. Marshall*, 564 U.S. 462, 482–84 (2011).  But it does not entirely prohibit Congress from doing so.  For example, Congress may provide for non–Article III tribunals to adjudicate matters affecting "public rights . . . —those arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments,'" as opposed to "private right[s], that is, . . . the liability of one individual to another under the law."  *Id.* at 489 (quoting *Crowell v. Benson*, 285 U.S. 22, 50, 51 (1932)).

"In determining the extent to which a given congressional decision to authorize the adjudication of Article III business in a non-Article III tribunal impermissibly threatens the institutional integrity of the Judicial Branch, the Court has declined to adopt formalistic and unbending rules."  *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986).  Instead, the analysis turns on whether the practical effect of the delegation is to undermine "the constitutionally assigned role of the federal judiciary."  *Id.*  The Supreme Court has identified three factors to consider in this determination: (1) the extent to which essential attributes of judicial power are reserved to Article III courts and the extent to which the non-Article III body exercises the range of jurisdiction and powers normally vested in Article III courts; (2) the origin and importance of the right to be adjudicated; and (3) the concerns motivating Congress to place adjudications outside of Article III.  *Schor*, 478 U.S. at 851.  Here, none of these factors hints at any Article III violation.

With respect to the first factor, the scheme in which FINRA operates does not encroach on the authority of Article III courts.  FINRA disciplinary proceedings operate only within a

23

"particularized area of law," *Schor*, 478 U.S. at 852.  FINRA's decisions are subject to review by the SEC as well as judicial review by Article III courts.  *See Schor*, 478 U.S. at 853 (noting that availability of further review weighed against finding an Article III violation).

The second factor, the origin and importance of the right to be adjudicated, also does not suggest any Article III violation in this case.  Many FINRA adjudications deal exclusively with FINRA's own rules and regulations.  *See Otto v. SEC*, 253 F.3d 960, 964 (7th Cir. 2001); Compl. ¶ 53.  FINRA disciplinary proceedings also may address alleged violations of federal securities laws and SEC regulations, but even in those instances, the subject matter—professional discipline within the securities industry—is fairly within the scope of a specialized regulatory scheme.  *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985) ("Congress has the power, under Article I, to authorize an agency administering a complex regulatory scheme . . . to condition issuance of registrations or licenses on compliance with agency procedures."); *id.* ("[W]hen Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is reduced.").

The third factor, the concerns that motivated Congress in designing the statutory scheme, also does not suggest an Article III violation.  Congress relied on self-regulation based on a judgment "that self-regulation is the best 'first-line' defense against unethical or illegal securities practices." *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979).  Self-regulation "allows the industry to set its own standards of proper conduct and permits their members to discipline themselves applying their own expertise and experience." *Id.*  This "specific and limited federal regulatory scheme," taking advantage of specialized "expertise," *Schor*, 473 U.S. at 855–56, does not violate Article III.

24

Industry self-regulation in matters of professional discipline poses no threat to "the constitutionally assigned role of the federal judiciary," and the plaintiff's Article III challenge should be rejected.[4]

**VI.      The statutory requirement to join an SRO does not violate the First Amendment.**

Plaintiff Kim's First Amendment claim—that the statutory requirement to join an SRO like FINRA as a condition of engaging in the broker-dealer industry violates his right of association—is also without merit.  "[F]orced associations" may be "impermissible" under the First Amendment in some circumstances where they "burden protected speech."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 12 (1986).  But the First Amendment does not protect against all compelled association—rather, it protects an individual's "right to eschew association *for expressive purposes*."  *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018) (emphasis added).

The statutory requirement that a securities broker or dealer register with an SRO as a condition of participating in that industry does not alone implicate any First Amendment right. Plaintiff Kim does not assert any "expressive purpose[]" for which he wishes to avoid

---

[4] The plaintiff's Fifth Amendment and Seventh Amendment claims also fail.  Because FINRA is "a private, non-profit Delaware corporation," *Turbeville*, 874 F.3d at 1270, it is "a private actor, not a state actor," *Desiderio*, 191 F.3d at 206, and thus is not subject to the Fifth or Seventh Amendments at all.  *See, e.g.*, *Mohlman*, 2020 WL 905269, at *6 (collecting cases) ("Courts have held without exception that FINRA is a private entity and not a state actor.").

Moreover, the Seventh Amendment does not establish any universal right to jury trial. Rather, it preserves the common-law right to jury trial as it existed in 1791.  *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41–42 (1989).  The matters of professional discipline within FINRA's ken are neither among nor even "analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century," *id.* at 42; *see also id.* at 53–54 ("[I]f Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.").

association with FINRA.  *Janus*, 138 S. Ct. at 2463.  He therefore fails to allege a protected First Amendment interest.

To the extent that plaintiff Kim's mandatory membership in FINRA may be considered analogous to an attorney's mandatory membership in an integrated state bar, the Supreme Court has concluded that such compelled membership does not on its own violate the First Amendment.  *See, e.g.*, *Lathrop v. Donohue*, 367 U.S. 820, 843 (1961) (holding that integrated state bar association may constitutionally require membership and dues); *see also, e.g.*, *File v. Martin*, 33 F.4th 385, 391–92 (7th Cir. 2022) (collecting cases), *cert. denied sub nom. File v. Hickey*, 143 S. Ct. 745 (2023) (holding constitutional the state bar's compulsory membership and mandatory membership dues); *Kaimowitz v. Fla. Bar*, 996 F.2d 1151, 1153–54 (11th Cir. 1993) (same).  The First Amendment may be implicated when the state compels payment of membership dues that are used to fund activities that are not "reasonably incurred for the purpose of regulating the . . . profession."  *Keller v. State Bar*, 496 U.S. 1, 13–14 (1990) (internal quotation marks omitted) (holding that state bar association may constitutionally use mandatory dues to fund activities "germane to th[e] goals" of "regulating the legal profession and improving the quality of legal services").[5]

Plaintiff Kim does not allege that FINRA has engaged in political or ideological expression—much less expressive conduct that is not "germane" to FINRA's purposes of "oversee[ing] and regulat[ing] securities firms who join its membership . . . and individuals associated with those firms."  *Turbeville*, 874 F.3d at 1270–71.  The requirement that the plaintiff

---

[5] To the extent that the plaintiff might contend that the Supreme Court's decision in *Janus* implicitly overturned *Keller* and *Lathrop*, that argument is meritless.  Every appellate court to consider the question since *Janus* has concluded that *Keller* and *Lathrop* remain good law.  *See File*, 33 F.4th at 391–92 (collecting cases).

join an SRO like FINRA and pay dues as a condition of participating in this industry thus does not infringe his First Amendment right of association.  Even if it did infringe such rights, "the compelling interest in statutorily mandated FINRA membership . . . outweighs any expressive association right."  *Scottsdale*, 2023 WL 3864557, at *11.

## CONCLUSION

The Court should hold that the challenged provisions of the federal securities laws are constitutional.

Date: September 20, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
CHRISTOPHER HALL
Assistant Branch Directors

/s/ JAMES C. LUH
JAMES C. LUH
Senior Trial Counsel
STEPHEN M. PEZZI (D.C. Bar. No. 995500)
Senior Trial Counsel
CHRISTINE L. COOGLE (D.C. Bar No. 1738913)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St NW
Washington DC 20530
Tel: (202) 514-4938
E-mail: James.Luh@usdoj.gov
Attorneys for Defendant-Intervenor United States