**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Eugene H. Kim,

        Plaintiff,

            v.

Financial Industry Regulatory Authority, Inc.,

        Defendant.

Case No. 1:23-cv-02420 (ACR)

**BRIEF OF AMICI CURIAE NATIONAL FUTURES ASSOCIATION, CME
GROUP INC., AND CBOE GLOBAL MARKETS, INC. IN SUPPORT OF
DEFENDANT**

ADAM UNIKOWSKY
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 639-6000
aunikowsky@jenner.com

GREGORY BOYLE (pro hac vice pending)
JENNER & BLOCK LLP
353 N Clark Street
Chicago, IL 60654
Phone: (312) 2222-9350
gboyle@jenner.com

*Counsel for Amici Curiae
National Futures Association,
CME Group Inc., and
Cboe Global Markets, Inc.*

**CORPORATE DISCLOSURE STATEMENT**

*Amici curiae* submit the following corporate disclosure statement:

National Futures Association is a nonprofit corporation.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

CME Group Inc. is a publicly held company.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Cboe Global Markets, Inc. is a publicly held company.  It has no parent corporation.  A third party's review of public filings indicates that The Vanguard Group, Inc. owned 10% or more of Cboe Global Markets, Inc.'s stock as of June 30, 2023.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................................... i

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF INTEREST ........................................................................................1

SUMMARY OF ARGUMENT ........................................................................................3

ARGUMENT ........................................................................................................3

I.    FINRA IS NOT A STATE ACTOR SUBJECT TO THE APPOINTMENTS
      CLAUSE. ......................................................................................................3

      A.    FINRA Is Not "Part of the Government" and Its Actions Are Not "Fairly
            Attributable" to the Government ..............................................................4

      B.    Longstanding Precedent and Practice Foreclose Plaintiff's Appointments
            Clause Challenge. ...............................................................................7

II.   A RULING IN PLAINTIFF'S FAVOR COULD BE USED BY OTHER MARKET
      PARTICIPANTS FACED WITH ENFORCEMENT ACTIONS TO ATTACK
      THE LONGSTANDING AND BENEFICIAL PRACTICE OF SELF-
      REGULATION IN THE DERIVATIVES INDUSTRY. ....................................10

      A.    The Derivatives Markets Have Long Relied on Self-Regulation.............................10

      B.    Congress Has Expressly Authorized Self-Regulation in the Derivatives
            Industry, Subject to Oversight by the CFTC. ...............................................12

      C.    Self-Regulation Is Beneficial for Both Market Participants and the Public..............16

      D.    Plaintiff's Argument, if Accepted by the Court, Could Be Used by Other
            Market Participants Faced with Enforcement Actions To Cast Doubt on Self-
            Regulation in the Futures Industry. .........................................................18

CONCLUSION.......................................................................................................18

# TABLE OF AUTHORITIES[*]

**CASES**

*Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179 (7th Cir. 1984) .....................................................6

**Blum v. Yaretsky*, 457 U.S. 991 (1982)..............................................................................5, 6, 7

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288
(2001) ...........................................................................................................................................6

*D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.*, 279 F.3d 155 (2d Cir.
2002) ........................................................................................................................................7, 8

*Desiderio v. NASD, Inc.*, 191 F.3d 198 (2d Cir. 1999)..............................................................8

*Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir. 1998), *overruled on
other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742
(9th Cir. 2003)............................................................................................................................8

**Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882 (7th Cir. 2019)................12, 14, 18

*Epstein v. SEC*, 416 F. App'x 142 (3d Cir. 2010) ...........................................................................8

*First Jersey Securities, Inc. v. Bergen*, 605 F.2d 690 (3d Cir. 1979) ...........................................8

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S.
477 (2010)....................................................................................................................................5

*Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659 (1975) ..................................................8

*Graman v. NASD*, No. 97-cv-1556, 1998 WL 294022 (D.D.C. Apr. 27, 1998)...........................8

*Herron v. Fannie Mae*, 861 F.3d 160 (D.C. Cir. 2017) ..................................................................4

*Hill v. Wallace*, 259 U.S. 44 (1922)..............................................................................................11

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) .......................................................5-6

*Jones v. SEC*, 115 F.3d 1173 (4th Cir. 1997) ...............................................................................8

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022)...................................................8

**Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) ......................................3, 4

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Lucia v. SEC*, 138 S. Ct. 2044 (2018) ........................................................................4

*\*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ..................................................3, 5

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ..................6, 7

*Marchiano v. NASD*, 134 F. Supp. 2d 90 (D.D.C. 2001) .............................................8

*MBH Commodity Advisors, Inc. v. CFTC*, 250 F.3d 1052 (7th Cir. 2001) .................13

*McGinn, Smith & Co. v. FINRA*, 786 F. Supp. 2d 139 (D.D.C. 2011) ......................7, 8

*\*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ...............10, 11, 12

*Mohlman v. FINRA*, No. 19-cv-154, 2020 WL 905269 (S.D. Ohio Feb. 25, 2020),
     *aff'd*, 977 F.3d 556 (6th Cir. 2020) ......................................................................8

*National Ass'n of Securities Dealers, Inc. v. SEC*, 431 F.3d 803 (D.C. Cir. 2005)................ 6, 8-9

*National Horsemen's Benevolent & Protective Ass'n v. Black*, No. 21-cv-71, __ F.
     Supp. 3d __, 2023 WL 3293298 (N.D. Tex. May 4, 2023), *appeal docketed*,
     No. 23-10520 (5th Cir. May 19, 2023) ...................................................................8

*NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ....................................................8, 12

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) ............................................7

*NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31 (D.C. Cir. 2015) ..................6

*\*Scottsdale Capital Advisors Corp. v. FINRA*, No. 23-1506, __ F. Supp. 3d __,
     2023 WL 3864557 (D.D.C. June 7, 2023), *appeal docketed*, No. 23-5129 (D.C.
     Cir. June 8, 2023)....................................................................................................5, 9

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) ...................................7

*Turbeville v. FINRA*, 874 F.3d 1268 (11th Cir. 2017)...................................................4

*United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975) .........................................7-8, 18

**STATUTES**

7 U.S.C. § 5(b) .............................................................................................................2, 12

7 U.S.C. § 7(d)(1)(A)(ii) ................................................................................................15

7 U.S.C. § 7(d)(4) .........................................................................................................15

7 U.S.C. § 7a-2(c) .........................................................................................................15

7 U.S.C. § 7b ........................................................................................................15

7 U.S.C. § 13a ......................................................................................................15

7 U.S.C. § 21 ..........................................................................................................1

7 U.S.C. § 21(a) ....................................................................................................14

7 U.S.C. § 21(b)(1) ...............................................................................................14

7 U.S.C. § 21(b)(2) ...............................................................................................14

7 U.S.C. § 21(c) ....................................................................................................14

7 U.S.C. § 21(h)(2) ...............................................................................................15

7 U.S.C. § 21(i)(1)(B) ...........................................................................................15

7 U.S.C. § 21(i)(4) ................................................................................................15

7 U.S.C. § 21(j) .....................................................................................................14

7 U.S.C. § 21(k) ....................................................................................................14

7 U.S.C. § 21(k)(1) ...............................................................................................14

7 U.S.C. § 21(k)(2) ...............................................................................................14

7 U.S.C. § 21(*l*) .....................................................................................................14

7 U.S.C. § 21(*l*)(1) ................................................................................................14

7 U.S.C. § 21(m) ...................................................................................................14

7 U.S.C. § 21(p) ....................................................................................................13

15 U.S.C. § 78s(d)(1) ..............................................................................................6

## LEGISLATIVE MATERIALS

H.R. Rep. No. 75-2307 (1938) .................................................................................9

H.R. Rep. No. 93-975 (1974) .................................................................................12

S. Rep. No. 94-75 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 179 .......................9

## OTHER AUTHORITIES

17 C.F.R. § 9.20(a) ................................................................................................15

17 C.F.R. § 9.24 ..................................................................................................15

17 C.F.R. § 9.33(a) .............................................................................................16

17 C.F.R. § 38.3(a)(1) .........................................................................................15

17 C.F.R. §§ 38.700-.712 ....................................................................................17

17 C.F.R. § 170.1 ...............................................................................................14

17 C.F.R. § 171.33(a) ..........................................................................................15

William A. Birdthistle & M. Todd Henderson, *Becoming A Fifth Branch*, 99
   Cornell L. Rev. 1 (2013) ............................................................................. 16-17

Cboe Futures Exchange Rulebook, § 209, https://cdn.cboe.com/resources/
   regulation/rule_book/cfe-rule-book.pdf.............................................................14

Concept Release Regarding Self-Regulation, Securities Exchange Act Release No.
   34-50700, 69 Fed. Reg. 71,255 (Dec. 8, 2004)...................................................6

CFTC, Designated Contract Markets (DCM), https://www.cftc.gov/Industry
   Oversight/IndustryFilings/TradingOrganizations ...............................................13

Chicago Mercantile Exchange Rulebook § 402, https://www.cmegroup.com/
   rulebook/CME/I/4/4.pdf.....................................................................................14

FINRA By-Laws art. VII, § 13, https://www.finra.org/rules-guidance/rule
   books/corporate-organization/election-governors ...............................................5

Douglas C. Michael, *Federal Agency Use of Audited Self-Regulation as a
   Regulatory Technique*, 47 ADMIN. L. REV. 171 (1995) .......................................17

NFA Rulebook, art. VII, https://www.nfa.futures.org/rulebooksql/
   rules.aspx?Section=2&RuleID=ARTICLE%20VII ...........................................13

NFA Rulebook, Bylaws § 704, https://www.nfa.futures.org/rulebooksql/
   rules.aspx?Section=3. .......................................................................................13

NFA Rulebook, Bylaws § 707, https://www.nfa.futures.org/rulebooksql/
   rules.aspx?Section=3. .......................................................................................13

NFA Rulebook, Compliance Rules 3-4 to 3-14,
   https://www.nfa.futures.org/rulebooksql/rules.aspx?Section=4 .........................17

Saule T. Omarova, *Wall Street as Community of Fate: Toward Financial Industry
   Self-Regulation*, 159 U. Penn. L. Rev. 411 (2011) ............................................17

Margot Priest, *The Privatization of Regulation: Five Models of Self-Regulation*, 29 Ottawa L. Rev. 233 (1997) ...................................................................................16

SEC, Self-Regulatory Organization Rulemaking, http://www.sec.gov.rules/sro (modified Aug. 31, 2023)..............................................................................................9

Thomas W. Sexton III, The Future of Digital Assets: Providing Clarity for the Digital Asset Ecosystem, Testimony Before the House Committee on Financial Services (June 13, 2023), https://www.nfa.futures.org/news/news Testimony.asp?ArticleID=5560..............................................................................13

Thomas W. Sexton III, Keynote Address to Association for Financial Markets in Europe (Oct. 3, 2019), https://www.nfa.futures.org/news/newsTesti mony.asp?ArticleID=5164.................................................................................11, 14

Heath P. Tarbert, *Self-Regulation in the Derivatives Markets: Stability Through Collaboration*, 41 Nw. J. Int'l L. & Bus. 175 (2021) ...................................11, 16, 18

United States Opposition to Emergency Motion for Injunction Pending Appeal, *Alpine Securities Corp. v. FINRA*, No. 23-5129 (D.C. Cir. June 15, 2023) .............................7

United States Supplemental Brief, *Scottsdale Capital Advisors Corp. v. FINRA*, No. 23-1506 (D.D.C. June 2, 2023), ECF No. 82.......................................................10

## STATEMENT OF INTEREST[1]

*Amici* are self-regulatory organizations (SROs) or own SROs that play a vital role in the derivatives industry.  These organizations assist the Commodity Futures Trading Commission (CFTC) in regulating futures and swaps market participants subject to the Commodity Exchange Act (CEA).

National Futures Association (NFA) is a private, non-profit industry-wide SRO for the United States derivatives industry.  *See* 7 U.S.C. § 21.  NFA is the only CFTC-registered futures association.  Its membership includes CFTC-registered futures commission merchants, swap dealers, commodity pool operators, commodity trading advisors, introducing brokers, and retail foreign exchange dealers, as well as the registered associated persons of these entities.  In total, NFA has approximately 3,000 member firms and 42,000 individual associate members.  NFA adopts financial and business conduct rules governing its members, subject to the CFTC's review; monitors its members for compliance with those rules; and enforces its rules through disciplinary actions against its members.

CME Group Inc. (CME) owns and operates four exchanges registered with and regulated by the CFTC: the Chicago Mercantile Exchange, Inc., the Board of Trade of the City of Chicago, Inc., the New York Mercantile Exchange, Inc., and the Commodity Exchange, Inc.  These exchanges offer a wide range of derivatives products available across all major asset classes,

---

[1] Under D.D.C. Local Civil Rule 7(o)(1), the Court may grant leave to file amicus briefs upon the court's "own initiative."  *Amici* construe this Court's August 28, 2023 order as preemptively granting leave to file amicus briefs upon the Court's own initiative.  Therefore, *amici* have not filed a separate motion for leave to file an amicus brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and D.D.C. Local Civil Rule 7(o)(5), *amici* state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person other than *amici* contributed money that was intended to fund preparing or submitting this brief.

including futures and options based on interest rates, equity indexes, foreign exchange, energy, metals, and agricultural commodities.  CME exchanges are also SROs who complement the CFTC's statutory and regulatory oversight of market participants.

Cboe Global Markets, Inc. (Cboe) provides trading, clearing, and investment solutions in multiple asset classes, including equities, derivatives, foreign currency exchange, and digital assets across North America, Europe, and Asia Pacific.  Cboe operates three CEA-regulated exchanges: Cboe Futures Exchange, LLC (CFE), which offers a platform for trading volatility and corporate bond index futures, Cboe Digital, which offers a unified platform for spot and regulated futures trading of digital assets, and Cboe SEF, LLC (Cboe SEF), which offers a platform for trading FX non-deliverable forwards.  CFE, Cboe Digital, and Cboe SEF are also SROs who complement the CFTC's statutory and regulatory oversight of market participants.

*Amici*'s self-regulatory functions safeguard the integrity of the U.S. derivatives markets, protect investors, and ensure that market participants meet their regulatory responsibilities. Reflecting Congress' intent expressed in the CEA to codify a "system of effective self-regulation," *amici* work to "deter and prevent price manipulation or any other disruptions to market integrity"; "ensure the financial integrity" of transactions in derivatives markets; "avoid[] systemic risk"; "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets"; and "promote responsible innovation and fair competition among boards of trade, other markets and market participants."  7 U.S.C. § 5(b).  Because a holding that the Financial Industry Regulatory Authority (FINRA) is a state actor could be used by market participants to challenge *amici*'s status as private entities not subject to the Appointments Clause and other constitutional requirements, *amici* have a substantial interest in this case.

## SUMMARY OF ARGUMENT

This Court requested amicus briefs on Plaintiff's pending motion for a temporary restraining order and preliminary injunction, noting that the Court is "particularly interested in the argument that FINRA hearing officers are 'officers of the United States' for purposes of the Appointments Clause.'"   Minute Order (Aug. 28, 2023).   *Amici* file this brief in support of Defendant FINRA to address the Court's specific question and the potential broader implications of a ruling in Plaintiff's favor.  With respect to Plaintiff's Appointments Clause argument, Plaintiff has not shown a likelihood of success on the merits because FINRA is a private entity that cannot be considered "part of the government" for constitutional purposes, *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 400 (1995), nor can its actions be "fairly attributable" to the government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  These conclusions are consistent with decades of precedent and reflect Congress' intent in the securities laws to preserve the model of self-regulation that has existed in the securities markets in the United States for more than 200 years.  As for the broader consequences of this case, *amici* emphasize that a holding that FINRA is a state actor subject to the Appointments Clause could encourage others to bring challenges to longstanding models of self-regulation not only in the securities markets but also in the derivatives markets, which have a similar history of self-regulation subject to federal oversight.

## ARGUMENT

## I.      FINRA IS NOT A STATE ACTOR SUBJECT TO THE APPOINTMENTS CLAUSE.

Plaintiff seeks a preliminary injunction that would bar FINRA from proceeding with its enforcement action against him.  Although Plaintiff nominally seeks a preliminary injunction that would apply only to him, all of Plaintiff's arguments would apply with identical force in *any* FINRA enforcement action.  Thus, if Plaintiff's position becomes law, FINRA would be disabled from carrying out its enforcement functions across the board.

Plaintiff's position conflicts with a wall of case law and would upend longstanding practice.  Further, Plaintiff's position could significantly disrupt securities regulation, to the detriment of both market participants and the general public.  The Court should reject Plaintiff's unprecedented effort to undermine the longstanding and effective system of securities regulation.

### A.    FINRA Is Not "Part of the Government" and Its Actions Are Not "Fairly Attributable" to the Government.

FINRA's Board of Directors, executives, and hearing officers are not "Officers of the United States" for purposes of the Appointments Clause because FINRA is a private entity not subject to the Appointments Clause's constraints.  FINRA, a "private, non-profit Delaware corporation," *Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017), is not subject to the requirements of a constitutional provision that applies only to a "class of government officials," *Lucia v. SEC*, 138 S. Ct. 2044, 2049 (2018).  Under governing precedent, a private entity performing a disciplinary function is not subject to the Appointments Clause.

FINRA does not fall into the limited category of private entities that, "though nominally a private corporation, must be regarded as a Government entity" subject to constitutional requirements.  *Lebron*, 513 U.S. at 383.  A "corporation is 'part of the Government' for constitutional purposes when '[(1)] the Government creates [the] corporation by special law, [(2)] for the furtherance of governmental objectives, and [(3)] retains for itself permanent authority to appoint a majority of the directors of that corporation.'"  *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (quoting *Lebron*, 513 U.S. at 400) (alterations in *Herron*).  None of those elements is satisfied here.  First, the government did not create FINRA, and FINRA receives no funding from the government.  Second, far from existing "for the furtherance of governmental objectives," *id.*, FINRA undertakes a range of actions that are "neither contemplated nor shared by the SEC," including, for example, administering broker qualification examinations and

enforcing compliance with professional industry standards.  *Scottsdale Capital Advisors Corp. v. FINRA*, No. 23-1506, __ F. Supp. 3d __, 2023 WL 3864557, at *8 (D.D.C. June 7, 2023), *appeal docketed*, No. 23-5129 (D.C. Cir. June 8, 2023).  Third, FINRA's Board of Directors, which is comprised of non-governmental industry and non-industry members, is not appointed by the government but rather is elected by FINRA's membership.  *See* FINRA By-Laws art. VII, § 13, https://www.finra.org/rules-guidance/rulebooks/corporate-organization/election-governors.   As Judge Howell correctly concluded, the "facts of FINRA's creation, operation, and oversight structure do not indicate state actor status" because "[n]o government entity funds FINRA nor plays any role in the selection of its board members or officers."  *Scottsdale*, 2023 WL 3864557, at *8.  Thus, "those individuals are in no way characterized as government officers."  *Id.*

Indeed, the Supreme Court has all but resolved the question of FINRA's status in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010).  There, the Court held that the structure of the Public Company Accounting Oversight Board violated the Appointments Clause, but it did so only after explicitly *distinguishing* the Board's structure and powers from that of self-regulatory organizations like FINRA.  In that case, unlike with respect to FINRA, the entity in question was created by federal legislation and its members were appointed by the SEC.  *See id.* at 484.  Those circumstances are absent here.

The Supreme Court has also stated that a private organization's actions may be deemed state action if they are "fairly attributable" to the government.  *Lugar*, 457 U.S. at 937.  FINRA's actions in this case, however, do not satisfy that requirement.  That inquiry turns on whether there is a "sufficiently close nexus between the State and the challenged action" such that "it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (internal quotation marks omitted); *see also Jackson v. Metro.*

*Edison Co.*, 419 U.S. 345, 351 (1974); *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015).   In answering that question, courts have examined a variety of factors, including whether the private entity is exercising "powers that are traditionally the exclusive prerogative of the State," *Blum*, 457 U.S. at 1005 (internal quotation marks omitted); whether the government "has exercised coercive power or has provided such significant encouragement, either overt or covert," that the private entity's action "must in law be deemed to be that of the State," *id.* at 1004; and whether the private entity is "entwined with governmental policies" or the government is "entwined in [the entity's] management or control," *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 296 (2001) (quotation marks omitted).

Plaintiff has not made any showing along these lines, nor could he.   FINRA's actions in this case have not been "traditionally *and* exclusively performed" by the government.   *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 (2019).   To the contrary, FINRA's disciplinary action against Plaintiff falls squarely within a longstanding tradition of self-regulation that "preexist[s] federal regulation" in the securities industry.   *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984); *see also* Concept Release Regarding Self-Regulation, Securities Exchange Act Release No. 34-50700, 69 Fed. Reg. 71,255, 71,257 (Dec. 8, 2004) ("Securities industry self-regulation has a long tradition in the U.S. securities markets" dating to 1792). Moreover, the government has not "exercised coercive power" or provided "significant encouragement" for FINRA to undertake this disciplinary action, because the choice to undertake such actions in the first instance belongs to FINRA alone.   *See* 15 U.S.C. § 78s(d)(1); *Nat'l Ass'n of Sec. Dealers, Inc. v. SEC*, 431 F.3d 803, 805 (D.C. Cir. 2005) (noting that FINRA "has the authority to consider disciplinary action in the first instance").   And while FINRA's imposition of a final disciplinary sanction is subject to subsequent *de novo* review by the SEC, "[m]ere approval"

6

by the State is "not sufficient to justify holding the State responsible." *Blum*, 457 U.S. at 1004-05.  Nor can Plaintiff establish any inappropriate form of entwinement between the challenged disciplinary action and the federal government, especially given that the Supreme Court has recognized that private corporations are permitted to assist in the enforcement of federal law as long as they do so in a manner that is subordinate to the federal agency.  *See, e.g.*, *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940); *Oklahoma v. United States*, 62 F.4th 221, 228-29 (6th Cir. 2023).  Moreover, holding that private entities are state actors simply because they are heavily regulated would be "entirely circular" and would "significantly endanger individual liberty and private enterprise." *Halleck*, 139 S. Ct. at 1932.[2]

### B.  Longstanding Precedent and Practice Foreclose Plaintiff's Appointments Clause Challenge.

A contrary holding would also conflict with decades of precedent uniformly holding that FINRA is not a state actor.  Courts have done so with respect to FINRA specifically.  *See, e.g.*, *McGinn, Smith & Co. v. FINRA*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011) ("Courts have repeatedly held that FINRA is a private entity and not a governmental functionary.").  They have done so with respect to FINRA's predecessor, the National Association of Securities Dealers (NASD).  *See, e.g.*, *D.L. Cromwell Inv., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 162 (2d Cir. 2002) ("It has been found, repeatedly, that the NASD itself is not a government functionary.").  And they have done so with respect to other SROs in the securities industry.  *See, e.g.*, *United States v. Solomon*,

---

[2] Even if Plaintiff could show that the challenged FINRA action is "fairly attributable to" the government, it would not follow that FINRA's Board of Directors, executives, and hearing officers are subject to the Appointments Clause.  As the United States has explained, "A private person undertaking a private action that is deemed to be an action of the state for certain purposes does not thereby become part of the government of the United States or a State."  U.S. Opposition to Emergency Motion for Injunction Pending Appeal at 25, *Alpine Sec. Corp. v. FINRA*, No. 23-5129 (D.C. Cir. June 15, 2023).

509 F.2d 863, 868-69 (2d Cir. 1975) (Friendly, J.) (New York Stock Exchange).  Against this outpouring of precedent, Plaintiff has not identified a single precedential holding that reaches the contrary result.[3]

Moreover, the longstanding practice of self-regulation heavily cautions against adopting Plaintiff's argument that FINRA is a state actor.  *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022) (stressing the importance of "historical practices and understandings" to constitutional interpretation (quotation marks omitted)).  When a court confronts a novel constitutional question, it "must hesitate to upset" long-established "compromises and working arrangements" established by "the elected branches of Government."  *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014).

Adopting Plaintiff's position would conflict with two centuries of practice in the securities industry, where self-regulation by private entities was the norm long before Congress passed the Exchange Act.  And it would conflict with Congress' clear intent to preserve that system of self-regulation, paired with SEC oversight, in the Exchange Act and the Maloney Act.  *Cf. Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 667 (1975) (recognizing that the Exchange Act adopted a "general policy of self-regulation by the exchanges coupled with oversight by the SEC"); *Nat'l*

---

[3] *See, e.g.*, *Desiderio v. NASD, Inc.*, 191 F.3d 198, 206-07 (2d Cir. 1999); *Mohlman v. FINRA*, No. 3:19-cv-154, 2020 WL 905269, at *6 (S.D. Ohio Feb. 25, 2020) (collecting cases), *aff'd*, 977 F.3d 556 (6th Cir. 2020); *D.L. Cromwell*, 279 F.3d at 162; *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1200-02 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 698-99 (3d Cir. 1979); *Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 21-cv-71, __ F. Supp. 3d __, 2023 WL 3293298, at *14 (N.D. Tex. May 4, 2023), *appeal docketed*, No. 23-10520 (5th Cir. May 19, 2023); *McGinn*, 786 F. Supp. 2d at 147; *Graman v. NASD*, No. 97-cv-1556, 1998 WL 294022, at *2-3 (D.D.C. Apr. 27, 1998); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001).

*Ass'n of Sec. Dealers*, 431 F.3d at 807 (noting that the Maloney Act "expresse[s] Congress's thoughtful view that self-regulation is the best first-line defense against unethical or illegal securities practices" because it "allows the industry to set its own standards of proper conduct and permits their members to discipline themselves applying their own expertise and experience" (internal quotation marks and citation omitted)); *see also* H.R. Rep. No. 75-2307, at 4-5 (1938) (noting a preference for "cooperative regulation, in which the task will be largely performed by representative organizations of investment bankers, dealers, and brokers, with the Government exercising appropriate supervision in the public interest, and exercising supplementary powers of direct regulation").  Congress continued to adhere to this model in subsequent amendments as well. *See, e.g.*, S. Rep. No. 94-75, at 23 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 179, 201 (noting that the "self-regulatory organizations exercise authority subject to SEC oversight," and that the "self-regulatory roles of the exchanges and the NASD have been major elements of the regulatory scheme of the Exchange Act since 1934 and 1938, respectively").

Breaking from this longstanding precedent and practice could introduce tremendous uncertainty into the regulation of securities markets.  As Judge Howell explained, "If FINRA were deemed a state actor, the ramifications would be significant and far-reaching" because FINRA "would be exposed to constitutional and administrative challenges from which Congress specifically sought to insulate FINRA." *Scottsdale*, 2023 WL 3864557, at *9.  That holding could give rise to endless litigation regarding the status of the dozens of other SROs that operate in the securities markets. *See* SEC, Self-Regulatory Organization Rulemaking, http://www.sec.gov/rules/sro (modified Aug. 31, 2023) (identifying nearly 50 such SROs).  And the ultimate result could be a "potentially dramatic increase to the SEC's workload," *Scottsdale*, 2023 WL 3864557, at *9, as well as underenforcement relative to the status quo.  In short, as the

United States has explained, "Deeming FINRA to be a state actor could . . . alter the contours of SEC-SRO relationships in unanticipated and problematic ways, and dramatically upend Congress's judgment for how to best regulate the nation's securities markets—markets that are vital to the health of our economy and to the role of the United States as an economic leader on the world stage."  U.S. Supplemental Brief at 5, *Scottsdale Capital Advisors Corp. v. FINRA*, No. 23-1506 (D.D.C. June 2, 2023), ECF No. 82.

## II.   A RULING IN PLAINTIFF'S FAVOR COULD BE USED BY OTHER MARKET PARTICIPANTS FACED WITH ENFORCMENT ACTIONS TO ATTACK THE LONGSTANDING AND BENEFICIAL PRACTICE OF SELF-REGULATION IN THE DERIVATIVES INDUSTRY.

The consequences of holding FINRA to be a state actor would not necessarily be confined to the securities markets.  That holding could allow market participants to bring similar challenges in the derivatives markets where *amici* operate because Plaintiff is attacking SRO examination, investigation, and disciplinary processes that have parallels in other industries.  The derivatives markets have long relied on a system of self-regulation under the Commodity Exchange Act that parallels the self-regulation found in the securities context.  That system has been beneficial both for market participants and for the general public.  A ruling in Plaintiff's favor could be used by market participants facing enforcement actions to cast doubt on the longstanding self-regulation regime in the derivatives industry.

### A.   The Derivatives Markets Have Long Relied on Self-Regulation.

Just as in the securities context, self-regulation in the derivatives industry long preexists congressional legislation.  Futures trading emerged in the mid-19th century.  As the Supreme Court has explained, "Prior to the advent of futures trading, agricultural products generally were sold at central markets" where "dramatic price fluctuations sometimes created severe hardship for farmers or for processors."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358

(1982).  Futures trading enabled (and still enables) farmers and processors to manage their risks by engaging in "hedging" facilitated by the "availability of speculators willing to assume the market risk that the hedging farmer or processor wants to avoid," thereby "mak[ing] it easier for farmers and processors to make firm commitments for future delivery at a fixed price."  *Id.*  "In the 19th century the practice of trading in futures contracts led to the development of recognized exchanges or boards of trade" where futures "were bought and sold pursuant to rules developed by the traders themselves."  *Id.*  The first of these was the Chicago Board of Trade, which is now a CME exchange.  It was created in 1848 and regulated its members with some oversight from state regulators (though not the federal government).  *See* Heath P. Tarbert, *Self-Regulation in the Derivatives Markets: Stability Through Collaboration*, 41 Nw. J. Int'l L. & Bus. 175, 179 & n.4 (2021).

In the early 1920s, Congress began to regulate futures markets with the passage of the Grain Futures Act.[4]  *Cf.* Thomas W. Sexton III, Keynote Address to Association for Financial Markets in Europe (Oct. 3, 2019), https://www.nfa.futures.org/news/newsTestimony.asp?ArticleID=5164 ("Sexton, Keynote Address") ("The United States Congress first passed legislation regulating futures markets in 1922.  By that time, self-regulatory mechanisms for those markets had already been in place for over 74 years.").  That legislation maintained the model of self-regulation that had long operated in futures markets.  Thus, the "principal function" of the Secretary of Agriculture under the Act was to "require the governors of a privately organized exchange to supervise the operation of the market."  *Merrill Lynch*, 456 U.S. at 361.  Similarly, when Congress changed the name of the Grain Futures Act to the Commodity Exchange Act in

---

[4] An earlier attempt, the Futures Trading Act of 1921, was struck down under the Taxing Clause. *See Hill v. Wallace*, 259 U.S. 44 (1922).

1936 and "added detailed provisions regulating trading in futures contracts" with respect to other commodities, it largely preserved the model of self-regulation that had been in place.  *Id.* at 362. And, most notably, when Congress amended the CEA in 1974 to create the Commodity Futures Trading Commission, it gave the CFTC oversight authority while preserving the role of the exchanges in policing market participants in the futures industry.  *See, e.g.*, H.R. Rep. No. 93-975, at 48 (1974) ("[W]ith proper Federal supervisory authority, needed self-regulatory efforts of the exchanges can live a useful life into the 21st Century and, hopefully, beyond.").  Thus, "from the enactment of the original federal legislation, Congress primarily has relied upon the exchanges to regulate the contract markets."  *Merrill Lynch*, 456 U.S. at 382.  This historical tradition of self-regulation should be accorded significant weight in considering any potential challenge to SROs in the derivatives industry.  *Cf. Noel Canning*, 573 U.S. at 525.

### B. Congress Has Expressly Authorized Self-Regulation in the Derivatives Industry, Subject to Oversight by the CFTC.

Today, the CEA outlines a variety of public interests that are to be served "through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission."  7 U.S.C. § 5(b).  As relevant here, in addition to preserving the role of exchanges as SROs, the CEA authorized the creation of "registered futures associations as self-regulatory organizations . . . to complement the [CFTC's] regulation of commodity futures markets and their participants."  *Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 886 (7th Cir. 2019).  As the sole registered futures association under the Commodity Exchange Act, NFA acts similarly to FINRA in the derivatives industry.  NFA is a non-profit, private entity formed by industry participants and is governed by a Board of Directors, the majority of which is comprised of representatives of different industry sectors who are elected

by the members they represent.  *See* NFA Rulebook, Articles of Incorporation, art. VII, https://www.nfa.futures.org/rulebooksql/rules.aspx?Section=2&RuleID=ARTICLE%20VII.

NFA undertakes a variety of self-regulatory activities that are crucial to protecting customers and safeguarding the integrity of the derivatives markets.  NFA does not enforce the CEA directly, but rather promulgates rules reflecting industry best practices to protect customers, which are approved by its Board of Directors and subject to CFTC review.  *See* 7 U.S.C. § 21(p); *MBH Commodity Advisors, Inc. v. CFTC*, 250 F.3d 1052, 1056-57 (7th Cir. 2001).  NFA also monitors members for compliance with NFA rules, investigates possible rule violations, and enforces its rules through disciplinary actions that can result in suspension or expulsion from NFA. In particular, NFA makes use of a Business Conduct Committee and a Hearing Committee, comprised of industry and non-industry persons nominated by the President of NFA and appointed by the Board, to adjudicate rule violations.  *See* NFA Rulebook, Bylaws §§ 704, 707 https://www.nfa.futures.org/rulebooksql/rules.aspx?Section=3; *see generally* Thomas W. Sexton III, The Future of Digital Assets: Providing Clarity for the Digital Asset Ecosystem: Testimony Before the House Committee on Financial Services (June 13, 2023), https://www.nfa.futures.org/news/newsTestimony.asp?ArticleID=5560.

In addition, just as there are exchange SROs in the securities industry, there are many exchange SROs in the derivatives industry.  These include the Cboe exchanges (Cboe Futures Exchange, Cboe Digital, and Cboe SEF) and the CME exchanges (the Chicago Mercantile Exchange, the Chicago Board of Trade, the New York Mercantile Exchange, Inc., and the Commodity Exchange).  *See* CFTC, Designated Contract Markets (DCM), https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations.  The exchange SROs engage in screening applicants for membership, rulemaking, market surveillance, market

firm financial surveillance, and investigations and enforcement to address violations of their respective rules.  These exchanges, too, appoint their own governing Boards and rely on Business Conduct Committees comprised of industry members to adjudicate rules violations.  *See, e.g.*, Cboe Futures Exchange Rulebook, § 209, https://cdn.cboe.com/resources/regulation/rule_book/ cfe-rule-book.pdf; Chicago Mercantile Exchange Rulebook § 402, https://www.cmegroup.com/ rulebook/CME/I/4/4.pdf.  These self-regulatory functions complement the CFTC's authority to regulate the derivatives markets and participants.

Of course, NFA and the futures exchanges undertake these functions "subject to the broad authority of the CFTC."  *Effex*, 933 F.3d at 888 (citing 7 U.S.C. § 21).  That oversight is essential for the self-regulation model to function—as these organizations have repeatedly recognized.  *See, e.g.*, Sexton, Keynote Address ("No single factor is more important to effective self-regulation than effective government oversight," which "should cover all aspects of the SRO's regulatory activity").  The CFTC's powers over NFA are broad and generally parallel the SEC's authority over FINRA.  For example, the CFTC must approve the creation of any futures association in the first place, finding that the association is "in the public interest" and can comply with applicable CFTC rules.  *See* 7 U.S.C. § 21(a), (b)(1).  In particular, the futures association must "demonstrate that it will require its members to adhere to regulatory requirements governing their business practices at least as stringent as those imposed by the [CFTC]." 17 C.F.R. § 170.1.  The CFTC is also empowered to suspend NFA's registration if it finds that NFA has violated the CEA or CFTC rules or "has failed to enforce compliance with its own rules, or has engaged in any other activity tending to defeat the purpose of" the Act, 7 U.S.C. § 21(*l*)(1); request "any specified alteration or supplement to [NFA's] rules" or "abrogate any rule of [NFA's]," *id.* § 21(k)(1), (2); and expel NFA's members or remove its officers and directors.  *See id.* § 21(b)(2), (c), (j), (k), (*l*), (m).

In addition, the CFTC is specifically authorized to review NFA's disciplinary actions.  *Id.* § 21(h).  The disciplinary actions are "subject to review by the [CFTC] on its [own] motion, or on application by any person aggrieved by the action."  *Id.* § 21(h)(2).  Moreover, the CFTC is empowered to "set aside the sanction imposed by [NFA] and, if appropriate, remand the case to [NFA] for further proceedings."  *Id.* § 21(i)(1)(B); *see also* 17 C.F.R. § 171.33(a) ("Upon review, the Commission may affirm, modify, set aside, or remand for further proceedings, in whole or in part, the decision of the National Futures Association.").  The Commission's decision in turn may be appealed to a court of appeals.  7 U.S.C. § 21(i)(4).

The CFTC also exercises oversight over the self-regulatory activities of futures exchanges.  Exchanges must "prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices."  *Id.* § 7(d)(4).  The CFTC is authorized to oversee these exchanges in several respects, including by imposing conditions on the approval of their applications, *see id.* § 7(d)(1)(A)(ii); 17 C.F.R. § 38.3(a)(1); reviewing and approving exchange rules through a self-certification process or after a more in-depth review by the CFTC, *see* 7 U.S.C. § 7a-2(c); suspending or revoking the exchanges' designations as registered entities, *id.* § 7b; and initiating enforcement actions against registered entities, issuing cease and desist orders, imposing other fines and penalties, and referring matters to the Attorney General, *id.* § 13a.  Moreover, CFTC regulations permit "any person who is the subject of disciplinary or access denial action by an exchange or any person who is otherwise adversely affected by any other action of an exchange" to appeal to the CFTC.  17 C.F.R. § 9.20(a).  The appealing party may seek a petition for stay pending review by the CFTC, *id.* § 9.24, and the CFTC is authorized to "affirm, modify, set aside, or remand for further proceedings, in whole or

in part, the decision of the exchange," *id.* § 9.33(a).  These mechanisms ensure that the CFTC exercises oversight with respect to the activities of SROs in the futures markets.

### C.    Self-Regulation Is Beneficial for Both Market Participants and the Public.

Self-regulation has resulted in a variety of benefits in the derivatives industry that would be threatened if SROs are held to be state actors subject to the Appointments Clause and other constitutional constraints.

First, SROs are not dependent on public money for their regulatory and enforcement activities.  Exchange SROs are generally funded through transaction and other fees, and NFA is generally funded through assessment fees and member dues, thereby reducing the need for federal appropriations for the important regulatory work they undertake.  "SROs such as the NFA are typically funded by the regulated industry, freeing up taxpayer resources for other measures." Heath P. Tarbert, *Self-Regulation, supra*, at 187; *see also* Margot Priest, *The Privatization of Regulation: Five Models of Self-Regulation*, 29 Ottawa L. Rev. 233, 270 (1997) (recognizing that self-regulation with government oversight results in "costs to government [that] are probably less than they would be if government took on the bulk of regulatory responsibilities").  Relying on funding from members also enhances the predictability and stability of funding separate from the federal appropriations process.  Indeed, federal oversight agencies would not be able to take on the responsibilities of SROs in their industries without massive increases to their budgets and staffs.

Second, self-regulation allows SROs like *amici* to make use of industry knowledge and expertise in the course of regulation.  As "organizations composed of industry members, SROs have their finger on the pulse of industry and can often obtain accurate information more quickly than their government counterparts can."  Tarbert, *Self-Regulation*, *supra*, at 189.  According to two scholars, "[p]erhaps the greatest single benefit that self-regulation possesses over other forms of regulation is its access to direct industry expertise."  William A. Birdthistle & M. Todd

Henderson, *Becoming A Fifth Branch*, 99 Cornell L. Rev. 1, 55 (2013); *see also, e.g.*, Douglas C. Michael, *Federal Agency Use of Audited Self-Regulation as a Regulatory Technique*, 47 Admin. L. Rev. 171, 181 (1995) ("[R]ules can be more effective because of the self-regulator's superior knowledge of the subject compared to the government agency."). The ability to make use of industry expertise is particularly important in industries, like the derivatives industry, that are constantly innovating and developing.

Third, self-regulation allows for greater flexibility, informality, and speed. The "regulated entities retain both a more informal structure and the desire created by competition to keep their rules current and cost-effective." Michael, *Audited Self-Regulation*, *supra*, at 182. Moreover, SROs can quickly adopt customer protection rules, and they can take enforcement actions more quickly than the CFTC can while providing notice and a hearing consistent with the requirements for a fair process. *See, e.g.*, NFA Rulebook, Compliance Rules 3-4 to 3-14, https://www.nfa.futures.org/rulebooksql/rules.aspx?Section=4 (providing, inter alia, notice of charges, a right to counsel, a right to submit a written Answer, hearing before a panel, a written decision, and a right to appeal before any penalty is imposed); *see also* 17 C.F.R. §§ 38.700-.712 (setting forth requirements for fair disciplinary procedures for exchanges). And because self-regulation operates through contractual relationships, it may permit more effective regulation across international borders than would reliance on federal legislation or a federal agency. *See, e.g.*, Saule T. Omarova, *Wall Street as Community of Fate: Toward Financial Industry Self-Regulation*, 159 U. Penn. L. Rev. 411, 436 (2011) ("Industry self-regulation also has significant potential advantages over direct government regulation with respect to globalization and the cross-border flow of financial activities."). Finally, self-regulation can lead to greater industry acceptance because the rules are viewed as imposed from the inside rather than the outside. Thus,

"[h]aving come together to construct the rules of the game through an SRO, regulated members often have little tolerance for those who break the rules."  Tarbert, *Self-Regulation*, *supra*, at 193.

### D. Plaintiff's Argument, if Accepted by the Court, Could Be Used by Other Market Participants Faced with Enforcement Actions To Cast Doubt on Self-Regulation in the Futures Industry.

A ruling in Plaintiff's favor with respect to FINRA in the securities industry could encourage market participants to bring similar challenges to SRO actions in the futures industry. *See Solomon*, 509 F.2d at 869 ("[W]e see no principled basis whereby acceptance of [Plaintiff's] argument could be confined" to "stock exchanges" because "this is but one of many instances where government relies on self-policing by private organizations to effectuate the purposes underlying federal regulating statutes").  Both the Securities Exchange Act and the Commodity Exchange Act authorize self-regulatory organizations, so a decision casting doubt on self-regulation under the former may similarly cast doubt on self-regulation under the latter.  *See, e.g.*, *id.* ("Under the Commodity Exchange Act, … boards of trade have self-policing functions quite similar to those of stock exchanges under the Securities Exchange Act."); *Effex*, 933 F.3d at 896 ("The Commodity Exchange Act is a different statute, but given the similarity of the statutes, the logic of the[] Securities Exchange Act decisions applies here.").

In view of the long tradition of self-regulation in the futures industry, as well as the substantial benefits it has long provided, the Court should reject Plaintiff's invitation to issue a blanket decision that could be used to challenge self-regulatory organizations outside the securities industry.

## CONCLUSION

Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction should be denied.

Dated: September 22, 2023

Respectfully submitted,

/s/ Adam Unikowsky

ADAM UNIKOWSKY
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 639-6000
aunikowsky@jenner.com

GREGORY BOYLE (pro hac vice pending)
JENNER & BLOCK LLP
353 N Clark Street
Chicago, IL 60654
Phone: (312) 2222-9350
gboyle@jenner.com


*Counsel for Amici Curiae*
*National Futures Association,*
*CME Group Inc., and*
*Cboe Global Markets, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that undersigned counsel served a true and correct copy of the foregoing to all parties of record through the Court's CM/ECF system.


Dated: September 22, 2023                          /s/ Adam Unikowsky
                                                   Adam Unikowsky