**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EUGENE H. KIM,

     *Plaintiff*,

     v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.,

     *Defendant*.

No. 1:23-cv-02420-ACR

**BRIEF OF *AMICI CURIAE* SECURITIES EXCHANGES IN SUPPORT OF
DEFENDANT AND IN OPPOSITION TO PLAINTIFF'S  MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Kevin King (D.C. Bar No. 1012403)
  *Counsel of Record*
Daniel G. Randolph (D.C. Bar No. 230150)
Emily A. Vernon (D.C. Bar No. 1719635)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

Bruce C. Bennett (N.Y. Bar No. 1914118)*
Harrison A. Newman (N.Y. Bar No. 5834569)*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
*D.D.C. admission forthcoming*

*Counsel for Amici Curiae
Securities Exchanges*

**CORPORATE DISCLOSURE STATEMENT**

BOX Exchange LLC does not have a parent corporation and each of the following entities holds 10% or more of the outstanding ownership of BOX Exchange LLC: MX US 2 LLC, an affiliate of TMX Group Inc.; IB Exchange Corp.; Citadel Securities Principal Investments LLC; UBS Americas Inc.; JPMC Strategic Investments I Corporation; and Aragon Solutions Ltd.

Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc. are each a direct or indirect wholly-owned subsidiary of Cboe Global Markets, Inc., a public company. Cboe Global Markets, Inc. has no parent corporation. A third party's review of public filings indicates that The Vanguard Group, Inc. owned 10% or more of Cboe Global Markets, Inc.'s common stock as of June 30, 2023.

Investors' Exchange LLC (IEX Exchange) is a national securities exchange organized as a Delaware limited liability company and is wholly owned by IEX Group, Inc. No public company owns more than 10% of IEX Group, Inc.

Long-Term Stock Exchange, Inc. is a registered national securities exchange. It is a Delaware corporation that is wholly owned by LTSE Group, Inc., a Delaware corporation that is not publicly traded. No publicly traded corporation owns any stock in LTSE Group Inc.

MEMX LLC is a registered national securities exchange. MEMX LLC is wholly owned by MEMX Holdings LLC, a Delaware limited liability company. Virtu Financial, Inc. and The Charles Schwab Corporation, each a publicly traded company, directly or indirectly (through one or more subsidiaries) owns more than 10% of MEMX Holdings LLC.

Miami International Securities Exchange, LLC, MIAX PEARL, LLC, and MIAX Emerald, LLC are registered national securities exchanges. Each is a Delaware limited liability company

and is wholly owned by Miami International Holdings, Inc., a private company.  No entity owns more than 10% of Miami International Holdings, Inc.

The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC each operate registered national securities exchanges. Each is a Delaware corporation or limited liability company and is wholly owned by Nasdaq, Inc., a public company.  Borse Dubai Limited and Investor AB own more than 10% of Nasdaq, Inc.'s shares.

New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc. are indirect, wholly-owned subsidiaries of Intercontinental Exchange, Inc., a public company.  Intercontinental Exchange, Inc. has no parent corporation and, as of the date hereof, no publicly held company owns 10% or more of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...............................................................i

TABLE OF AUTHORITIES .............................................................................................iv

INTEREST  OF *AMICI CURIAE* ................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 3

I.    The Long History of Private Self-Regulation in the Securities Industry Confirms that the Self-Regulatory Organization Model Is Constitutional. ....................................... 5

    A.    Supreme Court Precedent Requires This Court to Account for Self-Regulatory Organizations' Long History................................................................ 5

    B.    The Long History of Self-Regulation in the Securities Markets, Which Predates Congressional Regulation, Is Fatal to Plaintiff's Claims. ....................... 6

    C.    Congress Has Repeatedly Recognized and Preserved Self-Regulatory Organizations' Status as Private Entities. ...................................................... 9

II.    Self-Regulatory Organizations Are Not Subject to Constitutional Claims Because They Are Private Entities........................................................................................ 12

    A.    Privately Created, Privately Governed Organizations Are Not State Actors.......................................................................................................... 12

    B.    Self-Regulatory Organizations—Including FINRA and the Exchanges—Are Privately Created, Privately Governed, and Privately Funded. ..................... 14

    C.    FINRA and the Exchanges Lack Traditional Governmental Powers, Underscoring the Private Character of Their Disciplinary Proceedings............... 17

    D.    Courts Have Repeatedly Held that FINRA and the Exchanges Are Not State Actors. ..................................................................................................... 19

III.    Accepting Plaintiff's Arguments Would Threaten the Health of the Securities Markets by Undermining the Self-Regulatory Model. ................................................... 20

CONCLUSION................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Bernstein v. Lind-Waldock Co.*,
738 F.2d 179 (7th Cir. 1984) ...................................................................................21

*Blum v. Yaretsky*,
457 U.S. 991 (1982).........................................................................................6, 18

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015)..........................................................................................13, 17

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
191 F.3d 198 (2d Cir. 1999).....................................................................................19

*Duffield v. Robertson Stephens & Co.*,
144 F.3d 1182 (9th Cir. 1998) ..................................................................................20

*Fiero v. Fin. Indus. Reg. Auth., Inc.*,
660 F.3d 569 (2d Cir. 2011)....................................................................................18

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
140 S. Ct. 1649 (2020)............................................................................................12

*\*Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)............................................................................................. *passim*

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 2407 (2022)..............................................................................................6

*\*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995)...............................................................................13, 14, 16, 19

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982)................................................................................................17

*\*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019).........................................................................................6, 12

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803)....................................................................................6

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819)...........................................................................5, 6, 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022).............................................................................................6

*NLRB v. Noel Canning,*
   573 U.S. 513 (2014)........................................................................................4, 6, 12

*Perpetual Sec. Inc. v. Tang,*
   290 F.3d 132 (2d Cir. 2002).....................................................................................20

*United States v. Solomon,*
   509 F.2d 863 (2d Cir. 1975).....................................................................................20

**Statutes**

15 U.S.C. § 78c ........................................................................................................3, 7

15 U.S.C. § 78f .........................................................................................................10

15 U.S.C. § 78o-3 ..................................................................................................15, 18

Maloney Act of 1938, Pub. L. No. 75-519, 52 Stat. 1070 ...........................................10

**Legislative Materials**

H.R. Rep. No. 73-1383 (1934)......................................................................................10

S. Rep. No. 73-1455 (1934) ...........................................................................................8

S. Rep. No. 94-75 (1975) .............................................................................................11

Sec. & Exch. Comm'n, *Report of Special Study of Securities Markets*, H. Doc. 88-
   95.............................................................................................................................21

**Regulatory Materials**

*Concept Release Concerning Self-Regulation*, 69 Fed. Reg. 71,256 (Dec. 8, 2004) ............ *passim*

*In re Appl. by Nat. Ass'n of Sec. Dealers, Inc.*,
   Exchange Act Release No. 34-2211, 5 SEC Docket 627 (Aug. 7, 1939)...............................10

*Notice of Proposed Name Change to NYSE American LLC*, 82 Fed. Reg. 15,244
   (Mar. 27, 2017) ........................................................................................................8

*Order Approving Proposed Rule Change To Amend the By-Laws of NASD*, 72
   Fed. Reg. 42,169 (Aug. 1, 2007)...........................................................................15, 16

*Technical Amendments to Form BD and Form BDW*, 88 Fed. Reg. 32,963 (May
   23, 2023) ..................................................................................................................7

**Books and Articles**

Onnig H. Dombalagian, *Demythologizing the Stock Exchange: Reconciling Self-Regulation and the National Market System*, 39 U. Rich. L. Rev. 1069 (2005) .................................................9

Roberta S. Karmel, *The Future of Corporate Governance Listing Requirements*, 54 SMU L. Rev. 325 (2001) ...........................................................................................................................8

Roberta S. Karmel & Claire R. Kelly, *The Hardening of Soft Law in Securities Regulation*, 34 Brook. J. Int'l L. 883 (2009) ...............................................................................................7, 8

Paul G. Mahoney, *The Political Economy of the Securities Act of 1933*, 30 J. Legal Stud. 1 (2001) .....................................................................................................................................9, 10

Jerry W. Markham & Daniel J. Harty, *For Whom the Bell Tolls: The Demise of Exchange Trading Floors and the Growth of ECNs*, 33 J. Corp. L. 865 (2008) ........................................7

Donna M. Nagy, *Playing Peekaboo With Constitutional Law: The PCAOB and Its Public/Private Status*, 80 Notre Dame L. Rev. 975 (2005).........................................................................10, 11

Robert Sobel, *The Big Board: A History of the New York Stock Market* (The Free Press 1965)....8

Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation*, 62 N.C. L. Rev. 475 (1984)...................7

**Corporate Governance Documents**

By-Laws of Nasdaq, Inc. ...................................................................................................................16

By-Laws of The Nasdaq Stock Mkt.................................................................................................16

Fourteenth Am. and Restated Operating Agreement of N.Y. Stock Exch., LLC ...........................16

Ninth Am. and Restated Bylaws of Intercontinental Exch., Inc......................................................16

Restated Certificate of Incorporation of Fin. Indus. Regul. Auth., Inc...........................................15

**Other Authorities**

Cboe, U.S. Equities Market Volume Summary................................................................................19

Cboe Global Markets, Inc., *Regulatory Independence Policy for Regulatory Group Personnel* (Mar. 23, 2021)........................................................................................15

Cboe Global Markets, Inc., Annual Rep. (Form 10-K) (Feb. 17, 2023).................................15, 17

Intercontinental Exch., Inc., Annual Rep. (Form 10-K) (Feb. 2, 2023) .................................15, 17

Jerry W. Markham & Thomas Lee Hazen, Broker-Dealer Operations Sec. &
  Comm. Law (Dec. 2022 Update)..................................................................................8

Nasdaq, Inc., Annual Rep. (Form 10-K) (Feb. 23, 2023).......................................................15, 17

Nasdaq Mkt. Regul., *U.S. Regulatory Program* ...........................................................................15

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are self-regulatory organizations ("SROs") that operate and oversee the nation's securities exchanges (the "Exchanges"). Although Plaintiff's claims are directed only to the Financial Industry Regulatory Authority ("FINRA"), the resolution of those claims has broader relevance for other SROs, including the Exchanges. In particular, *amici* have an interest in defending the longstanding tradition of self-regulation in the U.S. securities markets, which Congress has repeatedly endorsed and courts have repeatedly upheld in the face of constitutional challenges. Additional information about each of the undersigned *amici* is set forth below:

- BOX Exchange LLC is a national securities exchange that began operations in 2012 and is owned by a consortium of firms. The Exchange currently oversees its facility, the BOX Options Market LLC, an equity options market with both electronic and floor-based trading.

- Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc. and Cboe Exchange, Inc., are affiliated national securities exchanges that include the largest options exchange in the United States and collectively comprise the third largest equity exchange group in the United States.

- Investors Exchange LLC (IEX Exchange) is a national securities exchange that combines a transparent business model with innovative design and technology designed to protect investors and improve market quality.

---

[1] No party or party's counsel authored this brief in whole or in part. Moreover, no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than *amici* or their counsel made such a monetary contribution. *Amici* file this brief in response to this Court's August 28, 2023 minute order inviting amicus briefs.

- Long-Term Stock Exchange, Inc. is approved to operate as an exchange that can list securities, and its listing rules contain governance standards requiring companies to implement policies designed to facilitate long-term focus.

- MEMX Holdings LLC owns and operates MEMX LLC, a national securities exchange founded in 2019 by a diverse group of financial firms to create healthy competition and advocate for market structure reform that results in more efficient and sensible trading experiences for all investors.

- Miami International Securities Exchange, LLC, MIAX PEARL, LLC, and MIAX Emerald, LLC (collectively referred to as the "MIAX Exchanges") are national securities exchanges owned by Miami International Holdings, Inc., which operates the thirteenth largest derivatives exchange group in the world.

- The Nasdaq Stock Market LLC ("Nasdaq"), Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC each operate registered securities exchanges. Nasdaq is the first electronic stock market for buying and selling stocks and is home to more than 3,500 listed companies representing $23 trillion in market capitalization across sectors. During the first eight and a half months of 2023, Nasdaq-listed companies raised $10.96 billion in initial public offering proceeds across 93 listings.

- The New York Stock Exchange LLC ("NYSE")—along with its affiliated exchanges NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.—together comprise the largest equity securities exchange group in the world. NYSE-listed companies comprise 87% of the companies in the Dow Jones Industrial Average, 77% of the S&P 500, and 80% of the Fortune 100.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Long before Congress regulated the securities industry, the securities industry regulated itself. Beginning in 1790, private actors formed securities exchanges that were voluntary in nature and included self-regulatory functions. These exchanges then developed into more formal organizations and adopted additional self-regulatory measures to maintain the integrity of the securities markets. Against this backdrop, Congress eventually crafted a governing framework that preserved the benefits of the preexisting self-regulatory system in the Securities Exchange Act of 1934 (the "Exchange Act") and subsequent legislation.

Plaintiff asserts constitutional challenges against FINRA, which is a self-regulatory organization under the Exchange Act and, like the Exchanges, carries out oversight functions with respect to its members.[2] As a result, Plaintiff's claims target core aspects of the longstanding system of self-regulation in the securities markets and endanger the supervision of this important part of the U.S. economy. Those claims against FINRA fail for the reasons stated in FINRA's brief, and they would fail for additional reasons if they had been asserted against an Exchange.

This brief addresses three points to aid the Court's analysis. *First*, we summarize the long history of self-regulation in the U.S. securities markets, which dates back more than two centuries. That history matters here because Supreme Court precedent requires courts to consider history and tradition in examining constitutional questions, including whether a private entity constitutes a state actor for constitutional purposes. Because SROs like FINRA and the Exchanges have existed as private entities outside the Government since the founding era, and because Congress designed

---

[2] Plaintiff is wrong when he asserts that FINRA is the "last remaining securities SRO." Dkt. No. 4-3 at 9. Instead, all national securities exchanges also are SROs. *See* 15 U.S.C. § 78c(a)(26) (defining "self-regulatory organization" as meaning any national securities exchange, any registered securities association, any registered clearing agency, and, for certain purposes, the Municipal Securities Rulemaking Board). Unless otherwise specified, this brief generally refers to the SRO function of the Exchanges when it refers to the Exchanges.

the securities laws in a way that maintains the self-regulatory model, the Court must "hesitate" before "upset[ting] the compromises and working arrangements" woven into the fabric of the securities laws. *NLRB v. Noel Canning*, 573 U.S. 513, 526 (2014).

*Second*, we demonstrate that FINRA and the Exchanges are not part of the Government to this day, and thus are not subject to constitutional challenges, because they are privately created, privately governed, and privately funded. The Supreme Court made that point in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), describing "self-regulatory organizations in the securities industry" as "private" entities, *id.* at 484, and the lower federal courts have repeatedly held that these SROs are not state actors. Those conclusions are inevitable in light of FINRA's and the Exchanges' characteristics. The argument described by the Court in its August 28 minute order—"that FINRA hearing officers are 'officers of the United States' for purposes of the Appointments Clause"—thus fails at the outset because FINRA and the Exchanges are not state actors.

*Third*, we explain why Plaintiff's claims could, if sustained, destabilize oversight of the securities markets in significant ways. The Nation's longstanding practice of securities self-regulation promotes fair and efficient markets and incorporates robust protections for investors. The self-regulatory model has been successful in large part because it is capable of acting more efficiently, more flexibly, and on the basis of better information compared to a purely governmental approach to enforcement. Treating FINRA and the Exchanges as state actors would therefore undermine the substantial public benefits that flow from the private ordering of securities markets and hamper the enforcement of rules that protect the integrity of those markets.

For these reasons and those given in FINRA's brief, the Court should deny Plaintiff's motion for such extraordinary preliminary relief.

**ARGUMENT**

I.    **The Long History of Private Self-Regulation in the Securities Industry Confirms that the Self-Regulatory Organization Model Is Constitutional.**

Plaintiff argues that FINRA merely "claims" to be a private entity. *See* Dkt. No. 4-3 at 5. But as with the Exchanges, FINRA's private status is not a mere label. FINRA and the Exchanges are privately organized, privately governed, and privately funded organizations whose self-regulation traces its lineage to the late eighteenth century. Since then, Congress has consistently preserved the self-regulatory framework through legislation, including the Exchange Act of 1934, the Maloney Act of 1938, the Exchange Act Amendments of 1975, and the Sarbanes-Oxley Act of 2002. As described below, that enduring tradition of private self-regulation in the securities industry confirms that the SRO model is fully consistent with the Constitution, and cuts decisively against Plaintiff's argument that FINRA is a state actor.

A.    **Supreme Court Precedent Requires This Court to Account for Self-Regulatory Organizations' Long History.**

Since the Founding, the Supreme Court has treated history and tradition as essential considerations when interpreting the Constitution. In *McCulloch v. Maryland*, the Supreme Court explained that, when confronted with "a doubtful question" of constitutional law, courts must account for "the practice of the government" in resolving the issue. 17 U.S. (4 Wheat.) 316, 401 (1819). Applying that rule, the Court interpreted the Constitution as allowing a practice that—like self-regulation in the securities markets—"was introduced at a very early period of our history, has been recognised by many successive legislatures, and has been acted upon by the judicial department." *Id*. at 401.

The Supreme Court's modern jurisprudence adheres to the same principle. As the Court reasoned in *Noel Canning*, "the longstanding 'practice of the government' can inform [the] determination of 'what the law is.'" 573 U.S. at 525 (quoting *McCullough*, 17 U.S. (4 Wheat.) at

- 5 -

401, and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803)).  And it is beyond dispute that courts must consider "history and tradition" in determining whether a regulation is constitutional. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022); *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022) (stressing the importance of "historical practices and understandings" to constitutional interpretation) (citation omitted).  This principle remains "an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era."  *Noel Canning*, 573 U.S. at 525.  Thus, when a court confronts a constitutional question, it "must hesitate to upset" long-established "compromises and working arrangements" established by "the elected branches of Government."  *Id.* at 526.

History and tradition also play a key role in the test for determining whether a private entity's conduct amounts to state action.  That test focuses on whether the private entity performs a public function by "exercis[ing] powers that are traditionally the exclusive prerogative of the State."  *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982) (citation and internal quotation marks omitted).  Action by a private entity rises to that level *only* if "the government" has "traditionally and exclusively performed the [same] function."  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 (2019) (emphasis omitted).

**B.     The Long History of Self-Regulation in the Securities Markets, Which Predates Congressional Regulation, Is Fatal to Plaintiff's Claims.**

Here, history and tradition cut decisively against Plaintiff's argument that FINRA is a state actor.  The SROs' core attributes have remained consistent for more than two centuries: from the 1790s to the present, the SROs have remained privately created, privately governed, and privately funded.  Well before Congress first regulated the securities industry, private actors within the securities industry organized to form SROs.  Those SROs included NYSE, among other

exchanges, and FINRA's predecessors, all of which began as voluntary organizations of individuals and entities. Before Congress recognized "self-regulatory organization[s]" like "national securities exchange[s]" and "registered securities association[s]" by statute, 15 U.S.C. § 78c(a)(2), both categories of SROs already existed.

Securities exchanges in the United States date back almost to the Founding, beginning in the eighteenth century. In 1790, ten merchants who called themselves the Philadelphia Board of Brokers began to trade bank stocks and government securities at a coffee house. *See* Jerry W. Markham & Daniel J. Harty, *For Whom the Bell Tolls: The Demise of Exchange Trading Floors and the Growth of ECNs*, 33 J. Corp. L. 865, 868 (2008). They formed the Philadelphia Stock Exchange, the nation's first securities exchange, which still operates today as Nasdaq PHLX. *See Technical Amendments to Form BD and Form BDW*, 88 Fed. Reg. 32,963, 32,964 & n.16 (May 23, 2023); Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation*, 62 N.C. L. Rev. 475, 480 (1984). By 1791, auctioneers on New York's Wall Street had agreed to a set of rules to govern their auctions of government stock. *See* Markham & Harty, *supra*, at 868. And in 1792, the New York Stock Exchange formed from the Buttonwood Agreement, through which a group of New York traders agreed to a commission structure based on sales of public stock and a system of mutual preferences in their dealings in an effort to centralize trading. *See id.* The Buttonwood Agreement sought to address the concern that earlier Wall Street stock auctions "had fueled the speculation that touched off a market panic" at the time. *Id.*; *see also* Roberta S. Karmel & Claire R. Kelly, *The Hardening of Soft Law in Securities Regulation*, 34 Brook. J. Int'l L. 883, 886 (2009) (NYSE "was organized in 1792 by brokers to govern securities trading in the wake of a scandal in the government bond

market after the Revolutionary War").  Exchanges have regulated their members under privately established governance structures ever since.

Over the following decades, exchanges adopted more formal structures and developed trading rules for their members and listing standards for companies.  For example, NYSE originally existed as an unincorporated association.  *See* S. Rep. No. 73-1455, at 77 (1934).  "As the NYSE and other stock exchanges developed, trading conventions became formalized as exchange rules."  *Concept Release Concerning Self-Regulation*, 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004) ("SEC Concept Release").  NYSE adopted its first constitution in 1817, a range of rules soon thereafter, and a set of bylaws in 1820.  *See id.*  By 1869, NYSE ratified a constitution that provided "listing requirements," "rigid scrutiny of all securities," and "surveillance over members in respect of their fidelity to contracts."  Robert Sobel, *The Big Board: A History of the New York Stock Market* 86 (The Free Press 1965).  And by the early twentieth century, NYSE had "successfully campaigned for more thorough disclosure from listing companies" to "provide certain safeguards for investors."  Roberta S. Karmel, *The Future of Corporate Governance Listing Requirements*, 54 SMU L. Rev. 325, 327 (2001).  Other contemporary exchanges formed during this era as well.  For example, NYSE American, the former American Stock Exchange, traces its origins to 1849.  *See* 23 Jerry W. Markham & Thomas Lee Hazen, Broker-Dealer Operations Sec. & Comm. Law § 1:7 (Dec. 2022 Update); *Notice of Proposed Name Change to NYSE American LLC*, 82 Fed. Reg. 15,244, 15,245 (Mar. 27, 2017).  Although many exchanges have come and gone over the years, all of the exchanges—old and new—assume the same set of self-regulatory duties rooted in the history of American securities exchanges.

FINRA's predecessors also were formed by private industry actors in the early twentieth century.  In 1912, several investment banks organized a trade group called the Investment Bankers

Association of America.  *See* Paul G. Mahoney, *The Political Economy of the Securities Act of 1933*, 30 J. Legal Stud. 1, 9 (2001).  Investment Bankers Association of America member firms grew sharply during the 1920s in both number and assets, as did the number of retail stock and bond salespeople.  *See id.* at 11.

The stock market crash of 1929 spurred a rethinking of best practices for securities dealers.  The crash "severely damaged the public reputation of over-the-counter . . . securities dealers."  SEC Concept Release, 69 Fed. Reg. at 71,257.  So in 1933, "in an effort to improve their collective image," the Investment Bankers Association of America trade group formed the Investment Bankers Code Committee as a voluntary organization to "promulgat[e] industry best practices."  *Id.*; *see also* Mahoney, *Political Economy*, *supra*, at 23.  The Investment Bankers Code Committee later became the National Association of Securities Dealers ("NASD"), FINRA's predecessor.

C. **Congress Has Repeatedly Recognized and Preserved Self-Regulatory Organizations' Status as Private Entities.**

Congress maintained the role of private SROs when it enacted the first comprehensive federal securities laws, and it has reaffirmed that model in subsequent statutes and amendments.

This process began with enactment of the Exchange Act in 1934, at a point when there were forty-three organized stock exchanges (many of which subsequently merged into other entities).  *See* Onnig H. Dombalagian, *Demythologizing the Stock Exchange: Reconciling Self-Regulation and the National Market System*, 39 U. Rich. L. Rev. 1069, 1072 n.10 (2005).  Section 6 of the Exchange Act "incorporated" the "self-regulatory system . . . into the federal securities laws" by "recogniz[ing] the regulatory role of exchanges, and requir[ing] all existing securities exchanges . . . to register with the Commission and to function as self-regulatory organizations."  SEC Concept Release, 69 Fed. Reg. at 71,256–57; *see* 15 U.S.C. § 78f.  But the Exchange Act "imposed no requirements on the governance structure of the exchange, on its

membership, or its purposes."   Dombalagian, *Demythologizing the Stock Exchange*, *supra*, at 1076.   Instead, with the Exchange Act, Congress left "a wide measure of initiative [and] responsibility . . .with the exchanges."  H.R. Rep. No. 73-1383, at 15 (1934).

Congress similarly recognized the value of private securities associations of broker-dealers in self-regulating the over-the-counter market through the Maloney Act of 1938.  In 1936, the Investment Bankers Code Committee reorganized into the Investment Bankers Conference ("IBC"). *See* Donna M. Nagy, *Playing Peekaboo With Constitutional Law: The PCAOB and Its Public/Private Status*, 80 Notre Dame L. Rev. 975, 1023–24 (2005).  The IBC was "a national, voluntary industry organization," SEC Concept Release, 69 Fed. Reg. at 71,257, in the form of "a self-regulatory organization for securities dealers," Mahoney, *Political Economy*, *supra*, at 23.  To facilitate further self-regulation, the Securities and Exchange Commission and IBC worked with Congress to draft an amendment to the Exchange Act that would "establish[] the concept of registered national securities association SRO."  SEC Concept Release, 69 Fed. Reg. at 71,257. Through that amendment, Congress endorsed the "registered securities association" SRO concept and "provide[d] for the establishment of a mechanism of regulation among over-the-counter brokers and dealers . . . to prevent acts and practices inconsistent with just and equitable principles of trade."  Maloney Act of 1938, Pub. L. No. 75-519, 52 Stat. 1070.  The IBC soon reorganized into the NASD.  *See* Nagy, *Playing Peekaboo*, *supra*, at 1024.  And in 1939, the NASD (FINRA's predecessor) registered with the Commission.  *See In re Appl. by Nat. Ass'n of Sec. Dealers, Inc.*, Exchange Act Release No. 34-2211, 5 SEC Docket 627, 627, 633 (Aug. 7, 1939).

In the decades following enactment of the Exchange Act and the Maloney Act, Congress has repeatedly reaffirmed the private status of FINRA and the Exchanges and recognized the value of self-regulation.  Congress has embraced SRO independence based on a view that "it would be

- 10 -

self-defeating to saddle the self-regulatory organizations with the whol[e] panoply of Governmental administrative procedure." S. Rep. No. 94-75, at 29 (1975). Instead, Congress has preferred self-regulation based on "the flexibility and informality of [its] decision-making procedures," *id.*, as well as the benefits of "supervis[ion] by an organization familiar with the nuances of securities industry operations," SEC Concept Release, 69 Fed. Reg. at 71,258. To that end, the federal securities laws "reflect Congress' determination to rely on self-regulation as a fundamental component of U.S. market and broker-dealer regulation." SEC Concept Release, 69 Fed. Reg. at 71,256.

Reflecting that approach, "Congress affirmed the desirability of self-regulation during its consideration of the Securities Act Amendments of 1975" by taking steps to "preserv[e] and strengthe[n]" the self-regulatory model. H.R. Rep. No. 98-106, at 6. Similarly, Congress reaffirmed the private nature of the Exchanges and NASD/FINRA when it enacted the Sarbanes-Oxley Act in 2002. That statute left the SROs' private structures intact while separately creating the Public Company Accounting Oversight Board, which commentators soon noted posed distinct constitutional problems that do not exist with FINRA and the Exchanges. *See* Nagy, *Playing Peekaboo*, *supra*, at 1022–26 (distinguishing NYSE and NASD/FINRA from the Public Company Accounting Oversight Board for the reasons discussed in Section II.A below); *see also Free Enterprise Fund*, 561 U.S. at 485 (adopting the same distinction).

\*     \*     \*

As these developments and the cases cited in Section II.D show, the self-regulatory model is entitled to a presumption of constitutionality because it "was introduced at a very early period of our history, has been recognised by many successive legislatures, and has been acted upon by the judicial department." *McCulloch*, 17 U.S. (4 Wheat.) at 401; *see also Noel Canning*, 573 U.S.

at 526 (courts should "hesitate to upset" long-established "compromises and working arrangements" established by "the elected branches of Government"). And although Congress has taken a more active role in *regulating* FINRA and the Exchanges since 1934, that regulation alone cannot convert the SROs into state actors. As the Supreme Court recently explained in *Manhattan Community Access*, "the 'being heavily regulated makes you a state actor' theory of state action is entirely circular and would significantly endanger individual liberty and private enterprise." 139 S. Ct. at 1932

## II. Self-Regulatory Organizations Are Not Subject to Constitutional Claims Because They Are Private Entities.

Private self-regulation in the securities industry is not merely a thing of the past. Without exception, FINRA and the Exchanges remain privately organized, privately governed, and privately funded to this day—such that they are *not* state actors as the Supreme Court has defined that category. Nor can FINRA and Exchange disciplinary proceedings be characterized as state action, because the SROs lack key governmental powers and the proceedings derive their force from members' voluntary agreement and participation. Because FINRA and the Exchanges are inherently private, their operations are not subject to constitutional challenge.

### A. Privately Created, Privately Governed Organizations Are Not State Actors.

The Appointments Clause and other constitutional requirements apply only to the Government. *See, e.g., Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658 (2020) ("If [individuals] are not officers of the United States, . . . the Appointments Clause says nothing about them."). That principle necessitates a test for distinguishing between entities that are part "of the . . . Federal Government," *Free Enterprise Fund*, 561 U.S. at 483, and those that are not.

For corporations, the Supreme Court has established a clear standard. In *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), the Court held that a corporation may be considered "part of the Government" for First Amendment purposes only when "the Government creates [the] corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation." *Id.* at 399. Amtrak satisfied that test in *Lebron* and was held to be a state actor because it was "created by a special statute, explicitly for the furtherance of federal governmental goals," and because "six of the corporation's eight externally named directors" were "appointed directly by the President of the United States." *Id.* at 397.

The Supreme Court later applied *Lebron* in affirming that Amtrak is also a governmental entity for separation-of-powers and nondelegation purposes. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 50–55 (2015). Again, the Court emphasized that Amtrak was created by the federal government; that its goals were mandated by statute; and that the President appointed a majority of its Board. *See id.* The Court also noted that "[t]he Secretary of Transportation holds all of Amtrak's preferred stock and most of its common stock," and that Amtrak is "dependent on federal financial support"—having received "more than $41 billion in federal subsidies" by then. *Id.* at 51, 53. That combination of features established a "practical reality of federal control" that conferred "governmental status" upon Amtrak. *Id.* at 55.

In *Free Enterprise Fund*, the Court invoked *Lebron* to highlight the fundamentally *private* character of Exchanges. *Free Enterprise Fund* considered whether it violated Article II for members of the Public Company Accounting Oversight Board—which was established by Congress under the Sarbanes-Oxley Act of 2002 and is not an SRO—to be insulated from executive control by multiple layers of good-cause removal protection. *See* 561 U.S. at 483–84.

- 13 -

Before engaging in that analysis, however, the Court confirmed—citing *Lebron*—that "the Board is 'part of the Government' for constitutional purposes." *Id.* at 486. The Court explained that the Board "was modeled on *private* self-regulatory organizations in the securities industry—such as the New York Stock Exchange—that investigate and discipline their own members subject to Commission oversight." *Id.* at 484 (emphasis added). But critically, the Board was different from the Exchanges because "*[u]nlike the self-regulatory organizations*, . . . the Board is a *Government-created*, *Government-appointed* entity, with expansive powers to govern an entire industry." *Id.* at 484–85 (emphasis added).

**B.      Self-Regulatory Organizations—Including FINRA and the Exchanges—Are Privately Created, Privately Governed, and Privately Funded.**

The Supreme Court's explanation in *Free Enterprise Fund* that FINRA and the Exchanges are private entities because they are not "Government-created" or "Government-appointed" reflects a straightforward application of the *Lebron* framework. Because FINRA and the Exchanges are privately created, privately governed, and privately funded, they are not "part of the Government" for constitutional purposes. *Lebron*, 513 U.S. at 399.

**1.      FINRA and the Exchanges Were Privately Created.**

The federal government did not "create[]" FINRA or the Exchanges, whether "by special law" or otherwise. *Compare Lebron*, 513 U.S. at 399. To the contrary, and as described above, securities self-regulation in the United States dates to the 1790s, when *private* actors in the industry formed securities exchanges that were voluntary in nature and included self-regulatory functions. *See supra* Section I.

The SROs remain privately organized and structured to this day. For example, FINRA is a not-for-profit membership corporation without capital stock, incorporated in Delaware. *See* Restated Certificate of Incorporation of Fin. Indus. Regul. Auth., Inc., https://perma.cc/B6TN-

CXGW.[3]  The NYSE family of exchanges is owned by the Intercontinental Exchange, Inc., a publicly traded company incorporated in Delaware.  *See* Intercontinental Exch., Inc., Annual Rep. (Form 10-K) (Feb. 2, 2023).  The Cboe family of exchanges is owned by Cboe Global Markets, Inc., a publicly traded company incorporated in Delaware.  *See* Cboe Global Markets, Inc., Annual Rep. (Form 10-K) (Feb. 17, 2023).  And the Nasdaq family of exchanges is owned by Nasdaq, Inc., a publicly traded company incorporated under Delaware law.  *See* Nasdaq, Inc., Annual Rep. (Form 10-K) (Feb. 23, 2023).  The other Exchanges are also privately organized and structured. *See supra* pp. i–ii (corporate disclosure statements).

### 2.    FINRA and the Exchanges Are Privately Governed.

Nor are directors of FINRA and the Exchanges "Government-appointed."  *See Free Enterprise Fund*, 561 U.S. at 485.  Unlike Amtrak, which was considered a state actor for constitutional purposes in part because most of its "externally named directors" were "appointed directly by the President of the United States," *Lebron*, 513 U.S. at 397, SROs have boards of directors that are selected by private entities, with no subsequent governmental approval.  FINRA and the Exchanges thus differ categorically from Amtrak because their board members are neither

---

[3] In 2007, the NASD and NYSE formed FINRA in a consolidation of "their member regulation operations into a single self-regulatory organization . . . that would provide member firm regulation for securities firms that do business with the public in the United States."  *Order Approving Proposed Rule Change To Amend the By-Laws of NASD*, 72 Fed. Reg. at 42,170.  Since then, NYSE has continued to have its own independent regulatory program, NYSE Regulation, which "performs the regulatory responsibilities for NYSE."  *Id.* at 42,169 n.6.  Indeed, all Exchanges bear responsibility for exercising independent regulatory authority over their markets. *See, e.g.*, Nasdaq Mkt. Regul., *U.S. Regulatory Program*, https://www.nasdaq.com/market-regulation/americas (last visited Sept. 22, 2023) ("At Nasdaq, our regulatory functions operate independently of Nasdaq's business units to safeguard the integrity of our markets."); Cboe Global Markets, Inc., *Regulatory Independence Policy for Regulatory Group Personnel* 2 (Mar. 23, 2021), https://perma.cc/3XYF-N6AM ("All regulatory decisions shall be made without regard to the actual or perceived business interests of the Cboe Companies or any of their trading permit holders.").  And FINRA remains a private company as a "registered securities association" with the authority to self-regulate its broker-dealer member firms.  15 U.S.C. § 78*o*-3; *see* Dkt. No. 11 at 4–6.

appointed nor approved by the Securities and Exchange Commission, the President, Congress, or any other governmental body.

For example, FINRA is governed by a board of twenty-two members, comprised of industry and non-industry members and FINRA's chief executive officer.  Board members are selected by FINRA's members; FINRA officers are appointed and removed by the board; and no board member is appointed by a governmental official.  *See Order Approving Proposed Rule Change To Amend the By-Laws of NASD*, 72 Fed. Reg. 42,169, 42,170–72 (Aug. 1, 2007).  Similarly, Nasdaq's board of directors is selected by its broker-dealer members and by Nasdaq, Inc.  Neither the Securities and Exchange Commission nor any other government agency has the power to make appointments to Nasdaq's board or otherwise control board membership.  *See* By-Laws of Nasdaq, Inc., arts. II, IV, https://ir.nasdaq.com/static-files/340019be-237d-49d2-bc7d-84ba9d5ccf0c; By-Laws of The Nasdaq Stock Mkt., arts. II–III, https://ir.nasdaq.com/static-files/250a7614-57d1-4c8f-8c57-98a9ff3783f5.  The same is true for the other Exchanges.[4]

### 3.    FINRA and the Exchanges Are Privately Funded.

Further cementing the private character of FINRA and the Exchanges is the source of their funding:  all of it comes from private sources, and none of it comes from the federal government.  *Cf., e.g.*, *Ass'n of Am. R.R.*, 575 U.S. at 50–55 (connecting Amtrak's "governmental status" to its being "dependent on federal financial support," including "more than $41 billion in federal subsidies").

---

[4] *See, e.g.*, Ninth Am. and Restated Bylaws of Intercontinental Exch., Inc., art. III, https://perma.cc/23Y8-PAMK; Fourteenth Am. and Restated Operating Agreement of N.Y. Stock Exch., LLC, art. II, https://perma.cc/VEY7-3W8M.  As a further example, the board of directors for each of the MIAX Exchanges is nominated by a Nominating Committee and Member Nominating Committee and elected by Miami International Holdings, Inc.  Neither the Securities and Exchange Commission nor any other government agency has the power to make appointments to the MIAX Exchanges SRO boards or otherwise control board membership.

For example, FINRA's "operations are funded by member firm fees—without the support of any taxpayer dollars."  FINRA, Financial Reports and Policies, https://perma.cc/93C7-5R6X (last visited Sept. 22, 2023).  And Exchange revenues derive from one-time listing fees and annual fees for listed companies; transaction fees for market participants; market data fees; market participant fees; regulatory fees; fines; trading software and technology; corporate governance and compliance services; and corporate venture programs.  *See, e.g.*, Cboe Global Markets, Inc., Annual Rep. 8–18 (Form 10-K) (Feb. 17, 2023); Intercontinental Exch., Inc., Annual Rep. 5–6, 14 (Form 10-K) (Feb. 2, 2023); Nasdaq, Inc., Annual Rep. 2–10 (Form 10-K) (Feb. 23, 2023).

**C.**    **FINRA and the Exchanges Lack Traditional Governmental Powers, Underscoring the Private Character of Their Disciplinary Proceedings.**

Not only are FINRA and the Exchanges inherently private entities—and therefore not state *actors*—but the disciplinary proceedings they undertake are not properly characterized as state *action*.  In rare circumstances, private parties can engage in state *action* that is subject to constitutional standards, but only if that conduct is "fairly attributable" to the state.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  That exacting standard requires that:  there must be a "close nexus between the State and the challenged action"; it must fairly "be said that the State is responsible for the specific conduct of which the plaintiff complains"; and the government must have "exercised coercive power" or provided "significant encouragement" such that the relevant "choice must in law be deemed to be that of the State."  *Blum*, 457 U.S. at 1004–05 (cleaned up).

Disciplinary proceedings conducted by FINRA and the Exchanges do not satisfy that rigorous test because they are not directed by the Securities and Exchange Commission or any other governmental body, but are instead generally initiated to enforce compliance with their own SRO rules, which members voluntarily agree to follow.  Further, the ultimate sanction SROs may

impose for noncompliance is not prison time or court-backed fines, but revocation of membership—*i.e.*, the same "sanction" that voluntary organizations (such as many bar associations) typically impose as the most severe consequence for breaking their rules.

Unlike the Commission, FINRA and the Exchanges lack the investigative and enforcement powers that are typical of governmental bodies. For example, FINRA and the Exchanges have no ability to issue subpoenas compelling witnesses to testify or to produce books, records, or other information, nor can they bring court actions to effectuate such compulsory process. Under the Exchange Act, SROs may discipline their members for the violation of SRO rules, among others, "by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction." 15 U.S.C. § 78*o*-3(b)(7). But critically, SROs have no judicial recourse when members refuse to pay fines or comply with other sanctions levied under their disciplinary procedures. *See Fiero v. Fin. Indus. Reg. Auth., Inc.*, 660 F.3d 569, 574–79 (2d Cir. 2011). Instead, SROs' only resort is to revoke a delinquent member's registration. *See id.* at 576 ("When a member fails to pay a fine levied by FINRA, FINRA can revoke the member's registration[.]").

The voluntary nature of exchange membership and participation is an additional reason why Plaintiff's claims would fail if raised in that context. While entities generally must be members of a registered national securities association to participate in the securities industry as broker-dealers, the same is not true for Exchanges. Joining an exchange is entirely optional: Parties seeking to transact in the securities markets need not be a member of any exchange, and those who wish to become an exchange member have many exchanges to choose between. Illustrating this point, many FINRA members are not members of the Exchanges. Exchange-based trading is decentralized as well, with about 20% of current U.S. securities market trading by

volume occurring on NYSE exchanges; 17% on Nasdaq exchanges; and 12% on Cboe exchanges, among others.[5]

**D.    Courts Have Repeatedly Held that FINRA and the Exchanges Are Not State Actors.**

Given the private nature of FINRA and the Exchanges under the Supreme Court's *Lebron* framework, it is unsurprising that courts have repeatedly held in a variety of contexts that these organizations are not state actors. *See*, *e.g.*, Dkt. No. 11 at 10–19 (collecting cases from various courts). Among the many examples, courts have ruled that:

- **NASD**, FINRA's predecessor, was not a state actor because it was "a private corporation that receive[d] no federal or state funding," "[i]ts creation was not mandated by statute," and the government did not "appoint its members or serve on any NASD board," *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999);

- **NYSE** is not a state actor because, among other things, it operates as a "self-policing" private body rather than an agent of the Commission, *United States v. Solomon*, 509 F.2d 863, 867–71 (2d Cir. 1975); and

- **NYSE's and NASD's** mandatory-arbitration requirements are not state action due to the SEC's "mere approval" of those provisions, since the requirements are not "fairly attributable to the state," *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1202 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003) (en banc); *see also Perpetual Sec. Inc. v. Tang*, 290 F.3d 132, 137–39 (2d Cir. 2002).

---

[5]    *See* Cboe, U.S. Equities Market Volume Summary, https://www.cboe.com/us/equities/market_share (Volume Summary, MTD) (last visited Sept. 22, 2023). About 44% of current U.S. equities market trading by volume occurs entirely outside the Exchanges. *See id.*

In short, courts have accurately and consistently applied Supreme Court precedent to hold that FINRA and the Exchanges are not state actors and are not engaged in state action when they undertake regulatory and disciplinary actions pursuant to their rules. This Court should not depart from that consensus.

### III.    Accepting Plaintiff's Arguments Would Threaten the Health of the Securities Markets by Undermining the Self-Regulatory Model.

While Plaintiff frames this case as a challenge to a single disciplinary proceeding, the consequences of a ruling in Plaintiff's favor could be sweeping and deeply problematic for oversight of the U.S. securities markets. As described above, private self-regulatory organizations have promoted the health and integrity of securities markets for more than two centuries, and Congress has repeatedly acted to affirm that model of self-regulation. The self-regulatory model has stood the test of time because it works: The United States' securities markets are the envy of the world, and their success in attracting capital is the product of markets that effectively police themselves. This Court should not embrace a flawed legal theory that would disrupt the Nation's settled ecosystem of self-regulation, which fosters fair and efficient markets with robust protections for investors.

The self-regulatory model is so successful in part because it is capable of acting more efficiently—and on the basis of better information—than a purely governmental approach to enforcement ever could. FINRA and the Exchanges empower "peers" to "set proscriptive standards relating to just and equitable principles of trade and detailed business conduct standards." SEC Concept Release, 69 Fed. Reg. at 71,257. This approach yields securities markets with "ethical standards beyond those any law can establish" because these private organizations have "effective reach" into areas of market activity that "self-government and self-government alone" can monitor. Sec. & Exch. Comm'n, *Report of Special Study of Securities Markets*, H.

Doc. 88-95, pt. 4, at 694 (1963) (quoting William O. Douglas, Address at the Bond Club of Hartford (Jan. 7, 1938)).  In real time, FINRA and the Exchanges provide a more efficient and "less invasive" approach to market surveillance because they are "familiar with the nuances of securities industry operations."  SEC Concept Release, 69 Fed. Reg. at 71,257.  For example, the Exchanges can quickly institute trading halts upon the leakage of material news to prevent some market participants from acting upon information that others lack.  This application of technical expertise derived from operational experience is the hallmark of self-regulation.  And the self-regulatory model can respond to market harms with speed and flexibility that the "rigid regulation" of governmental bureaucracy cannot offer.  *Id.*  Through both their proscriptive standards and their "policing function that preexisted federal regulation," FINRA and the Exchanges continue to be the first line of defense against malfeasance.  *Bernstein v. Lind-Waldock Co.*, 738 F.2d 179, 186 (7th Cir. 1984).

For all its governmental power, the Commission is not capable of filling the SROs' shoes. For example, the Commission does not possess the requisite financial and human capital to supplant the self-regulatory role that private enterprise has historically played.  The self-regulatory model has allowed the U.S. capital markets to lead on the global stage, furthering market efficiency, reliability, and safety.  Plaintiff now attempts to undermine the defining feature of that model and, in the process, threatens long-term harm to investors and markets more broadly.

- 21 -

**CONCLUSION**

For the foregoing reasons and those given in FINRA's brief, the Court should deny

Plaintiff's motion for a temporary restraining order and preliminary injunction.

Respectfully submitted,

/s/ *Kevin King*

Kevin King (D.C. Bar No. 1012403)
   *Counsel of Record*
Daniel G. Randolph (D.C. Bar No. 230150)
Emily A. Vernon (D.C. Bar No. 1719635)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

Bruce C. Bennett (N.Y. Bar No. 1914118)*
Harrison A. Newman (N.Y. Bar No. 5834569)*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
*D.D.C. admission forthcoming*

*Counsel for Amici Curiae*
*Securities Exchanges*

September 22, 2023

- 22 -

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2023, an electronic copy of the foregoing *Amicus Curiae* brief was filed with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM-ECF system and was served electronically by the Notice of Docket Activity upon registered CM-ECF participants.

September 22, 2023                                        Respectfully submitted,

                                                          /s/ *Kevin King*
                                                          Kevin King (D.C. Bar No. 1012403)
                                                          COVINGTON & BURLING LLP
                                                          One CityCenter
                                                          850 Tenth Street, NW
                                                          Washington, DC 20001
                                                          (202) 662-6000
                                                          kking@cov.com