UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| EUGENE H. KIM, | ) Civil Action |
| Plaintiff, | ) No. 23-CV-2420 |
| vs. | ) |
| | ) |
| FINANCIAL INDUSTRY REGULATORY | ) September 27, 2023 |
| AUTHORITY, INC., | ) 11:31 a.m. |
| Defendant. | ) Washington, D.C. |
| | ) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE ANA C. REYES,**
**UNITED STATES DISTRICT COURT JUDGE**


**<u>APPEARANCES</u>:**

FOR THE PLAINTIFF:  PHILIP C. ANDONIAN
                    1100 H Street, N.W.
                    Suite 315
                    Washington, DC 20005
                    (202) 953-9850
                    Email: phil@calebandonian.com

                    MARTIN H. KAPLAN
                    LAWRENCE G. NUSBAUM
                    Gusrae Kaplan Nusbaum, PLLC
                    120 Wall Street
                    New York, New York  10005
                    Email:  mkaplan@gusraekaplan.com


FOR FINRA:          AMIR C. TAYRANI
                    ALEX GESCH
                    MAX E. SCHULMAN
                    Gibson, Dunn & Crutcher, LLP
                    1050 Connecticut Avenue, NW
                    Suite 300
                    Washington, DC 20036-5306
                    (202) 887-3692
                    Email: atayrani@gibsondunn.com


*<u>(Appearances Continued)</u>*

**APPEARANCES (continued):**


FOR THE UNITED STATES:

                    JAMES LUH
                    LESLEY FARBY
                    CHRISTINE L. COOGLE
                    Civil Division
                    Federal Programs Branch
                    1100 L Street, NW
                    Washington, D.C. 20530
                    (202) 514-4938
                    Email:  james.luh@usdoj.gov



Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
                    U.S. Courthouse


          Proceedings reported by machine shorthand.
      Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  This is Civil Action 23-CV-2420, Eugene H. Kim versus Financial Industry Regulatory Authority, Inc.

Would the parties please come forward and identify themselves for the record.

MR. KAPLAN:  Martin H. Kaplan, Gusrae Kaplan Nusbaum, PLLC, New York, New York.

THE COURT:  All right.  Good morning, Mr. Kaplan.

MR. KAPLAN:  Good morning, Your Honor.

MR. TAYRANI:  Good morning, Your Honor. Amir Tayrani for defendant FINRA.

THE COURT:  Good morning, sir.

MR. LUH:  Good morning, Your Honor. James Luh for the Department of Justice for the United States.  With me at counsel table are Leslie Farby of the Department of Justice and Christine Coogle of Department of Justice.

THE COURT:  All right.  Thank you.

Mr. Luh, have you been in front of me before.

MR. LUH:  Yes, I have.

THE COURT:  For something like Medicare or something, right?

MR. LUH:  Yes.  A couple of weeks ago.

THE COURT:  What are you doing here?

MR. LUH:  We do all sorts of work.

THE COURT:  I just thought you did the boring Medicare stuff.  I feel better for your career now.

All right.  Welcome, Mr. Luh.  It's nice to see you again.

All right.  Anyone else who wants to introduce themselves?

MR. KAPLAN:  Your Honor, I neglected -- I should have introduced --

THE COURT:  Come to the mic, please.

MR. KAPLAN:  Sorry.

With me is my partner Larry Nusbaum and our local counsel Phil -- I am going to butcher this -- Andonian.

THE COURT:  Okay.  Welcome, gentlemen.

MR. GESCH:  Alex Gesch, also on behalf of FINRA.

MR. SCHULMAN:  Max Schulman, also on behalf of FINRA.

THE COURT:  Are you all with Covington?

MR. SCHULMAN:  Gibson Dunn.

THE COURT:  Sorry.  Are you with Gibson Dunn too?

MR. TAYRANI:  Yes, Your Honor.

THE COURT:  They're all the same to me.

So we have a long day ahead of us, I am just warning you, because I have a lot of questions.  I wanted to start off to see who is up on their securities history.

Maybe the amici -- do we have amici in the room?  No?

(No audible response was heard.)

THE COURT:  So anyone tell me what the world's first IPO was?

(No audible response was heard.)

THE COURT:  You guys do this for a living, right?

You guys never were curious as to what the world's first IPO was?

It was the Dutch East India Company in 1602.  They were the first ones to offer public shares.  Initially -- the initial point -- the initial certificate said that they were redeemable in ten years.  So they would have been redeemable in 1612.

And then some people realized early on, before they were actually issued, that people might not invest if they couldn't get their investments back in ten years.  So they added a provision that the securities essentially could be traded earlier than ten years.  So, therefore, you had also your first securities market.  So that's that.

Anyone tell me what the first public bailout was?

(No audible response was heard.)

THE COURT:  It was the East India Company, and England had to bail it out in 1773.

I won't bore you with all of the details; I can later if you want.

It led directly to the Boston Tea Party.  So the Boston Tea Party was actually not a result of prices going up on tea, the prices were going to go down on tea.

As part of England bailing out the East India Company, England gave it the right to sell tea directly to the Americas without having to do tariffs in England, which meant that the tea of the East India Company would cost a lot less than the tea that was coming in through smugglers, merchants and middlemen.  So none of the smugglers, merchants and middlemen liked that, so they didn't like the law.  And the Patriots didn't like the law because it presumed to say that Parliament could tax -- it had added a tax -- although the prices were still low -- to the colonies which no one was happy with.

So the first world's public bailout was one of the causes of the American Revolution.

Now we have come full circle.

All right.  That's it for the day, unless anyone else has any trivia they would like to share.

All right.  Mr. Kaplan, could I start with you?

I should say that I have -- the way I run hearings is:  I have read everything.  I have read everything in your case; I have read everything in Alpine.  I have read more FINRA or SRO cases than I ever thought I would.  And I have a number of questions.

And I am pretty good at knowing if my question is getting answered or not answered. If it's not getting answered, I direct you back to it; and I'll cut you off and do that, which I understand can be frustrating.

The upside is: No one will leave here until they have had the opportunity to say whatever they want for however long they want; it's just I get my questions answered first. Okay? You will have your chance to speak.

MR. KAPLAN: It is your courtroom, Your Honor.

THE COURT: So I have heard.

All right. I want to see if we can just start with areas of agreement to see sort of if there are things that we all agree on, in terms of the facts; and then we can take it from there.

All right. Do you agree or disagree that FINRA's predecessors all began as voluntary organizations of individuals and entities?

MR. KAPLAN: I agree.

THE COURT: Okay. And before Congress passed the Securities Exchange Act in 1934, SRO's and FINRA's predecessors already existed?

MR. KAPLAN: I thought that the NASD was the result of the adoption to become the first association. I can't say with certainty whether you are accurate or not.

THE COURT: Okay. So you can't tell me whether

the predecessors of FINRA existed before the Securities Exchange Act?

MR. KAPLAN:  I don't believe they did is my belief, but I can't say with certainty.

THE COURT:  You don't know one way or the other. You have a belief, but you don't know.

MR. KAPLAN:  I have a belief, but I can't back it up.

THE COURT:  Okay.  The SRO's started in 1790 or thereabouts?

MR. KAPLAN:  You mean the New York Stock Exchange, Your Honor?

THE COURT:  The securities and exchanges, yes, began -- dated back to 1790s?

MR. KAPLAN:  Buttonwood Agreement, Your Honor, yes.

THE COURT:  Okay.  You agree that when Congress first passed the first comprehensive federal securities laws, which I understand were in the 1930s, that Congress maintained the role of private SROs?

MR. KAPLAN:  Yes.

THE COURT:  Okay.  And you agree that the Exchange Act did not impose any requirements on the governed structure of an exchange on its membership or its purpose?

The Securities Exchange Act doesn't tell FINRA how it has to structure itself.

MR. KAPLAN:  Yes, that's true.

THE COURT:  Okay.  And then, again, Congress recognized private securities associations of broker dealings and self-regulating over-the-counter markets in the Maloney Act of 1938?

MR. KAPLAN:  Correct.

THE COURT:  Okay.  FINRA is privately organized?

MR. KAPLAN:  Yes.

THE COURT:  FINRA is privately governed?

MR. KAPLAN:  Yes.

THE COURT:  And it's privately funded?

MR. KAPLAN:  Yes.

THE COURT:  It does not receive any money from the federal or any state government, correct?

MR. KAPLAN:  Not that I am aware of.

THE COURT:  Okay.  The federal government did not create FINRA, correct?

MR. KAPLAN:  That is correct.

THE COURT:  All right.  None of the directors of FINRA are government appointed, correct?

MR. KAPLAN:  Correct.

THE COURT:  All right.  Neither the Securities and Exchange Commission nor any other government agency has the power to make appointments to its board or control its membership?

MR. KAPLAN:  Correct.

THE COURT:  Disciplinary proceedings conducted by FINRA are not directed by the Securities and Exchange Commission?

MR. KAPLAN:  Correct.

THE COURT:  They are generally initiated to enforce compliance with FINRA's own rules?

MR. KAPLAN:  I would say FINRA's own rules and the federal securities laws.

THE COURT:  Okay.  So your understanding is that enforcement actions happen to enforce the securities laws?

MR. KAPLAN:  Absolutely.  It's part of the mandate to FINRA.

THE COURT:  All right.  That's not the case in this case, right?

Mr. Kim is not being -- Mr. Kim is not alleged to have violated any SEC laws -- rules, correct?

MR. KAPLAN:  Not specifically.

THE COURT:  Not at all, right?

MR. KAPLAN:  Well, if you look at the language that he's charged with, it's the exact language that you would find in Section 10b -- Rule 10b-5 violation for fraud.

THE COURT:  But the actual claims are for violations of FINRA's rules.  There is no claim that he violated the securities laws, correct?

MR. KAPLAN:  There is no specific claim, that is

correct.

THE COURT:  Members voluntarily agree to follow FINRA's rules, correct?

MR. KAPLAN:  No.  I don't think that's correct.

THE COURT:  Why is that not correct?

MR. KAPLAN:  It's not a voluntary thing.

Because you must be associated with FINRA in order to be a participant in what we know is the broad securities markets.  I am not talking about exchange membership now, that's different.  I am talking about broker, dealers, associated persons, et cetera.

You must be a registrant with FINRA.  In order to be a registrant with FINRA, you must agree to abide by its rules.  So I don't think it's voluntary.

THE COURT:  I think there was some disagreement between you and -- and maybe I have to talk to the other side on this.

So your contention was that FINRA is the only SRO. But I understand from the other parties, in fact, there are other SROs that people can go to.

MR. KAPLAN:  It's a bit semantical, Your Honor.

So there are exchanges that are SROs, no question. They have put in a brief, an amicus brief.  They are SROs. But their membership cannot do what a broker-dealer does in the ordinary course of business dealing with the public.

And there used to be exceptions to that where proprietary trading firms could be associated with an exchange and not a FINRA member and do transactions for their own account being associated with an exchange.

As in our reply brief, we note that that rule was proposed to be changed, and it was changed by the SEC very recently.  And now there are no such traitors permitted in exchanges that are just proprietary trading firms.

THE COURT:  Mr. Tayrani, do you agree with that?  So if Mr. Kim wanted to do what he does, he has to go through FINRA --

MR. KAPLAN:  Has to.

THE COURT:  I'm asking Mr. Tayrani.

MR. KAPLAN:  I'm sorry.

THE COURT:  Go ahead.

MR. TAYRANI:  I'd agree with that, Your Honor.

THE COURT:  All right.

FINRA cannot enforce any ruling against a member through court-backed fines, or anything like that.  All it can do is revoke membership, correct?

MR. KAPLAN:  Well, yes and no, Your Honor.  That's the *Fiero* case, that's my case that I brought.  The *Fiero* case was trying to enforce civilly an award of disciplinary panel against *Fiero*.

It actually -- the district court affirmed it

because it had been affirmed and affirmed and affirmed forever. Every time FINRA went in, we went to the Second Circuit. And ultimately the Second Circuit reversed saying FINRA never had that authority.

The distinction here in your question is that while they cannot -- based on *Fiero* -- enforce monetary damages, their ruling, if final, has the effect of barring you from the securities business in all capacities, whether you are at an exchange, any other place; you are barred from the securities industry.

So while, yes, it's true, they can no longer enforce the penalties because the Second Circuit said this is inappropriate, you never had that authority. But they can issue a suspension, a bar; and you are barred from the securities industry. So I mean --

THE COURT: But they can't -- they can't bar -- they can't tell the other SROs or exchange industries what to do. They can say: You're no longer one of our members, and the other exchanges say -- no?

MR. KAPLAN: It used to be that way, not anymore, Your Honor. If you are barred, you are out; you can't go to any other SRO.

THE COURT: Mr. Tayrani, do you agree with that?

MR. TAYRANI: I do agree.

THE COURT: All right.

FINRA enforcement hearings do not have the ability to issue subpoenas compelling witnesses to testify or to produce books, records, or other information?

MR. KAPLAN:  Well, that's technically correct, Your Honor.

THE COURT:  Then the answer is yes.

MR. KAPLAN:  If you are a member of the industry, then under Rule 8210 you can be compelled -- let me rephrase that.

If you are a registrant or an associated person of a registrant you can be compelled under FINRA Rule 8210 to come in and testify.  Should you assert your constitutional right, they have expedited proceedings to bar you.  So you are compelled under 8210 to cooperate; that means come in, testify under oath where you are compelled.  If not, you are thrown out of the business and produce whatever records they want.

So it's a yes and no answer, Your Honor.

THE COURT:  But outside of their private entity and their private membership, if I got a subpoena to come to an enforcement hearing and testified because I knew Mr. Kim or I -- whatever, or I had emails from Mr. Kim, and I said, yeah, thanks, but no thanks, FINRA would be powerless to do anything, right?

MR. KAPLAN:  I agree.

THE COURT: Okay. So they can't bring any court actions to effectuate a compulsory process, correct?

MR. KAPLAN: Compulsory process? Yes.

THE COURT: If I ignore the subpoena --

MR. KAPLAN: No subpoena enforcement. They have no authority to issue subpoenas to nonassociated persons.

THE COURT: Okay. That's one set of questions. Hold on. I have a second set.

Okay. FINRA lacks the authority to promulgate general rules of prospective force.

MR. KAPLAN: If I understand your question, I don't agree. They do have that right.

May I -- I don't know if you have phrased it in the negative or a positive. But they do have the right to promulgate rules, prospective rules, rules for the industry to follow.

THE COURT: For their membership.

MR. KAPLAN: Yes.

THE COURT: But not for -- they can't pass a regulation for the SEC?

MR. KAPLAN: No, they cannot.

THE COURT: Okay. And no rule proposed by FINRA can take effect unless it's approved by the SEC commission, correct?

MR. KAPLAN: There are limited times it can happen

but, generally, that is correct.

THE COURT:  Okay.  Any decision by a hearing officer is subject to review by the SEC and Article III courts, correct?

MR. KAPLAN:  After exhaustion of the various stages of the administrative -- office of hearing officers' hearings at FINRA; you appeal to the SEC and then, of course, to the Court of Appeals.

THE COURT:  Okay.  But you have the appeal right, right?

You are not just stuck with whatever the enforcement panel does?  You can go to the SEC, you can go to a federal court, right?

MR. KAPLAN:  Absolutely, after you exhaust your remedies.

THE COURT:  Okay.  And that's pretty common in administrative law, right?  I mean, often people are forced to exhaust remedies before coming into federal court?  I mean, that's not novel, right?

MR. KAPLAN:  No.  That's a repetitive format for federal administrative efforts.

THE COURT:  Okay.  I take it you have seen the government's intervention brief?

MR. KAPLAN:  I did.

THE COURT:  Okay.  Could you please turn to

page 21 of that brief?

MR. KAPLAN:  Can you give me a moment?

THE COURT:  Sure.  Of course.

MR. KAPLAN:  You said page 21, Your Honor?

THE COURT:  Yes.

MR. KAPLAN:  Thank you.

I have it, Your Honor.

THE COURT:  Have you had a chance to look at the different commissions discussed in these various bullet points?

MR. KAPLAN:  I did not, Your Honor.

THE COURT:  At a break, can you go through that with your counsel, co-counsel --

MR. KAPLAN:  Sure.

THE COURT:  -- and tell me how FINRA differs from these?

MR. KAPLAN:  Sure.

THE COURT:  All right.  I wouldn't have expected you to do that, so no worries.  But we're going to have, I think, a few breaks today.  If you have a chance, that's fine.  If you need to do more briefing, that's fine.

Do you agree that FINRA does not have the power to regulate competitors?

MR. KAPLAN:  No.

THE COURT:  You don't agree?

MR. KAPLAN:  I don't.  They do regulate competitors.

THE COURT:  How do they regulate competitors?

MR. KAPLAN:  In many, many different ways.

THE COURT:  Give me some examples.

MR. KAPLAN:  I will give you many.  Markups limitations, disclosure limitations or requirements, but markups are particularly important because --

THE COURT:  Explain that to me.

MR. KAPLAN:  It sets rates.

So there are two different ways a security trades. One is either on a commission, that's where the broker is an agent; and then there is the other way where the broker is the principal.  Where there is a principal, there is a markup.  And there is a guideline on markups, and FINRA enforces that.  That guideline, as it's known, is sort of like the shifting target depending on what's happening in the securities industries at what time.

So the original rule, in spoken terms, of a five-percent markup for principal transactions and today it's much less because what's essentially happened is the cost of transactions have gone down dramatically.  But that's all governed then and regulated by FINRA in the ordinary course.

The amount of commissions you can charge is

regulated by FINRA.

THE COURT:  I'm sorry.  But these are for the members?

MR. KAPLAN:  These are for the members.

THE COURT:  I'm talking about competitors.

MR. KAPLAN:  What competitors, Your Honor?

There are no competitors to FINRA, that's the whole point.  What would a competitor be?

THE COURT:  All right.

Mr. Tayrani, you agree that the question doesn't make sense because there are no competitors?

MR. TAYRANI:  I agree that there are no other national securities associations, so I would say that FINRA does not regulate its competitors.

THE COURT:  Okay.  If there were would FINRA have the ability to regulate them under current law?

MR. TAYRANI:  I believe so, Your Honor.  They would be separate entities under the Exchange Act.

THE COURT:  So if -- I don't know, let's call it SHE-RA [sic] was to get created tomorrow and it was a direct competitor to FINRA, FINRA wouldn't be able to do anything to compete -- to regulate it or to somehow bar its competition, right?

MR. TAYRANI:  I agree with that, Your Honor.

THE COURT:  Do you agree with that, Mr. Kaplan?

MR. KAPLAN:  In the abstract, absolutely.

THE COURT:  Okay.

MR. KAPLAN:  Specifically, I might distinguish it, Your Honor, because I might say that we don't know how that would come about because there's never been another entity like FINRA, a national securities association.

THE COURT:  I don't know; people are pretty --

MR. KAPLAN:  They've tried, Your Honor.

THE COURT:  -- novel, enterprising.

MR. KAPLAN:  They have tried.  They have not succeeded.  Many times it's been tried in the industry.  It hasn't worked.

THE COURT:  Why hasn't it worked?

MR. KAPLAN:  Primarily, to get through the SEC's requirements to become that are so strict, and it's virtually after this point of such a long evolution of policies, procedures, and rules, what's happened essentially is -- I can't imagine any organization could start and get permission from the SEC to be that.

THE COURT:  All right.  Okay.

Can you talk to me about bar associations for a moment.

MR. KAPLAN:  Sure.

THE COURT:  So I am no longer a member of any bar association, but I was for a very long time.  And I know

that I could not be a practicing lawyer unless I was a member of a bar association, right?

MR. KAPLAN:  Not in New York, Your Honor.  In New York you have to be a member of the bar but you don't have to be a member of a bar association.

THE COURT:  All right.  Sorry.  You have to be a member of the bar, correct?

MR. KAPLAN:  Yes.  Absolutely.

THE COURT:  I was loose with my words.

In D.C. you have to be a member of the bar?

MR. KAPLAN:  Say that again.

THE COURT:  In D.C. -- in any state you have to be a member of a bar to practice law?

MR. KAPLAN:  Yes, and get that license.

THE COURT:  Yes.  Okay.

And if I lose my license to practice in D.C. there is a pretty good chance, if I'm barred elsewhere, there are going to be proceedings against me in Kentucky, too, and I may lose my license there too, right?

MR. KAPLAN:  It's possible.  Certainly.

Just ask Rudy Giuliani.

THE COURT:  Yes.  Well, we'll avoid that for now.

But a bar -- I have to pass a test to get into the bar.

MR. KAPLAN:  Generally.

THE COURT:  I have to follow its rules.

MR. KAPLAN:  Yes.

THE COURT:  I have to do the endless CLE credits; I have to pay yearly fines, or dues, right?

MR. KAPLAN:  That's a very good slip, Your Honor. A lot of people think it's fines.

THE COURT:  I have to pay them, right?

There are rules of the bar, there are ethical rules.  There are various rules.  And if I violate those rules I can get kicked out of the bar, right?

MR. KAPLAN:  Sanctioned severely.

THE COURT:  And the way it typically works, as I understand it, is:  I go to a bar committee, which are not judges but members of a bar commission, which take a look at an enforcement action that may be brought against me by lawyers of the bar.

MR. KAPLAN:  I can't comment.  That's not the way it works in New York, Your Honor.  In New York, the appellate division, which is the interim appeals court, has an office in each department that does the disciplinary review and determinations.

THE COURT:  Okay.  But that's not done by the judges in the first instance.

MR. KAPLAN:  Not by the judges.  It's done by the staff in the first instance.

THE COURT: Right. Yes. Not by judges, right? And, of course, if you get kicked out, you can appeal it to a judge after you have exhausted your remedies.

MR. KAPLAN: Well, if -- they can't kick you out. They can bring a case that you violated this or that, and then you have a hearing in front of a judge.

THE COURT: You have a hearing in front of the judge.

MR. KAPLAN: Yes.

THE COURT: So you have the ability to go to a judge, and the judge can kick you out?

MR. KAPLAN: The judge will kick you out if he finds that you violated.

THE COURT: Okay. I think in D.C. it's actually quite different, that there is a commission that you go to before you actually get judicial review.

Someone can correct me on that if I am wrong.

MR. KAPLAN: I hope never to know, Your Honor.

THE COURT: I imagine no one in here has had to go through that process.

Why is FINRA any different -- why is it any different -- I mean, I basically have set up a membership organization that's in charge of determining where I can practice or if I can practice; it enforces its own rules. It enforces federal rules, too, to the extent that if I

break federal rules I can be kicked out of the bar; and there is ultimately judicial review for any enforcement proceeding against me.

MR. KAPLAN:  The distinction are multiple -- distinctions are multiple.  I would point out that using the *Halleck* standard they are engaging in government action.

THE COURT:  No one has ever accused the bar of being a state actor, right?  I mean, no one thinks that bar commission members or staff members have to be appointed by the President?

MR. KAPLAN:  Yes.  But they don't have the Constitution of the United States governing the conduct of the law; meaning that -- it's not a federally mandated event; the bar association is a state --

THE COURT:  Well, they're state mandated, right?

MR. KAPLAN:  Yes.  But it's not -- I can't speak for the constitutions of 50 states.  I can speak for the Constitution of the United States.

THE COURT:  But no one would say that the New York Bar is a state actor in New York, right?  No one would make that argument?

MR. KAPLAN:  I wouldn't.

THE COURT:  Right.  It's a private entity, right?

MR. KAPLAN:  Quasi-private, but yes.

THE COURT:  Quasi-private.

It regulates its own members, right?

MR. KAPLAN:  True.

THE COURT:  It forms its own rules, right?

MR. KAPLAN:  Somewhat.

THE COURT:  I mean, so does the American Medical Association, right?

I mean, I can go through any number of industries where you have to be a member of an association to practice, and the association can kick you out if you violate the rules, and then you are stuck, you are no longer practicing, that aren't even close to being considered state actors or that you need delegated authority for.

MR. KAPLAN:  I would distinguish a number of those associations as not being state actors.

THE COURT:  But why?  That's my question.

Why is FINRA a state actor but not the New York Bar?

MR. KAPLAN:  Because they're enforcing federal law.

THE COURT:  No, no.  We went over this.

FINRA is not enforcing federal law.  FINRA is enforcing FINRA rules.

MR. KAPLAN:  And federal rule.

THE COURT:  It can, but it's mainly enforcing FINRA's rules.

MR. KAPLAN:  "Mainly," I think is a word I cannot accept, Your Honor.  I have been involved --

THE COURT: Mr. Tayrani.

MR. KAPLAN: -- in many disciplinary actions --

THE COURT: Let me just get his view on this.

MR. KAPLAN: Sure.

THE COURT: Am I totally off base comparing this to bar associations because they don't implement federal rules?

MR. TAYRANI: I think a lot of what you are saying makes very good sense, Your Honor.

I do think there are some state bar associations that are created by state law and their membership. Their board of directors are appointed by state officials, so they are state actors and, in that way, they are different from FINRA because FINRA was not created by federal law and its board of directors is not appointed by federal officials.

But there are some state bars -- if you look, for example, at the *Keller* case from the Supreme Court that was a First Amendment challenge against the California state bar. The First Amendment applied there because the California bar was the state actor.

THE COURT: Okay. But let's forget those for a moment, right?

The state bars that are not created by state laws, they're voluntary associations; those are like FINRA, yes or no?

Also, with respect to this argument about enforcing federal law -- I mean, bar associations enforce federal law to the extent that if I am a bar member and I violate federal law I am going to get kicked out of my bar.

MR. TAYRANI:  I think if you commit a federal crime then you will be disbarred because you have acted contrary to the bar's standards.

THE COURT:  Is that how FINRA works or does FINRA actually enforce federal law?

MR. TAYRANI:  FINRA enforces its own rules and can also enforce SEC rules and the Exchange Act.  In this case it is enforcing a FINRA rule.

THE COURT:  Okay.  So that's the difference between my discussion of the bar associations and FINRA, is that FINRA can actually say:  I am kicking out Mr. Kim because he violated 10b-5?  Or does FINRA always say:  I am kicking out Mr. Kim because he violated our rules by violating 10b-5?

MR. TAYRANI:  No.  FINRA can say, in an appropriate case, that the respondent has violated the Exchange Act.

THE COURT:  Okay.  So does that distinction sort of kill my analogy?

MR. TAYRANI:  I think state bars are different in kind for several reasons, including because many of them are

created by state government.  They are overseen by --

THE COURT:  Not those.  I am talking about a state bar that's not created by state government.

MR. TAYRANI:  I think a state bar that is not a state actor that kicks out an attorney for violating state law is not enforcing state law.  They are enforcing their own rules which require --

THE COURT:  Okay.

MR. TAYRANI:  -- high standards of ethical conduct from bar members.

THE COURT:  All right.  Mr. Luh, do you agree with all of this?

I thought in your brief I saw a reference to the bar association claim, which I had on my own -- which is why I am thinking about this.

MR. LUH:  Yes, Your Honor.

We do agree that FINRA enforces both its own rules and in some cases -- though I believe it's a much smaller part of FINRA's work -- and FINRA also can enforce federal securities laws and regulations.

We did discuss state bars in the context of the First Amendment arguments raised by the plaintiff, and we do think the analogy is apt in that sense.  Though, for the reasons that Mr. Tayrani discussed, I think there are probably limits to the analogy.

THE COURT: Okay. All right.

All right. Mr. Kaplan, I have some more specific questions about your client.

If we go forward -- if the proceeding goes forward you have to file an answer, correct?

MR. KAPLAN: Correct.

THE COURT: And then there is an exchange of discovery. But as I understand it, your client has already given over discovery. The only discovery left to do is from the SEC or FINRA to you; is that correct or not?

MR. KAPLAN: It's not the SEC, Your Honor, it's FINRA.

THE COURT: FINRA to you.

MR. KAPLAN: And the rules are basically not like the federal rules of discovery. It's more the hearing officer issues an order that FINRA turn over its files, investigatory file in bulk. So you don't get to ask questions, interrogatories, demand for production; you get the entire production in bulk. And then it's up to you --

THE COURT: But your client has already made his production -- right? -- he's done with his production?

MR. KAPLAN: Not necessarily. I have been involved in situations where they have asked for things after.

During the investigation he did appear under 8210

and testified, and produced documents also.

THE COURT:  Mr. Tayrani, do you know if FINRA plans to ask Mr. Kim for more documents?

Can you make a showing -- can you make a representation on that one way or the other?

MR. TAYRANI:  I cannot, Your Honor.

THE COURT:  Okay.

MR. KAPLAN:  Your Honor, if I may, I just want to point something out.

THE COURT:  Sure.

MR. KAPLAN:  Under FINRA's Rule 8210 they can continue to take investigatory testimony even after they bring the disciplinary complaint.

THE COURT:  Okay.  All right.

I want to talk to both of you for a bit about what is going to happen if this proceeding goes forward.

Mr. Tayrani, can you please come up.  You may both stay standing.

Okay.  We agree that currently FINRA is not pursuing any violations of federal law; it's just pursuing a violation of FINRA, correct?  Everyone agrees?

MR. KAPLAN:  That is true, Your Honor.

THE COURT:  Are we agreed that FINRA is not seeking the death penalty?

MR. KAPLAN:  No, I don't agree.  I will tell you

why I don't agree.

THE COURT:  Let me ask him if he agrees with that first.

MR. TAYRANI:  I agree with you, Your Honor, that FINRA is not seeking to expel or bar Mr. Kim.

THE COURT:  Okay.  I noticed in your declaration that you had a clause at the end that said "at this time."

So I think what he is about to tell me is that there is nothing to stop you from adding that.

MR. KAPLAN:  No, that's not what I am going to say, Your Honor.

THE COURT:  Okay.  Hold on.  I am going to let you say whatever you want to say.

MR. KAPLAN:  Thank you.

THE COURT:  Why was that clause added?

MR. TAYRANI:  I think enforcement would like to reserve the flexibility to seek additional sanctions in the event --

THE COURT:  Well, enforcement can't have it both ways.  It can't tell me:  Don't worry, Judge, because we're not pursuing the death penalty, but we might pursue the death penalty.  I mean, you have got to take one stand or the other.

MR. TAYRANI:  My understanding of the declaration is that, based on the circumstances that enforcement is

aware of now, it does not intend to seek or bar Mr. Kim.

If it learns new information or there are new developments then it reserves the right to seek additional sanctions.

THE COURT:  But it would have to bring different claims for that.

MR. TAYRANI:  It's possible that during the hearing itself --

THE COURT:  Okay.  Mr. Tayrani, I have to tell you, the declarations are literally meaningless to me if FINRA can change its mind tomorrow.  I mean, I am going to -- I mean, both of you are going to have homework.

Your homework is going to include trying to figure out which way you all want it.  Because if you are telling me I can allow this to go forward and that this is different from Alpine because there is no death penalty, then I need to know there is no death penalty.  It can't just be:  There is no death penalty as of this moment.

MR. TAYRANI:  Your Honor, I understand the declarations to make clear --

THE COURT:  No, no, no.  I am telling you, I have read the declarations; they're totally ambiguous.

I mean, to say that we're not going to pursue the death penalty unless new information comes out is, like, wiggly -- what do you call it? -- wiggliest -- it is

literally meaningless.  Because they can -- you know how this works.

You can come up tomorrow:  Oh, we didn't have this one email; now we are pursuing the death penalty.  He is there having to argue judicial estoppel because it's not new and he is going to lose that.

So what I am telling you is:  You are going to want to go back to your client and get a firm commitment, one way or the other, as to whether you are going to pursue the death penalty.  If you are going to leave it open, that's totally fine, but I am just going to have to take that into account in my decision.

MR. TAYRANI:  I understand, Your Honor.

The declarations as drafted are intended to preserve that flexibility.

THE COURT:  Okay.  Then they're meaningless to me.

So I guess what I'm telling you is:  If you want the declarations to have any import and meaning in this case, they can't stand as they currently are.

MR. TAYRANI:  I appreciate that, Your Honor.

At the end of the day, I don't believe the declarations have significance, in terms of the outcome that this Court should reach; but I appreciate your interpretation of the wiggle room that may exist under the current terms of those declarations.

THE COURT:  Yes.  I mean, you may well be right about that, but you are the one who introduced them.  I am just telling you what worth they have.

You can sit down, sir.

Do you want to tell me why they are pursuing the death penalty even though they say they are not?

MR. KAPLAN:  It's not up to them.

THE COURT:  You can sit down.

MR. KAPLAN:  I'm sorry, Your Honor.

It's not up to them, it's up to the panel.

Most interesting, they say they're not pursuing the death penalty but, when you look at the sanction guidelines governing this particular violation, it specifically says:  Strongly consider barring the respondent --

THE COURT:  It says what?

MR. KAPLAN:  It says:  Intentional or reckless misconduct.

If you read the charges against Mr. Kim, as we recited in our reply brief, they are quite significant allegations of intentional conduct.

In the sentencing guideline itself it says -- for intentional or reckless misconduct it tells the panel:  Strongly consider barring the respondent.  It doesn't really matter.

It may be -- it's sort of like when a defense counsel pleads with Your Honor in a criminal sentencing not to put his client away or her client away for a long time; it's the same proposition.  It's your decision, Judge, it's not theirs.

This demonstrates that those declarations are of really no probative value --

THE COURT:  Mr. Tayrani, is that right?

Is what he is saying right?

MR. TAYRANI:  I agree that the hearing panel makes the ultimate decision about what sanction to impose and can impose a sanction that is different from what enforcement requests.

THE COURT:  Well, then why do these declarations -- why even submit the declarations?

MR. TAYRANI:  The fact that enforcement is not requesting a bar makes it far less likely that the panel will actually impose that sanction.

THE COURT: Okay.  All right.  Thank you.

Mr. Tayrani, actually, can you stand up for a moment.  I apologize for the jack-in-the-box.

MR. KAPLAN:  May I sit down?

THE COURT:  You can sit down, sir.

MR. KAPLAN:  Thank you.

THE COURT:  At our last status conference I was

told that an answer in a FINRA proceeding is actually quite involved or more involved than a federal court answer; is that correct?

MR. TAYRANI:  I think it depends on what Mr. Kaplan decides to file.  There is leeway in terms of how detailed or how cursory that answer --

THE COURT:  If he just -- if there was like an arbitration and he just sort of issued a flat denial, I deny everything, would that be a sufficient answer under the rules?

MR. TAYRANI:  I don't know the answer to that, Your Honor.  I think --

THE COURT:  Can you find the answer?

MR. TAYRANI:  -- there is a lot of leeway in terms of what he finds.

THE COURT:  Can you find out the answer to that for me on a break?

MR. TAYRANI:  Absolutely.

THE COURT:  Ideally, if I could see some samples of answers that have been filed in similar enforcement proceedings, that would be helpful.

MR. TAYRANI:  Absolutely.

THE COURT:  I just want to make sure I fully understand what happens.

So he answers if I don't enjoin.  He answers.  The hearing officer may call a status conference to talk

schedule?

MR. TAYRANI:  Correct.

THE COURT:  The panel?  It's not an officer, right?

MR. TAYRANI:  Yes.  There is one hearing officer among the panel of three.

THE COURT:  All right.  So he or she is acting on behalf of the panel?

MR. TAYRANI:  Correct.

THE COURT:  And they will set a schedule with enforcement action that you-all, I think, agree might happen sort of in a few months?

MR. TAYRANI:  We think the hearing itself is likely to be in early to mid-2024.

THE COURT:  Do you agree with that, Mr. Kaplan?

MR. KAPLAN:  Usually they take 9 to 12 months, Your Honor.  That's about right.  That seems --

THE COURT:  All right.  During that interim time, what is Mr. Kim going to be required to do?

MR. TAYRANI:  He may be required to produce additional materials, additional documents.  He may be required to submit prehearing briefs.

THE COURT:  All right.  What happens at the hearing?  Can he bring witnesses to the hearing?  What happens at a hearing?

MR. TAYRANI:  Yes, Your Honor.

Enforcement can call witnesses, Mr. Kim can call witnesses, and each side can cross-examine the other side's witnesses.

THE COURT:  All right.  Is there a post-hearing briefing?

MR. TAYRANI:  There typically is, Your Honor.

THE COURT:  All right.

What happens if I don't enjoin him -- I don't enjoin you, but he just doesn't answer, what happens then?

MR. TAYRANI:  Then enforcement can move for the entry of a default judgment.

THE COURT:  All right.  So he's going to answer if this doesn't get enjoined?

MR. TAYRANI:  That is my expectation.

THE COURT:  That would be my expectation, right, Mr. Kaplan?

MR. KAPLAN:  Yes, Your Honor.

THE COURT:  All right.  Anything else associated with the hearing, the process, the burden on Mr. Kim that we have not yet discussed?

MR. KAPLAN:  May I be heard, Your Honor.

THE COURT:  Yes.  Sure.  Come on up.  You stay up, both of you.

MR. KAPLAN:  I just want to clarify something.

It's not like an arbitration panel, the three-member panel.  There are two industry members that are on the NAC or on the district committee, and sometimes they don't have people so they appoint them.

But the essence of the hearing and all of the preliminary matters are done by the hearing officer.  So when you have your conferences and you have your motions for whatever it could be -- by way of illustration, we get discovery from FINRA and enforcement and we realize that there are related matters they didn't produce.  FINRA says, no, we're not giving them to you, we don't think they're relevant.  You then go into motion practice like you would in federal court, the same way.

THE COURT:  Okay.

MR. KAPLAN:  All of those decisions are made by the hearing officer.  And the hearing officer writes the decision and essentially creates the findings of facts.

THE COURT:  All right.  Mr. Kaplan, come back up.

You can sit down, sir.

MR. KAPLAN:  Sorry.

THE COURT:  Is there anything else about the hearing or the burden on Mr. Kim that we have not yet discussed?  Anything else that he would be required to do?

MR. KAPLAN:  Just disclosure, Your Honor.

THE COURT:  If there is judgment against him by

the panel, say a fine or the death penalty, is all of that stayed pending his exhaustion of administrative remedies?

MR. KAPLAN:  It's stayed while you appeal to the NAC.

THE COURT:  Okay.

MR. KAPLAN:  It's not stayed if you get the death penalty; you have to go ask the SEC to stay it.  And if you go beyond that, obviously, you go to the -- depending on which case, either to the district court or to the Court of Appeals for a stay.

THE COURT:  All right.  I want to turn to Alpine for a bit.

You agree -- does everyone agree that the Alpine order is not binding on me?

MR. KAPLAN:  I would say it's suggestive, Your Honor.

THE COURT:  Yes.  I get a lot of suggestions.

My question is:  Is it binding on me?

MR. KAPLAN:  I don't believe it is.

THE COURT:  Right.  Okay.

Mr. Tayrani, do you agree with that?

MR. TAYRANI:  I most definitely agree.

THE COURT:  Mr. Luh, do you agree with that?

MR. LUH:  Not binding, Your Honor.

THE COURT:  Okay.  Thank you.

This is a little bit out of order.  But one of my questions is -- and we've looked at this extensively.  I think I have an answer but I am not sure that we have a case example other than two cases that I sent you all, and I think are really -- only *Benisek* fully applies.

If I were to find that there is a likelihood of success on the merits and I were to find irreparable harm, which I think I have to do regardless because there is a Constitution violation -- I don't think because of Axon by the way, I think that's totally different; but I think under D.C. Circuit precedent I have to find that.

Can I nonetheless find -- can I nonetheless deny the TRO and the injunction by saying that the public interest and the equities overcome those two first factors?

MR. KAPLAN:  Judge, you can say whatever you determine to say.  You said, Could I say that?  Sure.

But I would think it would be error.

And the reason I think it would be error is because we're ignoring the constitutional public rights which, at least in my understanding of the pyramid and the law, is the height of the law, and everything flows from there.

THE COURT:  Well, see, that's my question though.

Because if that is the correct interpretation, that if there is a substantial likelihood of success on a

constitutional claim, then essentially you automatically get a preliminary injunction, that seems to me to undercut well-settled precedent that you can never have preliminary injunction as of right.

MR. KAPLAN:  Yes.  I understand that.

THE COURT:  I have never seen a case that said: If you get a preliminary injunction -- if you get substantial likelihood of success on a constitutional claim you basically get the preliminary injunction; there is basically no discretion left for the judge.  The other factors, no matter what is going on it doesn't matter.

MR. KAPLAN:  Your Honor, there are many possibilities we can come up with to distinguish this fact pattern.

THE COURT:  I just want to know -- basically, I am ordering you-all to give me supplemental briefing on this point, not to exceed five pages; and that's going to be due Saturday at 11.  I am very apologetic for causing work on a Friday evening and weekends, I try really hard not to do that in my cases but we are where we are.

I think, Mr. Tayrani and Mr. Luh -- I mean, there is a D.C. Circuit case -- what is the case?  Do you have that?  Do we have copies?

Hold on.  Sorry.

MR. KAPLAN:  Your Honor, you are alluding to the

cases that your law clerk sent us -- the names the other day -- in an email?

THE COURT:  Yes.  Those are two cases that will get you started, but there is another D.C. Circuit case that will be very helpful to you that they are going to have to figure their way out of that I am about to tell you all about that I don't think was briefed.

Okay.  The case that I want you all to also brief is *Archdiocese of Washington versus Washington Metro Area Transit Authority*, 897 F.3d, 314, 334, D.C. Circuit, 2018. And the pin cite -- hold on.  Essentially, what -- sorry.

So basically this says the Archdiocese -- to show likelihood of success on the merits, it would prevail on the final three factors because the loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury.  So that's one case that is helpful to you.

I am going to get you another case that is helpful to you.  Just wait one second.

We're going to take a short break after that, if you want to sit down while you wait, that will be good.

MR. KAPLAN:  Thank you, Your Honor.

THE COURT:  So the second case is *League of Women Voters of U.S. v Newby*, 838 F.3d, 1, pin cite 12, D.C. Circuit 2016.  It says:  Appellant's extremely high

likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest.  There is generally no public interest in the perpetuation of unlawful agency action.

So this leaves a lot of wiggle room because here they're saying if there is an extremely high likelihood of success on the merits it's a strong indicator, but not dispositive that a preliminary injunction would serve the public interest.  So there you go.

Both of you have cases to get started with. Again, I want supplemental briefing by Saturday.  I think I said -- did I say 10 or 11?

MR. KAPLAN:  11.

THE COURT:  And on the issue of:  If I were to assume without deciding or decide that there is a substantial likelihood of success whether I have the discretion to nonetheless deny the TRO and the PI if I find that the likelihood of success -- if I find that the equities and public interest nonetheless outweigh the first two factors finding and, specifically, how the equities and the public interest overcome the constitutional harm.

Mr. Luh, I don't think your brief discussed the preliminary injunction at all.  I definitely want to hear from you all about the government's contention as to what the public interest harm and equities harms are here either

way, whether there is a substantial likelihood of success or not a substantial likelihood of success.

MR. LUH:  Your Honor, the reason we didn't address that in our brief is that our intervention here is limited to the merits and the likelihood of success.  And we aren't taking a position on how the Court's balancing of factors should come out.

THE COURT:  Okay.  Can I order you to take a position?

Let me put it to you this way:  I am highly interested -- it would make a great deal of meaning to me to know what the government's position is on this.

MR. LUH:  Sure.

THE COURT:  Like you can't just, like, play the first quarter and then bop out.

MR. LUH:  I can speak in general, Your Honor, to the preliminary injunction standard, and I would point to Supreme Court guidance.

Supreme Court holdings in *Winter versus NRDC*, 555, U.S. 7, saying that a preliminary injunction is an extraordinary remedy never awarded as of right.  So that would suggest that the Court -- no matter how the factors pan out, that the Court always has discretion to deny relief for equitable reasons.  Preliminary injunction is an equitable remedy, and that leaves discretion in the hands of

the Court.

THE COURT:  Okay.  Well, I want you to file a supplemental brief, too, on this question.  I mean, if you don't want to take a position, that's fine; I don't understand why you wouldn't.

But I do want the government's position on:  If I find that there is a likelihood of success on the merits, whether I nonetheless legally can deny the TRO and the PI.

MR. LUH:  Understood.

THE COURT:  Okay.  Mr. Tayrani, I take it one of the things you are going to tell me is that the public has an interest in the enforcement of securities rules and laws because millions of dollars every day are at stake, tens of millions of dollars every day are at stake, and you can't just upend everything, and that you are afraid of add-on cases, right?

MR. TAYRANI:  That's exactly what we intend to say, Your Honor.

I would point you back to the decision you pointed us to, which is *Benisek versus Lamone*, where the district court did assume that there was a likelihood of success on the merits.  And there was most definitely the possibility of irreparable harm because the plaintiffs were challenging a map that was going to apply in the upcoming 2018 election.  The Supreme Court nevertheless concluded that it was well

within the district court's equitable discretion to deny preliminary injunctive relief because of the disruptive impact of granting that relief and because there was a pending case before the Supreme Court that could shed additional light on the likelihood of success on the merits. So we think that this case is on all fours with *Benisek versus Lamone*, and this Court would be acting well within its broad equitable discretion to deny an injunction even if it were to find or to assume a likelihood of success on the merits and irreparable harm.

THE COURT:  Okay.  Well, John has excellent legal research skills, better than all of you guys.

And I believe *Benisek* is on 3.84 -- 3.8 legs.

My concern -- which you are going to point out for me, I assume, in your supplemental brief -- is that there was a six-year delay there between when the plaintiff had a claim and when he brought the claim; you are going to need to address that.

You are going to need to address the fact that the Supreme Court clearly said, on an alleged constitutional violation, that I can nonetheless deny -- that I have wide discretion to deny the PI, especially since there is a case on appeal that would answer basically this question.

You guys don't need to do it now.  You can if you want.  But that's what I want in the supplemental briefing.

You are going to have to figure out this D.C. Circuit issue for me.

MR. TAYRANI:  We will look closely at those cases, Your Honor.

On *Benisek*, all I would add is to the extent that there was a plus factor in that case that additionally weighed in favor of denying the injunction, which was the six-year delay, nothing in the Court's opinion suggests that that additional factor was a prerequisite to the district court's exercising its discretion to deny injunctive relief.

THE COURT:  Okay.  That is helpful.

With respect to this sort of opening the flood, have you had any more cases?  Is this the only case since *Alpine*?

MR. TAYRANI:  So we are aware of one additional FINRA respondent who has moved for a stay of his FINRA disciplinary proceeding based on the constitutional arguments that are at issue here today.  That stay was denied by the hearing officer, and that respondent has communicated to FINRA's enforcement staff that he intends to initiate litigation and seek a preliminary injunction.  That has not happened yet.

In addition, there is a FINRA respondent who is challenging his sanction before the SEC and there has requested supplemental briefing, which the SEC ordered on

these constitutional issues.  So it's clear that they are front and center in the minds of many FINRA respondents.  And we do fear that if this Court were to grant a preliminary injunction, that it would lead to a proliferation of copycat lawsuits.

THE COURT:  Well, let me ask you this -- and I promise we will take a break, but I am on a roll.

What's the real harm?

I mean, briefing is going to be done in November, right?  November 17 is the end of briefing in Alpine.

I have to think that the D.C. Circuit is going to move quickly on this, given that it's a PI and the other cases are coming.  I mean, it's going to know about this one because, whatever I do, someone is going to appeal.  So let's say you get a decision in January, February, which I probably think is the outside of when you might get a decision, let's say March -- right? -- let's give them a couple of extra months.  That's -- if I do my math correctly, that's six months from now, a half a year from now.

What if you just stayed enforcement actions for a year?  I mean, what would the actual harm be of doing that?

It's not a rhetorical question; I mean, I actually want to know.

MR. TAYRANI:  FINRA has a statutory obligation

under the Exchange Act to protect investors, to protect the public interest, to enforce its own rules and the securities laws, and we take that obligation extraordinarily seriously.

If FINRA were unable to move forward with its disciplinary proceedings for six months, for a year, then that does remove the frontline regulator on which the SEC relies, on which Congress relies to police the securities markets.  It would dramatically increase the workload on the SEC, which is one of the reasons that Judge Howell denied a preliminary injunction.  She was --

THE COURT:  Yes, but she got tossed, so that is not helpful.

MR. TAYRANI:  On a preliminary tentative basis by a divided motions panel.

THE COURT:  But she got tossed.

MR. TAYRANI:  Her decision was enjoined; you are absolutely right, Your Honor.  But these concerns did resonate with her in the first instance.

And it is a concern that if you take FINRA out of the picture for a year that the essential first-line regulator for the securities industry is no longer able to do its job, and that there is no one able to take its place because the SEC simply does not have the resources which is why Congress has preserved this self-regulatory model in the Exchange Act and reaffirmed it again and again.

So we think the harm to investors, the harm to the markets would be severe.  And the message that it would send to broker-dealers who are contemplating maybe pushing the bounds of legality or the bounds of ethics is that there is no one watching you for the next 6 to 12 months.

THE COURT:  Well, there is no one watching you for right now, but they are going to start watching when they come back.  It's not like you get a free pass for those six months to violate the rules.

MR. TAYRANI:  That will depend, Your Honor, on the outcome of the legal issues that we're discussing today because some of these issues are so far-reaching that they would threaten FINRA's continued existence as well as the existence of other SROs, which is one of the reasons that we believe there is no likelihood of success on the merits because the consequences are so far reaching and unprecedented that they would eliminate the self-regulatory framework that has worked so well for the last 17-plus years.

THE COURT:  But why would it eliminate it?  Why wouldn't it just happen -- what happened in *Lucia* where the SEC just said:  Fine, we will appoint the ALJs?

Why wouldn't that just be the answer here?  Here, you have all of these commissioners; you are now duly appointed by the executive?

MR. TAYRANI:  Because this is not a problem that FINRA could fix itself.  If the Court or if the D.C. Circuit were to hold that FINRA's board members and its hearing officers are subject to the requirements of the appointments clause and the Constitution's removal requirements, then those board members and those hearing officers would need to be presidentially appointed and presidentially removable.

THE COURT:  Right.  But there are two versions of presidential appointment under the nondelegation clause, as I understand it:  The really important people who actually have to be nominated by the President, and the sort of random people who aren't that important who can just be appointed by agencies through the President.

As I understood it -- and I can be wrong -- that was the ALJs and the SEC.  What the SEC did was say:  Now we have appointed all of you.  Certainly, FINRA would undoubtedly fall into that latter category.

MR. TAYRANI:  The SEC is a head of department under the appointment --

THE COURT:  Right.  So couldn't the SEC appoint all of the FINRA people?

MR. TAYRANI:  There is no statutory mechanism for the SEC to appoint FINRA hearing officers and FINRA board members.

THE COURT:  Yes, there is a constitutional

mechanism though.

If there is a finding that in order -- that this is a state actor and, therefore, has to -- the officers have to be appointed by the executive, you don't need a statute, you have got the Constitution, good old article -- whatever, Article 1, 2.

MR. TAYRANI:  It would need to be a statutory fix, Your Honor.

The SEC needs to get its appointment authority from somewhere.  The appointments clause simply says that an inferior officer can be appointed by the President, a head of a department or the judiciary if Congress vests that appointment authority in one of those three entities.  So we would need a congressional fix.  And until Congress got its act together and amended the Exchange Act in response to this Court's ruling or the D.C. Circuit's ruling, FINRA may well be sidelined because it would not have constitutionally appointed board members and officers.

THE COURT:  Okay.  But that's if the President doesn't do it.  What if the President just -- someone hands the President:  Here are all of the FINRA hearing officers and board members who have been doing their job beautifully. The President can appoint them directly without getting congressional approval if they fall into that second category, right?

MR. TAYRANI:  I don't think that's the case, Your Honor.

THE COURT:  What do you think?

MR. KAPLAN:  I think that would solve part of the problem.

THE COURT:  If I find -- if there is a finding by me or the higher power similarly -- that's all we are worried about right now, I am a stepping stone -- if they find that this is a violation and that the officers -- hearing officers or board members have to be appointed by the executive, do they -- is he right?  Is there going to need to be a congressional fix?

MR. KAPLAN:  That's one way of doing it, but he can also be appointed by the President and that would resolve the immediate problem, I believe.

THE COURT:  If those people have to be confirmed by the Senate, let me tell you -- if all of those people have to be confirmed by the Senate, I can tell you from personal experience, we're going to be here for years.

MR. KAPLAN:  I don't think that level would be required.  It's certainly not the same as an ambassador or a federal judge.

THE COURT:  Mr. Luh, would the President need Senate approval or confirmation?

MR. LUH:  So, Your Honor, there are inferior

officers and there are principal officers.

THE COURT:  Right.  That's what I was trying to say earlier but I didn't say it as well as you did.

MR. LUH:  Below that, there are employees or functionaries who are not subject to the appointments clause.

The problem here is, though, that FINRA is a private entity.  This is -- you are talking about an apparatus that would have to be set up.  It wouldn't just be a simple matter of signing a few papers.  This whole apparatus relies on FINRA's private status.

THE COURT:  Right.  But that is assuming that FINRA is really a private actor and not a state actor.  But what if I find that FINRA -- what if the D.C. Circuit -- let's be honest, that's who we're worried about.

What if the D.C. Circuit finds that FINRA is a state actor and then you are subject to the delegation clause?  Why do you need a whole mechanism?  They are now a state actor.

MR. LUH:  Your Honor, I think it's important to draw a distinction between whether FINRA is a state actor and whether they are part of the government for purposes of the Appointments Clause.

THE COURT:  I'm sorry, you are right.  Okay.  Let me rephrase the question.  You are absolutely right.  I got

those confused.

The D.C. Circuit finds that it is not a state actor but it's subject to the delegation clause, right?

MR. LUH:  Finds it -- I'm sorry.  It finds that -- you are talking about the appointment?

THE COURT:  If the D.C. Circuit finds that FINRA is subject to the delegation clause, that FINRA hearing officers have to be appointed.

MR. LUH:  The appointments clause, Your Honor?

THE COURT:  Sorry.  Sorry.  Sorry.

The appointments clause.

I'm sorry.  I apologize.  The appointments clause.

I am talking about the appointments clause.  I have confused you by saying "delegation clause."

MR. LUH:  Your Honor, I think my hesitation and my lack of understanding here is because it would be such a radical departure to find a private entity subject to the appointments clause.

I think it's difficult to imagine what the remedy would be or what remedial steps would need to be taken because, in point of fact, FINRA is not a part of the government.  It was neither created nor is it appointed by the government, so we're talking about a fundamental difference in structure here.  That's why I am finding it difficult to -- I don't think it would just be a matter of

signing a few papers -- somebody signing a few papers in the afternoon is what I am saying.

MR. TAYRANI:  Your Honor, may I be heard?

THE COURT:  Come on up.

MR. KAPLAN:  It seems to me that when Your Honor says:  Take a six-month hiatus and see what the circuit court does, it makes a lot of sense.

THE COURT:  You know, I love it when people say I am absolutely right and I make a lot of sense.  He is going to say that makes no sense, and you are going to say I was absolutely wrong about with whatever he said I was absolutely right about.

MR. KAPLAN:  Well, but there is a logic to it, Your Honor.  It's not because it fits -- clearly, you said it yourself a moment ago, you are a stepping stone to the circuit court, and maybe not.

Maybe if there is a hiatus and the court decides before you, maybe this isn't theoretically, then that would bind you, whatever it is.  Good or bad for Mr. Kim.  But I would imagine that is taking the next step, too, to the Supreme Court.

But it seems to me that -- logically, let's go the other way; you don't grant an injunction.  Now Mr. Kim must go through that entire proceeding, all of the expenses.  And it turns out that it's correct what Mr. Kim says; the

circuit court agrees that there is constitutional problems with this structure.  In that event, what does he do?

THE COURT:  He waits for the en banc decision to come down, which will come down I assure you.

I mean, if I was Mr. Kim I would not be waiting around for the appellate court to save me -- in terms of how I conducted my business going forward.

MR. KAPLAN:  Well, he doesn't have a choice but to conduct it the way he is doing it, Your Honor.  I mean, he is in the industry, he earns his living there, he has got to proceed.  He has no choice.  He doesn't want to give that up.

But I don't know that it lacks sense because if it turns out that the en banc decision of the Washington circuit is the same as Judge Walker, hypothetically, then the problem with that is there is going to be an avalanche of litigation, an avalanche with nothing to do with Kim and bringing disciplinary proceedings because all of those people who have been sanctioned are going to take issue with the legitimacy of those sanctions.

I was thinking about one other thing I wanted to bring up; it's very important.

You know, the SEC has a statute of limitations; five years, you are done.  If the SEC doesn't address the improper conduct in five years from the date of the conduct, assuming it's not continuing, they can't bring an action.

THE COURT:  Okay.

MR. KAPLAN:  FINRA doesn't have that limitation. FINRA doesn't get prejudiced at all; they don't have any limitations.

THE COURT:  Okay.  I think you may be taking this a little bit too far.

I mean, to say that FINRA is not prejudiced at all -- if they have to stop all hearings and enforcement actions for six months to a year, and they don't know how long it's going to last -- I mean, could you imagine, I don't know, if on October 1 this entire court had to shut down and it didn't come back to life for six months -- no civil cases could go forward, no criminal cases could go forward -- you know, that would be a problem.

You would agree with that, right?

MR. KAPLAN:  Sure.  That would be a problem.  One of society's critical governing elements would disappear for a while.  That's not acceptable, particularly under the Constitution.

THE COURT:  I mean, but he is right that the public --

MR. KAPLAN:  It's not quite the same, Your Honor.

THE COURT:  It's not exactly the same, but it's not that far apart.  I mean, the public does have an interest in the efficient working of the market and the

efficient enforcement of people who are violating or alleged to be violating market rules.

MR. KAPLAN:  But again -- but these events occurred many -- a few years ago, many -- a few; three, four years ago these events occurred, the events underlying the complaint.

THE COURT:  No, no.  I understand.

But if I grant your injunction there are going to be dozens of cases brought --

MR. KAPLAN:  They don't bring that -- again, there will be other cases.  But you notice, no one has brought a case in federal court, only us.

THE COURT:  Well, I think one is about to come.

MR. KAPLAN:  Who knows?

THE COURT:  I am guessing that -- I will bet you -- you might not be able to know this, but I will bet you everything I own -- except my dog and my Red Sox jersey that I got from the Red Sox president -- if I grant your injunction and it gets upheld on their motion to overturn it immediately pending appeal that there will be many, many more federal lawsuits.

I mean, you have to agree with that?

MR. KAPLAN:  I wouldn't take that bet, Judge, I would agree with you.

THE COURT:  Yeah.  Okay.  All right.

Mr. Tayrani, how many enforcement actions are going at any given time?

MR. TAYRANI:  I don't know the answer to that.  I will find out during the break, Your Honor.

THE COURT:  All right.  Let's take a -- let's come back at 1:05.  When I say we come back at "1:05," I mean, I will be on this bench at 1:05, okay?

Thank you, everyone.

(Whereupon, a recess was taken.)

THE COURT:  I realize that -- given where we are on timing, I don't think we're going to get done in the next 45 minutes, although I could be wrong.

The cafeteria is closes at 2:00.  Will you survive if we go until after 2:00 and you guys eat lunch somewhere else, or would you prefer to break at 1:45 so you can grab some of the wonderful food downstairs?

MR. KAPLAN:  Whatever suits Your Honor.

MR. TAYRANI:  I brought a snack, so I am okay.

THE COURT:  All right.  Well, there are bars down there, so if you want to have someone go down and grab some stuff because -- probably what I'll do is try to just finish in the next -- what's wrong?

(Whereupon, the Court and staff confer.)

THE COURT:  Mr. Tayrani, Mr. Luh, one of you -- whoever wants to come up to talk about state actor, I have

some questions.  And please bring Mr. Kaplan's reply brief.

By the way, I thought all of the briefing was very well done.  Thank you.  It's been helpful.  I wish once side had been less well done, but we are where we are.  Not any particular side, just a side so it would be easier; I should clarify.

Can I direct you to -- I am trying to find the line -- the page where Mr. Kaplan and his team basically distinguish -- I mean, your argument is, like, since the beginning of time courts have held that FINRA is not a state actor.  And I thought Mr. Kaplan, you know, did a nice job -- he and his team did a nice job.  It's page 7 of his reply.  It's, you know, interesting.

So can you talk to me about why I should ignore how he distinguishes basically all of your cases?

MR. TAYRANI:  Yes, Your Honor.

None of the distinctions, the temporal distinctions and the label distinctions between NASD and FINRA change the underlying legal reality, which is that FINRA, like its predecessor, the NASD is a private company; it was not created by Congress, its board members are not appointed by Congress --

THE COURT:  I know, I know, I know.  We have been through all of that.

Well, let me just -- let's go to Bullet No. 1.

Thirteen of FINRA's cases predate FINRA's formation in ascension as the nation's only SRO that governs securities brokerages and their personnel.

Why does that distinction not matter?

MR. TAYRANI:  It doesn't matter, Your Honor, because there is no difference between the NASD, which several of these cases pertain to, and FINRA when it comes to matters of state action.

NASD's regulatory responsibilities were not directed or coerced by the SEC.  FINRA's self-regulatory responsibilities are not directed or coerced by the SEC. Those responsibilities are not traditional or exclusive governmental functions in a way that would give rise to state action.

THE COURT:  Okay.

MR. TAYRANI:  The core responsibilities that the NASD was undertaking are the same responsibilities that FINRA undertakes today --

THE COURT:  At the time, was NASD also the only game in town?

MR. TAYRANI:  Part of the regulatory responsibility was performed by NYSE.  And in 2007, NASD and NYSE's enforcement arm merged to create FINRA.

THE COURT:  Okay.  Was there a competitor to NASD and NYSE before, when they were together doing whatever they

were doing?

MR. TAYRANI:  No, Your Honor.

THE COURT:  All right.  Twelve cases call FINRA private without actually analyzing whether it can ever be considered a public actor for constitutional purposes.

Why should I pay attention to those cases?

MR. TAYRANI:  Well, it's highly relevant, Your Honor, that FINRA is private and has been recognized as private.  When we discuss whether the Appointments Clause and the Constitution's removal requirements apply here. They do not apply.  They are categorically inapplicable to private entities and to the employees of private entities.

THE COURT:  And I apologize, Mr. Luh, and everyone.  I had gotten "delegation" and "appointment," the words, confused in my head.  So I apologize for confusing everybody.

Mr. Luh, I thought you had told me I was not making any sense in a very polite way.  Thank you.

Okay.  But what about with respect to the state actor point?  Can I consider these for the state actor point?

MR. TAYRANI:  Several of these cases do engage in an analysis of the state action question, in particular the *Young Habliston* case that is cited, which is from one of your colleague's on this court, Your Honor.

THE COURT:  I'm sorry.  Which one?

MR. TAYRANI:  But I acknowledge that not all of the cases have a comprehensive or rigorous examination of the state action issue, some are more thorough than others.

THE COURT:  Which was the one that you pointed to?

MR. TAYRANI:  *Young Habliston*.

THE COURT:  Oh, got it.  Got it.  All right.

MR. TAYRANI:  In terms of the most thorough analyses of these questions, I would direct the Court to the Second Circuit's decision in *Desiderio*, which is the decision on which many courts have built their state action analysis.  That's cited in the middle of the first bullet point.

THE COURT:  Yeah.  I have it.

But here is a question:  So if I said -- if I were to write something along the lines of:  I am well aware of the divided panel's decision in *Alpine* -- order in *Alpine* and Judge Walker's concurrence, to which I give a lot of deference and respect.  But at the end of the day, I am bound by D.C. Circuit and Supreme Court precedent, and I can't do anything about the fact that there is an order out there because I am actually bound by precedent.

What do I cite next?

What's the precedent from the Supreme Court or the D.C. Circuit that I am bound to on the substantial

likelihood of success point?

MR. TAYRANI:  So I would take that question in two parts.  There are the cases that are relevant to the Appointments Clause question, and those are cases that speak to what it means to be an officer of the United States.

THE COURT:  Okay.

MR. TAYRANI:  And then there are cases in the state action realm that define when a private company can be a state actor for a limited purpose because a discrete set of its responsibilities constitute state action.

With respect to the application of the Appointments Clause, I would point the Court to the Supreme Court's decision in *Lucia* in 2018 where the Court describes officers of the United States as, quote, government officials, which is precisely the reason that the Appointments Clause and the Constitution's removal requirements are inapplicable to FINRA and other SROs; they are all private entities.

I would also point the Court to *Free Enterprise Fund*, where the Supreme Court contrasted private self-regulatory organizations with the PCAOB.

THE COURT:  Okay.  So I actually have a lot of questions for Mr. Kaplan about that case.  But I think what he is going to tell me -- and my main concern is, I don't think that's precedent.  Because I think what he is going to

tell me is that the discussion of the SROs in that case, helpful as they are to your cause, are dicta.  I am not bound by it.

MR. TAYRANI:  It's not the holding of the case, Your Honor, I acknowledge that.

It is dicta from the Supreme Court that warrants respect and should be afforded the persuasive force to which it is entitled.  And I would submit that it is entitled to significant --

THE COURT:  Okay.  But, see, my question was -- my line is, as much as I respect the D.C. Circuit's order in *Alpine*, I am bound by D.C. Circuit and Supreme Court, quote, italicized, bold, precedent.

You are giving me *Lucia* as precedent for the Appointments Clause.  What is the precedent for the state action clause?

MR. TAYRANI:  So I would point the Court to *Manhattan Community Access versus Halleck*, which is cited by all of the parties in their briefing, which identifies three circumstances in which a private party can be deemed to be a state actor.  And those would be where the private party is engaged in a traditional and exclusive governmental function where it is acting under the coercion or direction of the federal government or where it is engaged in joint conduct with the federal government.  None of those three criteria

is met here.

The self-regulatory responsibilities that FINRA is carrying out are traditionally private functions that date back to the time of the founding.  It was not until 1934 that Congress carved out a role for the Securities and Exchange Commission in the regulation of the securities markets and the broker-dealer industry.

FINRA is not acting under the direction or control of the SEC when it carries out its self-regulatory responsibilities.

Mr. Kim acknowledges, on page 14 of his memorandum of law, that it is FINRA who decides whom to bring an enforcement action against, what charges to bring, and what sanctions to seek.  Those are decisions made by FINRA, not by the SEC.  So there is no discretion and no control by the SEC.

THE COURT:  Well, let me stop you there because Judge Walker, we know, is literally and figuratively above me, cites to *Halleck* as a CF in his opinion.

Do you have his opinion?

MR. TAYRANI:  I do have it, Your Honor.

THE COURT:  You can probably all recite by memory by the end of this whole process.  But if you go to Star 3, he goes on to -- a few paragraphs down that starts:  From start to finish, FINRA.

Do you see where I am?

MR. TAYRANI:  I do, Your Honor.

THE COURT:  Mr. Kaplan, do you see where I am?

MR. KAPLAN:  What page, Your Honor?

THE COURT:  Star 3 of the Westlaw.

MR. KAPLAN:  Thank you.

THE COURT:  And then it's, like, on the second column, paragraph down, "from start to finish."

Can you show him?

MR. KAPLAN:  Thank you, Your Honor.

THE COURT:  Okay.  It says:  From start to finish -- Judge Walker says:  From start to finish, FINRA hearing officers execute government laws subject to a government plan, with little to no room for private control, *Cf. Halleck,* at 1928.  Quote:  A private entity can qualify as a state actor... when the government compels the private entity to take a particular action.

So why shouldn't I just listen to Judge Walker on that?

MR. TAYRANI:  Well, with all due respect to Judge Walker, I don't believe he is correct in his assessment of the level of government control here.

I agree there is a government plan, to the extent that the Exchange Act lays out broadly the responsibilities of national securities associations, but I do not agree that

there is little to no room for private control.

As Mr. Kim himself acknowledges, it's FINRA who decides whom to bring enforcement actions against, what charges to bring, what sanctions to seek.  No one in the SEC or any other government agency directed, suggested, encouraged FINRA to bring an enforcement action against Mr. Kim.

The SEC will have the opportunity to review any sanction that FINRA imposes, which means that FINRA is regulated by the SEC.  But the *Halleck* case makes very clear that being regulated -- even being closely regulated by the federal government does not constitute state action.

THE COURT:  Okay.  Well, let's go a paragraph up.

He says:  Does it make a difference that FINRA hearing officers are employees of a nominally private corporation?  Probably not.

Though FINRA is private, its enforcement activities are controlled by the government.  Let me stop there.

Are FINRA's enforcement activities controlled by the government?

MR. TAYRANI:  No, Your Honor.

THE COURT:  Mr. Kaplan, are FINRA's -- you guys should be up here together for a bit.

Anyone ever do an international arbitration?

MR. KAPLAN:  I did, once.

THE COURT:  You did once?

MR. KAPLAN:  Yes.

THE COURT:  You didn't sound like you had a fun experience.

MR. KAPLAN:  It's very weird.

THE COURT:  One of the weird things in international arbitration is that opposing experts often testify at the same time so that, basically, they start talking to each other.  And it drives the lawyers crazy because they end up agreeing on things, and it's never good for anyone but the tribunal.

Anyway, in the international arbitration world, that's called hot tubbing.  So we are going to hot tub here for a while.

MR. KAPLAN:  Hey, don't push.

THE COURT:  Are FINRA's enforcement activities controlled by the government, Mr. Kaplan?

MR. KAPLAN:  Not directly.

THE COURT:  Okay.  How about indirectly?

MR. KAPLAN:  Well, there is a requirement under the Exchange Act that FINRA enforce the federal securities law, so that's an instruction under federal law that they do that.

THE COURT:  But they have full discretion as to

how they do that?

MR. KAPLAN:  But there is no day-to-day activity by the SEC over FINRA.

THE COURT:  Okay.

Mr. Tayrani, the Securities Exchange Act requires FINRA to enforce government standards, including statutory provisions of SEC regulations 15 U.S.C. 78(s)(g)(1).

Is that what you were just referring to, Mr. Kaplan?

MR. KAPLAN:  Yes, ma'am.

THE COURT:  Okay.  Agree?

MR. TAYRANI:  Agreed.

THE COURT:  Okay.  So you agree with that.  But you don't think that's -- okay.

MR. TAYRANI:  It's regulation, Your Honor; it's not control of specific disciplinary decisions.

THE COURT:  Okay.  FINRA's own rules are generally vetted by the SEC before taking effect?

MR. TAYRANI:  That's correct, Your Honor.

THE COURT:  Okay.  Why doesn't that put us into the state actor world?

MR. TAYRANI:  Because the SEC is not controlling what rules FINRA proposes; it's not directing FINRA to propose specific rules.

FINRA develops rules itself and submits them to

the SEC for review and approval, just like many other private industries are regulated by the federal government; that doesn't make them state actors or entities engaged in state action.

THE COURT:  Okay.  And the SEC can modify them at any time, agree?

MR. TAYRANI:  Yes.

THE COURT:  Okay.  FINRA does not enjoy prosecutorial discretion.  Indeed, the SEC may remove FINRA's directors and officers if they do not enforce government standards.

So let me just ask you:  What do you agree or disagree with about that?  Because that seems to run counter to your argument that FINRA can do what it wants in enforcement.

MR. TAYRANI:  Well, I think it's a compound question, Your Honor.  I --

THE COURT:  Okay.  So you can take them one by one.

MR. TAYRANI:  I disagree --

THE COURT:  Did you just object to one of my questions as compound?  That's pretty bold.

MR. TAYRANI:  I was merely noting the fact that my answer may be less straightforward than it otherwise would be.

THE COURT:  Okay.  Let's start with the:  Does not enjoy prosecutorial discretion.

MR. TAYRANI:  I do not agree that FINRA lacks prosecutorial discretion.

THE COURT:  Mr. Kaplan, agree or disagree, FINRA has prosecutorial discretion?

MR. KAPLAN:  I agree.

THE COURT:  Okay.

Second point:  SEC may remove FINRA's directors and officers if they do not enforce government standards, agree?

MR. TAYRANI:  Yes.  The Exchange Act provides for for-cause removal of FINRA board members.

THE COURT:  But?

MR. TAYRANI:  But that does not constitute control over the day-to-day decision-making of FINRA's enforcement status.

THE COURT:  Because SEC couldn't -- how many board members are there?

MR. TAYRANI:  Twenty-two.

THE COURT:  Okay.  SEC couldn't, like, come up one day and say:  We just want to get rid of all 22 of you.  You are all fired, and now we are going to put in 22 new people, right?

MR. TAYRANI:  It would have to meet the demanding

standards of for cause --

THE COURT:  Each of them would have to be for cause?

MR. TAYRANI:  Yes.

THE COURT:  If they didn't have cause, they couldn't just go in and fire everyone?

MR. TAYRANI:  Correct.

THE COURT:  Do you agree with that?

MR. KAPLAN:  I do.

THE COURT:  All right.  And I take it you also agree that they can remove FINRA's directors and officers for cause, right?

MR. KAPLAN:  I do agree, Your Honor.

THE COURT:  Okay.

Even FINRA's code of procedures is approved by the SEC, agree or disagree?

MR. TAYRANI:  Agreed.

THE COURT:  Agreed?

MR. KAPLAN:  Yes, ma'am.

THE COURT:  Okay.  Any reason that shouldn't be relevant?

MR. TAYRANI:  I think it is very relevant, Your Honor, for several reasons, including that the SEC is required to ensure that FINRA provides fair procedures to respondents in disciplinary actions, which is quite germane

to Mr. Kim's due process challenge here.

THE COURT:  Okay.

All right.  Sir, you can sit down.

MR. KAPLAN:  Thank you.

THE COURT:  Okay.  Let's go back to his reply brief, please.

Two cases are not about FINRA at all, *Daniel* and *National Horsemen's*.  Why are those relevant to me?

MR. TAYRANI:  Those are cases that pointed to FINRA in reaching a conclusion about another entity and whether that other entity was a state actor.

THE COURT:  Okay.

MR. TAYRANI:  So FINRA is invoked by analogy.

THE COURT:  All right.  So let's go back to Judge Walker's opinion.

And he discusses -- I mean, you told me *Lucia* is precedent on me; that means I have to deny the PI.

He cites *Lucia* for the proposition that they have substantial likelihood of success.  So tell me what I should do with that.

MR. TAYRANI:  Again, with all due respect to Judge Walker, he is mistaken about the application of *Lucia* because he is skipping the fundamental first step, which is whether the Appointments Clause applies here where we're dealing with a private company, not a federal agency and not

a company that is, in any way, akin to Amtrak in the *Lebron* case or the PCAOB in the *Free Enterprise Fund* case.  Outside of those two very narrow settings, the Appointments Clause, by its terms, does not apply to private entities.

THE COURT:  Sorry.  State those terms again.  I missed it.

MR. TAYRANI:  The cases are --

THE COURT:  No, no.  The two terms you just mentioned, government officials and -- of the clause.  I just don't have it memorized.

MR. TAYRANI:  So the Appointments Clause applies to officers of the United States.

THE COURT:  Right.  Okay.

MR. TAYRANI:  So it would apply to officers of a federal agency and it would apply to officers of a nominally private company, such as Amtrak or the PCAOB, that is created by the government for a governmental purpose and that is controlled by the government through the appointment of a majority of the company's board members.

In *Lebron*, the Supreme Court held that Amtrak, while nominally private, was part of the federal government because those two criteria were met.

THE COURT:  Yeah, yeah.  No, okay.

And we all agree that none of the FINRA board members are appointed by the SEC or the government, right?

MR. TAYRANI:  That's certainly my position.

MR. KAPLAN:  We agree.

THE COURT:  Okay.

All right.  So in some ways -- maybe I wasn't as confused as I thought I was.

The state actor or, at least, state control prong does mesh into the Appointments Clause prong?

MR. TAYRANI:  Not the separate question, Your Honor, of whether FINRA is a private company that in a discrete set of circumstances is engaged in state action.

THE COURT:  Okay.  So we're doing the state action versus the state actor distinction?

MR. TAYRANI:  Correct.

THE COURT:  Okay.  So for *Lucia*, with respect to the Appointments Clause, there is no state action.  Is that the point?

MR. TAYRANI:  There is no state actor, there is no governmental entity.

The Appointments Clause applies to officers of the United States.  So unless we have here a federal agency or we have a nominally private entity akin to Amtrak or the PCAOB that is actually part of the government because of government creation and government control, the Appointments Clause and the Constitution's removal requirements are categorically inapplicable because that clause applies to

officers of the United States, not officers of a state, not officers of a private company.

And there is no case anywhere that holds that the Appointments Clause applies to private companies that are carrying out delegated federal responsibilities.  If it did, it would mean that every time a court held that a private company was engaged in state action in a narrow set of circumstances, that private company would need to have a federally appointed and federally removable board of directors; that would massively expand the scope of the Appointments Cause.

It would mean that in the *Peacock* case, which is cited in our briefing involving Xerox, which is indisputably a private company, that Xerox would have needed to have a government-appointed board and a government-removable board of directors simply because in a discrete set of circumstances it was engaged in state action when assisting the government in administering Medicare.

We know that Xerox is engaged in a host of private enterprises that have nothing to do with state action.  It is not a state actor when it produces copy machines or produces other technology.  But applying the Appointments Clause based simply on state action would mean that Xerox would need to have a presidentially appointed and presidentially removable board.  There is no support for

that interpretation of the Appointments Clause.

THE COURT:  Okay.  Judge Walker's decision, do you take that -- do you take his decision to be that there was a substantial likelihood of success on -- on what?  What was he saying there was a substantial likelihood of success on?

MR. TAYRANI:  So to be absolutely honest with you, Your Honor, I am not 100 percent clear.

I think there are two ways to read his opinion; one is that he believes that there is a substantial likelihood of success in establishing that the Appointments Clause applies to anyone who carries out federally delegated responsibilities, whether they are employed by the government or are employed by a private company such as FINRA.  There are certainly --

THE COURT:  Because, as he says, though FINRA is private, its enforcement activities are controlled by the government.

MR. TAYRANI:  Well, I read that part of his opinion as suggesting that FINRA is engaged in state action --

THE COURT:  Right, okay.

MR. TAYRANI:  -- and is, therefore, subject to the Appointments Clause.

THE COURT:  Okay.  And what is the second reading of his decision?

MR. TAYRANI:  It's also possible that he is finding a likelihood of success with respect to nondelegation, and that FINRA is a private entity that is engaged in federally delegated responsibilities and that violates the private nondelegation doctrine.

*Alpine* advanced both arguments in seeking an injunction pending appeal, so we don't know which of those two lines of argument Judge Henderson relied on.

And with respect to Judge Walker, I think there is some ambiguity in his opinion as to the direction in which he is going.

THE COURT:  Okay.  Mr. Kaplan, come up for just a moment.

How do I read Judge Walker's opinion?

What did he think there was a substantial likelihood of success on?

MR. KAPLAN:  As I read Judge Walker's opinion, it seemed to me that he was looking at the function of FINRA and then determining that that was an -- that function required permission or appointment under the Appointments Clause.

THE COURT:  So you think it was a -- you think he was resting on the Appointments Clause not the nondelegation?

MR. KAPLAN:  No.  I think it's -- you then get to

the second point.

THE COURT:  Okay.

MR. KAPLAN:  And it's part of the:  If you find hypothetically that FINRA is not a state actor, you still could interpret it by the nondelegation clause that they were.

I read it was belt and suspenders, in my view; they were attached.

THE COURT:  So what's the language that you would cite me to by Judge Walker where he's saying that:  If there is no Appointments Clause issue, then we have a delegation issue?

Mr. Luh, do you have a view on all of this?

Come on up.  Everyone party for a moment.

Mr. Luh, what did Judge Walker hold there was a substantial likelihood of success on?

MR. LUH:  Your Honor, my understanding of Judge Walker's view, which -- to be clear, was his tentative view, and he is not committing himself --

THE COURT:  No, no.  Understood.  Understood.

MR. LUH:  -- but my understanding was that it is based on the Appointments Clause and what -- you know, his theory seemed to be that a function, a particular function needs to be -- a person who is going to be exercising a particular function needs to be appointed in the manner

specified under the Appointments Clause.

THE COURT:  So do we all read Judge Walker as saying that -- for example, there is a FINRA hearing officer.  When they're applying federal -- when they're enforcing the federal securities laws -- for those purposes they need to be appointed, but when they're just enforcing the FINRA laws they don't?  Or is he saying that because they do any government work then they have to be appointed by the government, by the executive?

MR. TAYRANI:  So I don't think he gets into that level of detail.

What I would say, though, is that the Supreme Court has made clear that:  If you are an officer for any purpose, you are an officer for all purposes; that's the *Freytag* decision involving special trial judges in support of the tax court --

THE COURT:  Well, that helps him, right?

MR. TAYRANI:  I don't think so, Your Honor, because it demonstrates the breadth of the argument that he is asking this Court to adopt.  That any time a private actor is engaged in state action it would become an officer of the United States for all purposes and be subject to the Appointments Clause even though, in the vast majority of other activities, the private actor is not engaged in state action.

THE COURT:  Just give me one moment, please.

So when you talk about the Appointments Clause, you keep talking about government officials?

MR. TAYRANI:  Yes, Your Honor.

THE COURT:  Okay.  Where is the language for that in the clause?

MR. TAYRANI:  I think that is very clear from the text of the clause, Your Honor.

The clause, as you know, appoints -- provides that the President, quote, shall appoint ambassadors, other public ministers, and consuls, Judges of the Supreme Court, and all other officers of the United States.

Ambassadors, public ministers, consuls, and Judges of the Supreme Court are indisputably government officials, which means that under the canon of *ejusdem generis*, all other officers --

THE COURT:  Can you spell that for her?  For me too.

MR. TAYRANI:  E-J-U-S-D-E-M, *ejusdem;* G-E-N-E-R-I-S.

-- under that canon of interpretation, all other officers of the United States would necessarily be limited to government officials.

THE COURT:  Do you have a D.C. Circuit decision applying that principle?  Can you find me some?

MR. TAYRANI: Yes. Not applying it to the Appointments Clause, Your Honor, but --

THE COURT: I know. I know. I know.

Because it hasn't been applied -- the Appointments Clause has not -- other than *Lucia* has not been sort of brought to the fore, right?

MR. TAYRANI: It has not been examined in this granular level of detail before.

THE COURT: All right. Mr. Kaplan, do you want to get up for a minute and tell me why he's wrong on everything he just said?

And, in particular, focusing on -- I am interested in the response to the sort of textual and statutory interpretation version of the Appointments Clause.

MR. KAPLAN: Well, I think *Halleck* clearly stands for the proposition that they are -- they, FINRA, is a state actor, I should say it is a state actor; and that the interpretation that somehow *Halleck* doesn't apply is not accurate. I think it's even more encompassing than the one provision of *Halleck* picked up by Judge Walker as saying that's why it applies, but the actual test is threefold in the disjunctive, and I think they all apply to FINRA. So I think you -- *Halleck* clearly stands for the state actor proposition.

With respect to the Appointments Clause, I don't

know that I have a great deal of clarity to add to the issue, other than to say that I -- the predicate Constitutional requirement is obviously important because if FINRA has that power, then -- and it's not subject to the executive, then who controls it?  How are the constitutional rights of the people protected?  How are the people protected?

And the underlying constitutional concept is that when the President or subordinates don't do their job properly, they'll -- it'll be -- they will be removed by the voters.  But if they --

THE COURT:  But isn't the issue that there is a separate task for the Appointments Clause and for the delegation issue?  Because you could not be an officer for purposes of the test under the Appointments Clause but, yet, Congress appropriately or the administrative agency, whoever, appropriately delegated authority to you because there is enough supervision.  Otherwise, for one you need control, for the other you need supervision, and the two are not synonymous.

MR. KAPLAN:  I agree the two are not synonymous. I think they can exist separately, as you say, absolutely.

THE COURT:  Okay.

MR. KAPLAN:  And I think it's sort of belt and suspenders, in my mind, and how you argue that the current

circumstance is constitutional defective because one is the Appointments Clause, clearly.  And the second is the concept that the nondelegation principle prevents, as Judge Walker said -- and I am paraphrasing it somewhat -- from doing that which you couldn't do if you were in the government.

I mean, it's the same underlying principle.

And one other point, I think, is very important here.  I think, if you look at the cases coming out of the Supreme Court in the last five years, you will see there is an evolution of thought relative to this entire area and that the unfettered, unlimited administrative application to what I would say are government actors who don't have the proper credentials or the proper authority, that that is something that the Court is looking at hard.

And if you look at the most recent case in *Axon*, I mean, to me -- obviously Judge Walker's memorandum was inspirational for me being here today, but so is *Axon*, because that's an important concept.  Because before *Axon* it wasn't a here-and-now issue, it was --

THE COURT:  But the hear-and-now issue is whether or not you have jurisdiction in the federal courts as a collateral attack if there is a constitutional issue.  And *Axon* wasn't saying that you stop everything until you figure out the constitutional question.

All *Axon* said -- because I have looked *Axon* very,

very carefully -- is that:  If you have a constitutional issue you don't have to wait to go through the full process before you can bring it to a federal court.

MR. KAPLAN:  Absolutely.

THE COURT:  It is not saying if you have an alleged constitutional violation and you have a substantial likelihood of success, ergo PI is automatic, by any stretch.

MR. KAPLAN:  I agree with you, Your Honor, it doesn't say that.

But I wouldn't be here but for *Axon* because I would have faced a world of decisions that said:  Exhaust your administrative remedies, and it would be very difficult to get here.

THE COURT:  Oh, you don't mean on this issue, just in my courtroom?

MR. KAPLAN:  Just jurisdiction in the court.

THE COURT:  Got it.  Got it.  I understand.

So I don't remember the case, but there is a famous Judge Posner quote which is basically dealing with this very issue that you are raising, where everyone can see sort of the through line of where the Supreme Court is likely to go based on connecting the dots of what it's done.

And Judge Posner said:  You can't look at that; all you can do is look at precedent.  Precedent might be a rock, it might be a moss covered rock, but it's still the

rock as the precedent.

I can't think:  Well, I think the Supreme Court is going to do X and, therefore, I am going to do Y.  I am just bound by precedent.

MR. KAPLAN:  I don't disagree with that, Judge, but certainly there is a tone to it of protecting rights that have never been identified previously.

And what do we look at, 90 years of historical decisions regarding the NASD and FINRA?

I mean, it is a marked change.  And there is an application -- I shouldn't say "application" -- certiori was granted in -- I am probably murdering this name -- but I think it's *Jarkesy*; and that the Court has granted because of the Fifth Circuit split and granted -- dismissed the case and said that there was a right to a jury in the matter.

And so this is all, at least -- and I don't -- I agree with your quote, that you can't predict what the Supreme Court is going to do.  But based on what it's done, you can see the Constitution -- the importance of these constitutional issues that for years had maybe been in the background but nobody really dealt with them --

THE COURT:  I don't think they were in the background, though, because even though it's not binding it was very clear that the PCAOB -- the SROs were very clearly in the foreground of the Supreme Court's -- I mean, one of

the things I want you to discuss is -- putting aside for a moment that it's dicta, why hasn't the Supreme Court basically told us what an SRO is?

I mean, it was literally the example used to distinguish a controlled entity, which was a PCAOB. I mean, I can't ignore that, right?

MR. KAPLAN: Yes. But it is dicta. And the fact is that it seems to be at least somewhat inconsistent with the flow of logic to what is being presented and determined by the Court.

And I would point out that it's these constitutional issues that really are critical in this analysis because if these acts -- FINRA's conduct are violative, then we're undermining the rights of all citizens.

There are two briefs that were filed, the amicus briefs filed in the *Alpine* case, both -- there were many others. But the two that were filed, I thought, were very interesting and summed up our view of the world pretty well. I mean, I had a debate with one of my senior associates about whether we could cite that and incorporate it by reference, but we didn't.

THE COURT: You can cite it. I don't know why you wouldn't be able to cite it.

MR. KAPLAN: But the point is that those amicus

briefs are very well written, and I think communicate --

THE COURT:  All right.  Other than PCAOB and Amtrak, which -- well, let me put it to you this way:  Is there any case holding anywhere that a private entity which has no board members appointed by the SEC or even just a minority appointed by -- sorry -- a federal agency are controlled by the federal government for purposes of the Appointments Clause?

MR. KAPLAN:  Honestly, I'm not aware of such a case, but I would like to have a chance to answer that by Saturday at 11 a.m.

THE COURT:  Go to town.

You are going to tell me that there are no such cases, right?

MR. KAPLAN:  There are no such cases, Your Honor.

THE COURT:  I mean, you can double-check them --

MR. KAPLAN:  I think he is right, but I would like to double-check.

THE COURT:  Okay.  Well, tell me one way or the other in your supplemental brief.  If you can't find any, let me know that.

MR. KAPLAN:  Certainly, Your Honor.

THE COURT:  All right.  And there certainly haven't been any opinions that have found that an SRO is a state actor, right?

MR. KAPLAN:  Opinions?  No.

THE COURT:  We just have *Alpine* --

MR. KAPLAN:  Judge Walker.

THE COURT:  Yeah.  All right.  You can sit down.

MR. KAPLAN:  Thank you.

THE COURT:  Let me just look at my notes for a moment.  I may be done with my questions for now.

Mr. Tayrani, if there is a fine here, do we know what the maximum fine would be?

MR. TAYRANI:  Your Honor, FINRA's enforcement staff is planning to request a fine of $30,000.

The FINRA guidelines provide a range of 5,000 to $100,000; and those guidelines are designed to inform the hearing panel's decision, they are not binding on the hearing panel.

THE COURT:  So 13,000 [sic] is -- are you seeking fines and -- 13,000 is the restitution?

MR. TAYRANI:  Sorry.  30,000, 3-0 thousand.

THE COURT:  Oh, okay.  That's the restitution?

MR. TAYRANI:  That would be the fine.  And disgorgement is approximately $16,000, in addition to the $30,000 fine.

THE COURT:  Okay.  Are you standing up because they're not bound by that?

MR. KAPLAN:  No.  I am standing up because I don't

think that's correct.

THE COURT:  Okay.  What do you think it is?

MR. KAPLAN:  I think it's very clear.  It says:
Intentional or reckless misconduct, fine of 10,000 to
100,000.

THE COURT:  I think that's what he just said.

MR. KAPLAN:  No.  He said 5,000 to 100,000.  And
the reason for that is the 5,000 to 50,000 is negligent
misconduct and --

THE COURT:  Okay.  Guys, guys.

MR. KAPLAN:  -- and this is intentional and
reckless.

THE COURT:  This is not -- guys -- guys, I don't
care.

Do you guys agree that for intentional and
reckless it's 10,000 to 100,000?

MR. TAYRANI:  Yes, Your Honor.

THE COURT:  And do you agree that this is an
intentional and reckless case?

MR. TAYRANI:  I agree it's being pled that way,
but it's not binding, of course, on what the hearing panel
decides.

THE COURT:  Okay.  But that's what your client is
contending it is?

MR. TAYRANI:  Yes.  Which is why they're seeking a

$30,000 penalty.

THE COURT:  All right.  Have you been served with a complaint yet?

MR. TAYRANI:  We have not been served.

THE COURT:  Why am I not dismissing this for failure of service and get you guys out of my hair?

MR. TAYRANI:  Well, we would certainly welcome that, Your Honor.  We have not answered; we have not moved to dismiss.

THE COURT:  Why haven't they been served, Mr. Kaplan?

MR. KAPLAN:  Because, Your Honor, I thought they were.

THE COURT:  Okay.  Well, take care of that, please --

MR. KAPLAN:  I will immediately.

THE COURT:  -- so I don't dismiss your case.

MR. KAPLAN:  Yes, I will, Your Honor.  Thank you.

THE COURT:  Because, trust me, depending on how late I have to stay up Thursday night, I may will do that.  So I would get on that.

Okay.  If you can believe it, I think those were my sort of prewritten questions.  And so usually what happens is:  By the time we get to these, people have said what they want.  But I did tell you all that you would get

as much time as you wanted to tell me anything you want.

So you can go, then, Mr. Luh.  Please don't be repetitive, and then Mr. Kaplan.  And then we will go until you guys are sort of exhausted, okay?

MR. TAYRANI:  Thank you, Your Honor.

I would like to begin just by answering a few of the questions that you raised and that I was unable to answer earlier.

I was informed by FINRA that there are currently 19, 1-9, active complaints before hearing FINRA officers.

THE COURT:  Okay.

MR. TAYRANI:  And that there are 1452 active investigations that FINRA's enforcement staff is carrying out.

THE COURT:  Okay.  But those would not have to be stayed, or would they be stayed, too?

MR. TAYRANI:  Well, in many of those investigations, the respondent will know that he or she or it is under investigation because they would have received a Rule 8210 demand for documents or testimony.

So it is possible that one of those entities under investigation could seek to enjoin the ongoing investigation.

THE COURT:  Okay.

MR. TAYRANI:  Also, Your Honor asked over email

about the possibility of extending the answer date until October the 6th.  The hearing officer has granted the parties' joint request.  So --

THE COURT:  Okay.  Well, thank the hearing officer for me because otherwise he or she was going to get a pretty angry order.

Go ahead.

MR. TAYRANI:  So we have, indeed, covered a lot of the ground that I intended to cover today, Your Honor.

Let me return to the far-reaching implications of what the plaintiff here is asking this Court to do.

In the words of Judge Howell:  Ruling in favor of the plaintiff here really would be a seismic shift in state action jurisprudence.

THE COURT:  Do you agree with that, Mr. Kaplan?

I mean, we're not just talking about something on the margins here.  You agree that this would be a seismic shift.

MR. KAPLAN:  This would be a significant decision.

THE COURT:  It's a seismic shift?

MR. KAPLAN:  I -- yes.  To at least -- I don't know if it's ten on the Richter scale, but it's some --

THE COURT:  All right.  Thank you.

MR. TAYRANI:  And I think that's underscored by the fact that 27 SROs joined amicus briefs in this case to

convey their concern about the position that the plaintiff is advocating here.

THE COURT:  So I don't know if any of them are on the public line, but the amicus briefs were very well done, too, and I appreciate them.  Thank you.

MR. TAYRANI:  They were, indeed, very helpful; and we share the concerns that they express that extending the Appointments Clause and removal requirements to SROs, that deeming them to be engaged in state action and subject to other constitutional requirements really would upend the self-regulatory system that has worked so well since the time of the founding, and certainly since 1934 --

THE COURT:  Would you be able to find out if any people have filed similar claims against other SROs?  Is that something FINRA could find out and let me know about?

MR. TAYRANI:  We can certainly do our best to find that out, Your Honor.

THE COURT:  Okay.  Hold on a second.

Okay.

MR. TAYRANI:  So if this Court were to agree with plaintiff, that really would upend the existing self-regulatory system.  It would mean that the SEC would need to shoulder the burden of being the first-line regulator for the securities industry --

THE COURT:  Is it currently set up to do that?

MR. TAYRANI:  In my view, Your Honor, it does not have the resources, as it is currently set up, to handle the responsibilities that FINRA is currently performing.

There have been studies over the years that the SEC has undertaken about whether it should be more involved as the frontline regulator and should displace the SROs. And the outcome of those studies has been that it does not have the human capital, it does not have the --

THE COURT:  Can you cite one of those -- can someone send around those studies, or make sure they're copied so I can see those?

MR. TAYRANI:  Absolutely.

THE COURT:  If they are not already cited.  If they're cited, let me know.

MR. TAYRANI:  I don't believe they're studied in these briefs.

THE COURT:  All right.  So next point.

MR. TAYRANI:  So the ramifications of a decision in plaintiff's favor would be profound for the SEC, it would be profound for investors; and they certainly would be profound for FINRA and the 27 other SROs that have filed amicus briefs in this case.

If it would be helpful, I can also speak to the nondelegation doctrine, which is an issue that we have not discussed today.  There are no nondelegation problems with

the Exchange Act framework and with the delegation of responsibilities to FINRA because FINRA is acting subordinately to the SEC under the *Sunshine Anthracite versus Adkins* precedent from the Supreme Court.

We have discussed that FINRA is regulated by the SEC, and those regulations ensure that FINRA's rules and that its disciplinary decisions are reviewed and superintended by the SEC.

THE COURT:  Okay.

Mr. Kaplan, I know you don't agree in this case but, theoretically, it would be possible to not be a private corporation -- I mean, not be subject to the Appointments Clause because you are not controlled by the government, but also satisfy the delegation clause because you are regulated by the government, right?

MR. KAPLAN:  Yes, I believe so.

THE COURT:  Okay.  All right.  Thank you.

MR. TAYRANI:  That nondelegation question has been squarely addressed by multiple courts, including multiple circuit courts in published opinions.  And every court that has addressed the issue has rejected nondelegation challenges to FINRA; to its predecessor, the NASD; and to other self-regulatory organizations.

I will spend two minutes on Mr. Kim's other claims.

THE COURT:  You don't have to spend any minutes on them.

MR. TAYRANI:  Okay.  Then I will save the Court two minutes, and I will thank you for your time.

THE COURT:  Okay.  Who did I say would go next?

Mr. Luh?  Yes.  Nothing repetitive, please.

MR. LUH:  Yes, Your Honor.

With your indulgence, I will just make a --

THE COURT:  Was this more or less fun for you than the Medicare case hearing?

MR. LUH:  Equally fun, Your Honor.

THE COURT:  Why didn't your kids come to this hearing?  This would have been much more interesting.

MR. LUH:  I thought about it, but I thought it might be a little bit more technical for --

THE COURT:  Than the Medicare case?

MR. LUH:  They're seven and nine.

THE COURT:  All right.

MR. LUH:  Your Honor, just a few points on the Appointments Clause issues.  You asked about a textual basis for reading the Appointments Clause.  We would also point to the phrase "of the United States" --

THE COURT:  Yes.

MR. LUH:  -- "Officers of the United States" as an additional textual basis.  But I don't think you even need

to rely solely on the textual basis here.

The notion in Judge Walker's opinion that functions -- that may be performed by officers of the United States must be performed by officers of the United States, otherwise it would create a Constitution loophole.

THE COURT:  Yeah.  I was going to ask you about that.  Why do we not have a loophole?

MR. LUH:  That is, first of all, not supported by any prior Supreme Court decisions, and it also conflicts with prior Supreme Court decisions.

The Appointments Clause, as understood by the Supreme Court, applies when the government establishes a continuing and permanent office -- governmental offices exercising significant federal authority.

So it's not merely the functions that trigger application of the Appointments Clause.  For example, we cited, on page 16 of the government's brief, *Auffmordt versus Hedden* and *United States versus Germaine*.  Those are cases holding that when a governmental actor who does not occupy a continuing and permanent office exercises certain functions, that that person is not subject to the Appointments Clause.

I would also point out more --

THE COURT:  Aren't those the cases from, like, the

1800s or something?

MR. LUH:  Those cases were from 1890 and --
*Auffmordt* was from 1890, and I believe *Germaine* was around
the same time.

THE COURT:  So those have a lot of moss on them.

MR. LUH:  I'm sorry?

THE COURT:  Those have a lot of moss on them, but
you are telling me they haven't been overruled or --

MR. LUH:  They don't have an expiration date; they
haven't been overruled, Your Honor.

I would also point, Your Honor, more recently to
*Financial Oversight and Management Board versus Aurelius
Investment, LLC*, which is a 2020 decision.  In that case the
Supreme Court found that officers with primarily local
duties, again, governmental officers, with primarily local
duties were not officers of the United States.

The key in that opinion is on page 1658.  They
say:  If they are not officers of the United States but are
instead some other type of officer, the Appointments Clause
says nothing about them.

So, again, it's important to determine first
whether the Appointments Clause applies before determining
whether -- you need to examine whether there is -- the
Appointments Clause applies before determining whether there
is a violation of the Appointments Clause.

THE COURT: Okay. Because I have a feeling someone is going to ask this at some point, do we sort of the originalism argument on how to interpret the Appointments Clause?

MR. LUH: I'm sorry?

THE COURT: The originalism argument? Like, do we know sort of why the founders put this in, what was going on?

MR. LUH: I believe, Your Honor, that part of the rational, at least as explained by the Supreme Court, is an accountable rationale so that there are controls going on. And I think that that is, in some respects, animating Judge Walker's concern.

However, again, Judge -- there has never been a holding that the Appointments Clause applies to all functions; and, again, that would be inconsistent with how the Supreme Court --

THE COURT: And which was the Supreme Court case you were just referencing?

MR. LUH: The one I was referencing most recently --

THE COURT: The one that talked about --

MR. LUH: -- was *Aurelius Investment, LLC*.

THE COURT: No, no. The one that you just sort of referenced about the Supreme Court talking about the origins

of the amendment.  You said there was a Supreme Court case that said that the Appointments Clause, not amendment, came around because of concern for accountable and control.

MR. LUH:  Your Honor, I'm sorry.  I can't point to you a specific -- that's my understanding of what some cases have said, but I can't point to you a specific --

THE COURT:  That's fine.  That's fine.

MR. LUH:  -- case where that's laid out, at least off the top of my head.

But, again, also in *Aurelius*, the Court explained that *Lucia* doesn't -- *Lucia* is not the last word on the Appointments Clause.  *Lucia* dealt mostly with the importance and the significance of the functions that were at issue in that case.

THE COURT:  I mean, Judge Walker says there is really no difference between FINRA and the SEC ALJs.  Isn't the fundamental difference that FINRA is a private entity and SEC isn't?

MR. LUH:  Yes.  And, Your Honor, that's a relevant and dispositive difference because it means the requirements of the Appointments Clause are inapplicable, and the control -- the limitation that ensures accountability is the standard laid out in *Adkins* requiring that the private entity remain subject to the control and supervision of the government agency, in this case the SEC.

As we discussed in our brief, Your Honor, it's not a constitutional loophole when the Constitution, in fact, permits various avenues for accomplishing certain goals.

You know, for example, ordinarily the House has a role in creating laws, passing federal statutes; but you also have treaties, which are also federal law, and that the supremacy -- and the supreme law of the land under the Supremacy Clause.  The House has no role in ratifying treaties, but we wouldn't call that a constitutional loophole.  Instead, we would simply point that out as another feature of the constitutional design.

And in any event, if the Court perceives a flaw in the constitutional design --

THE COURT:  I am not taking up flaws in the constitutional design.  That's not my role; I know that much.

MR. LUH:  Sure.  And our position, Your Honor, would be that that -- a perception of such a flaw would not empower a court to go and fix that flaw itself.

THE COURT:  You need not convince me of that.

MR. LUH:  So respectfully -- with all due respect to Judge Walker's opinion, we think that that is sort of going in the wrong direction, and we're hopeful that he will revise his tentative view at the appropriate time.

THE COURT:  Well, do we know that he is going to

be on the panel?  I thought he was just --

MR. LUH:  I don't know that, Your Honor.

THE COURT:  Okay.  All right.

Last word?

MR. KAPLAN:  A few, Judge, not very many.

THE COURT:  Yeah.  Sure.  Sure.

MR. KAPLAN:  I think in Judge Walker's memorandum -- I think his quotation from the *Students For Fair Admissions*, that the quote "The Constitution deals with substance and not shadows," is very significant here.  And I think ultimately the concerns have to focus on the rights of the citizens, and the rights of the citizens to be able to hold their representatives accountable.

FINRA is a nonaccountable representative and it is clearly, clearly engaging in government action based on the *Halleck* decision.

We're hopeful that you will see it our way.

Thank you, Your Honor.

THE COURT:  Okay.  Thank you, everyone.

Really great job.  Everyone was super well prepared.  I really appreciate it.

You guys know to talk to Ms. White, and I will see you again soon.

MR. KAPLAN:  Thank you, your Honor.

                    *  *  *  *  *

## **CERTIFICATE**

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 1st day of October, 2023.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

**$**

**$100,000** [1] - 92:13
**$16,000** [1] - 92:21
**$30,000** [3] - 92:11, 92:22, 94:1

**/**

**/s** [1] - 107:14

**1**

**1** [4] - 43:24, 53:6, 59:11, 62:25
**1-9** [1] - 95:10
**10** [1] - 44:12
**10,000** [2] - 93:4, 93:16
**100** [1] - 80:7
**100,000** [3] - 93:5, 93:7, 93:16
**10005** [1] - 1:17
**1050** [1] - 1:21
**10b** [1] - 10:21
**10b-5** [3] - 10:21, 27:16, 27:18
**11** [4] - 42:18, 44:12, 44:13, 91:11
**1100** [2] - 1:12, 2:6
**11:31** [1] - 1:5
**12** [3] - 37:16, 43:24, 51:5
**120** [1] - 1:16
**13,000** [2] - 92:16, 92:17
**14** [1] - 68:11
**1452** [1] - 95:12
**15** [1] - 72:7
**16** [1] - 101:18
**1602** [1] - 5:9
**1612** [1] - 5:13
**1658** [1] - 102:17
**17** [1] - 49:10
**17-plus** [1] - 51:18
**1773** [1] - 5:23
**1790** [1] - 8:8
**1790s** [1] - 8:13
**1800s** [1] - 102:1
**1890** [2] - 102:2, 102:3
**19** [1] - 95:10
**1928** [1] - 69:15
**1930s** [1] - 8:17
**1934** [3] - 7:20, 68:4, 97:12
**1938** [1] - 9:4
**1:05** [3] - 61:6, 61:7
**1:45** [1] - 61:15
**1st** [1] - 107:13

**2**

**2** [1] - 53:6
**20005** [1] - 1:13
**20036-5306** [1] - 1:22
**2007** [1] - 63:22
**2016** [1] - 43:25
**2018** [3] - 43:10, 46:24, 66:13
**202** [3] - 1:13, 1:22, 2:7
**2020** [1] - 102:13
**2023** [2] - 1:5, 107:13
**20530** [1] - 2:6
**21** [2] - 17:1, 17:4
**22** [2] - 74:22, 74:23
**23-CV-2420** [2] - 1:3, 3:3
**27** [3] - 1:5, 96:25, 98:21
**2:00** [2] - 61:13, 61:14

**3**

**3** [2] - 68:23, 69:5
**3-0** [1] - 92:18
**3.8** [1] - 47:13
**3.84** [1] - 47:13
**30,000** [1] - 92:18
**300** [1] - 1:21
**314** [1] - 43:10
**315** [1] - 1:12
**334** [1] - 43:10

**4**

**45** [1] - 61:12

**5**

**5,000** [3] - 92:12, 93:7, 93:8
**50** [1] - 24:17
**50,000** [1] - 93:8
**514-4938** [1] - 2:7
**555** [1] - 45:19

**6**

**6** [1] - 51:5
**6th** [1] - 96:2

**7**

**7** [2] - 45:20, 62:12
**78(s)(g)(1)** [1] - 72:7

**8**

**8210** [6] - 14:8, 14:11, 14:14, 29:25, 30:11, 95:20
**838** [1] - 43:24
**887-3692** [1] - 1:22
**897** [1] - 43:10

**9**

**9** [1] - 37:16
**90** [1] - 89:8
**953-9850** [1] - 1:13

**A**

**a.m** [2] - 1:5, 91:11
**abide** [1] - 11:13
**ability** [4] - 14:1, 19:16, 23:10, 107:7
**able** [7] - 19:21, 50:21, 50:22, 60:16, 90:24, 97:13, 106:12
**absolutely** [15] - 10:11, 16:14, 20:1, 21:8, 36:17, 36:21, 50:17, 55:25, 57:9, 57:11, 57:12, 80:6, 86:22, 88:4, 98:12
**abstract** [1] - 20:1
**accept** [1] - 25:25
**acceptable** [1] - 59:18
**Access** [1] - 67:18
**accomplishing** [1] - 105:3
**account** [2] - 12:3, 33:12
**accountability** [1] - 104:22
**accountable** [3] - 103:11, 104:3, 106:13
**accurate** [3] - 7:24, 85:19, 107:4
**accused** [1] - 24:7
**acknowledge** [2] - 65:2, 67:5
**acknowledges** [2] - 68:11, 70:2
**Act** [16] - 7:20, 8:2, 8:21, 8:23, 9:4, 19:18, 27:11, 27:21, 50:1, 50:25, 53:15, 69:24, 71:22, 72:5, 74:12, 99:1
**act** [1] - 53:15
**acted** [1] - 27:6
**acting** [5] - 37:7, 47:7, 67:23, 68:8, 99:2
**action** [31] - 22:15, 24:6, 37:11, 44:4, 58:25, 63:8, 63:14, 64:23, 65:4, 65:11, 66:8, 66:10, 67:16, 68:13, 69:17, 70:6, 70:12, 73:4, 78:10, 78:11, 78:15, 79:7, 79:17, 79:20, 79:23, 80:20, 83:21, 83:25, 96:14, 97:9, 106:15
**Action** [2] - 1:3, 3:3
**actions** [8] - 10:10, 15:2, 26:2, 49:21, 59:9, 61:1, 70:3, 75:25
**active** [2] - 95:10, 95:12
**activities** [5] - 70:18, 70:20, 71:17, 80:16, 83:24
**activity** [1] - 72:2
**actor** [33] - 24:8, 24:20, 25:16, 26:20, 28:5, 53:3, 55:13, 55:17, 55:19, 55:21, 56:3, 61:25, 62:11, 64:5, 64:20, 66:9, 67:21, 72:21, 76:11, 78:6, 78:12, 78:17, 79:21, 82:4, 83:21, 83:24, 85:17, 85:23, 91:25, 101:20
**actor..** [1] - 69:16
**actors** [5] - 25:11, 25:14, 26:13, 73:3, 87:12
**acts** [1] - 90:13
**actual** [3] - 10:22, 49:22, 85:21
**add** [3] - 46:15, 48:5, 86:1
**add-on** [1] - 46:15
**added** [3] - 5:17, 6:12, 31:15
**adding** [1] - 31:9
**addition** [2] - 48:23, 92:21
**additional** [8] - 31:17, 32:3, 37:21, 47:5, 48:9, 48:15, 100:25
**additionally** [1] - 48:6
**address** [4] - 45:3, 47:18, 47:19, 58:23
**addressed** [2] - 99:19, 99:21
**Adkins** [2] - 99:4, 104:23
**administering** [1] - 79:18
**administrative** [7] - 16:6, 16:17, 16:21, 40:2, 86:16, 87:11, 88:12
**Admissions** [1] - 106:9
**adopt** [1] - 83:20
**adoption** [1] - 7:23
**advanced** [1] - 81:6
**advocating** [1] - 97:2
**affirmed** [4] - 12:25, 13:1
**afforded** [1] - 67:7
**afraid** [1] - 46:15
**afternoon** [1] - 57:2
**agencies** [1] - 52:13
**agency** [9] - 9:22, 44:4, 70:5, 76:25, 77:15, 78:20, 86:16, 91:6, 104:25
**agent** [1] - 18:13
**ago** [4] - 3:24, 57:15, 60:4, 60:5
**agree** [62] - 7:13, 7:15, 7:18, 8:15, 8:20, 11:2, 11:13, 12:9, 12:16, 13:23, 13:24, 14:25, 15:12, 17:22, 17:25, 19:10, 19:12, 19:24, 19:25, 28:11, 28:17, 30:19, 30:25, 31:1, 31:4, 35:10, 37:11, 37:15, 40:13, 40:21, 40:22, 40:23, 59:15, 60:22, 60:24, 69:23, 69:25, 72:11, 72:13, 73:6, 73:12, 74:3, 74:5, 74:7, 74:11, 75:8, 75:11, 75:13, 75:16, 77:24, 78:2, 86:21, 88:8, 89:17, 93:15, 93:18, 93:20, 96:15, 96:17, 97:20, 99:10
**agreed** [4] - 30:23, 72:12, 75:17, 75:18
**agreeing** [1] - 71:11
**agreement** [1] - 7:12
**Agreement** [1] - 8:14
**agrees** [3] - 30:21, 31:2, 58:1
**ahead** [3] - 4:23, 12:15, 96:7
**aided** [1] - 2:12
**akin** [2] - 77:1, 78:21
**Alex** [1] - 4:15
**ALEX** [1] - 1:19
**ALJs** [3] - 51:22, 52:15, 104:16
**allegations** [1] - 34:21
**alleged** [4] - 10:15, 47:20, 60:1, 88:6
**allow** [1] - 32:15

2

**alluding** [1] - 42:25
**Alpine** [12] - 6:23, 32:16, 40:11, 40:13, 48:14, 49:10, 65:17, 67:12, 81:6, 90:17, 92:2
**ambassador** [1] - 54:21
**ambassadors** [2] - 84:10, 84:13
**ambiguity** [1] - 81:10
**ambiguous** [1] - 32:22
**amended** [1] - 53:15
**Amendment** [3] - 26:18, 26:19, 28:22
**amendment** [2] - 104:1, 104:2
**American** [2] - 6:16, 25:5
**Americas** [1] - 6:6
**amici** [2] - 5:1
**amicus** [6] - 11:23, 90:16, 90:25, 96:25, 97:4, 98:22
**Amir** [1] - 3:12
**AMIR** [1] - 1:19
**amount** [1] - 18:25
**Amtrak** [5] - 77:1, 77:16, 77:20, 78:21, 91:3
**ANA** [1] - 1:8
**analogy** [4] - 27:23, 28:23, 28:25, 76:13
**analyses** [1] - 65:9
**analysis** [3] - 64:23, 65:12, 90:13
**analyzing** [1] - 64:4
**Andonian** [1] - 4:13
**ANDONIAN** [1] - 1:11
**angry** [1] - 96:6
**animating** [1] - 103:12
**answer** [20] - 14:6, 14:18, 29:5, 36:1, 36:2, 36:6, 36:9, 36:10, 36:12, 36:15, 38:10, 38:13, 41:3, 47:23, 51:23, 61:3, 73:24, 91:10, 95:8, 96:1
**answered** [5] - 7:2, 7:3, 7:8, 94:8
**answering** [1] - 95:6
**answers** [3] - 36:19, 36:24
**Anthracite** [1] - 99:3
**anyway** [1] - 71:13
**apart** [1] - 59:24
**apologetic** [1] - 42:18
**apologize** [4] - 35:21, 56:12, 64:13, 64:15

**apparatus** [2] - 55:9, 55:11
**appeal** [8] - 16:7, 16:9, 23:2, 40:3, 47:23, 49:14, 60:20, 81:7
**appeals** [1] - 22:19
**Appeals** [2] - 16:8, 40:10
**appear** [1] - 29:25
**APPEARANCES** [2] - 1:10, 2:1
**appearances** [1] - 1:24
**appellant's** [1] - 43:25
**appellate** [2] - 22:19, 58:6
**application** [6] - 66:11, 76:22, 87:11, 89:11, 101:17
**applied** [2] - 26:19, 85:4
**applies** [12] - 41:5, 76:24, 77:11, 78:19, 78:25, 79:4, 80:11, 85:21, 101:13, 102:22, 102:24, 103:15
**apply** [8] - 46:24, 64:10, 64:11, 77:4, 77:14, 77:15, 85:18, 85:22
**applying** [4] - 79:22, 83:4, 84:25, 85:1
**appoint** [6] - 39:4, 51:22, 52:20, 52:23, 53:23, 84:10
**appointed** [25] - 9:19, 24:9, 26:12, 26:15, 51:25, 52:7, 52:13, 52:16, 53:4, 53:11, 53:18, 54:10, 54:14, 56:8, 56:22, 62:22, 77:25, 79:9, 79:15, 79:24, 82:25, 83:6, 83:8, 91:5, 91:6
**appointment** [8] - 52:9, 52:19, 53:9, 53:13, 56:5, 64:14, 77:18, 81:20
**Appointments** [50] - 55:23, 64:9, 66:4, 66:12, 66:16, 67:15, 76:24, 77:3, 77:11, 78:7, 78:15, 78:19, 78:23, 79:4, 79:11, 79:22, 80:1, 80:10, 80:23, 81:20, 81:23, 82:11, 82:22, 83:1, 83:23, 84:2, 85:2, 85:4, 85:14, 85:25,

86:13, 86:15, 87:2, 91:8, 97:8, 99:12, 100:20, 100:21, 101:12, 101:17, 101:23, 102:19, 102:22, 102:24, 102:25, 103:4, 103:15, 104:2, 104:12, 104:21
**appointments** [9] - 9:23, 52:4, 53:10, 55:5, 56:9, 56:11, 56:12, 56:13, 56:18
**appoints** [1] - 84:9
**appreciate** [4] - 33:20, 33:23, 97:5, 106:21
**appropriate** [2] - 27:20, 105:24
**appropriately** [2] - 86:16, 86:17
**approval** [3] - 53:24, 54:24, 73:1
**approved** [2] - 15:23, 75:15
**apt** [1] - 28:23
**arbitration** [5] - 36:8, 39:1, 70:25, 71:8, 71:13
**Archdiocese** [2] - 43:9, 43:12
**area** [1] - 87:10
**Area** [1] - 43:9
**areas** [1] - 7:12
**argue** [2] - 33:5, 86:25
**argument** [8] - 24:21, 27:1, 62:9, 73:14, 81:8, 83:19, 103:3, 103:6
**arguments** [3] - 28:22, 48:18, 81:6
**arm** [1] - 63:23
**Article** [2] - 16:3, 53:6
**article** [1] - 53:5
**ascension** [1] - 63:2
**aside** [1] - 90:1
**assert** [1] - 14:12
**assessment** [1] - 69:21
**assisting** [1] - 79:17
**associated** [6] - 11:7, 11:11, 12:2, 12:4, 14:10, 38:19
**associates** [1] - 90:20
**association** [9] - 7:23, 20:6, 20:25, 21:2, 21:5, 24:14, 25:8, 25:9, 28:14
**Association** [1] - 25:6
**associations** [10] - 9:2, 19:13, 20:21,

25:14, 26:6, 26:10, 26:24, 27:2, 27:14, 69:25
**assume** [4] - 44:15, 46:21, 47:9, 47:15
**assuming** [2] - 55:12, 58:25
**assure** [1] - 58:4
**atayrani@ gibsondunn.com** [1] - 1:23
**attached** [1] - 82:8
**attack** [1] - 87:22
**attention** [1] - 64:6
**attorney** [1] - 28:5
**audible** [3] - 5:2, 5:5, 5:21
**Auffmordt** [2] - 101:18, 102:3
**Aurelius** [3] - 102:12, 103:23, 104:10
**authority** [10] - 13:4, 13:13, 15:6, 15:9, 25:12, 53:9, 53:13, 86:17, 87:13, 101:15
**Authority** [2] - 3:4, 43:10
**AUTHORITY** [1] - 1:5
**authorization** [1] - 107:10
**automatic** [1] - 88:7
**automatically** [1] - 42:1
**avalanche** [2] - 58:15, 58:16
**Avenue** [1] - 1:21
**avenues** [1] - 105:3
**avoid** [1] - 21:22
**award** [1] - 12:23
**awarded** [1] - 45:21
**aware** [5] - 9:14, 32:1, 48:15, 65:16, 91:9
**Axon** [8] - 41:9, 87:15, 87:17, 87:18, 87:23, 87:25, 88:10

**B**

**backed** [1] - 12:19
**background** [2] - 89:21, 89:23
**bad** [1] - 57:19
**bail** [1] - 5:23
**bailing** [1] - 6:4
**bailout** [2] - 5:20, 6:15
**balancing** [1] - 45:6
**banc** [2] - 58:3, 58:13
**bar** [38] - 13:14, 13:16, 14:13, 19:22, 20:21, 20:24, 21:2, 21:4,

21:5, 21:7, 21:10, 21:13, 21:23, 21:24, 22:8, 22:10, 22:13, 22:14, 22:16, 24:1, 24:7, 24:8, 24:14, 26:6, 26:10, 26:19, 26:20, 27:2, 27:3, 27:4, 27:14, 28:3, 28:4, 28:10, 28:14, 31:5, 32:1, 35:17
**Bar** [2] - 24:20, 25:16
**bar's** [1] - 27:7
**barred** [4] - 13:9, 13:14, 13:21, 21:17
**barring** [3] - 13:7, 34:14, 34:24
**bars** [5] - 26:16, 26:23, 27:24, 28:21, 61:19
**base** [1] - 26:5
**based** [8] - 13:6, 31:25, 48:17, 79:23, 82:22, 88:22, 89:18, 106:15
**basis** [4] - 50:13, 100:20, 100:25, 101:1
**beautifully** [1] - 53:22
**become** [3] - 7:23, 20:15, 83:21
**BEFORE** [1] - 1:8
**began** [2] - 7:16, 8:13
**begin** [1] - 95:6
**beginning** [1] - 62:10
**behalf** [3] - 4:15, 4:16, 37:8
**belief** [3] - 8:4, 8:6, 8:7
**believes** [1] - 80:9
**below** [2] - 55:4, 107:11
**belt** [2] - 82:7, 86:24
**bench** [1] - 61:7
**Benisek** [5] - 41:5, 46:20, 47:6, 47:13, 48:5
**best** [2] - 97:16, 107:6
**bet** [3] - 60:15, 60:16, 60:23
**better** [2] - 4:3, 47:12
**between** [7] - 11:16, 27:14, 47:16, 55:21, 62:18, 63:6, 104:16
**beyond** [1] - 40:8
**bind** [1] - 57:19
**binding** [6] - 40:14, 40:18, 40:24, 89:23, 92:14, 93:21
**bit** [7] - 11:21, 30:15, 40:12, 41:1, 59:6, 70:24, 100:15

**Board** [1] - 102:12
**board** [19] - 9:23, 26:12, 26:15, 52:3, 52:6, 52:23, 53:18, 53:22, 54:10, 62:21, 74:13, 74:18, 77:19, 77:24, 79:9, 79:15, 79:25, 91:5
**bold** [2] - 67:13, 73:22
**books** [1] - 14:3
**bop** [1] - 45:15
**bore** [1] - 5:24
**boring** [1] - 4:2
**Boston** [2] - 6:1, 6:2
**bound** [7] - 65:20, 65:22, 65:25, 67:3, 67:12, 89:4, 92:24
**bounds** [2] - 51:4
**box** [1] - 35:21
**Branch** [1] - 2:5
**breadth** [1] - 83:19
**break** [7] - 17:12, 24:1, 36:16, 43:20, 49:7, 61:4, 61:15
**breaks** [1] - 17:20
**brief** [17] - 11:23, 12:5, 16:23, 17:1, 28:13, 34:20, 43:8, 44:22, 45:4, 46:3, 47:15, 62:1, 76:6, 91:20, 101:18, 105:1
**briefed** [1] - 43:7
**briefing** [11] - 17:21, 38:6, 42:16, 44:11, 47:25, 48:25, 49:9, 49:10, 62:2, 67:19, 79:13
**briefs** [8] - 37:22, 90:16, 90:17, 91:1, 96:25, 97:4, 98:16, 98:22
**bring** [15] - 15:1, 23:5, 30:13, 32:5, 37:24, 58:21, 58:25, 60:10, 62:1, 68:12, 68:13, 70:3, 70:4, 70:6, 88:3
**bringing** [1] - 58:17
**broad** [2] - 11:8, 47:8
**broadly** [1] - 69:24
**broker** [7] - 9:2, 11:10, 11:24, 18:12, 18:13, 51:3, 68:7
**broker-dealer** [2] - 11:24, 68:7
**broker-dealers** [1] - 51:3
**brokerages** [1] - 63:3
**brought** [7] - 12:22, 22:15, 47:17, 60:9,

60:11, 61:18, 85:6
**built** [1] - 65:11
**bulk** [2] - 29:17, 29:19
**bullet** [2] - 17:9, 65:12
**Bullet** [1] - 62:25
**burden** [3] - 38:20, 39:22, 97:23
**business** [4] - 11:25, 13:8, 14:16, 58:7
**butcher** [1] - 4:13
**buttonwood** [1] - 8:14

## C

**cafeteria** [1] - 61:13
**California** [2] - 26:18, 26:20
**cannot** [6] - 11:24, 12:18, 13:6, 15:21, 25:24, 30:6
**canon** [2] - 84:15, 84:21
**capacities** [1] - 13:8
**capital** [1] - 98:8
**care** [2] - 93:14, 94:14
**career** [1] - 4:3
**carefully** [1] - 88:1
**carries** [2] - 68:9, 80:11
**carrying** [3] - 68:3, 79:5, 95:13
**carved** [1] - 68:5
**case** [56] - 6:23, 10:13, 10:14, 12:22, 12:23, 23:5, 26:17, 27:11, 27:20, 33:19, 40:9, 41:3, 42:6, 42:22, 43:4, 43:8, 43:16, 43:18, 43:23, 47:4, 47:6, 47:22, 48:6, 48:13, 54:1, 60:12, 64:24, 66:23, 67:1, 67:4, 70:10, 77:2, 79:3, 79:12, 87:15, 88:18, 89:14, 90:17, 91:4, 91:10, 93:19, 94:17, 96:25, 98:22, 99:10, 100:10, 100:16, 102:13, 103:18, 104:1, 104:8, 104:14, 104:25
**cases** [35] - 6:24, 28:18, 41:4, 42:20, 43:1, 43:3, 44:10, 46:16, 48:3, 48:13, 49:13, 59:13, 60:9, 60:11, 62:15, 63:1, 63:7, 64:3, 64:6, 64:22, 65:3, 66:3,

66:4, 66:7, 76:7, 76:9, 77:7, 87:8, 91:14, 91:15, 101:20, 101:25, 102:2, 104:5
**categorically** [2] - 64:11, 78:25
**category** [2] - 52:17, 53:25
**causes** [1] - 6:16
**causing** [1] - 42:18
**center** [1] - 49:2
**certain** [2] - 101:21, 105:3
**certainly** [12] - 21:20, 52:16, 54:21, 78:1, 80:14, 89:6, 91:22, 91:23, 94:7, 97:12, 97:16, 98:20
**certainty** [2] - 7:24, 8:4
**certificate** [2] - 5:11, 107:8
**CERTIFICATE** [1] - 107:1
**certify** [1] - 107:4
**certiori** [1] - 89:11
**cetera** [1] - 11:11
**CF** [1] - 68:19
**Cf** [1] - 69:15
**challenge** [2] - 26:18, 76:1
**challenges** [1] - 99:22
**challenging** [2] - 46:23, 48:24
**chance** [5] - 7:8, 17:8, 17:20, 21:17, 91:10
**change** [3] - 32:11, 62:19, 89:10
**changed** [2] - 12:6
**charge** [2] - 18:25, 23:23
**charged** [1] - 10:20
**charges** [3] - 34:19, 68:13, 70:4
**check** [2] - 91:16, 91:18
**choice** [2] - 58:8, 58:11
**CHRISTINE** [1] - 2:4
**Christine** [1] - 3:17
**circle** [1] - 6:17
**Circuit** [20] - 13:3, 13:12, 41:11, 42:22, 43:4, 43:10, 43:25, 48:1, 49:11, 52:2, 55:14, 55:16, 56:2, 56:6, 65:20, 65:25, 67:12, 84:24, 89:14
**circuit** [5] - 57:6,

57:16, 58:1, 58:14, 99:20
**Circuit's** [3] - 53:16, 65:10, 67:11
**circumstance** [1] - 87:1
**circumstances** [5] - 31:25, 67:20, 78:10, 79:8, 79:17
**cite** [8] - 43:11, 43:24, 65:23, 82:10, 90:21, 90:23, 90:24, 98:9
**cited** [7] - 64:24, 65:12, 67:18, 79:13, 98:13, 98:14, 101:18
**cites** [2] - 68:19, 76:18
**citizens** [3] - 90:15, 106:12
**Civil** [3] - 1:3, 2:5, 3:2
**civil** [1] - 59:13
**civilly** [1] - 12:23
**claim** [7] - 10:23, 10:25, 28:14, 42:1, 42:8, 47:17
**claims** [4] - 10:22, 32:6, 97:14, 99:25
**clarify** [2] - 38:25, 62:6
**clarity** [1] - 86:1
**clause** [23] - 31:7, 31:15, 52:5, 52:9, 53:10, 55:6, 55:18, 56:3, 56:7, 56:9, 56:11, 56:12, 56:13, 56:14, 56:18, 67:16, 77:9, 78:25, 82:5, 84:6, 84:8, 84:9, 99:14
**Clause** [50] - 55:23, 64:9, 66:4, 66:12, 66:16, 67:15, 76:24, 77:3, 77:11, 78:7, 78:15, 78:19, 78:24, 79:4, 79:23, 80:1, 80:11, 80:23, 81:21, 81:23, 82:11, 82:22, 83:1, 83:23, 84:2, 85:2, 85:5, 85:14, 85:25, 86:13, 86:15, 87:2, 91:8, 97:8, 99:13, 100:20, 100:21, 101:12, 101:17, 101:23, 102:19, 102:22, 102:24, 102:25, 103:4, 103:15, 104:2, 104:12, 104:21, 105:8
**CLE** [1] - 22:3
**clear** [9] - 32:20, 49:1, 70:10, 80:7, 82:18,

83:13, 84:7, 89:24, 93:3
**clearly** [8] - 47:20, 57:14, 85:15, 85:23, 87:2, 89:24, 106:15
**clerk** [1] - 43:1
**client** [7] - 29:3, 29:8, 29:20, 33:8, 35:3, 93:23
**close** [1] - 25:11
**closely** [2] - 48:3, 70:11
**closes** [1] - 61:13
**co** [1] - 17:13
**co-counsel** [1] - 17:13
**code** [1] - 75:15
**coerced** [2] - 63:10, 63:11
**coercion** [1] - 67:23
**collateral** [1] - 87:22
**colleague's** [1] - 64:25
**colonies** [1] - 6:13
**COLUMBIA** [1] - 1:1
**column** [1] - 69:8
**coming** [4] - 6:8, 16:18, 49:13, 87:8
**comment** [1] - 22:17
**Commission** [3] - 9:22, 10:3, 68:6
**commission** [5] - 15:23, 18:12, 22:14, 23:15, 24:9
**commissioners** [1] - 51:24
**commissions** [2] - 17:9, 18:25
**commit** [1] - 27:5
**commitment** [1] - 33:8
**committee** [2] - 22:13, 39:3
**committing** [1] - 82:19
**common** [1] - 16:16
**communicate** [1] - 91:1
**communicated** [1] - 48:20
**Community** [1] - 67:18
**companies** [1] - 79:4
**Company** [4] - 5:9, 5:22, 6:5, 6:7
**company** [11] - 62:20, 66:8, 76:25, 77:1, 77:16, 78:9, 79:2, 79:7, 79:8, 79:14, 80:13
**company's** [1] - 77:19
**comparing** [1] - 26:5
**compelled** [4] - 14:8, 14:11, 14:14, 14:15

**compelling** [1] - 14:2
**compels** [1] - 69:16
**compete** [1] - 19:22
**competition** [1] - 19:23
**competitor** [3] - 19:8, 19:21, 63:24
**competitors** [8] - 17:23, 18:2, 18:3, 19:5, 19:6, 19:7, 19:11, 19:14
**complaint** [3] - 30:13, 60:6, 94:3
**complaints** [1] - 95:10
**complete** [1] - 107:6
**compliance** [1] - 10:6
**compound** [2] - 73:16, 73:22
**comprehensive** [2] - 8:16, 65:3
**compulsory** [2] - 15:2, 15:3
**computer** [1] - 2:12
**computer-aided** [1] - 2:12
**concept** [3] - 86:8, 87:2, 87:18
**concern** [6] - 47:14, 50:19, 66:24, 97:1, 103:13, 104:3
**concerns** [3] - 50:17, 97:7, 106:11
**concluded** [1] - 46:25
**conclusion** [1] - 76:10
**concurrence** [1] - 65:18
**conduct** [8] - 24:12, 28:9, 34:21, 58:9, 58:24, 67:24, 90:13
**conducted** [2] - 10:1, 58:7
**confer** [1] - 61:23
**conference** [2] - 35:25, 36:25
**conferences** [1] - 39:7
**confirmation** [1] - 54:24
**confirmed** [2] - 54:16, 54:18
**conflicts** [1] - 101:10
**confused** [4] - 56:1, 56:14, 64:15, 78:5
**confusing** [1] - 64:15
**Congress** [12] - 7:19, 8:15, 8:17, 9:1, 50:7, 50:24, 53:12, 53:14, 62:21, 62:22, 68:5, 86:16
**congressional** [3] - 53:14, 53:24, 54:12

**Connecticut** [1] - 1:21
**connecting** [1] - 88:22
**consequences** [1] - 51:16
**consider** [3] - 34:14, 34:24, 64:20
**considered** [3] - 25:11, 64:5, 107:8
**constitute** [3] - 66:10, 70:12, 74:15
**constitutes** [2] - 43:16, 107:4
**Constitution** [9] - 24:12, 24:18, 41:9, 53:5, 59:19, 89:19, 101:5, 105:2, 106:9
**Constitution's** [4] - 52:5, 64:10, 66:16, 78:24
**Constitutional** [1] - 86:3
**constitutional** [27] - 14:12, 41:19, 42:1, 42:8, 43:14, 44:21, 47:20, 48:17, 49:1, 52:25, 58:1, 64:5, 86:5, 86:8, 87:1, 87:22, 87:24, 88:1, 88:6, 89:20, 90:12, 97:10, 105:2, 105:9, 105:11, 105:13, 105:15
**constitutionally** [1] - 53:17
**constitutions** [1] - 24:17
**consuls** [2] - 84:11, 84:13
**contemplating** [1] - 51:3
**contending** [1] - 93:24
**contention** [2] - 11:18, 44:24
**context** [1] - 28:21
**continue** [1] - 30:12
**Continued** [1] - 1:24
**continued** [2] - 2:1, 51:13
**continuing** [3] - 58:25, 101:14, 101:21
**contrary** [1] - 27:7
**contrasted** [1] - 66:20
**control** [14] - 9:23, 68:8, 68:15, 69:14, 69:22, 70:1, 72:16, 74:15, 78:6, 78:23, 86:19, 104:3, 104:22, 104:24
**controlled** [8] - 70:18, 70:20, 71:18, 77:18,

80:16, 90:5, 91:7, 99:13
**controlling** [1] - 72:22
**controls** [2] - 86:5, 103:11
**convey** [1] - 97:1
**convince** [1] - 105:20
**Coogle** [1] - 3:17
**COOGLE** [1] - 2:4
**cooperate** [1] - 14:14
**copied** [1] - 98:11
**copies** [1] - 42:23
**copy** [1] - 79:21
**copycat** [1] - 49:5
**core** [1] - 63:16
**corporation** [2] - 70:16, 99:12
**correct** [36] - 9:5, 9:13, 9:16, 9:17, 9:19, 9:20, 9:25, 10:4, 10:16, 10:24, 11:1, 11:3, 11:4, 11:5, 12:20, 14:4, 15:2, 15:24, 16:1, 16:4, 21:7, 23:17, 29:5, 29:6, 29:10, 30:21, 36:3, 37:2, 37:9, 41:24, 57:25, 69:21, 72:19, 75:7, 78:13, 93:1
**correctly** [1] - 49:19
**cost** [2] - 6:7, 18:22
**counsel** [5] - 3:16, 4:13, 17:13, 35:2
**counter** [2] - 9:3, 73:13
**couple** [2] - 3:24, 49:18
**course** [6] - 11:25, 16:8, 17:3, 18:24, 23:2, 93:21
**court** [24] - 12:19, 12:25, 15:1, 16:13, 16:18, 22:19, 36:2, 39:13, 40:9, 46:21, 57:7, 57:16, 57:17, 58:1, 58:6, 59:11, 60:12, 64:25, 79:6, 83:16, 88:3, 88:16, 99:20, 105:19
**Court** [58] - 2:9, 2:10, 16:8, 26:17, 33:23, 40:9, 45:18, 45:19, 45:22, 45:23, 46:1, 46:25, 47:4, 47:7, 47:20, 49:3, 52:2, 57:21, 61:23, 65:9, 65:20, 65:24, 66:12, 66:13, 66:19, 66:20, 67:6, 67:12, 67:17,

77:20, 83:13, 83:20, 84:11, 84:14, 87:9, 87:14, 88:21, 89:2, 89:13, 89:18, 90:2, 90:10, 96:11, 97:20, 99:4, 100:3, 101:10, 101:11, 101:13, 102:14, 103:10, 103:17, 103:18, 103:25, 104:1, 104:10, 105:12, 107:15
**COURT** [364] - 1:1, 1:9, 3:9, 3:13, 3:19, 3:22, 3:25, 4:2, 4:10, 4:14, 4:18, 4:20, 4:22, 5:3, 5:6, 5:22, 7:10, 7:19, 7:25, 8:5, 8:8, 8:12, 8:15, 8:20, 9:1, 9:6, 9:8, 9:10, 9:12, 9:15, 9:18, 9:21, 10:1, 10:5, 10:9, 10:13, 10:18, 10:22, 11:2, 11:5, 11:15, 12:9, 12:13, 12:15, 12:17, 13:16, 13:23, 13:25, 14:6, 14:19, 15:1, 15:4, 15:7, 15:17, 15:19, 15:22, 16:2, 16:9, 16:16, 16:22, 16:25, 17:3, 17:5, 17:8, 17:12, 17:15, 17:18, 17:25, 18:3, 18:5, 18:9, 19:2, 19:5, 19:9, 19:15, 19:19, 19:25, 20:2, 20:7, 20:9, 20:13, 20:20, 20:24, 21:6, 21:9, 21:12, 21:15, 21:22, 22:1, 22:3, 22:7, 22:12, 22:22, 23:1, 23:7, 23:10, 23:14, 23:19, 24:7, 24:15, 24:19, 24:23, 24:25, 25:3, 25:5, 25:15, 25:18, 25:22, 26:1, 26:3, 26:5, 26:21, 27:8, 27:13, 27:22, 28:2, 28:8, 28:11, 29:1, 29:7, 29:13, 29:20, 30:2, 30:7, 30:10, 30:14, 30:23, 31:2, 31:6, 31:12, 31:15, 31:19, 32:5, 32:9, 32:21, 33:16, 34:1, 34:8, 34:16, 35:8, 35:14, 35:19, 35:23, 35:25, 36:7, 36:12, 36:15, 36:18, 36:22, 37:3, 37:7,

37:10, 37:15, 37:18, 37:23, 38:5, 38:8, 38:13, 38:16, 38:19, 38:23, 39:14, 39:18, 39:21, 39:25, 40:5, 40:11, 40:17, 40:20, 40:23, 40:25, 41:23, 42:6, 42:15, 43:3, 43:23, 44:14, 45:8, 45:14, 46:2, 46:10, 47:11, 48:11, 49:6, 50:11, 50:15, 51:6, 51:20, 52:8, 52:20, 52:25, 53:19, 54:3, 54:6, 54:16, 54:23, 55:2, 55:12, 55:24, 56:6, 56:10, 57:4, 57:8, 58:3, 59:1, 59:5, 59:20, 59:23, 60:7, 60:13, 60:15, 60:25, 61:5, 61:10, 61:19, 61:24, 62:23, 63:15, 63:19, 63:24, 64:3, 64:13, 65:1, 65:5, 65:7, 65:14, 66:6, 66:22, 67:10, 68:17, 68:22, 69:3, 69:5, 69:7, 69:11, 70:13, 70:23, 71:2, 71:4, 71:7, 71:17, 71:20, 71:25, 72:4, 72:11, 72:13, 72:17, 72:20, 73:5, 73:8, 73:18, 73:21, 74:1, 74:5, 74:8, 74:14, 74:18, 74:21, 75:2, 75:5, 75:8, 75:10, 75:14, 75:18, 75:20, 76:2, 76:5, 76:12, 76:14, 77:5, 77:8, 77:13, 77:23, 78:3, 78:11, 78:14, 80:2, 80:15, 80:21, 80:24, 81:12, 81:22, 82:2, 82:9, 82:20, 83:2, 83:17, 84:1, 84:5, 84:17, 84:24, 85:3, 85:9, 86:12, 86:23, 87:20, 88:5, 88:14, 88:17, 89:22, 90:23, 91:2, 91:12, 91:16, 91:19, 91:23, 92:2, 92:4, 92:6, 92:16, 92:19, 92:23, 93:2, 93:6, 93:10, 93:13, 93:18, 93:23, 94:2, 94:5, 94:10, 94:14, 94:17, 94:19, 95:11, 95:15, 95:24, 96:4, 96:15, 96:20, 96:23, 97:3, 97:13, 97:18,

97:25, 98:9, 98:13, 98:17, 99:9, 99:17, 100:1, 100:5, 100:9, 100:12, 100:16, 100:18, 100:23, 101:7, 101:25, 102:5, 102:7, 103:1, 103:6, 103:18, 103:22, 103:24, 104:7, 104:15, 105:14, 105:20, 105:25, 106:3, 106:6, 106:19
**court's** [2] - 47:1, 48:10
**Court's** [5] - 45:6, 48:8, 53:16, 66:13, 89:25
**court-backed** [1] - 12:19
**Courthouse** [1] - 2:10
**courtroom** [2] - 7:9, 88:15
**COURTROOM** [1] - 3:2
**courts** [6] - 16:4, 62:10, 65:11, 87:21, 99:19, 99:20
**cover** [1] - 96:9
**covered** [2] - 88:25, 96:8
**Covington** [1] - 4:18
**crazy** [1] - 71:10
**create** [3] - 9:16, 63:23, 101:5
**created** [9] - 19:20, 26:11, 26:14, 26:23, 28:1, 28:3, 56:22, 62:21, 77:17
**creates** [1] - 39:17
**creating** [1] - 105:5
**creation** [1] - 78:23
**credentials** [1] - 87:13
**credits** [1] - 22:3
**crime** [1] - 27:6
**criminal** [2] - 35:2, 59:13
**criteria** [2] - 67:25, 77:22
**critical** [2] - 59:17, 90:12
**cross** [1] - 38:3
**cross-examine** [1] - 38:3
**Crutcher** [1] - 1:20
**curious** [1] - 5:7
**current** [3] - 19:16, 33:25, 86:25
**cursory** [1] - 36:6
**cut** [1] - 7:3

# D

**D.C** [24] - 1:6, 2:6, 21:10, 21:12, 21:16, 23:14, 41:11, 42:22, 43:4, 43:10, 43:24, 48:1, 49:11, 52:2, 53:16, 55:14, 55:16, 56:2, 56:6, 65:20, 65:25, 67:11, 67:12, 84:24
**damages** [1] - 13:7
**Daniel** [1] - 76:7
**date** [4] - 58:24, 68:3, 96:1, 102:9
**Dated** [1] - 107:13
**dated** [1] - 8:13
**day-to-day** [2] - 72:2, 74:16
**DC** [2] - 1:13, 1:22
**deal** [2] - 45:11, 86:1
**dealer** [2] - 11:24, 68:7
**dealers** [2] - 11:10, 51:3
**dealing** [3] - 11:25, 76:25, 88:19
**dealings** [1] - 9:3
**deals** [1] - 106:9
**dealt** [2] - 89:21, 104:12
**death** [13] - 30:24, 31:21, 31:22, 32:16, 32:17, 32:18, 32:24, 33:4, 33:10, 34:6, 34:12, 40:1, 40:6
**debate** [1] - 90:20
**decide** [1] - 44:15
**decides** [5] - 36:5, 57:17, 68:12, 70:3, 93:22
**deciding** [1] - 44:15
**decision** [26] - 16:2, 33:12, 35:4, 35:11, 39:17, 46:19, 49:15, 49:17, 50:16, 58:3, 58:13, 65:10, 65:11, 65:17, 66:13, 74:16, 80:2, 80:3, 80:25, 83:15, 84:24, 92:14, 96:19, 98:18, 102:13, 106:16
**decision-making** [1] - 74:16
**decisions** [8] - 39:15, 68:14, 72:16, 88:11, 89:9, 99:7, 101:10, 101:11
**declaration** [2] - 31:6, 31:24

**declarations** [10] - 32:10, 32:20, 32:22, 33:14, 33:18, 33:22, 33:25, 35:6, 35:15
**deemed** [1] - 67:20
**deeming** [1] - 97:9
**default** [1] - 38:12
**defective** [1] - 87:1
**Defendant** [1] - 1:6
**defendant** [1] - 3:12
**defense** [1] - 35:1
**deference** [1] - 65:19
**define** [1] - 66:8
**definitely** [3] - 40:22, 44:23, 46:22
**delay** [2] - 47:16, 48:8
**delegated** [5] - 25:12, 79:5, 80:11, 81:4, 86:17
**delegation** [9] - 55:17, 56:3, 56:7, 56:14, 64:14, 82:11, 86:14, 99:1, 99:14
**demand** [2] - 29:18, 95:20
**demanding** [1] - 74:25
**demonstrates** [2] - 35:6, 83:19
**denial** [1] - 36:8
**denied** [2] - 48:19, 50:9
**deny** [11] - 36:8, 41:12, 44:17, 45:23, 46:8, 47:1, 47:8, 47:21, 47:22, 48:10, 76:17
**denying** [1] - 48:7
**department** [3] - 22:20, 52:18, 53:12
**Department** [3] - 3:15, 3:17
**departure** [1] - 56:17
**DEPUTY** [1] - 3:2
**describes** [1] - 66:13
**Desiderio** [1] - 65:10
**design** [3] - 105:11, 105:13, 105:15
**designed** [1] - 92:13
**detail** [2] - 83:11, 85:8
**detailed** [1] - 36:6
**details** [1] - 5:24
**determinations** [1] - 22:21
**determine** [2] - 41:16, 102:21
**determined** [1] - 90:9
**determining** [4] - 23:23, 81:19, 102:22, 102:24
**developments** [1] -

32:3
**develops** [1] - 72:25
**dicta** [4] - 67:2, 67:6, 90:2, 90:7
**difference** [7] - 27:13, 56:24, 63:6, 70:14, 104:16, 104:17, 104:20
**different** [13] - 11:10, 17:9, 18:4, 18:11, 23:15, 23:21, 23:22, 26:13, 27:24, 32:5, 32:15, 35:12, 41:10
**differs** [1] - 17:15
**difficult** [3] - 56:19, 56:25, 88:12
**direct** [4] - 7:3, 19:20, 62:7, 65:9
**directed** [4] - 10:2, 63:10, 63:11, 70:5
**directing** [1] - 72:23
**direction** [4] - 67:23, 68:8, 81:10, 105:23
**directly** [4] - 6:1, 6:5, 53:23, 71:19
**directors** [8] - 9:18, 26:12, 26:15, 73:10, 74:9, 75:11, 79:10, 79:16
**disagree** [6] - 7:15, 73:13, 73:20, 74:5, 75:16, 89:5
**disagreement** [1] - 11:15
**disappear** [1] - 59:17
**disassembled** [1] - 107:9
**disbarred** [1] - 27:6
**disciplinary** [11] - 10:1, 12:23, 22:20, 26:2, 30:13, 48:17, 50:5, 58:17, 72:16, 75:25, 99:7
**disclosure** [2] - 18:7, 39:24
**discovery** [5] - 29:8, 29:9, 29:15, 39:9
**discrete** [3] - 66:9, 78:10, 79:16
**discretion** [14] - 42:10, 44:17, 45:23, 45:25, 47:1, 47:8, 47:22, 48:10, 68:15, 71:25, 73:9, 74:2, 74:4, 74:6
**discuss** [3] - 28:21, 64:9, 90:1
**discussed** [8] - 17:9, 28:24, 38:21, 39:23, 44:22, 98:25, 99:5,

105:1
**discusses** [1] - 76:16
**discussing** [1] - 51:11
**discussion** [2] - 27:14, 67:1
**disgorgement** [1] - 92:21
**disjunctive** [1] - 85:22
**dismiss** [2] - 94:9, 94:17
**dismissed** [1] - 89:14
**dismissing** [1] - 94:5
**displace** [1] - 98:6
**dispositive** [2] - 44:8, 104:20
**disruptive** [1] - 47:2
**distinction** [6] - 13:5, 24:4, 27:22, 55:21, 63:4, 78:12
**distinctions** [4] - 24:5, 62:17, 62:18
**distinguish** [5] - 20:3, 25:13, 42:13, 62:9, 90:5
**distinguishes** [1] - 62:15
**DISTRICT** [3] - 1:1, 1:1, 1:9
**district** [6] - 12:25, 39:3, 40:9, 46:20, 47:1, 48:9
**divided** [2] - 50:14, 65:17
**division** [1] - 22:19
**Division** [1] - 2:5
**doctrine** [2] - 81:5, 98:24
**documents** [4] - 30:1, 30:3, 37:21, 95:20
**dog** [1] - 60:17
**dollars** [2] - 46:13, 46:14
**done** [13] - 22:22, 22:24, 29:21, 39:6, 49:9, 58:23, 61:11, 62:3, 62:4, 88:22, 89:18, 92:7, 97:4
**dots** [1] - 88:22
**double** [2] - 91:16, 91:18
**double-check** [2] - 91:16, 91:18
**down** [17] - 6:3, 18:22, 34:4, 34:8, 35:22, 35:23, 39:19, 43:21, 58:4, 59:12, 61:19, 61:20, 68:24, 69:8, 76:3, 92:4
**downstairs** [1] - 61:16
**dozens** [1] - 60:9

6

**drafted** [1] - 33:14
**dramatically** [2] - 18:22, 50:8
**draw** [1] - 55:21
**drives** [1] - 71:10
**due** [5] - 42:17, 69:20, 76:1, 76:21, 105:21
**dues** [1] - 22:4
**duly** [1] - 51:24
**Dunn** [3] - 1:20, 4:19, 4:20
**during** [4] - 29:25, 32:7, 37:18, 61:4
**Dutch** [1] - 5:9
**duties** [2] - 102:15, 102:16

**E**

**early** [2] - 5:14, 37:14
**earns** [1] - 58:10
**easier** [1] - 62:5
**East** [4] - 5:9, 5:22, 6:4, 6:7
**eat** [1] - 61:14
**effect** [3] - 13:7, 15:23, 72:18
**effectuate** [1] - 15:2
**efficient** [2] - 59:25, 60:1
**efforts** [1] - 16:21
**either** [3] - 18:12, 40:9, 44:25
**ejusdem** [2] - 84:15, 84:19
**EJUSDEM** [1] - 84:19
**election** [1] - 46:24
**elements** [1] - 59:17
**eliminate** [2] - 51:17, 51:20
**ELIZABETH** [1] - 107:3
**Elizabeth** [2] - 2:9, 107:14
**elsewhere** [1] - 21:17
**email** [3] - 33:4, 43:2, 95:25
**Email** [4] - 1:14, 1:17, 1:23, 2:7
**emails** [1] - 14:22
**employed** [2] - 80:12, 80:13
**employees** [3] - 55:4, 64:12, 70:15
**empower** [1] - 105:19
**en** [2] - 58:3, 58:13
**encompassing** [1] - 85:19
**encouraged** [1] - 70:6
**end** [6] - 31:7, 33:21,

49:10, 65:19, 68:23, 71:11
**endless** [1] - 22:3
**enforce** [15] - 10:6, 10:10, 12:18, 12:23, 13:6, 13:12, 27:2, 27:9, 27:11, 28:19, 50:2, 71:22, 72:6, 73:10, 74:10
**enforcement** [35] - 10:10, 14:1, 14:21, 15:5, 16:12, 22:15, 24:2, 31:16, 31:19, 31:25, 35:12, 35:16, 36:19, 37:11, 38:2, 38:11, 39:9, 46:12, 48:20, 49:21, 59:8, 60:1, 61:1, 63:23, 68:13, 70:3, 70:6, 70:17, 70:20, 71:17, 73:15, 74:16, 80:16, 92:10, 95:13
**enforces** [5] - 18:16, 23:24, 23:25, 27:10, 28:17
**enforcing** [10] - 25:17, 25:19, 25:20, 25:22, 27:2, 27:12, 28:6, 83:5, 83:6
**engage** [1] - 64:22
**engaged** [12] - 67:22, 67:24, 73:3, 78:10, 79:7, 79:17, 79:19, 80:19, 81:4, 83:21, 83:24, 97:9
**engaging** [2] - 24:6, 106:15
**England** [4] - 5:23, 6:4, 6:5, 6:6
**enjoin** [4] - 36:24, 38:9, 38:10, 95:22
**enjoined** [2] - 38:14, 50:16
**enjoy** [2] - 73:8, 74:2
**ensure** [2] - 75:24, 99:6
**ensures** [1] - 104:22
**Enterprise** [2] - 66:19, 77:2
**enterprises** [1] - 79:20
**enterprising** [1] - 20:9
**entire** [4] - 29:19, 57:24, 59:11, 87:10
**entities** [9] - 7:17, 19:18, 53:13, 64:12, 66:18, 73:3, 77:4, 95:21
**entitled** [2] - 67:8
**entity** [16] - 14:19, 20:5, 24:23, 55:8,

56:17, 69:15, 69:17, 76:10, 76:11, 78:18, 78:21, 81:3, 90:5, 91:4, 104:17, 104:24
**entry** [1] - 38:12
**equally** [1] - 100:11
**equitable** [4] - 45:24, 45:25, 47:1, 47:8
**equities** [4] - 41:14, 44:19, 44:20, 44:25
**ergo** [1] - 88:7
**error** [2] - 41:17, 41:18
**especially** [1] - 47:22
**essence** [1] - 39:5
**essential** [1] - 50:20
**essentially** [6] - 5:17, 18:21, 20:17, 39:17, 42:1, 43:11
**establishes** [1] - 101:13
**establishing** [1] - 80:10
**estoppel** [1] - 33:5
**et** [1] - 11:11
**ethical** [2] - 22:8, 28:9
**ethics** [1] - 51:4
**EUGENE** [1] - 1:3
**Eugene** [1] - 3:3
**evening** [1] - 42:19
**event** [4] - 24:14, 31:18, 58:2, 105:12
**events** [3] - 60:3, 60:5
**evolution** [2] - 20:16, 87:10
**exact** [1] - 10:20
**exactly** [2] - 46:17, 59:23
**examination** [1] - 65:3
**examine** [2] - 38:3, 102:23
**examined** [1] - 85:7
**example** [6] - 26:17, 41:4, 83:3, 90:4, 101:17, 105:4
**examples** [1] - 18:5
**exceed** [1] - 42:17
**excellent** [1] - 47:11
**except** [1] - 60:17
**exceptions** [1] - 12:1
**Exchange** [19] - 7:20, 8:2, 8:10, 8:20, 8:23, 9:22, 10:2, 19:18, 27:11, 27:21, 50:1, 50:25, 53:15, 68:6, 69:24, 71:22, 72:5, 74:12, 99:1
**exchange** [7] - 8:22, 11:9, 12:2, 12:4, 13:9, 13:17, 29:7
**exchanges** [4] - 8:12,

11:22, 12:8, 13:19
**exclusive** [2] - 63:12, 67:22
**execute** [1] - 69:13
**executive** [5] - 51:25, 53:4, 54:11, 83:9, 86:5
**exercises** [1] - 101:21
**exercising** [3] - 48:10, 82:24, 101:15
**exhaust** [3] - 16:14, 16:18, 88:11
**exhausted** [2] - 23:3, 95:4
**exhaustion** [2] - 16:5, 40:2
**exist** [2] - 33:24, 86:22
**existed** [2] - 7:21, 8:1
**existence** [2] - 51:13, 51:14
**existing** [1] - 97:21
**expand** [1] - 79:10
**expectation** [2] - 38:15, 38:16
**expected** [1] - 17:18
**expedited** [1] - 14:13
**expel** [1] - 31:5
**expenses** [1] - 57:24
**experience** [2] - 54:19, 71:5
**experts** [1] - 71:8
**expiration** [1] - 102:9
**explain** [1] - 18:9
**explained** [2] - 103:10, 104:10
**express** [1] - 97:7
**extending** [2] - 96:1, 97:7
**extensively** [1] - 41:2
**extent** [4] - 23:25, 27:3, 48:5, 69:23
**extra** [1] - 49:18
**extraordinarily** [1] - 50:3
**extraordinary** [1] - 45:21
**extremely** [2] - 43:25, 44:6

**F**

**F.3d** [2] - 43:10, 43:24
**faced** [1] - 88:11
**fact** [10] - 11:19, 35:16, 42:13, 47:19, 56:21, 65:21, 73:23, 90:7, 96:25, 105:2
**factor** [2] - 48:6, 48:9
**factors** [6] - 41:14, 42:11, 43:14, 44:20,

45:6, 45:22
**facts** [2] - 7:13, 39:17
**failure** [1] - 94:6
**fair** [1] - 75:24
**Fair** [1] - 106:9
**fall** [2] - 52:17, 53:24
**famous** [1] - 88:19
**far** [6] - 35:17, 51:12, 51:16, 59:6, 59:24, 96:10
**far-reaching** [2] - 51:12, 96:10
**FARBY** [1] - 2:4
**Farby** [1] - 3:16
**favor** [3] - 48:7, 96:12, 98:19
**FCRR** [3] - 2:9, 107:3, 107:14
**fear** [1] - 49:3
**feature** [1] - 105:11
**February** [1] - 49:15
**federal** [48] - 8:16, 9:13, 9:15, 10:8, 16:13, 16:18, 16:21, 23:25, 24:1, 25:17, 25:19, 25:21, 26:6, 26:14, 26:15, 27:2, 27:3, 27:4, 27:5, 27:9, 28:19, 29:15, 30:20, 36:2, 39:13, 54:22, 60:12, 60:21, 67:24, 67:25, 70:12, 71:22, 71:23, 73:2, 76:25, 77:15, 77:21, 78:20, 79:5, 83:4, 83:5, 87:21, 88:3, 91:6, 91:7, 101:15, 105:5, 105:6
**Federal** [1] - 2:5
**federally** [5] - 24:13, 79:9, 80:11, 81:4
**few** [11] - 17:20, 37:12, 55:10, 57:1, 60:4, 68:24, 95:6, 100:19, 106:5
**Fiero** [4] - 12:22, 12:24, 13:6
**Fifth** [1] - 89:14
**figuratively** [1] - 68:18
**figure** [4] - 32:13, 43:6, 48:1, 87:23
**file** [4] - 29:5, 29:17, 36:5, 46:2
**filed** [6] - 36:19, 90:16, 90:17, 90:18, 97:14, 98:21
**files** [1] - 29:16
**final** [2] - 13:7, 43:14
**FINANCIAL** [1] - 1:5
**Financial** [2] - 3:3,

102:12
**findings** [1] - 39:17
**fine** [14] - 17:21, 33:11, 40:1, 46:4, 51:22, 92:8, 92:9, 92:11, 92:20, 92:22, 93:4, 104:7
**fines** [4] - 12:19, 22:4, 22:6, 92:17
**finish** [5] - 61:21, 68:25, 69:8, 69:12
**FINRA** [158] - 1:19, 3:12, 4:15, 4:17, 6:24, 8:1, 8:23, 9:6, 9:8, 9:16, 9:19, 10:2, 10:12, 11:7, 11:12, 11:13, 11:18, 12:3, 12:11, 12:18, 13:2, 13:4, 14:1, 14:11, 14:23, 15:9, 15:22, 16:7, 17:15, 17:22, 18:15, 18:23, 19:1, 19:7, 19:13, 19:15, 19:21, 20:6, 23:21, 25:16, 25:19, 25:20, 26:14, 26:24, 27:8, 27:10, 27:12, 27:14, 27:15, 27:16, 27:19, 28:17, 28:19, 29:10, 29:12, 29:13, 29:16, 30:2, 30:19, 30:21, 30:23, 31:5, 32:11, 36:1, 39:9, 39:10, 48:16, 48:23, 49:2, 49:25, 50:4, 50:19, 52:2, 52:16, 52:21, 52:23, 53:16, 53:21, 55:7, 55:13, 55:14, 55:16, 55:21, 56:6, 56:7, 56:21, 59:2, 59:3, 59:7, 62:10, 62:19, 62:20, 63:7, 63:18, 63:23, 64:3, 64:8, 66:17, 68:2, 68:8, 68:12, 68:14, 68:25, 69:12, 70:2, 70:6, 70:9, 70:14, 70:17, 71:22, 72:3, 72:6, 72:23, 72:25, 73:8, 73:14, 74:3, 74:5, 74:13, 75:24, 76:7, 76:10, 76:13, 77:24, 78:9, 80:14, 80:15, 80:19, 81:3, 81:18, 82:4, 83:3, 83:7, 85:16, 85:22, 86:4, 89:9, 92:12, 95:9, 95:10, 97:15, 98:3, 98:21, 99:2, 99:5, 99:22, 104:16,

104:17, 106:14
**FINRA's** [29] - 7:15, 7:20, 10:6, 10:7, 10:23, 11:3, 25:23, 28:19, 30:11, 48:20, 51:13, 52:3, 55:11, 63:1, 63:10, 70:20, 70:23, 71:17, 72:17, 73:10, 74:9, 74:16, 75:11, 75:15, 90:13, 92:10, 95:13, 99:6
**fire** [1] - 75:6
**fired** [1] - 74:23
**firm** [1] - 33:8
**firms** [2] - 12:2, 12:8
**First** [3] - 26:18, 26:19, 28:22
**first** [23] - 5:4, 5:8, 5:10, 5:19, 5:20, 6:15, 7:8, 7:23, 8:16, 22:23, 22:25, 31:3, 41:14, 44:19, 45:15, 50:18, 50:20, 65:12, 76:23, 97:23, 101:9, 102:21
**first-line** [2] - 50:20, 97:23
**fits** [1] - 57:14
**five** [5] - 18:20, 42:17, 58:23, 58:24, 87:9
**five-percent** [1] - 18:20
**fix** [5] - 52:2, 53:7, 53:14, 54:12, 105:19
**flat** [1] - 36:8
**flaw** [3] - 105:12, 105:18, 105:19
**flaws** [1] - 105:14
**flexibility** [2] - 31:17, 33:15
**flood** [1] - 48:12
**flow** [1] - 90:9
**flows** [1] - 41:21
**focus** [1] - 106:11
**focusing** [1] - 85:12
**follow** [3] - 11:2, 15:16, 22:1
**food** [1] - 61:16
**FOR** [4] - 1:1, 1:11, 1:19, 2:2
**for-cause** [1] - 74:13
**force** [2] - 15:10, 67:7
**forced** [1] - 16:17
**fore** [1] - 85:6
**foregoing** [1] - 107:4
**foreground** [1] - 89:25
**forever** [1] - 13:2
**forget** [1] - 26:21
**format** [1] - 16:20
**formation** [1] - 63:1

**forms** [1] - 25:3
**forward** [9] - 3:5, 29:4, 30:16, 32:15, 50:4, 58:7, 59:13, 59:14
**founders** [1] - 103:7
**founding** [2] - 68:4, 97:12
**four** [1] - 60:4
**fours** [1] - 47:6
**framework** [2] - 51:18, 99:1
**fraud** [1] - 10:21
**free** [1] - 51:8
**Free** [2] - 66:19, 77:2
**freedoms** [1] - 43:15
**Freytag** [1] - 83:15
**Friday** [1] - 42:19
**front** [4] - 3:20, 23:6, 23:7, 49:2
**frontline** [2] - 50:6, 98:6
**frustrating** [1] - 7:4
**full** [4] - 6:17, 71:25, 88:2, 107:5
**fully** [2] - 36:22, 41:5
**fun** [3] - 71:4, 100:9, 100:11
**function** [6] - 67:22, 81:18, 81:19, 82:23, 82:25
**functionaries** [1] - 55:5
**functions** [7] - 63:13, 68:3, 101:3, 101:16, 101:22, 103:16, 104:13
**Fund** [2] - 66:20, 77:2
**fundamental** [3] - 56:23, 76:23, 104:17
**funded** [1] - 9:10

## G

**G-E-N-E-R-I-S** [1] - 84:20
**game** [1] - 63:20
**general** [2] - 15:10, 45:16
**generally** [5] - 10:5, 16:1, 21:25, 44:3, 72:17
**generis** [1] - 84:15
**gentlemen** [1] - 4:14
**Germaine** [2] - 101:19, 102:3
**germane** [1] - 75:25
**Gesch** [1] - 4:15
**GESCH** [2] - 1:19, 4:15
**Gibson** [3] - 1:20,

4:19, 4:20
**Giuliani** [1] - 21:21
**given** [4] - 29:9, 49:12, 61:2, 61:10
**goals** [1] - 105:3
**governed** [3] - 8:21, 9:8, 18:23
**governing** [3] - 24:12, 34:13, 59:17
**government** [53] - 9:13, 9:15, 9:19, 9:22, 24:6, 28:1, 28:3, 55:22, 56:22, 56:23, 66:14, 67:24, 67:25, 69:13, 69:14, 69:16, 69:22, 69:23, 70:5, 70:12, 70:18, 70:21, 71:18, 72:6, 73:2, 73:11, 74:10, 77:9, 77:17, 77:18, 77:21, 77:25, 78:22, 78:23, 79:15, 79:18, 80:13, 80:17, 83:8, 83:9, 84:3, 84:14, 84:23, 87:5, 87:12, 91:7, 99:13, 99:15, 101:13, 104:25, 106:15
**government's** [5] - 16:23, 44:24, 45:12, 46:6, 101:18
**government-appointed** [1] - 79:15
**government-removable** [1] - 79:15
**governmental** [7] - 63:13, 67:22, 77:17, 78:18, 101:14, 101:20, 102:15
**governs** [1] - 63:2
**grab** [2] - 61:15, 61:20
**grant** [4] - 49:3, 57:23, 60:8, 60:18
**granted** [4] - 89:12, 89:13, 89:14, 96:2
**granting** [1] - 47:3
**granular** [1] - 85:8
**great** [3] - 45:11, 86:1, 106:20
**ground** [1] - 96:9
**guess** [1] - 33:17
**guessing** [1] - 60:15
**guidance** [1] - 45:18
**guideline** [3] - 18:15, 18:16, 34:22
**guidelines** [3] - 34:13, 92:12, 92:13
**Gusrae** [2] - 1:16, 3:7
**guys** [14] - 5:6, 5:7,

47:12, 47:24, 61:14, 70:23, 93:10, 93:13, 93:15, 94:6, 95:4, 106:22

## H

**Habliston** [2] - 64:24, 65:6
**hair** [1] - 94:6
**half** [1] - 49:19
**Halleck** [10] - 24:6, 67:18, 68:19, 69:15, 70:10, 85:15, 85:18, 85:20, 85:23, 106:16
**handle** [1] - 98:2
**hands** [2] - 45:25, 53:20
**happy** [1] - 6:14
**hard** [2] - 42:19, 87:14
**harm** [9] - 41:7, 44:21, 44:25, 46:23, 47:10, 49:8, 49:22, 51:1
**harms** [1] - 44:25
**head** [4] - 52:18, 53:11, 64:15, 104:9
**hear** [2] - 44:23, 87:20
**hear-and-now** [1] - 87:20
**heard** [6] - 5:2, 5:5, 5:21, 7:10, 38:22, 57:3
**HEARING** [1] - 1:8
**hearing** [39] - 14:21, 16:2, 16:6, 23:6, 23:7, 29:15, 32:8, 35:10, 36:25, 37:5, 37:13, 37:24, 37:25, 38:5, 38:20, 39:5, 39:6, 39:16, 39:22, 48:19, 52:3, 52:6, 52:23, 53:21, 54:10, 56:7, 69:13, 70:15, 83:3, 92:14, 92:15, 93:21, 95:10, 96:2, 96:4, 100:10, 100:13
**hearings** [4] - 6:21, 14:1, 16:7, 59:8
**Hedden** [1] - 101:19
**height** [1] - 41:21
**held** [3] - 62:10, 77:20, 79:6
**helpful** [10] - 36:20, 43:5, 43:17, 43:18, 48:11, 50:12, 62:3, 67:2, 97:6, 98:23
**helps** [1] - 83:17
**Henderson** [1] - 81:8
**here-and-now** [1] - 87:19

**hereby** [1] - 107:3
**hesitation** [1] - 56:15
**hiatus** [2] - 57:6, 57:17
**high** [3] - 28:9, 43:25, 44:6
**higher** [1] - 54:7
**highly** [2] - 45:10, 64:7
**himself** [2] - 70:2, 82:19
**historical** [1] - 89:8
**history** [1] - 4:25
**hold** [8] - 15:8, 31:12, 42:24, 43:11, 52:3, 82:15, 97:18, 106:13
**holding** [4] - 67:4, 91:4, 101:20, 103:15
**holdings** [1] - 45:19
**holds** [1] - 79:3
**homework** [2] - 32:12, 32:13
**honest** [2] - 55:15, 80:6
**honestly** [1] - 91:9
**Honor** [120] - 3:10, 3:11, 3:14, 4:8, 4:21, 7:9, 8:11, 8:14, 11:21, 12:16, 12:21, 13:21, 14:5, 14:18, 17:4, 17:7, 17:11, 19:6, 19:17, 19:24, 20:4, 20:8, 21:3, 22:5, 22:18, 23:18, 25:25, 26:9, 28:16, 29:11, 30:6, 30:8, 30:22, 31:4, 31:11, 32:19, 33:13, 33:20, 34:9, 35:2, 36:11, 37:17, 38:1, 38:7, 38:18, 38:22, 39:24, 40:16, 40:24, 42:12, 42:25, 43:22, 45:3, 45:16, 46:18, 48:4, 50:17, 51:10, 53:8, 54:2, 54:25, 55:20, 56:9, 56:15, 57:3, 57:5, 57:14, 58:9, 59:22, 61:4, 61:17, 62:16, 63:5, 64:2, 64:8, 64:25, 67:5, 68:21, 69:2, 69:4, 69:10, 70:22, 72:15, 72:19, 73:17, 75:13, 75:23, 78:9, 80:7, 82:17, 83:18, 84:4, 84:8, 85:2, 88:8, 91:15, 91:22, 92:10, 93:17, 94:8, 94:12, 94:18, 95:5, 95:25,

96:9, 97:17, 98:1, 100:7, 100:11, 100:19, 102:10, 102:11, 103:9, 104:4, 104:19, 105:1, 105:17, 106:2, 106:18, 106:24
**HONORABLE** [1] - 1:8
**hope** [1] - 23:18
**hopeful** [2] - 105:23, 106:17
**Horsemen's** [1] - 76:8
**host** [1] - 79:19
**hot** [2] - 71:14
**House** [2] - 105:4, 105:8
**Howell** [2] - 50:9, 96:12
**human** [1] - 98:8
**hypothetically** [2] - 58:14, 82:4

**I**

**ideally** [1] - 36:18
**identified** [1] - 89:7
**identifies** [1] - 67:19
**identify** [1] - 3:5
**ignore** [3] - 15:4, 62:14, 90:6
**ignoring** [1] - 41:19
**III** [1] - 16:3
**illustration** [1] - 39:8
**imagine** [5] - 20:18, 23:19, 56:19, 57:20, 59:10
**immediate** [1] - 54:15
**immediately** [2] - 60:20, 94:16
**impact** [1] - 47:3
**implement** [1] - 26:6
**implications** [1] - 96:10
**import** [1] - 33:18
**importance** [2] - 89:19, 104:12
**important** [9] - 18:8, 52:10, 52:12, 55:20, 58:21, 86:3, 87:7, 87:18, 102:21
**impose** [4] - 8:21, 35:11, 35:12, 35:18
**imposes** [1] - 70:9
**improper** [1] - 58:24
**inapplicable** [4] - 64:11, 66:17, 78:25, 104:21
**inappropriate** [1] - 13:13

**Inc** [1] - 3:4
**INC** [1] - 1:5
**include** [1] - 32:13
**including** [4] - 27:25, 72:6, 75:23, 99:19
**inconsistent** [2] - 90:8, 103:16
**incorporate** [1] - 90:21
**increase** [1] - 50:8
**indeed** [3] - 73:9, 96:8, 97:6
**India** [4] - 5:9, 5:22, 6:4, 6:7
**indicator** [2] - 44:1, 44:7
**indirectly** [1] - 71:20
**indisputably** [2] - 79:13, 84:14
**individuals** [1] - 7:17
**indulgence** [1] - 100:8
**industries** [4] - 13:17, 18:18, 25:7, 73:2
**Industry** [1] - 3:3
**industry** [10] - 13:10, 13:15, 14:7, 15:15, 20:11, 39:2, 50:21, 58:10, 68:7, 97:24
**INDUSTRY** [1] - 1:5
**inferior** [2] - 53:11, 54:25
**inform** [1] - 92:13
**information** [3] - 14:3, 32:2, 32:24
**informed** [1] - 95:9
**initial** [2] - 5:11
**initiate** [1] - 48:21
**initiated** [1] - 10:5
**injunction** [20] - 41:13, 42:2, 42:4, 42:7, 42:9, 44:2, 44:8, 44:23, 45:17, 45:20, 45:24, 47:8, 48:7, 48:21, 49:4, 50:10, 57:23, 60:8, 60:19, 81:7
**injunctive** [2] - 47:2, 48:10
**injury** [1] - 43:16
**inspirational** [1] - 87:17
**instance** [3] - 22:23, 22:25, 50:18
**instead** [2] - 102:19, 105:10
**instruction** [1] - 71:23
**intend** [2] - 32:1, 46:17
**intended** [2] - 33:14, 96:9

**intends** [1] - 48:20
**intentional** [7] - 34:17, 34:21, 34:23, 93:4, 93:11, 93:15, 93:19
**interest** [10] - 41:14, 44:3, 44:9, 44:19, 44:21, 44:25, 46:12, 50:2, 59:25
**interested** [2] - 45:11, 85:12
**interesting** [4] - 34:11, 62:13, 90:19, 100:13
**interim** [2] - 22:19, 37:18
**international** [3] - 70:25, 71:8, 71:13
**interpret** [2] - 82:5, 103:3
**interpretation** [6] - 33:24, 41:24, 80:1, 84:21, 85:14, 85:18
**interrogatories** [1] - 29:18
**intervention** [2] - 16:23, 45:4
**introduce** [1] - 4:6
**introduced** [2] - 4:9, 34:2
**invest** [1] - 5:15
**investigation** [4] - 29:25, 95:19, 95:22, 95:23
**investigations** [2] - 95:13, 95:18
**investigatory** [2] - 29:17, 30:12
**Investment** [2] - 102:13, 103:23
**investments** [1] - 5:16
**investors** [3] - 50:1, 51:1, 98:20
**invoked** [1] - 76:13
**involved** [5] - 25:25, 29:23, 36:2, 98:5
**involving** [2] - 79:13, 83:15
**IPO** [2] - 5:4, 5:8
**irreparable** [4] - 41:7, 43:16, 46:23, 47:10
**issue** [22] - 13:14, 14:2, 15:6, 44:14, 48:1, 48:18, 58:18, 65:4, 82:11, 82:12, 86:2, 86:12, 86:14, 87:19, 87:20, 87:22, 88:2, 88:14, 88:20, 98:24, 99:21, 104:13
**issued** [2] - 5:15, 36:8
**issues** [7] - 29:16, 49:1, 51:11, 51:12,

89:20, 90:12, 100:20
**it'll** [1] - 86:10
**italicized** [1] - 67:13
**itself** [7] - 8:24, 32:8, 34:22, 37:13, 52:2, 72:25, 105:19

**J**

**jack** [1] - 35:21
**jack-in-the-box** [1] - 35:21
**JAMES** [1] - 2:3
**James** [1] - 3:15
**james.luh@usdoj. gov** [1] - 2:7
**January** [1] - 49:15
**Jarkesy** [1] - 89:13
**jersey** [1] - 60:17
**job** [6] - 50:22, 53:22, 62:12, 86:9, 106:20
**John** [1] - 47:11
**joined** [1] - 96:25
**joint** [2] - 67:24, 96:3
**JUDGE** [1] - 1:9
**judge** [9] - 23:3, 23:6, 23:8, 23:11, 23:12, 41:15, 42:10, 54:22
**Judge** [36] - 31:20, 35:4, 50:9, 58:14, 60:23, 65:18, 68:18, 69:12, 69:18, 69:20, 76:14, 76:21, 80:2, 81:8, 81:9, 81:14, 81:17, 82:10, 82:15, 82:17, 83:2, 85:20, 87:3, 87:16, 88:19, 88:23, 89:5, 92:3, 96:12, 101:2, 103:12, 103:14, 104:15, 105:22, 106:5, 106:7
**Judges** [2] - 84:11, 84:13
**judges** [5] - 22:14, 22:23, 22:24, 23:1, 83:15
**judgment** [2] - 38:12, 39:25
**judicial** [3] - 23:16, 24:2, 33:5
**judiciary** [1] - 53:12
**jurisdiction** [2] - 87:21, 88:16
**jurisprudence** [1] - 96:14
**jury** [1] - 89:15
**Justice** [3] - 3:15, 3:17, 3:18

## K

**KAPLAN** [190] - 1:15, 3:7, 3:10, 4:8, 4:11, 7:9, 7:18, 7:22, 8:3, 8:7, 8:10, 8:14, 8:19, 8:25, 9:5, 9:7, 9:9, 9:11, 9:14, 9:17, 9:20, 9:25, 10:4, 10:7, 10:11, 10:17, 10:19, 10:25, 11:4, 11:6, 11:21, 12:12, 12:14, 12:21, 13:20, 14:4, 14:7, 14:25, 15:3, 15:5, 15:11, 15:18, 15:21, 15:25, 16:5, 16:14, 16:20, 16:24, 17:2, 17:4, 17:6, 17:11, 17:14, 17:17, 17:24, 18:1, 18:4, 18:6, 18:10, 19:4, 19:6, 20:1, 20:3, 20:8, 20:10, 20:14, 20:23, 21:3, 21:8, 21:11, 21:14, 21:20, 21:25, 22:2, 22:5, 22:11, 22:17, 22:24, 23:4, 23:9, 23:12, 23:18, 24:4, 24:11, 24:16, 24:22, 24:24, 25:2, 25:4, 25:13, 25:17, 25:21, 25:24, 26:2, 26:4, 29:6, 29:11, 29:14, 29:22, 30:8, 30:11, 30:22, 30:25, 31:10, 31:14, 34:7, 34:9, 34:17, 35:22, 35:24, 37:16, 38:18, 38:22, 38:25, 39:15, 39:20, 39:24, 40:3, 40:6, 40:15, 40:19, 41:15, 42:5, 42:12, 42:25, 43:22, 44:13, 54:4, 54:13, 54:20, 57:5, 57:13, 58:8, 59:2, 59:16, 59:22, 60:3, 60:10, 60:14, 60:23, 61:17, 69:4, 69:6, 69:10, 71:1, 71:3, 71:6, 71:16, 71:19, 71:21, 72:2, 72:10, 74:7, 75:9, 75:13, 75:19, 76:4, 78:2, 81:17, 81:25, 82:3, 85:15, 86:21, 86:24, 88:4, 88:8, 88:16, 89:5, 90:7, 90:25, 91:9, 91:15, 91:17, 91:22, 92:1, 92:3, 92:5, 92:25, 93:3, 93:7, 93:11, 94:12, 94:16, 94:18, 96:19, 96:21, 99:16, 106:5, 106:7, 106:24
**Kaplan** [25] - 1:16, 3:7, 3:9, 6:20, 19:25, 29:2, 36:5, 37:15, 38:17, 39:18, 62:8, 62:11, 66:23, 69:3, 70:23, 71:18, 72:9, 74:5, 81:12, 85:9, 94:11, 95:3, 96:15, 99:10
**Kaplan's** [1] - 62:1
**keep** [1] - 84:3
**Keller** [1] - 26:17
**Kentucky** [1] - 21:18
**key** [1] - 102:17
**kick** [4] - 23:4, 23:11, 23:12, 25:9
**kicked** [4] - 22:10, 23:2, 24:1, 27:4
**kicking** [2] - 27:15, 27:17
**kicks** [1] - 28:5
**kids** [1] - 100:12
**kill** [1] - 27:23
**Kim** [24] - 3:3, 10:15, 12:10, 14:21, 14:22, 27:15, 27:17, 30:3, 31:5, 32:1, 34:19, 37:19, 38:2, 38:20, 39:22, 57:19, 57:23, 57:25, 58:5, 58:16, 68:11, 70:2, 70:7
**KIM** [1] - 1:3
**Kim's** [2] - 76:1, 99:24
**kind** [1] - 27:25
**knowing** [1] - 7:1
**known** [1] - 18:16
**knows** [1] - 60:14

## L

**label** [1] - 62:18
**lack** [1] - 56:16
**lacks** [3] - 15:9, 58:12, 74:3
**laid** [2] - 104:8, 104:23
**Lamone** [2] - 46:20, 47:7
**land** [1] - 105:7
**language** [4] - 10:19, 10:20, 82:9, 84:5
**Larry** [1] - 4:12
**last** [6] - 35:25, 51:18, 59:10, 87:9, 104:11, 106:4
**late** [1] - 94:20
**latter** [1] - 52:17

**law** [25] - 6:11, 16:17, 19:16, 21:13, 24:13, 25:17, 25:19, 26:11, 26:14, 27:2, 27:3, 27:4, 27:9, 28:6, 30:20, 41:21, 43:1, 68:12, 71:23, 105:6, 105:7
**LAWRENCE** [1] - 1:15
**laws** [13] - 8:17, 10:8, 10:10, 10:16, 10:24, 26:23, 28:20, 46:12, 50:3, 69:13, 83:5, 83:7, 105:5
**lawsuits** [2] - 49:5, 60:21
**lawyer** [1] - 21:1
**lawyers** [2] - 22:16, 71:10
**lays** [1] - 69:24
**lead** [1] - 49:4
**League** [1] - 43:23
**learns** [1] - 32:2
**least** [7] - 41:20, 78:6, 89:16, 90:8, 96:21, 103:10, 104:8
**leave** [2] - 7:5, 33:10
**leaves** [2] - 44:5, 45:25
**Lebron** [2] - 77:1, 77:20
**led** [1] - 6:1
**leeway** [2] - 36:5, 36:13
**left** [2] - 29:9, 42:10
**legal** [3] - 47:11, 51:11, 62:19
**legality** [1] - 51:4
**legally** [1] - 46:8
**legitimacy** [1] - 58:19
**legs** [1] - 47:13
**LESLEY** [1] - 2:4
**Leslie** [1] - 3:16
**less** [6] - 6:8, 18:21, 35:17, 62:4, 73:24, 100:9
**level** [4] - 54:20, 69:22, 83:11, 85:8
**license** [3] - 21:14, 21:16, 21:19
**life** [1] - 59:12
**light** [1] - 47:5
**likelihood** [25] - 41:6, 41:25, 42:8, 43:13, 44:1, 44:6, 44:16, 44:18, 45:1, 45:2, 45:5, 46:7, 46:21, 47:5, 47:9, 51:15, 66:1, 76:19, 80:4, 80:5, 80:10, 81:2,

81:16, 82:16, 88:7
**likely** [3] - 35:17, 37:14, 88:22
**limitation** [2] - 59:2, 104:22
**limitations** [4] - 18:7, 58:22, 59:4
**limited** [4] - 15:25, 45:4, 66:9, 84:22
**limits** [1] - 28:25
**line** [6] - 50:20, 62:8, 67:11, 88:21, 97:4, 97:23
**lines** [2] - 65:16, 81:8
**listen** [1] - 69:18
**literally** [4] - 32:10, 33:1, 68:18, 90:4
**litigation** [2] - 48:21, 58:16
**living** [2] - 5:6, 58:10
**LLC** [2] - 102:13, 103:23
**LLP** [1] - 1:20
**local** [3] - 4:12, 102:14, 102:15
**logic** [2] - 57:13, 90:9
**logically** [1] - 57:22
**look** [12] - 10:19, 17:8, 22:14, 26:16, 34:12, 48:3, 87:8, 87:15, 88:23, 88:24, 89:8, 92:6
**looked** [2] - 41:2, 87:25
**looking** [2] - 81:18, 87:14
**loophole** [4] - 101:6, 101:8, 105:2, 105:10
**loose** [1] - 21:9
**lose** [3] - 21:16, 21:19, 33:6
**loss** [1] - 43:14
**Loth** [2] - 2:9, 107:14
**LOTH** [1] - 107:3
**love** [1] - 57:8
**low** [1] - 6:13
**Lucia** [11] - 51:21, 66:13, 67:14, 76:16, 76:18, 76:22, 78:14, 85:5, 104:11, 104:12
**Luh** [15] - 3:15, 3:20, 4:4, 28:11, 40:23, 42:21, 44:22, 54:23, 61:24, 64:13, 64:17, 82:13, 82:15, 95:2, 100:6
**LUH** [39] - 2:3, 3:14, 3:21, 3:24, 4:1, 28:16, 40:24, 45:3, 45:13, 45:16, 46:9,

54:25, 55:4, 55:20, 56:4, 56:9, 56:15, 82:17, 82:21, 100:7, 100:11, 100:14, 100:17, 100:19, 100:24, 101:9, 102:2, 102:6, 102:9, 103:5, 103:9, 103:20, 103:23, 104:4, 104:8, 104:19, 105:17, 105:21, 106:2
**lunch** [1] - 61:14

## M

**ma'am** [2] - 72:10, 75:19
**machine** [1] - 2:12
**machines** [1] - 79:21
**main** [1] - 66:24
**maintained** [1] - 8:18
**majority** [2] - 77:19, 83:23
**Maloney** [1] - 9:4
**Management** [1] - 102:12
**mandate** [1] - 10:11
**mandated** [2] - 24:13, 24:15
**Manhattan** [1] - 67:18
**manner** [2] - 82:25, 107:10
**map** [1] - 46:24
**March** [1] - 49:17
**margins** [1] - 96:17
**marked** [1] - 89:10
**market** [3] - 5:19, 59:25, 60:2
**markets** [5] - 9:3, 11:9, 50:8, 51:2, 68:7
**markup** [2] - 18:15, 18:20
**markups** [3] - 18:6, 18:8, 18:15
**MARTIN** [1] - 1:15
**Martin** [1] - 3:7
**massively** [1] - 79:10
**materials** [1] - 37:21
**math** [1] - 49:18
**matter** [9] - 34:25, 42:11, 45:22, 55:10, 56:25, 63:4, 63:5, 89:15
**matters** [3] - 39:6, 39:10, 63:8
**MAX** [1] - 1:20
**Max** [1] - 4:16
**maximum** [1] - 92:9

mean [46] - 8:10, 13:15, 16:17, 16:19, 23:22, 24:8, 25:5, 25:7, 27:2, 31:22, 32:11, 32:12, 32:23, 34:1, 42:21, 46:3, 49:9, 49:13, 49:22, 49:23, 58:5, 58:9, 59:7, 59:10, 59:20, 59:24, 60:22, 61:6, 62:9, 76:16, 79:6, 79:12, 79:23, 87:6, 87:16, 88:14, 89:10, 89:25, 90:4, 90:5, 90:20, 91:16, 96:16, 97:22, 99:12, 104:15
meaning [3] - 24:13, 33:18, 45:11
meaningless [3] - 32:10, 33:1, 33:16
means [6] - 14:14, 66:5, 70:9, 76:17, 84:15, 104:20
meant [1] - 6:7
mechanism [3] - 52:22, 53:1, 55:18
Medical [1] - 25:5
Medicare [5] - 3:22, 4:3, 79:18, 100:10, 100:16
meet [1] - 74:25
member [13] - 12:3, 12:18, 14:7, 20:24, 21:2, 21:4, 21:5, 21:7, 21:10, 21:13, 25:8, 27:3, 39:2
members [22] - 11:2, 13:18, 19:3, 19:4, 22:14, 24:9, 25:1, 28:10, 39:2, 52:3, 52:6, 52:24, 53:18, 53:22, 54:10, 62:21, 74:13, 74:19, 77:19, 77:25, 91:5
membership [9] - 8:22, 9:24, 11:9, 11:24, 12:20, 14:20, 15:17, 23:22, 26:11
memorandum [3] - 68:11, 87:16, 106:8
memorized [1] - 77:10
memory [1] - 68:22
mentioned [1] - 77:9
merchants [2] - 6:9, 6:10
merely [2] - 73:23, 101:16
merged [1] - 63:23
merits [10] - 41:7, 43:13, 44:1, 44:7,

45:5, 46:7, 46:22, 47:5, 47:10, 51:15
mesh [1] - 78:7
message [1] - 51:2
met [2] - 68:1, 77:22
Metro [1] - 43:9
mic [1] - 4:10
mid-2024 [1] - 37:14
middle [1] - 65:12
middlemen [2] - 6:9, 6:10
might [10] - 5:15, 20:3, 20:4, 31:21, 37:11, 49:16, 60:16, 88:24, 88:25, 100:15
millions [2] - 46:13, 46:14
mind [2] - 32:11, 86:25
minds [1] - 49:2
minimal [1] - 43:15
ministers [2] - 84:11, 84:13
minority [1] - 91:6
minute [1] - 85:10
minutes [4] - 61:12, 99:24, 100:1, 100:4
misconduct [4] - 34:18, 34:23, 93:4, 93:9
missed [1] - 77:6
mistaken [1] - 76:22
mkaplan@ gusraekaplan.com [1] - 1:17
model [1] - 50:24
modify [1] - 73:5
moment [11] - 17:2, 20:22, 26:22, 32:18, 35:21, 57:15, 81:13, 82:14, 84:1, 90:2, 92:7
monetary [1] - 13:6
money [1] - 9:12
month [1] - 57:6
months [9] - 37:12, 37:16, 49:18, 49:19, 50:5, 51:5, 51:9, 59:9, 59:12
morning [5] - 3:9, 3:10, 3:11, 3:13, 3:14
moss [3] - 88:25, 102:5, 102:7
most [6] - 34:11, 40:22, 46:22, 65:8, 87:15, 103:20
mostly [1] - 104:12
motion [2] - 39:12, 60:19

motions [2] - 39:7, 50:14
move [3] - 38:11, 49:12, 50:4
moved [2] - 48:16, 94:8
MR [363] - 3:7, 3:10, 3:11, 3:14, 3:21, 3:24, 4:1, 4:8, 4:11, 4:15, 4:16, 4:19, 4:21, 7:9, 7:18, 7:22, 8:3, 8:7, 8:10, 8:14, 8:19, 8:25, 9:5, 9:7, 9:9, 9:11, 9:14, 9:17, 9:20, 9:25, 10:4, 10:7, 10:11, 10:17, 10:19, 10:25, 11:4, 11:6, 11:21, 12:12, 12:14, 12:16, 12:21, 13:20, 13:24, 14:4, 14:7, 14:25, 15:3, 15:5, 15:11, 15:18, 15:21, 15:25, 16:5, 16:14, 16:20, 16:24, 17:2, 17:4, 17:6, 17:11, 17:14, 17:17, 17:24, 18:1, 18:4, 18:6, 18:10, 19:4, 19:6, 19:12, 19:17, 19:24, 20:1, 20:3, 20:8, 20:10, 20:14, 20:23, 21:3, 21:8, 21:11, 21:14, 21:20, 21:25, 22:2, 22:5, 22:11, 22:17, 22:24, 23:4, 23:9, 23:12, 23:18, 24:4, 24:11, 24:16, 24:22, 24:24, 25:2, 25:4, 25:13, 25:17, 25:21, 25:24, 26:2, 26:4, 26:8, 27:5, 27:10, 27:19, 27:24, 28:4, 28:9, 28:16, 29:6, 29:11, 29:14, 29:22, 30:6, 30:8, 30:11, 30:22, 30:25, 31:4, 31:10, 31:14, 31:16, 31:24, 32:7, 32:19, 33:13, 33:20, 34:7, 34:9, 34:17, 35:10, 35:16, 35:22, 35:24, 36:4, 36:10, 36:13, 36:17, 36:21, 37:2, 37:5, 37:9, 37:13, 37:16, 37:20, 38:1, 38:7, 38:11, 38:15, 38:18, 38:22, 38:25, 39:15, 39:20, 39:24, 40:3, 40:6, 40:15, 40:19, 40:22, 40:24, 41:15,

42:5, 42:12, 42:25, 43:22, 44:13, 45:3, 45:13, 45:16, 46:9, 46:17, 48:3, 48:15, 49:25, 50:13, 50:16, 51:10, 52:1, 52:18, 52:22, 53:7, 54:1, 54:4, 54:13, 54:20, 54:25, 55:4, 55:20, 56:4, 56:9, 56:15, 57:3, 57:5, 57:13, 58:8, 59:2, 59:16, 59:22, 60:3, 60:10, 60:14, 60:23, 61:3, 61:17, 61:18, 62:16, 63:5, 63:16, 63:21, 64:2, 64:7, 64:22, 65:2, 65:6, 65:8, 66:2, 66:7, 67:4, 67:17, 68:21, 69:2, 69:4, 69:6, 69:10, 69:20, 70:22, 71:1, 71:3, 71:6, 71:16, 71:19, 71:21, 72:2, 72:10, 72:12, 72:15, 72:19, 72:22, 73:7, 73:16, 73:20, 73:23, 74:3, 74:7, 74:12, 74:15, 74:20, 74:25, 75:4, 75:7, 75:9, 75:13, 75:17, 75:19, 75:22, 76:4, 76:9, 76:13, 76:21, 77:7, 77:11, 77:14, 78:1, 78:2, 78:8, 78:13, 78:17, 80:6, 80:18, 80:22, 81:1, 81:17, 81:25, 82:3, 82:17, 82:21, 83:10, 83:18, 84:4, 84:7, 84:19, 85:1, 85:7, 85:15, 86:21, 86:24, 88:4, 88:8, 88:16, 89:5, 90:7, 90:25, 91:9, 91:15, 91:17, 91:22, 92:1, 92:3, 92:5, 92:10, 92:18, 92:20, 92:25, 93:3, 93:7, 93:11, 93:17, 93:20, 93:25, 94:4, 94:7, 94:12, 94:16, 94:18, 95:5, 95:12, 95:17, 95:25, 96:8, 96:19, 96:21, 96:24, 97:6, 97:16, 97:20, 98:1, 98:12, 98:15, 98:18, 99:16, 99:18, 100:3, 100:7, 100:11, 100:14, 100:17, 100:19, 100:24, 101:9, 102:2, 102:6,

102:9, 103:5, 103:9, 103:20, 103:23, 104:4, 104:8, 104:19, 105:17, 105:21, 106:2, 106:5, 106:7, 106:24
multiple [4] - 24:4, 24:5, 99:19
murdering [1] - 89:12
must [5] - 11:7, 11:12, 11:13, 57:23, 101:4

## N

N.W [1] - 1:12
NAC [2] - 39:3, 40:4
name [1] - 89:12
names [1] - 43:1
narrow [2] - 77:3, 79:7
NASD [10] - 7:22, 62:18, 62:20, 63:6, 63:17, 63:19, 63:22, 63:24, 89:9, 99:22
NASD's [1] - 63:9
nation's [1] - 63:2
National [1] - 76:8
national [3] - 19:13, 20:6, 69:25
necessarily [2] - 29:22, 84:22
need [23] - 17:21, 25:12, 32:16, 47:17, 47:19, 47:24, 52:6, 53:4, 53:7, 53:14, 54:12, 54:23, 55:18, 56:20, 79:8, 79:24, 83:6, 86:18, 86:19, 97:23, 100:25, 102:23, 105:20
needed [1] - 79:14
needs [3] - 53:9, 82:24, 82:25
negative [1] - 15:14
neglected [1] - 4:8
negligent [1] - 93:8
never [11] - 5:7, 13:4, 13:13, 20:5, 23:18, 42:3, 42:6, 45:21, 71:11, 89:7, 103:14
nevertheless [1] - 46:25
new [5] - 32:2, 32:24, 33:5, 74:23
New [12] - 1:17, 3:8, 8:10, 21:3, 21:4, 22:18, 24:19, 24:20, 25:16
Newby [1] - 43:24
next [7] - 51:5, 57:20, 61:11, 61:22, 65:23,

11

98:17, 100:5
**nice** [3] - 4:4, 62:11, 62:12
**night** [1] - 94:20
**nine** [1] - 100:17
**nobody** [1] - 89:21
**nominally** [4] - 70:15, 77:15, 77:21, 78:21
**nominated** [1] - 52:11
**nonaccountable** [1] - 106:14
**nonassociated** [1] - 15:6
**nondelegation** [10] - 52:9, 81:3, 81:5, 81:24, 82:5, 87:3, 98:24, 98:25, 99:18, 99:21
**none** [5] - 6:9, 9:18, 62:17, 67:25, 77:24
**nonetheless** [6] - 41:12, 44:17, 44:19, 46:8, 47:21
**note** [1] - 12:5
**notes** [2] - 92:6, 107:5
**nothing** [6] - 31:9, 48:8, 58:16, 79:20, 100:6, 102:20
**notice** [1] - 60:11
**noticed** [1] - 31:6
**noting** [1] - 73:23
**notion** [1] - 101:2
**novel** [2] - 16:19, 20:9
**November** [2] - 49:9, 49:10
**NRDC** [1] - 45:19
**null** [1] - 107:8
**number** [3] - 6:25, 25:7, 25:13
**NUSBAUM** [1] - 1:15
**Nusbaum** [3] - 1:16, 3:8, 4:12
**NW** [2] - 1:21, 2:6
**NYSE** [2] - 63:22, 63:25
**NYSE's** [1] - 63:23

**O**

**oath** [1] - 14:15
**object** [1] - 73:21
**obligation** [2] - 49:25, 50:3
**obviously** [3] - 40:8, 86:3, 87:16
**occupy** [1] - 101:21
**occurred** [2] - 60:4, 60:5
**October** [3] - 59:11, 96:2, 107:13

**OF** [2] - 1:1, 1:8
**offer** [1] - 5:10
**office** [4] - 16:6, 22:20, 101:14, 101:21
**officer** [19] - 16:3, 29:16, 36:25, 37:3, 37:5, 39:6, 39:16, 48:19, 53:11, 66:5, 83:4, 83:13, 83:14, 83:21, 86:14, 96:2, 96:4, 102:19
**officers** [34] - 52:4, 52:6, 52:23, 53:3, 53:18, 53:21, 54:9, 54:10, 55:1, 56:8, 66:14, 69:13, 70:15, 73:10, 74:10, 75:11, 77:12, 77:14, 77:15, 78:19, 79:1, 79:2, 84:12, 84:16, 84:22, 95:10, 101:3, 101:4, 102:14, 102:15, 102:16, 102:18
**Officers** [1] - 100:24
**officers'** [1] - 16:6
**offices** [1] - 101:14
**official** [1] - 107:15
**Official** [1] - 2:10
**officials** [7] - 26:12, 26:15, 66:15, 77:9, 84:3, 84:14, 84:23
**often** [2] - 16:17, 71:8
**old** [1] - 53:5
**once** [3] - 62:3, 71:1, 71:2
**one** [59] - 6:14, 6:15, 7:5, 8:5, 13:18, 15:7, 18:12, 23:19, 24:7, 24:8, 24:19, 24:20, 30:5, 31:22, 33:4, 33:9, 34:2, 37:5, 41:1, 43:16, 43:19, 46:10, 48:15, 49:13, 50:9, 50:22, 51:5, 51:6, 51:14, 53:13, 54:13, 58:20, 59:16, 60:11, 60:13, 61:24, 64:24, 65:1, 65:5, 70:4, 71:7, 73:18, 73:19, 73:21, 74:21, 80:9, 84:1, 85:19, 86:18, 87:1, 87:7, 89:25, 90:20, 91:19, 95:21, 98:9, 103:20, 103:22, 103:24
**ones** [1] - 5:10
**ongoing** [1] - 95:22
**open** [1] - 33:10
**opening** [1] - 48:12

**opinion** [12] - 48:8, 68:19, 68:20, 76:15, 80:8, 80:19, 81:10, 81:14, 81:17, 101:2, 102:17, 105:22
**opinions** [3] - 91:24, 92:1, 99:20
**opportunity** [2] - 7:6, 70:8
**opposing** [1] - 71:8
**order** [11] - 11:7, 11:12, 29:16, 40:14, 41:1, 45:8, 53:2, 65:17, 65:21, 67:11, 96:6
**ordered** [1] - 48:25
**ordering** [1] - 42:16
**ordinarily** [1] - 105:4
**ordinary** [2] - 11:25, 18:24
**organization** [2] - 20:18, 23:23
**organizations** [3] - 7:16, 66:21, 99:23
**organized** [1] - 9:6
**original** [1] - 18:19
**originalism** [2] - 103:3, 103:6
**origins** [1] - 103:25
**otherwise** [4] - 73:24, 86:18, 96:5, 101:5
**outcome** [3] - 33:22, 51:11, 98:7
**outside** [3] - 14:19, 49:16, 77:2
**outweigh** [1] - 44:19
**over-the-counter** [1] - 9:3
**overcome** [2] - 41:14, 44:21
**overruled** [2] - 102:8, 102:10
**overseen** [1] - 28:1
**Oversight** [1] - 102:12
**overturn** [1] - 60:19
**own** [13] - 10:6, 10:7, 12:3, 23:24, 25:1, 25:3, 27:10, 28:7, 28:14, 28:17, 50:2, 60:17, 72:17

**P**

**page** [8] - 17:1, 17:4, 62:8, 62:12, 68:11, 69:4, 101:18, 102:17
**pages** [1] - 42:17
**pan** [1] - 45:23
**panel** [16] - 12:24, 16:12, 34:10, 34:23,

35:10, 35:17, 37:3, 37:6, 37:8, 39:1, 39:2, 40:1, 50:14, 92:15, 93:21, 106:1
**panel's** [2] - 65:17, 92:14
**papers** [3] - 55:10, 57:1
**paragraph** [2] - 69:8, 70:13
**paragraphs** [1] - 68:24
**paraphrasing** [1] - 87:4
**Parliament** [1] - 6:12
**part** [12] - 6:4, 10:11, 28:19, 54:4, 55:22, 56:21, 63:21, 77:21, 78:22, 80:18, 82:3, 103:9
**participant** [1] - 11:8
**particular** [7] - 34:13, 62:5, 64:23, 69:17, 82:23, 82:25, 85:12
**particularly** [2] - 18:8, 59:18
**parties** [3] - 3:5, 11:19, 67:19
**parties'** [1] - 96:3
**partner** [1] - 4:12
**parts** [1] - 66:3
**party** [4] - 67:20, 67:21, 82:14, 107:10
**Party** [2] - 6:1, 6:2
**pass** [3] - 15:19, 21:23, 51:8
**passed** [2] - 7:19, 8:16
**passing** [1] - 105:5
**Patriots** [1] - 6:11
**pattern** [1] - 42:14
**pay** [3] - 22:4, 22:7, 64:6
**PCAOB** [7] - 66:21, 77:2, 77:16, 78:22, 89:24, 90:5, 91:2
**Peacock** [1] - 79:12
**penalties** [1] - 13:12
**penalty** [14] - 30:24, 31:21, 31:22, 32:16, 32:17, 32:18, 32:24, 33:4, 33:10, 34:6, 34:12, 40:1, 40:7, 94:1
**pending** [4] - 40:2, 47:4, 60:20, 81:7
**people** [20] - 5:14, 5:15, 11:20, 16:17, 20:7, 22:6, 39:4, 52:10, 52:12, 52:21, 54:16, 54:17, 57:8, 58:18, 60:1, 74:23,

86:6, 94:24, 97:14
**perceives** [1] - 105:12
**percent** [2] - 18:20, 80:7
**perception** [1] - 105:18
**performed** [3] - 63:22, 101:3, 101:4
**performing** [1] - 98:3
**periods** [1] - 43:15
**permanent** [2] - 101:14, 101:21
**permission** [2] - 20:19, 81:20
**permits** [1] - 105:3
**permitted** [1] - 12:7
**perpetuation** [1] - 44:4
**person** [3] - 14:10, 82:24, 101:22
**personal** [1] - 54:19
**personnel** [1] - 63:3
**persons** [2] - 11:11, 15:6
**persuasive** [1] - 67:7
**pertain** [1] - 63:7
**Phil** [1] - 4:13
**phil@calebandonian .com** [1] - 1:14
**PHILIP** [1] - 1:11
**photocopied** [1] - 107:9
**phrase** [1] - 100:22
**phrased** [1] - 15:13
**PI** [6] - 44:17, 46:8, 47:22, 49:12, 76:17, 88:7
**picked** [1] - 85:20
**picture** [1] - 50:20
**pin** [2] - 43:11, 43:24
**place** [2] - 13:9, 50:22
**plaintiff** [6] - 28:22, 47:16, 96:11, 96:13, 97:1, 97:21
**Plaintiff** [1] - 1:3
**PLAINTIFF** [1] - 1:11
**plaintiff's** [1] - 98:19
**plaintiffs** [1] - 46:23
**plan** [2] - 69:14, 69:23
**planning** [1] - 92:11
**plans** [1] - 30:3
**play** [1] - 45:14
**pleads** [1] - 35:2
**pled** [1] - 93:20
**PLLC** [2] - 1:16, 3:8
**plus** [1] - 48:6
**point** [31] - 5:11, 19:8, 20:16, 24:5, 30:9, 42:17, 45:17, 46:19,

47:14, 56:21, 64:20, 64:21, 65:13, 66:1, 66:12, 66:19, 67:17, 74:9, 78:16, 82:1, 87:7, 90:11, 90:25, 98:17, 100:21, 101:24, 102:11, 103:2, 104:4, 104:6, 105:10
**pointed** [3] - 46:19, 65:5, 76:9
**points** [2] - 17:10, 100:19
**police** [1] - 50:7
**policies** [1] - 20:17
**polite** [1] - 64:18
**position** [8] - 45:6, 45:9, 45:12, 46:4, 46:6, 78:1, 97:1, 105:17
**positive** [1] - 15:14
**Posner** [2] - 88:19, 88:23
**possibilities** [1] - 42:13
**possibility** [2] - 46:22, 96:1
**possible** [5] - 21:20, 32:7, 81:1, 95:21, 99:11
**post** [1] - 38:5
**post-hearing** [1] - 38:5
**power** [4] - 9:23, 17:22, 54:7, 86:4
**powerless** [1] - 14:23
**practice** [6] - 21:13, 21:16, 23:24, 25:8, 39:12
**practicing** [2] - 21:1, 25:10
**precedent** [15] - 41:11, 42:3, 65:20, 65:22, 65:24, 66:25, 67:13, 67:14, 67:15, 76:17, 88:24, 89:1, 89:4, 99:4
**precisely** [1] - 66:15
**predate** [1] - 63:1
**predecessor** [2] - 62:20, 99:22
**predecessors** [3] - 7:16, 7:21, 8:1
**predicate** [1] - 86:2
**predict** [1] - 89:17
**prefer** [1] - 61:15
**prehearing** [1] - 37:22
**prejudiced** [2] - 59:3, 59:7
**preliminary** [16] -

39:6, 42:2, 42:3, 42:7, 42:9, 44:2, 44:8, 44:23, 45:17, 45:20, 45:24, 47:2, 48:21, 49:4, 50:10, 50:13
**prepared** [1] - 106:21
**prerequisite** [1] - 48:9
**presented** [1] - 90:9
**preserve** [1] - 33:15
**preserved** [1] - 50:24
**President** [12] - 24:10, 52:11, 52:13, 53:11, 53:19, 53:20, 53:21, 53:23, 54:14, 54:23, 84:10, 86:9
**president** [1] - 60:18
**presidential** [1] - 52:9
**presidentially** [4] - 52:7, 79:24, 79:25
**presumed** [1] - 6:12
**pretty** [7] - 7:1, 16:16, 20:7, 21:17, 73:22, 90:19, 96:5
**prevail** [1] - 43:13
**prevents** [1] - 87:3
**previously** [1] - 89:7
**prewritten** [1] - 94:23
**prices** [3] - 6:2, 6:3, 6:13
**primarily** [3] - 20:14, 102:14, 102:15
**principal** [4] - 18:14, 18:20, 55:1
**principle** [3] - 84:25, 87:3, 87:6
**private** [52] - 8:18, 9:2, 14:19, 14:20, 24:23, 24:24, 24:25, 55:8, 55:11, 55:13, 56:17, 62:20, 64:4, 64:8, 64:9, 64:12, 66:8, 66:18, 66:20, 67:20, 67:21, 68:3, 69:14, 69:15, 69:16, 70:1, 70:15, 70:17, 73:2, 76:25, 77:4, 77:16, 77:21, 78:9, 78:21, 79:2, 79:4, 79:6, 79:8, 79:14, 79:19, 80:13, 80:16, 81:3, 81:5, 83:20, 83:24, 91:4, 99:11, 104:17, 104:23
**privately** [3] - 9:6, 9:8, 9:10
**probative** [1] - 35:7
**problem** [7] - 52:1, 54:5, 54:15, 55:7, 58:15, 59:14, 59:16

**problems** [2] - 58:1, 98:25
**procedures** [3] - 20:17, 75:15, 75:24
**proceed** [1] - 58:11
**proceeding** [6] - 24:3, 29:4, 30:16, 36:1, 48:17, 57:24
**Proceedings** [1] - 2:12
**proceedings** [7] - 10:1, 14:13, 21:18, 36:20, 50:5, 58:17, 107:6
**process** [7] - 15:2, 15:3, 23:20, 38:20, 68:23, 76:1, 88:2
**produce** [4] - 14:3, 14:16, 37:20, 39:10
**produced** [2] - 2:12, 30:1
**produces** [2] - 79:21, 79:22
**production** [4] - 29:18, 29:19, 29:21
**profound** [3] - 98:19, 98:20, 98:21
**Programs** [1] - 2:5
**proliferation** [1] - 49:5
**promise** [1] - 49:7
**promulgate** [2] - 15:9, 15:15
**prong** [2] - 78:6, 78:7
**proper** [2] - 87:13
**properly** [1] - 86:10
**propose** [1] - 72:24
**proposed** [2] - 12:6, 15:22
**proposes** [1] - 72:23
**proposition** [4] - 35:4, 76:18, 85:16, 85:24
**proprietary** [2] - 12:1, 12:8
**prosecutorial** [4] - 73:9, 74:2, 74:4, 74:6
**prospective** [2] - 15:10, 15:15
**protect** [2] - 50:1
**protected** [2] - 86:6, 86:7
**protecting** [1] - 89:6
**provide** [1] - 92:12
**provides** [3] - 74:12, 75:24, 84:9
**provision** [2] - 5:17, 85:20
**provisions** [1] - 72:7
**public** [20] - 5:10, 5:20, 6:15, 11:25,

41:13, 41:19, 44:2, 44:3, 44:9, 44:19, 44:21, 44:25, 46:11, 50:2, 59:21, 59:24, 64:5, 84:11, 84:13, 97:4
**published** [1] - 99:20
**purpose** [4] - 8:22, 66:9, 77:17, 83:14
**purposes** [7] - 55:22, 64:5, 83:5, 83:14, 83:22, 86:15, 91:7
**pursue** [3] - 31:21, 32:23, 33:9
**pursuing** [6] - 30:20, 31:21, 33:4, 34:5, 34:11
**push** [1] - 71:16
**pushing** [1] - 51:3
**put** [7] - 11:23, 35:3, 45:10, 72:20, 74:23, 91:3, 103:7
**putting** [1] - 90:1
**pyramid** [1] - 41:20

## Q

**qualify** [1] - 69:15
**quarter** [1] - 45:15
**quasi** [2] - 24:24, 24:25
**quasi-private** [2] - 24:24, 24:25
**questions** [14] - 4:24, 6:25, 7:7, 15:7, 29:3, 29:18, 41:2, 62:1, 65:9, 66:23, 73:22, 92:7, 94:23, 95:7
**quickly** [1] - 49:12
**quite** [5] - 23:15, 34:20, 36:1, 59:22, 75:25
**quotation** [1] - 106:8
**quote** [7] - 66:14, 67:12, 69:15, 84:10, 88:19, 89:17, 106:9

## R

**RA** [1] - 19:20
**radical** [1] - 56:17
**raised** [2] - 28:22, 95:7
**raising** [1] - 88:20
**ramifications** [1] - 98:18
**random** [1] - 52:12
**range** [1] - 92:12
**rates** [1] - 18:10
**ratifying** [1] - 105:8

**rational** [1] - 103:10
**rationale** [1] - 103:11
**reach** [1] - 33:23
**reaching** [4] - 51:12, 51:16, 76:10, 96:10
**read** [12] - 6:22, 6:23, 32:22, 34:19, 80:8, 80:18, 81:14, 81:17, 82:7, 83:2
**reading** [2] - 80:24, 100:21
**reaffirmed** [1] - 50:25
**real** [1] - 49:8
**reality** [1] - 62:19
**realize** [2] - 39:9, 61:10
**realized** [1] - 5:14
**really** [14] - 34:24, 35:7, 41:5, 42:19, 52:10, 55:13, 89:21, 90:12, 96:13, 97:10, 97:21, 104:16, 106:20, 106:21
**realm** [1] - 66:8
**reason** [5] - 41:18, 45:3, 66:15, 75:20, 93:8
**reasons** [6] - 27:25, 28:24, 45:24, 50:9, 51:14, 75:23
**receive** [1] - 9:12
**received** [1] - 95:19
**recent** [1] - 87:15
**recently** [3] - 12:7, 102:11, 103:21
**recess** [1] - 61:9
**recite** [1] - 68:22
**recited** [1] - 34:20
**reckless** [6] - 34:17, 34:23, 93:4, 93:12, 93:16, 93:19
**recognized** [2] - 9:2, 64:8
**record** [1] - 3:6
**records** [2] - 14:3, 14:16
**Red** [2] - 60:17, 60:18
**redeemable** [2] - 5:12, 5:13
**reference** [2] - 28:13, 90:22
**referenced** [1] - 103:25
**referencing** [2] - 103:19, 103:20
**referring** [1] - 72:8
**regarding** [1] - 89:9
**regardless** [1] - 41:8
**registrant** [4] - 11:12, 11:13, 14:10, 14:11

**regulate** [6] - 17:23, 18:1, 18:3, 19:14, 19:16, 19:22
**regulated** [8] - 18:23, 19:1, 70:10, 70:11, 73:2, 99:5, 99:14
**regulates** [1] - 25:1
**regulating** [1] - 9:3
**regulation** [3] - 15:20, 68:6, 72:15
**regulations** [3] - 28:20, 72:7, 99:6
**regulator** [4] - 50:6, 50:21, 97:24, 98:6
**Regulatory** [1] - 3:4
**regulatory** [11] - 50:24, 51:17, 63:9, 63:10, 63:21, 66:21, 68:2, 68:9, 97:11, 97:22, 99:23
**REGULATORY** [1] - 1:5
**rejected** [1] - 99:21
**related** [1] - 39:10
**relative** [1] - 87:10
**relevant** [7] - 39:12, 64:7, 66:3, 75:21, 75:22, 76:8, 104:19
**relied** [1] - 81:8
**relief** [4] - 45:23, 47:2, 47:3, 48:10
**relies** [3] - 50:7, 55:11
**rely** [1] - 101:1
**remain** [1] - 104:24
**remedial** [1] - 56:20
**remedies** [5] - 16:15, 16:18, 23:3, 40:2, 88:12
**remedy** [3] - 45:21, 45:25, 56:19
**remember** [1] - 88:18
**removable** [4] - 52:7, 79:9, 79:15, 79:25
**removal** [6] - 52:5, 64:10, 66:16, 74:13, 78:24, 97:8
**remove** [4] - 50:6, 73:9, 74:9, 75:11
**removed** [1] - 86:10
**repetitive** [3] - 16:20, 95:3, 100:6
**rephrase** [2] - 14:8, 55:25
**reply** [5] - 12:5, 34:20, 62:1, 62:13, 76:5
**reported** [1] - 2:12
**Reporter** [3] - 2:9, 2:10, 107:15
**representation** [1] - 30:5

**representative** [1] - 106:14
**representatives** [1] - 106:13
**request** [2] - 92:11, 96:3
**requested** [1] - 48:25
**requesting** [1] - 35:17
**requests** [1] - 35:13
**require** [1] - 28:7
**required** [7] - 37:19, 37:20, 37:22, 39:23, 54:21, 75:24, 81:20
**requirement** [2] - 71:21, 86:3
**requirements** [11] - 8:21, 18:7, 20:15, 52:4, 52:5, 64:10, 66:17, 78:24, 97:8, 97:10, 104:20
**requires** [1] - 72:5
**requiring** [1] - 104:23
**research** [1] - 47:12
**reserve** [1] - 31:17
**reserves** [1] - 32:3
**resolve** [1] - 54:15
**resonate** [1] - 50:18
**resources** [2] - 50:23, 98:2
**respect** [14] - 27:1, 48:12, 64:19, 65:19, 66:11, 67:7, 67:11, 69:20, 76:21, 78:14, 81:2, 81:9, 85:25, 105:21
**respectfully** [1] - 105:21
**respects** [1] - 103:12
**respondent** [7] - 27:20, 34:15, 34:24, 48:16, 48:19, 48:23, 95:18
**respondents** [2] - 49:2, 75:25
**response** [5] - 5:2, 5:5, 5:21, 53:15, 85:13
**responsibilities** [14] - 63:9, 63:11, 63:12, 63:16, 63:17, 66:10, 68:2, 68:10, 69:24, 79:5, 80:12, 81:4, 98:3, 99:2
**responsibility** [1] - 63:22
**resting** [1] - 81:23
**restitution** [2] - 92:17, 92:19
**result** [2] - 6:2, 7:23
**return** [1] - 96:10

**reversed** [1] - 13:3
**review** [6] - 16:3, 22:21, 23:16, 24:2, 70:8, 73:1
**reviewed** [1] - 99:7
**revise** [1] - 105:24
**revoke** [1] - 12:20
**Revolution** [1] - 6:16
**REYES** [1] - 1:8
**rhetorical** [1] - 49:23
**Richter** [1] - 96:22
**rid** [1] - 74:22
**rights** [6] - 41:19, 86:6, 89:6, 90:14, 106:11, 106:12
**rigorous** [1] - 65:3
**rise** [1] - 63:13
**rock** [3] - 88:25, 89:1
**role** [5] - 8:18, 68:5, 105:5, 105:8, 105:15
**roll** [1] - 49:7
**room** [5] - 5:1, 33:24, 44:5, 69:14, 70:1
**RPR** [3] - 2:9, 107:3, 107:14
**Rudy** [1] - 21:21
**Rule** [5] - 10:21, 14:8, 14:11, 30:11, 95:20
**rule** [5] - 12:5, 15:22, 18:19, 25:21, 27:12
**rules** [41] - 10:6, 10:7, 10:16, 10:23, 11:3, 11:14, 15:10, 15:15, 20:17, 22:1, 22:8, 22:9, 22:10, 23:24, 23:25, 24:1, 25:3, 25:10, 25:20, 25:23, 26:7, 27:10, 27:11, 27:17, 28:7, 28:17, 29:14, 29:15, 36:9, 46:12, 50:2, 51:9, 60:2, 72:17, 72:23, 72:24, 72:25, 99:6
**ruling** [5] - 12:18, 13:7, 53:16, 96:12
**run** [2] - 6:21, 73:13

**S**

**SAINT** [1] - 107:3
**Saint** [2] - 2:9, 107:14
**SAINT-LOTH** [1] - 107:3
**Saint-Loth** [2] - 2:9, 107:14
**samples** [1] - 36:18
**sanction** [6] - 34:12, 35:11, 35:12, 35:18, 48:24, 70:9
**sanctioned** [2] -

22:11, 58:18
**sanctions** [5] - 31:17, 32:4, 58:19, 68:14, 70:4
**satisfy** [1] - 99:14
**Saturday** [3] - 42:18, 44:11, 91:11
**save** [2] - 58:6, 100:3
**saw** [1] - 28:13
**scale** [1] - 96:22
**schedule** [2] - 37:1, 37:10
**SCHULMAN** [3] - 1:20, 4:16, 4:19
**Schulman** [1] - 4:16
**scope** [1] - 79:10
**SEC** [57] - 10:16, 12:6, 15:20, 15:23, 16:3, 16:7, 16:12, 20:19, 27:11, 29:10, 29:11, 40:7, 48:24, 48:25, 50:6, 50:9, 50:23, 51:22, 52:15, 52:18, 52:20, 52:23, 53:9, 58:22, 58:23, 63:10, 63:11, 68:9, 68:15, 68:16, 70:4, 70:8, 70:10, 72:3, 72:7, 72:18, 72:22, 73:1, 73:5, 73:9, 74:9, 74:18, 74:21, 75:16, 75:23, 77:25, 91:5, 97:22, 98:5, 98:19, 99:3, 99:6, 99:8, 104:16, 104:18, 104:25
**SEC's** [1] - 20:14
**Second** [4] - 13:2, 13:3, 13:12, 65:10
**second** [10] - 15:8, 43:19, 43:23, 53:24, 69:7, 74:9, 80:24, 82:1, 87:2, 97:18
**Section** [1] - 10:21
**securities** [27] - 4:25, 5:17, 5:19, 8:12, 8:16, 9:2, 10:8, 10:10, 10:24, 11:8, 13:8, 13:10, 13:15, 18:18, 19:13, 20:6, 28:20, 46:12, 50:2, 50:7, 50:21, 63:2, 68:6, 69:25, 71:22, 83:5, 97:24
**Securities** [7] - 7:20, 8:1, 8:23, 9:21, 10:2, 68:5, 72:5
**security** [1] - 18:11
**see** [16] - 4:4, 4:25, 7:11, 7:12, 36:18,

41:23, 57:6, 67:10, 69:1, 69:3, 87:9, 88:20, 89:19, 98:11, 106:17, 106:22
**seek** [7] - 31:17, 32:1, 32:3, 48:21, 68:14, 70:4, 95:22
**seeking** [5] - 30:24, 31:5, 81:6, 92:17, 93:25
**seismic** [3] - 96:13, 96:17, 96:20
**self** [10] - 9:3, 50:24, 51:17, 63:10, 66:21, 68:2, 68:9, 97:11, 97:22, 99:23
**self-regulating** [1] - 9:3
**self-regulatory** [9] - 50:24, 51:17, 63:10, 66:21, 68:2, 68:9, 97:11, 97:22, 99:23
**sell** [1] - 6:5
**semantical** [1] - 11:21
**Senate** [3] - 54:17, 54:18, 54:24
**send** [2] - 51:2, 98:10
**senior** [1] - 90:20
**sense** [8] - 19:11, 26:9, 28:23, 57:7, 57:9, 57:10, 58:12, 64:18
**sent** [2] - 41:4, 43:1
**sentencing** [2] - 34:22, 35:2
**separate** [3] - 19:18, 78:8, 86:13
**separately** [1] - 86:22
**September** [1] - 1:5
**seriously** [1] - 50:3
**serve** [2] - 44:2, 44:8
**served** [3] - 94:2, 94:4, 94:10
**service** [1] - 94:6
**set** [11] - 15:7, 15:8, 23:22, 37:10, 55:9, 66:9, 78:10, 79:7, 79:16, 97:25, 98:2
**sets** [1] - 18:10
**settings** [1] - 77:3
**settled** [1] - 42:3
**seven** [1] - 100:17
**several** [4] - 27:25, 63:7, 64:22, 75:23
**severe** [1] - 51:2
**severely** [1] - 22:11
**shadows** [1] - 106:10
**shall** [2] - 84:10, 107:8
**share** [2] - 6:19, 97:7
**shares** [1] - 5:10

**SHE** [1] - 19:20
**SHE-RA** [1] - 19:20
**shed** [1] - 47:4
**shift** [3] - 96:13, 96:18, 96:20
**shifting** [1] - 18:17
**short** [1] - 43:20
**shorthand** [1] - 2:12
**shoulder** [1] - 97:23
**show** [2] - 43:12, 69:9
**showing** [1] - 30:4
**shut** [1] - 59:11
**sic** [2] - 19:20, 92:16
**side** [5] - 11:17, 38:3, 62:3, 62:5
**side's** [1] - 38:3
**sidelined** [1] - 53:17
**signatory** [1] - 107:10
**significance** [2] - 33:22, 104:13
**significant** [5] - 34:20, 67:9, 96:19, 101:15, 106:10
**signing** [3] - 55:10, 57:1
**similar** [2] - 36:19, 97:14
**similarly** [1] - 54:7
**simple** [1] - 55:10
**simply** [5] - 50:23, 53:10, 79:16, 79:23, 105:10
**sit** [8] - 34:4, 34:8, 35:22, 35:23, 39:19, 43:21, 76:3, 92:4
**situations** [1] - 29:23
**six** [8] - 47:16, 48:8, 49:19, 50:5, 51:8, 57:6, 59:9, 59:12
**six-month** [1] - 57:6
**six-year** [2] - 47:16, 48:8
**skills** [1] - 47:12
**skipping** [1] - 76:23
**slip** [1] - 22:5
**smaller** [1] - 28:18
**smugglers** [2] - 6:8, 6:9
**snack** [1] - 61:18
**society's** [1] - 59:17
**solely** [1] - 101:1
**solve** [1] - 54:4
**someone** [6] - 23:17, 49:14, 53:20, 61:20, 98:10, 103:2
**sometimes** [1] - 39:3
**somewhat** [3] - 25:4, 87:4, 90:8
**somewhere** [2] -

53:10, 61:14
**soon** [1] - 106:23
**sorry** [22] - 4:11, 4:20, 12:14, 19:2, 21:6, 34:9, 39:20, 42:24, 43:11, 55:24, 56:4, 56:10, 56:12, 65:1, 77:5, 91:6, 92:18, 102:6, 103:5, 104:4
**sort** [18] - 7:12, 18:16, 27:22, 35:1, 36:8, 37:12, 48:12, 52:11, 85:5, 85:13, 86:24, 88:21, 94:23, 95:4, 103:2, 103:7, 103:24, 105:22
**sorts** [1] - 4:1
**sound** [1] - 71:4
**Sox** [2] - 60:17, 60:18
**special** [1] - 83:15
**specific** [6] - 10:25, 29:2, 72:16, 72:24, 104:5, 104:6
**specifically** [4] - 10:17, 20:3, 34:14, 44:20
**specified** [1] - 83:1
**spell** [1] - 84:17
**spend** [2] - 99:24, 100:1
**split** [1] - 89:14
**spoken** [1] - 18:19
**squarely** [1] - 99:19
**SRO** [6] - 6:24, 11:18, 13:22, 63:2, 90:3, 91:24
**SRO's** [2] - 7:20, 8:8
**SROs** [14] - 8:18, 11:20, 11:22, 11:23, 13:17, 51:14, 66:17, 67:1, 89:24, 96:25, 97:8, 97:14, 98:6, 98:21
**staff** [6] - 22:25, 24:9, 48:20, 61:23, 92:11, 95:13
**stages** [1] - 16:6
**stake** [2] - 46:13, 46:14
**stand** [3] - 31:22, 33:19, 35:20
**standard** [3] - 24:6, 45:17, 104:23
**standards** [6] - 27:7, 28:9, 72:6, 73:11, 74:10, 75:1
**standing** [3] - 30:18, 92:23, 92:25
**stands** [2] - 85:15, 85:23

**Star** [1] - 68:23
**star** [1] - 69:5
**start** [11] - 4:25, 6:20, 7:11, 20:18, 51:7, 68:25, 69:8, 69:11, 69:12, 71:9, 74:1
**started** [3] - 8:8, 43:4, 44:10
**starts** [1] - 68:24
**state** [77] - 9:13, 21:12, 24:8, 24:14, 24:15, 24:20, 25:11, 25:14, 25:16, 26:10, 26:11, 26:12, 26:13, 26:16, 26:18, 26:20, 26:23, 27:24, 28:1, 28:2, 28:3, 28:4, 28:5, 28:6, 28:21, 53:3, 55:13, 55:17, 55:19, 55:21, 56:2, 61:25, 62:10, 63:8, 63:14, 64:19, 64:20, 64:23, 65:4, 65:11, 66:8, 66:9, 66:10, 67:15, 67:21, 69:16, 70:12, 72:21, 73:3, 73:4, 76:11, 77:5, 78:6, 78:10, 78:11, 78:12, 78:15, 78:17, 79:1, 79:7, 79:17, 79:20, 79:21, 79:23, 80:19, 82:4, 83:21, 83:24, 85:16, 85:17, 85:23, 91:25, 96:13, 97:9
**states** [1] - 24:17
**States** [18] - 3:16, 24:12, 24:18, 66:5, 66:14, 77:12, 78:20, 79:1, 83:22, 84:12, 84:22, 100:22, 100:24, 101:4, 101:5, 101:19, 102:16, 102:18
**STATES** [3] - 1:1, 1:9, 2:2
**status** [4] - 35:25, 36:25, 55:11, 74:17
**statute** [2] - 53:4, 58:22
**statutes** [1] - 105:5
**statutory** [5] - 49:25, 52:22, 53:7, 72:6, 85:13
**stay** [7] - 30:18, 38:23, 40:7, 40:10, 48:16, 48:18, 94:20
**stayed** [6] - 40:2, 40:3, 40:6, 49:21, 95:16
**stenographic** [1] -

107:5
**step** [2] - 57:20, 76:23
**stepping** [2] - 54:8, 57:15
**steps** [1] - 56:20
**still** [3] - 6:13, 82:4, 88:25
**Stock** [1] - 8:10
**stone** [2] - 54:8, 57:15
**stop** [5] - 31:9, 59:8, 68:17, 70:18, 87:23
**straightforward** [1] - 73:24
**Street** [3] - 1:12, 1:16, 2:6
**stretch** [1] - 88:7
**strict** [1] - 20:15
**strong** [2] - 44:1, 44:7
**strongly** [2] - 34:14, 34:24
**structure** [4] - 8:22, 8:24, 56:24, 58:2
**stuck** [2] - 16:11, 25:10
**Students** [1] - 106:8
**studied** [1] - 98:15
**studies** [3] - 98:4, 98:7, 98:10
**stuff** [2] - 4:3, 61:21
**subject** [15] - 16:3, 52:4, 55:5, 55:17, 56:3, 56:7, 56:17, 69:13, 80:22, 83:22, 86:4, 97:9, 99:12, 101:22, 104:24
**submit** [3] - 35:15, 37:22, 67:8
**submits** [1] - 72:25
**subordinately** [1] - 99:3
**subordinates** [1] - 86:9
**subpoena** [3] - 14:20, 15:4, 15:5
**subpoenas** [2] - 14:2, 15:6
**substance** [1] - 106:10
**substantial** [13] - 41:25, 42:8, 44:16, 45:1, 45:2, 65:25, 76:19, 80:4, 80:5, 80:9, 81:15, 82:16, 88:6
**succeeded** [1] - 20:11
**success** [25] - 41:7, 41:25, 42:8, 43:13, 44:1, 44:7, 44:16, 44:18, 45:1, 45:2, 45:5, 46:7, 46:21,

47:5, 47:9, 51:15, 66:1, 76:19, 80:4, 80:5, 80:10, 81:2, 81:16, 82:16, 88:7
**sufficient** [1] - 36:9
**suggest** [1] - 45:22
**suggested** [1] - 70:5
**suggesting** [1] - 80:19
**suggestions** [1] - 40:17
**suggestive** [1] - 40:15
**suggests** [1] - 48:8
**Suite** [2] - 1:12, 1:21
**suits** [1] - 61:17
**summed** [1] - 90:19
**Sunshine** [1] - 99:3
**super** [1] - 106:20
**superintended** [1] - 99:8
**supervision** [3] - 86:18, 86:19, 104:24
**supplemental** [7] - 42:16, 44:11, 46:3, 47:15, 47:25, 48:25, 91:20
**support** [2] - 79:25, 83:15
**supported** [1] - 101:9
**supremacy** [1] - 105:7
**Supremacy** [1] - 105:8
**Supreme** [33] - 26:17, 45:18, 45:19, 46:25, 47:4, 47:20, 57:21, 65:20, 65:24, 66:12, 66:20, 67:6, 67:12, 77:20, 83:12, 84:11, 84:14, 87:9, 88:21, 89:2, 89:18, 89:25, 90:2, 99:4, 101:10, 101:11, 101:13, 102:14, 103:10, 103:17, 103:18, 103:25, 104:1
**supreme** [1] - 105:7
**survive** [1] - 61:13
**suspenders** [2] - 82:7, 86:25
**suspension** [1] - 13:14
**synonymous** [2] - 86:20, 86:21
**system** [2] - 97:11, 97:22

---

**T**

**table** [1] - 3:16
**target** [1] - 18:17
**tariffs** [1] - 6:6
**task** [1] - 86:13

**tax** [3] - 6:12, 6:13, 83:16
**Tayrani** [19] - 3:12, 12:9, 12:13, 13:23, 19:10, 26:1, 28:24, 30:2, 30:17, 32:9, 35:8, 35:20, 40:21, 42:21, 46:10, 61:1, 61:24, 72:5, 92:8
**TAYRANI** [134] - 1:19, 3:11, 4:21, 12:16, 13:24, 19:12, 19:17, 19:24, 26:8, 27:5, 27:10, 27:19, 27:24, 28:4, 28:9, 30:6, 31:4, 31:16, 31:24, 32:7, 32:19, 33:13, 33:20, 35:10, 35:16, 36:4, 36:10, 36:13, 36:17, 36:21, 37:2, 37:5, 37:9, 37:13, 37:20, 38:1, 38:7, 38:11, 38:15, 40:22, 46:17, 48:3, 48:15, 49:25, 50:13, 50:16, 51:10, 52:1, 52:18, 52:22, 53:7, 54:1, 57:3, 61:3, 61:18, 62:16, 63:5, 63:16, 63:21, 64:2, 64:7, 64:22, 65:2, 65:6, 65:8, 66:2, 66:7, 67:4, 67:17, 68:21, 69:2, 69:20, 70:22, 72:12, 72:15, 72:19, 72:22, 73:7, 73:16, 73:20, 73:23, 74:3, 74:12, 74:15, 74:20, 74:25, 75:4, 75:7, 75:17, 75:22, 76:9, 76:13, 76:21, 77:7, 77:11, 77:14, 78:1, 78:8, 78:13, 78:17, 80:6, 80:18, 80:22, 81:1, 83:10, 83:18, 84:4, 84:7, 84:19, 85:1, 85:7, 92:10, 92:18, 92:20, 93:17, 93:20, 93:25, 94:4, 94:7, 95:5, 95:12, 95:17, 95:25, 96:8, 96:24, 97:6, 97:16, 97:20, 98:1, 98:12, 98:15, 98:18, 99:18, 100:3
**Tea** [2] - 6:1, 6:2
**tea** [5] - 6:3, 6:5, 6:7, 6:8
**team** [2] - 62:8, 62:12
**technical** [1] - 100:15

**technically** [1] - 14:4
**technology** [1] - 79:22
**temporal** [1] - 62:17
**ten** [4] - 5:12, 5:16, 5:18, 96:22
**tens** [1] - 46:13
**tentative** [3] - 50:13, 82:18, 105:24
**terms** [11] - 7:13, 18:19, 33:22, 33:25, 36:5, 36:13, 58:6, 65:8, 77:4, 77:5, 77:8
**test** [3] - 21:23, 85:21, 86:15
**testified** [2] - 14:21, 30:1
**testify** [4] - 14:2, 14:12, 14:15, 71:9
**testimony** [2] - 30:12, 95:20
**text** [1] - 84:8
**textual** [4] - 85:13, 100:20, 100:25, 101:1
**THE** [367] - 1:1, 1:8, 1:11, 2:2, 3:2, 3:9, 3:13, 3:19, 3:22, 3:25, 4:2, 4:10, 4:14, 4:18, 4:20, 4:22, 5:3, 5:6, 5:22, 7:10, 7:19, 7:25, 8:5, 8:8, 8:12, 8:15, 8:20, 9:1, 9:6, 9:8, 9:10, 9:12, 9:15, 9:18, 9:21, 10:1, 10:5, 10:9, 10:13, 10:18, 10:22, 11:2, 11:5, 11:15, 12:9, 12:13, 12:15, 12:17, 13:16, 13:23, 13:25, 14:6, 14:19, 15:1, 15:4, 15:7, 15:17, 15:19, 15:22, 16:2, 16:9, 16:16, 16:22, 16:25, 17:3, 17:5, 17:8, 17:12, 17:15, 17:18, 17:25, 18:3, 18:5, 18:9, 19:2, 19:5, 19:9, 19:15, 19:19, 19:25, 20:2, 20:7, 20:9, 20:13, 20:20, 20:24, 21:6, 21:9, 21:12, 21:15, 21:22, 22:1, 22:3, 22:7, 22:12, 22:22, 23:1, 23:7, 23:10, 23:14, 23:19, 24:7, 24:15, 24:19, 24:23, 24:25, 25:3, 25:5, 25:15, 25:18, 25:22,

26:1, 26:3, 26:5, 26:21, 27:8, 27:13, 27:22, 28:2, 28:8, 28:11, 29:1, 29:7, 29:13, 29:20, 30:2, 30:7, 30:10, 30:14, 30:23, 31:2, 31:6, 31:12, 31:15, 31:19, 32:5, 32:9, 32:21, 33:16, 34:1, 34:8, 34:16, 35:8, 35:14, 35:19, 35:23, 35:25, 36:7, 36:12, 36:15, 36:18, 36:22, 37:3, 37:7, 37:10, 37:15, 37:18, 37:23, 38:5, 38:8, 38:13, 38:16, 38:19, 38:23, 39:14, 39:18, 39:21, 39:25, 40:5, 40:11, 40:17, 40:20, 40:23, 40:25, 41:23, 42:6, 42:15, 43:3, 43:23, 44:14, 45:8, 45:14, 46:2, 46:10, 47:11, 48:11, 49:6, 50:11, 50:15, 51:6, 51:20, 52:8, 52:20, 52:25, 53:19, 54:3, 54:6, 54:16, 54:23, 55:2, 55:12, 55:24, 56:6, 56:10, 57:4, 57:8, 58:3, 59:1, 59:5, 59:20, 59:23, 60:7, 60:13, 60:15, 60:25, 61:5, 61:10, 61:19, 61:24, 62:23, 63:15, 63:19, 63:24, 64:3, 64:13, 65:1, 65:5, 65:7, 65:14, 66:6, 66:22, 67:10, 68:17, 68:22, 69:3, 69:5, 69:7, 69:11, 70:13, 70:23, 71:2, 71:4, 71:7, 71:17, 71:20, 71:25, 72:4, 72:11, 72:13, 72:17, 72:20, 73:5, 73:8, 73:18, 73:21, 74:1, 74:5, 74:8, 74:14, 74:18, 74:21, 75:2, 75:5, 75:8, 75:10, 75:14, 75:18, 75:20, 76:2, 76:5, 76:12, 76:14, 77:5, 77:8, 77:13, 77:23, 78:3, 78:11, 78:14, 80:2, 80:15, 80:21, 80:24, 81:12, 81:22, 82:2, 82:9, 82:20, 83:2, 83:17, 84:1, 84:5, 84:17, 84:24,

85:3, 85:9, 86:12, 86:23, 87:20, 88:5, 88:14, 88:17, 89:22, 90:23, 91:2, 91:12, 91:16, 91:19, 91:23, 92:2, 92:4, 92:6, 92:16, 92:19, 92:23, 93:2, 93:6, 93:10, 93:13, 93:18, 93:23, 94:2, 94:5, 94:10, 94:14, 94:17, 94:19, 95:11, 95:15, 95:24, 96:4, 96:15, 96:20, 96:23, 97:3, 97:13, 97:18, 97:25, 98:9, 98:13, 98:17, 99:9, 99:17, 100:1, 100:5, 100:9, 100:12, 100:16, 100:18, 100:23, 101:7, 101:25, 102:5, 102:7, 103:1, 103:6, 103:18, 103:22, 103:24, 104:7, 104:15, 105:14, 105:20, 105:25, 106:3, 106:6, 106:19
**theirs** [1] - 35:5
**themselves** [2] - 3:6, 4:7
**theoretically** [2] - 57:18, 99:11
**theory** [1] - 82:23
**thereabouts** [1] - 8:9
**therefore** [4] - 5:18, 53:3, 80:22, 89:3
**they've** [1] - 20:8
**thinking** [2] - 28:15, 58:20
**thinks** [1] - 24:8
**Thirteen** [1] - 63:1
**thorough** [2] - 65:4, 65:8
**thousand** [1] - 92:18
**threaten** [1] - 51:13
**three** [7] - 37:6, 39:2, 43:14, 53:13, 60:4, 67:19, 67:25
**three-member** [1] - 39:2
**threefold** [1] - 85:21
**thrown** [1] - 14:16
**Thursday** [1] - 94:20
**timing** [1] - 61:11
**today** [8] - 17:20, 18:20, 48:18, 51:11, 63:18, 87:17, 96:9, 98:25
**together** [3] - 53:15, 63:25, 70:24

**tomorrow** [3] - 19:20, 32:11, 33:3
**tone** [1] - 89:6
**top** [1] - 104:9
**tossed** [2] - 50:11, 50:15
**totally** [4] - 26:5, 32:22, 33:11, 41:10
**town** [2] - 63:20, 91:12
**traded** [1] - 5:18
**trades** [1] - 18:11
**trading** [2] - 12:2, 12:8
**traditional** [2] - 63:12, 67:22
**traditionally** [1] - 68:3
**traitors** [1] - 12:7
**transactions** [3] - 12:3, 18:20, 18:22
**TRANSCRIPT** [1] - 1:8
**transcript** [3] - 107:5, 107:6, 107:9
**Transcript** [1] - 2:12
**transcription** [1] - 2:12
**Transit** [1] - 43:10
**treaties** [2] - 105:6, 105:9
**trial** [1] - 83:15
**tribunal** [1] - 71:12
**tried** [3] - 20:8, 20:10, 20:11
**trigger** [1] - 101:16
**trivia** [1] - 6:19
**TRO** [3] - 41:13, 44:17, 46:8
**true** [6] - 8:25, 13:11, 25:2, 30:22, 107:4, 107:5
**trust** [1] - 94:19
**try** [2] - 42:19, 61:21
**trying** [4] - 12:23, 32:13, 55:2, 62:7
**tub** [1] - 71:14
**tubbing** [1] - 71:14
**turn** [3] - 16:25, 29:16, 40:11
**turns** [2] - 57:25, 58:13
**twelve** [1] - 64:3
**twenty** [1] - 74:20
**twenty-two** [1] - 74:20
**two** [21] - 18:11, 39:2, 41:4, 41:14, 43:3, 44:20, 52:8, 66:2, 74:20, 76:7, 77:3, 77:8, 77:22, 80:8, 81:8, 86:19, 86:21, 90:16, 90:18, 99:24, 100:4
**type** [1] - 102:19

16

**typically** [2] - 22:12, 38:7

## U

**U.S** [3] - 2:10, 43:24, 45:20
**U.S.C** [1] - 72:7
**ultimate** [1] - 35:11
**ultimately** [3] - 13:3, 24:2, 106:11
**unable** [2] - 50:4, 95:7
**under** [28] - 14:8, 14:11, 14:14, 14:15, 19:16, 19:18, 29:25, 30:11, 33:24, 36:9, 41:10, 50:1, 52:9, 52:19, 59:18, 67:23, 68:8, 71:21, 71:23, 81:20, 83:1, 84:15, 84:21, 86:15, 95:19, 95:21, 99:3, 105:7
**undercut** [1] - 42:2
**underlying** [4] - 60:5, 62:19, 86:8, 87:6
**undermining** [1] - 90:14
**underscored** [1] - 96:24
**understood** [5] - 46:9, 52:14, 82:20, 101:12
**undertaken** [1] - 98:5
**undertakes** [1] - 63:18
**undertaking** [1] - 63:17
**undoubtedly** [1] - 52:17
**unfettered** [1] - 87:11
**UNITED** [3] - 1:1, 1:9, 2:2
**United** [18] - 3:16, 24:12, 24:18, 66:5, 66:14, 77:12, 78:20, 79:1, 83:22, 84:12, 84:22, 100:22, 100:24, 101:4, 101:5, 101:19, 102:16, 102:18
**unlawful** [1] - 44:4
**unless** [5] - 6:18, 15:23, 21:1, 32:24, 78:20
**unlimited** [1] - 87:11
**unprecedented** [1] - 51:17
**unquestionably** [1] - 43:15
**up** [35] - 4:25, 6:3, 8:7, 23:22, 29:19, 30:17, 33:3, 34:7, 34:10,

35:20, 38:23, 39:18, 42:13, 55:9, 57:4, 58:11, 58:21, 61:25, 70:13, 70:24, 71:11, 74:21, 81:12, 82:14, 85:10, 85:20, 90:19, 92:23, 92:25, 94:20, 97:25, 98:2, 105:14
**upcoming** [1] - 46:24
**upend** [3] - 46:15, 97:10, 97:21
**upheld** [1] - 60:19
**upside** [1] - 7:5

## V

**value** [1] - 35:7
**various** [4] - 16:5, 17:9, 22:9, 105:3
**vast** [1] - 83:23
**version** [1] - 85:14
**versions** [1] - 52:8
**versus** [11] - 3:3, 43:9, 45:19, 46:20, 47:7, 67:18, 78:12, 99:4, 101:19, 102:12
**vests** [1] - 53:12
**vetted** [1] - 72:18
**view** [8] - 26:3, 82:7, 82:13, 82:18, 90:19, 98:1, 105:24
**violate** [4] - 22:9, 25:9, 27:4, 51:9
**violated** [7] - 10:16, 10:24, 23:5, 23:13, 27:16, 27:17, 27:20
**violates** [1] - 81:5
**violating** [4] - 27:18, 28:5, 60:1, 60:2
**violation** [8] - 10:21, 30:21, 34:13, 41:9, 47:21, 54:9, 88:6, 102:25
**violations** [2] - 10:23, 30:20
**violative** [1] - 90:14
**virtually** [1] - 20:16
**void** [1] - 107:8
**voluntarily** [1] - 11:2
**voluntary** [4] - 7:16, 11:6, 11:14, 26:24
**Voters** [1] - 43:24
**voters** [1] - 86:11
**vs** [1] - 1:4

## W

**wait** [3] - 43:19, 43:21, 88:2
**waiting** [1] - 58:5

**waits** [1] - 58:3
**Walker** [14] - 58:14, 68:18, 69:12, 69:18, 69:21, 76:22, 81:9, 82:10, 82:15, 83:2, 85:20, 87:3, 92:3, 104:15
**Walker's** [11] - 65:18, 76:15, 80:2, 81:14, 81:17, 82:18, 87:16, 101:2, 103:13, 105:22, 106:7
**Wall** [1] - 1:16
**wants** [3] - 4:6, 61:25, 73:14
**warning** [1] - 4:24
**warrants** [1] - 67:6
**Washington** [7] - 1:6, 1:13, 1:22, 2:6, 43:9, 58:13
**watching** [3] - 51:5, 51:6, 51:7
**ways** [5] - 18:4, 18:11, 31:20, 78:4, 80:8
**weekends** [1] - 42:19
**weeks** [1] - 3:24
**weighed** [1] - 48:7
**weird** [2] - 71:6, 71:7
**welcome** [3] - 4:4, 4:14, 94:7
**well-settled** [1] - 42:3
**Westlaw** [1] - 69:5
**White** [1] - 106:22
**whole** [4] - 19:8, 55:10, 55:18, 68:23
**wide** [1] - 47:21
**wiggle** [2] - 33:24, 44:5
**wiggliest** [1] - 32:25
**wiggly** [1] - 32:25
**Winter** [1] - 45:19
**wish** [1] - 62:3
**witnesses** [5] - 14:2, 37:24, 38:2, 38:3, 38:4
**Women** [1] - 43:23
**wonderful** [1] - 61:16
**word** [3] - 25:24, 104:11, 106:4
**words** [3] - 21:9, 64:15, 96:12
**workload** [1] - 50:8
**works** [4] - 22:12, 22:18, 27:8, 33:2
**world** [4] - 71:13, 72:21, 88:11, 90:19
**world's** [3] - 5:3, 5:7, 6:15
**worried** [2] - 54:8, 55:15

**worries** [1] - 17:19
**worry** [1] - 31:20
**worth** [1] - 34:3
**write** [1] - 65:16
**writes** [1] - 39:16
**written** [1] - 91:1

## X

**Xerox** [4] - 79:13, 79:14, 79:19, 79:23

## Y

**year** [7] - 47:16, 48:8, 49:19, 49:22, 50:5, 50:20, 59:9
**yearly** [1] - 22:4
**years** [13] - 5:12, 5:16, 5:18, 51:19, 54:19, 58:23, 58:24, 60:4, 60:5, 87:9, 89:8, 89:20, 98:4
**York** [12] - 1:17, 3:8, 8:10, 21:3, 21:4, 22:18, 24:19, 24:20, 25:16
**you-all** [2] - 37:11, 42:16
**Young** [1] - 64:24
**young** [1] - 65:6
**yourself** [1] - 57:15