## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EUGENE H. KIM,

*Plaintiff*,

v.

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.,

*Defendant*,

UNITED STATES OF AMERICA,

*Intervenor*.

Civil Action No. 1:23-cv-02420 (ACR)

## <u>MEMORANDUM OPINION</u>

In 1790, Philadelphia merchants meeting at a coffee house formed the nation's first stock exchange, giving rise to the Philadelphia Stock Exchange.  Two years later, New York brokers meeting under a buttonwood tree negotiated an agreement to regulate traders, giving rise to the New York Stock Exchange.  Since the Republic's early days, private organizations now known as self-regulatory organizations or SROs have governed exchanges and regulated brokers.  And since the 1930s, they have done so with statutory recognition and regulatory oversight by the Securities and Exchange Commission.  This case concerns one SRO regulated by the SEC, the Defendant Financial Industry Regulatory Authority, Inc. (FINRA).  Though opportunities have abounded, no court has ever held that FINRA or its relationship with the SEC is unconstitutional.

Plaintiff Eugene H. Kim, a securities broker registered with FINRA, contends that the courts have it all wrong.  Facing an enforcement action for allegedly unethical conduct, he

contends that FINRA either is a state actor bound by Article II's appointment and removal requirements, *see* U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 2, cl. 2, *or* is structured in a way that violates the private nondelegation doctrine. Either way, he alleges, the enforcement action violates these and other constitutional provisions and, for added measure, the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1–7. He seeks a temporary restraining order and preliminary injunction enjoining FINRA from proceeding with the enforcement action. *See* Dkt. 4.

He is not alone. A D.C. Circuit motions panel recently enjoined a different, expedited FINRA enforcement action based on similar claims. *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, No. 23-5129, 2023 WL 4703307, at *1 (D.C. Cir. July 5, 2023) (mem.) (per curiam). The court's short order held that the appellant had "satisfied the stringent requirements for an injunction pending appeal." *Id.* In a concurring statement, Judge Walker wrote that FINRA might prevail on the appellant's Appointments Clause and removal power claims, "but on the briefing before [him], that seem[ed] unlikely." *Id.* at *3 (Walker, J., concurring). Judge Garcia would not have granted the injunction. The appeal remains pending, with briefing scheduled to finish on November 17, 2023. Plaintiff argues that the *Alpine* order, although not binding, should guide the Court's decision. Agreed. But the order does not suggest that courts must enjoin every challenged FINRA enforcement action pending the *Alpine* merits decision.

The Court must instead apply longstanding precedent and the record before it to assess this plaintiff's claims. On precedent, the Court has benefitted from extensive briefing, amicus briefs, and a multi-hour hearing that all addressed Judge Walker's well-founded concerns. On the record, Plaintiff faces a less severe and less imminent harm than the *Alpine* plaintiff. *Alpine* involved an expedited enforcement proceeding "to expel Alpine [Securities Corporation] from FINRA membership"—a sanction known as "the corporate death penalty"—after FINRA found

that Alpine violated a cease-and-desist order more than 35,000 times. *Scottsdale Cap. Advisors Corp. v. Fin. Indus. Regul. Auth., Inc.*, — F. Supp. 3d —, 2023 WL 3864557, at *4 (D.D.C. June 7, 2023). For good reason, Judge Walker repeatedly referenced that FINRA sought, on an expedited basis, the "corporate death penalty" or to "put [Alpine] out of business." *Alpine*, 2023 WL 4703307, at *1–2, *4 (Walker, J., concurring). But here, FINRA is not insisting on the "corporate death penalty." Dkt. 25 at 32:1–4. It currently seeks a $30,000 fine and disgorgement of about $16,000 in profits. *Id.* at 92:10–11, 92:20–22. And in *Alpine*, FINRA had scheduled the enforcement hearing for four days after the district court's hearing on the preliminary injunction motion. *Scottsdale*, 2023 WL 3864557, at *4. The parties here agree that an enforcement hearing and sanction, if any, are many months—and potentially up to a year— away. Dkt. 25 at 37:13–17; *see* Dkt. 11-2 ¶¶ 12, 17.

The Court finds that Plaintiff has not met the high burden for the "extraordinary" relief of a TRO or preliminary injunction, relief which is "never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). *First*, Plaintiff cannot establish he is likely to succeed on the merits. Plaintiff's Article II Appointments Clause and removal power claims require establishing that FINRA is a state actor, which "clearly requires permanent government control." *Herron v. Fannie Mae*, 861 F.3d 160, 168 (D.C. Cir. 2017) (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 398–99 (1995)). But Plaintiff concedes, and the record reflects, that the government *does not* control FINRA. On Plaintiff's private nondelegation claim, the Court finds that FINRA likely "function[s] subordinately to" the SEC, which has "authority and surveillance over [its] activities." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). Nor are Plaintiff's other claims likely to succeed. *Second*, Plaintiff does not face irreparable harm. He faces instead an enforcement hearing, months away, and most likely, monetary fines. *Third*

and *fourth*, the balance of equities and public interest weigh against granting preliminary injunctive relief because enjoining this enforcement proceeding would interfere with FINRA's regulatory mission and threaten the integrity of U.S. securities markets.

Though a closer call, the equities and public harm factors would lead the Court to deny Plaintiff's motion even if it assumed that Plaintiff established a likelihood of success on the merits and irreparable harm.  *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) (explaining that balance of equities and public interest factors may overcome other two factors even in cases involving constitutional claims).[1]  Reading the *Alpine* order as effectively halting all FINRA enforcement actions for now would upend FINRA's work—a result that would put investors and U.S. securities markets at risk.

## I.    BACKGROUND

### A.    Legal Background and Overview of FINRA

#### 1.    *History of Self-Regulation in the Securities Industry*

It began, as many things do, over cups of joe.  In 1790, ten Philadelphia merchants calling themselves the "Board of Brokers" began trading bank stocks and government securities out of a local coffee house.  Jerry W. Markham & Daniel J. Harty, *For Whom the Bell Tolls: The Demise of Exchange Trading Floors and the Growth of ECNs*, 33 J. Corp. L. 865, 868 (2008).  "Within a year, express coaches were speeding to Philadelphia from New York bearing news from ships docking in the New York port that might affect security prices on the Philadelphia exchange."  *Id.*  The Philadelphia Stock Exchange, still in existence today, emerged from that coffee house.  *See id.*

---

[1] The Court thanks amici CBOE Global Markets, Inc.; CME Group Inc.; National Futures Association; and the Securities Exchanges for their insight, in particular into the history of SROs. *See* Dkts. 19, 20.

Things in New York did not proceed as smoothly.  In January 1792, the prices of government and bank securities soared, "exceeding any sane levels of valuation."  Ron Chernow, *Alexander Hamilton* 381 (2004).  Then prices started to drop, panic spread, and, natch, prices plummeted.  *Id.*  "[F]inancial mayhem" ensued.  *Id.*  New York brokers did not sit idly by.  On May 17, 1792, they gathered "under the shade of a buttonwood tree at 68 Wall Street" and drew up the aptly named "Buttonwood Agreement." *Id.* at 384.  It contained rules to govern securities trading, including setting a minimum for brokers' commissions.  *Id.*  Out of this agreement, the New York Stock Exchange was born, like the Philadelphia exchange, without aid of any federal or state law or government intervention, oversight, or regulation.  *Id.*[2]

Over a century later, in 1929, there was another market crash.  In the aftermath, Congress acted, including by passing the Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. § 78a *et seq.*).  *See generally* Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation*, 62 N.C. L. Rev. 475, 480–83 (1984).  The Exchange Act subjected over-the-counter broker-dealers to direct regulation by the government, specifically the SEC, for the first time.  *See* Smythe, *supra*, at 481–83.  It soon became apparent, however, that the SEC lacked the capacity to regulate the over-the-counter market directly.  *Id.* at 483–84; *see*

---

[2] The idea of a joint stock company sprang in Tudor England "from the flint of the medieval craft guilds, where merchants and manufacturers could pool their resources to undertake ventures none could afford to make individually."  William Dalrymple, *The Anarchy* 7 (2019).  The joint stock company added passive investors, individuals who invested in a company "but were not themselves involved in the running of it."  *Id.*  The idea took hold in September 1599, when English merchants met at Founders' Hall in London to draw up a contract and include their contributions in a subscription book to create the East India Company.  *Id.* at 1–3.  About a mile away, William Shakespeare was drafting *Hamlet*, *id.* at 1—perhaps even the line "neither a borrower nor a lender be."

*also* SEC Concept Release Concerning Self-Regulation, Securities Exchange Act Release No. 50700, 69 Fed. Reg. 71,256, 71,257 & n.23 (Dec. 8, 2004).

In 1937, Congress considered how to address the unanticipated consequences of leaving the SEC with full regulatory power in the industry. *See* Smythe, *supra*, at 483–85. Congress worried that governmental regulation alone "would involve a pronounced expansion of the organization of the [SEC]; the multiplication of branch offices; a large increase in the expenditure of public funds; an increase in the problem of avoiding the evils of bureaucracy; and a minute, detailed, and rigid regulation of business conduct by law." *Id.* at 485 (quoting S. Rep. No. 75-1455, at 3 (1938)). An SEC Commissioner confirmed that self-regulation fulfilled Congress's purpose and was needed due to "the immense burden" of effective rule enforcement. *Regulation of Over-the-Counter Markets: Hearing on S. 3255 Before the S. Comm. on Banking and Currency*, 75th Cong. 15–16 (1938). And so Senator Francis Maloney of Connecticut introduced a bill to create a system of "cooperative regulation in which the task [of regulation would] . . . be largely performed by representative organizations of investment bankers, dealers, and brokers," but "with the Government exercising appropriate supervision in the public interest, and exercising supplementary powers of direct regulation." Smythe, *supra*, at 484 (alteration and omission in original) (quoting S. Rep. No. 75-1455, at 4).

Congress passed the Maloney Act in 1938 to keep self-regulation in the enforcement picture by establishing the concept of registered national securities association SROs. Pub. L. No. 75-719, 52 Stat. 1070 (1938) (codified as amended at 15 U.S.C. § 78o-3); *see* SEC Concept Release Concerning Self-Regulation, 69 Fed. Reg. at 71,257. Congress again amended the Exchange Act in 1975. SEC Concept Release Concerning Self-Regulation, 69 Fed. Reg. at 71,257–58. Rather than adopt a purely governmental approach, "Congress determined that it

was distinctly preferable to rely on cooperative regulation, in which the task will be largely performed by representative organizations of investment bankers, dealers, and brokers, with the Government exercising appropriate supervision in the public interest, and exercising supplementary powers of direct regulation." *Id*. (cleaned up).  Congress kept this regime in large part because of the "sheer ineffectiveness of attempting to assure [regulation] directly through the government on a wide scale." *Id.* at 71,258 (alteration in original) (quoting S. Rep. No. 94-75, at 22 (1975)).  And yet again in 2004, the SEC explained that "[e]xperience appears to indicate that the [SEC], in its current form, does not have the resources to effectively carry out on its own the full panoply of duties for which the SROs are currently responsible." *Id.* at 71,267; *see also* 15 U.S.C. § 78o-3(b)(2).[3]

Together, the Exchange Act, the Maloney Act, and the 1975 amendments "reflect Congress'[s] determination to rely on self-regulation as a fundamental component of U.S. market and broker-dealer regulation, despite [an] inherent conflict of interest." *Id.* at 71,256.  Thus, for over eight decades, federal law has maintained "a system of cooperative self-regulation through voluntary associations of brokers and dealers" to supplement the SEC's regulation of over-the-counter markets.  *United States v. Nat'l Ass'n of Sec. Dealers*, 422 U.S. 694, 700 n.6 (1975). Under this statutory framework, SROs like FINRA supervise the securities industry but are also subject to oversight from the SEC.  *See id.*; 15 U.S.C. § 78s.

Subject to a narrow exemption, brokers and dealers transacting in the securities industry must register with the SEC and join a national securities association.  *See* 15 U.S.C. § 78o(a)(1),

---

[3] The SEC has also noted that a shift to direct regulation "would require dramatic change" in funding because the SEC would need to promulgate "detailed" rules and significantly expand its surveillance and enforcement efforts.  SEC Concept Release Concerning Self-Regulation, 69 Fed. Reg. at 71,281–82.  FINRA and amici contend that the situation remains the same today. *See* Dkt. 25 at 98:1–11; Dkt. 19 at 16; Dkt. 20 at 20–21.

(b)(1).  Today, FINRA is the only national securities association registered with the SEC.  *Turbeville v. Fin. Indus. Regul. Auth.*, 874 F.3d 1268, 1270 n.2 (11th Cir. 2017); Press Release, U.S. SEC, SEC Adopts Amendments to Exemption from National Securities Association Membership (Aug. 23, 2023), https://www.sec.gov/news/press-release/2023-154.

### 2.     *FINRA's Structure, Rulemaking Power, and Enforcement Proceedings*

For a detailed review of FINRA's structure, rulemaking power, and enforcement proceedings, the Court commends to the reader the background section in Judge Howell's *Scottsdale* opinion.  *See* 2023 WL 3864557, at *1–3.  To avoid repetition, the Court lays out the undisputed facts relevant here.  Those facts demonstrate that FINRA (1) is privately organized; (2) is privately funded; and (3) exercises discretion in its enforcement proceedings, which are subject to de novo review by the SEC.  Dkt. 25 at 9:6–11.

#### a.     *Private Organization*

FINRA's predecessors began as voluntary organizations.  Dkt. 25 at 7:15–18.  Although the Exchange Act provides overarching guidance, it does not direct how FINRA must organize itself or set its membership requirements.  *Id.* at 8:20–25; *see* 15 U.S.C. § 78o-3(b).  The SEC may, however, limit FINRA's operations or registration if FINRA violates a statute or SEC regulation.  *See* 15 U.S.C. § 78s(h)(1).  The SEC also reviews and approves rules proposed by FINRA.  *See id.* § 78s(b)–(c).

FINRA sets professional rules of conduct for its roughly 3,400 brokerage firms, 150,000 branch offices, and 624,000 associated persons.  *Saad v. SEC*, 873 F.3d 297, 299 (D.C. Cir. 2017); Dkt. 2-1 ¶ 62.  Its board has twenty-two directors selected by FINRA's members.  *Scottsdale*, 2023 WL 3864557, at *2; FINRA By-Laws, Composition and Qualifications of the Board, art. VII, § 4; Dkt. 25 at 74:18–20; Dkt. 2-1 ¶¶ 111, 145–46.  Neither the SEC nor any

other government entity can appoint FINRA's directors or control its board.  Dkt. 25 at 9:18–25.

A majority vote of FINRA's board is needed to remove a director.  *See* 15 U.S.C. § 78s(h)(4).

The SEC can do so in limited circumstances, such as a violation of law.  *See id.*

### b.   Private Funding

FINRA is a not-for-profit corporation incorporated in Delaware.  *See Scottsdale*, 2023

WL 3864557, at *2; Dkt. 2-1 ¶¶ 3, 25.  It does not receive funding from the government.  Dkt. 25

at 9:12–14.  Instead, FINRA's funding is derived almost exclusively through membership fees,

penalties, and sanctions.  *See, e.g.*, *Scottsdale*, 2023 WL 3864557, at *2; Dkt. 2-1 ¶ 65; *see also*

FINRA By-Laws, Power of the Corporation to Fix and Levy Assessments, art. VI, § 1.

### c.   Enforcement Discretion

Plaintiff concedes that FINRA has enforcement discretion.  Dkt. 25 at 74:1–7.  FINRA

decides whom to investigate, whom to bring charges against, what charges to bring, and what

sanctions to seek.  *See* Dkt. 4-3 at 14, 28.[4]  Other than serving as a level of review after a

hearing, the SEC plays no active role in FINRA's enforcement proceedings.  Dkt. 25 at 10:1–4,

71:17–72:3.  FINRA can take enforcement actions against those who violate the securities laws

or FINRA's own rules.  *Id.* at 10:5–12, 28:17–20; *see* 15 U.S.C. § 78o-3(b)(7).

Disciplinary decisions are typically issued between nine and twenty-one months after

FINRA files a complaint.  *See* Dkt. 11-2 ¶¶ 12, 17; *see also* Dkt. 25 at 37:13–17.[5]  After a

---

[4] The Exchange Act provides for the SEC to remove or censure FINRA officers and directors, among other scenarios, if those individuals "*without reasonable justification* or excuse ha[ve] failed to enforce compliance" with the securities laws.  15 U.S.C. § 78s(h)(4) (emphasis added). Neither party contends that this impedes FINRA's enforcement discretion.

[5] In this case, the parties agree that the enforcement hearing will likely take place in "early to mid-2024."  Dkt. 25 at 37:13–17.

hearing panel issues a written decision, *see* 15 U.S.C. § 78o-3(h)(1), and an aggrieved party

exhausts its internal appeals within FINRA, *see* Dkt. 2-1 ¶¶ 121–40, it may appeal to the SEC,

which conducts a de novo review, and, from there, to a federal appellate court, *see* 15 U.S.C.

§ 78y; Dkt. 25 at 16:5–8; *see also* 17 C.F.R. § 201.452 (permitting SEC to consider additional

evidence).

### B.      FINRA's Enforcement Action Against Plaintiff

Plaintiff is a securities broker registered with FINRA, Dkt. 2-1 ¶¶ 19, 22, who was

previously associated with the FINRA member firm National Securities Corporation (NSC), Dkt.

11-5 ¶¶ 1, 4.  FINRA began issuing requests for information and documents related to Plaintiff's

activities in January 2020 and took Plaintiff's testimony in August 2020.  Dkt. 11-3 ¶ 6.[6]  On

July 11, 2023, FINRA brought a disciplinary proceeding against Plaintiff.  *See* Dkt. 11-5.

FINRA alleges that between December 2017 and June 2019, Plaintiff "engaged in unethical

conduct, acted in bad faith, and misused customer funds in connection with a private offering

sold by NSC."  *Id.* ¶ 1.  Specifically, FINRA alleges that Plaintiff prompted a private offering in

"Company A" at a maximum price of $9.75 per share—in which 48 customers invested a total of

$4.055 million—even though he "had not confirmed a source of shares for the offering at any

price."  *Id.*  FINRA further alleges that Plaintiff received a $16,220 commission and misled NSC

and investors "into believing that the fund had purchased Company A shares at the $9.75 price"

when "[i]nstead, investors owned Company A shares at a higher price and some of their funds

had not been used to purchase Company A shares at all."  *Id.* ¶¶ 2–3.  Based on these allegations,

---

[6] In December 2021, Plaintiff terminated settlement negotiations with FINRA, and, following a
call with FINRA's staff, in early 2022, Plaintiff's counsel declined to file a submission arguing
why FINRA should not bring a disciplinary action.  *See* Dkt. 11-3 ¶¶ 7, 9.  NSC reached a
settlement with FINRA in April 2022.  *Id.* ¶ 8.

FINRA alleges that Plaintiff violated FINRA Rule 2010, which requires members to "observe high standards of commercial honor and just and equitable principles of trade."  FINRA Rule 2010.[7]

FINRA seeks a fine of $30,000 and disgorgement of about $16,000 in profits.  Dkt. 25 at 92:10–22.  It "does not [currently] intend to seek a bar against [Plaintiff's participating in the securities industry]."  Dkt. 11-2 ¶ 22; *see also* Dkt. 11-3 ¶ 16.  It reserves the right to seek additional sanctions later if new information emerges.  Dkt. 25 at 32:2–4.  Ultimately, the hearing panel imposes the sanction.  *Id.* at 34:5–10, 35:10–13.

### C.   Plaintiff's Claims and the District Court Proceedings

On August 18, 2023, Plaintiff brought this lawsuit.  Dkts. 1, 2-1.[8]  It asserts four causes of action, alleging violations of (1) the separation of powers, including Article II's Appointments Clause and removal power, and the nondelegation doctrine; (2) Article III and the Fifth and Seventh Amendments; (3) the First Amendment; and (4) the Sherman Act.  *See* Dkt. 2-1 ¶¶ 199–261.

On August 21, 2023—a day before his answer was due—Plaintiff filed the present motion for a TRO and preliminary injunction to prohibit FINRA from proceeding with its enforcement action against him.  *See* Dkt. 4.  After extensions by FINRA's hearing officer, Plaintiff's answer is now due on October 6, 2023.  Dkt. 25 at 95:25–96:3.  On September 20, 2023, the United States intervened pursuant to Federal Rules of Civil Procedure 5.1 and 24(a)(1).  *See* Dkt. 14.

---

[7] FINRA's rules are available at https://www.finra.org/rules-guidance/rulebooks/finra-rules.

[8] Plaintiff filed a corrected complaint on August 21, 2023.  *See* Dkt. 2-1.

The Court held a multi-hour argument on Plaintiff's motion on September 27, 2023. Dkt. 25. During this hearing, the Court requested supplemental briefing on whether it may deny preliminary injunctive relief even if it finds or assumes a likelihood of success on a constitutional claim. *See* Dkt. 25 at 41:6–42:20; Dkts. 22, 23, 26.

### D.       Proceedings in *Scottsdale* and *Alpine*

Although the facts differ, some of Plaintiff's claims overlap with those in *Alpine*. *See Scottsdale,* 2023 WL 3864557; *Alpine*, 2023 WL 4703307. Those include Plaintiff's separation of powers, Appointments Clause and removal power, private nondelegation, First Amendment, Fifth Amendment, and Seventh Amendment claims. *Scottsdale*, 2023 WL 3864557, at *7. In *Scottsdale*, Alpine moved for a TRO and preliminary injunction to stop FINRA's enforcement proceedings against it. *Id*. at *1. Judge Howell denied the request for preliminary injunctive relief, holding that Alpine had "failed on all [four] factors." *Id.* at *7.

Alpine appealed the denial of the preliminary injunction and sought an injunction pending appeal, which a divided motions panel of the D.C. Circuit granted in a four-sentence per curiam order on July 5, 2023. *See Alpine*, 2023 WL 4703307, at *1. The order stated that the appellant, Alpine, "ha[d] satisfied the stringent requirements for an injunction pending appeal." *Id.* In a concurring statement, Judge Walker reasoned that FINRA's structure is likely unconstitutional because "Alpine ha[d] raised a serious argument that FINRA impermissibly exercises significant executive power." *Id.* at *2 (Walker, J., concurring). He also reasoned that the other three preliminary injunction factors favor Alpine. *Id*. Judge Walker cautioned, however, that he did "not rule out the possibility that further briefing and argument might convince [him] that [his] current view [was] unfounded" and that "a vote to stay is not a decision on the merits." *Id.* (cleaned up). On August 22, 2023, the D.C. Circuit denied FINRA's motion

for en banc reconsideration of the motions panel's decision.  Merits briefing is scheduled to

finish by November 17, 2023.  Oral argument has not yet been scheduled.

## II.  LEGAL STANDARD

Temporary restraining orders and preliminary injunctions are "extraordinary and drastic

remed[ies] . . . that should not be granted unless the movant, *by a clear showing*, carries the

burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (cleaned

up); *see also Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  The same standard applies to

both forms of relief.  *Sterling Com. Credit—Mich., LLC v. Phoenix Indus. I, LLC*, 762 F. Supp.

2d 8, 12 (D.D.C. 2011).

A plaintiff seeking preliminary injunctive relief must establish four factors: (1) "that he is

likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of

preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction

is in the public interest."  *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022) (quoting *Winter*, 555

U.S. at 20).[9]  "[T]he movant has the burden to show that all four factors, taken together, weigh in

favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis*

---

[9] The Court notes some "tension in the case law regarding the showing required on the merits for
a preliminary injunction"—whether the plaintiff must show a "likelihood of success" or a
"substantial likelihood of success" on the merits.  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d
500, 505 n.1 (D.C. Cir. 2016).  The Supreme Court recently used "likely to succeed on the
merits" as the test, *Ramirez*, 142 S. Ct. at 1275, so the Court does as well.  And because Plaintiff
cannot prevail under this standard, he also could not prevail under the more stringent "substantial
likelihood of success" standard.

*v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).[10]  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (per curiam).  Further, "a party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek*, 138 S. Ct. at 1944.

## III.    ANALYSIS

### A.    Likelihood of Success on the Merits

None of Plaintiff's claims are likely to succeed on the merits.

*First*, Plaintiff's Article II claims are unlikely to succeed because FINRA is likely not a state actor.  Being a state actor requires permanent control by the government, *Herron*, 861 F.3d at 168, but Plaintiff concedes, and the record reflects, that the government does *not* control FINRA, *see, e.g.*, Dkt. 25 at 9:5–14, 9:21–25, 71:17–19.  And even if Plaintiff's state action theory applied to structural constitutional claims—which it does not—that theory, too, would likely not succeed because it requires that FINRA share a close nexus with the government when performing its enforcement work.  FINRA does not.

*Second*, Plaintiff's private nondelegation claim is unlikely to succeed.  FINRA—not subject to the government's permanent control—functions subordinately to the SEC.

---

[10] The D.C. Circuit has previously "applied a sliding scale approach under which a strong showing on one factor could make up for a weaker showing on another."  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (cleaned up).  But the D.C. Circuit has recently questioned "whether the sliding-scale approach remains valid" in light of "Supreme Court decisions stating without qualification that a party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits."  *Id.* (cleaned up) (citing *Munaf v. Geren*, 553 U.S. 674, 690 (2008); *Winter*, 555 U.S. at 20).  The Court would deny Plaintiff's motion under either approach because he has not made a strong showing on any factor and because of the particular importance of the balance of equities and public interest factors to this case.

*Third*, Plaintiff's First Amendment claim, which the Court and the parties construe as a challenge to the Exchange Act's requirement to join FINRA, is unlikely to succeed because Plaintiff has not shown how this requirement implicates his associational rights.  Nor does Plaintiff explain how FINRA uses its "arbitrary" fees in a way that is not "germane" to FINRA's mission.  *Keller v. State Bar of Cal.*, 496 U.S. 1, 14 (1990).

*Fourth*, Plaintiff conceded his Article III, Fifth Amendment, Seventh Amendment, and Sherman Act claims because he did not address FINRA's arguments that this Court lacks jurisdiction over them.

### 1.     *Article II Appointments Clause and Removal Power Claims*

Plaintiff is unlikely to succeed on his Article II claims because they require establishing that FINRA is a state actor.  And every court to have considered this state actor argument has rejected it.  *See, e.g.*, *Scottsdale*, 2023 WL 3864557, at *8 n.7 (collecting cases); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, — F. Supp. 3d —, 2023 WL 3293298, at *14 (N.D. Tex. May 4, 2023) (same), *appeal docketed*, No. 23-10520 (5th Cir.); *Mohlman v. Fin. Indus. Regul. Auth., Inc.*, No. 19-cv-154, 2020 WL 905269, at *6 (S.D. Ohio Feb. 25, 2020) (same), *aff'd*, 977 F.3d 556 (6th Cir. 2020).

### a.     *Whether FINRA, Though Nominally a Private Corporation, Is Regarded as a State Actor*

"[M]ost rights secured by the Constitution are protected only against infringement by governments," *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982) (quoting *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 156 (1978)), so the question is whether FINRA, "though nominally a private corporation, must be regarded as a Government entity" for constitutional purposes, *Lebron*, 513 U.S. at 383.  Likely not.  The D.C. Circuit has emphasized that "[t]o find that a government-created corporation is a government actor for constitutional purposes, *Lebron*

clearly requires permanent government control." *Herron*, 861 F.3d at 168.  This factor alone can

be dispositive.  *Id.*  And here, Plaintiff concedes that the government does not control FINRA's

board, Dkt. 25 at 9:22–25, and that "FINRA's enforcement activities" are "[n]ot directly"

"controlled by the government," *id.* at 71:17–19.  And with respect to the Court's follow-up

question about any indirect control, Plaintiff conceded that "there is no day-to-day activity by the

SEC over FINRA."  *Id.* at 71:20–72:3.  He is correct.

  In *Lebron*, the Supreme Court held that Amtrak, though a private corporation, was a state

actor, or "part of the Government[,] for purposes of" individual constitutional rights because

(1) the "Government create[d] a corporation by special law," (2) "for the furtherance of

governmental objectives," and (3) "retain[ed] for itself permanent authority to appoint a majority

of the directors of that corporation."  513 U.S. at 399; *see Herron*, 861 F.3d at 167 (explaining

that "*Lebron* sets forth a three-part standard to determine whether a government-created

corporation is part of the government for constitutional purposes").  The Court later applied

*Lebron* to hold that Amtrak is also a government entity for separation-of-powers and

nondelegation purposes.  *See Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 55 (2015).

  *Lebron*'s three-factor test shows that FINRA is likely not a state actor.  *First*, Plaintiff

concedes that the government did not "create" FINRA "by special law" or any law.  *Lebron*, 513

U.S. at 399.  Private actors did.  In 2007, the National Association of Securities Dealers and

NYSE Group, Inc., two SROs, transacted "to consolidate their member regulation operations into

a single [SRO] that would provide member firm regulation for securities firms that do business

with the public in the United States."  Order Approving Proposed Rule Change to Amend the

By-Laws of NASD, 72 Fed. Reg. 42,169, 42,170 (Aug. 1, 2007).  And as explained above, this

practice of private self-regulation "dates to the 1790s, when *private* actors in the industry formed

securities exchanges that were voluntary in nature." Dkt. 20 at 14. For good reason, then, Plaintiff has conceded that the "federal government did not create FINRA." Dkt. 25 at 9:15–17.

*Second*, to be sure, FINRA furthers governmental objectives. But that is not all of its work. The organization also performs a variety of tasks outside the SEC's mandate, such as administering broker qualification exams and creating and enforcing professional standards for brokers. See *Turbeville*, 874 F.3d at 1271; Dkt. 19 at 4–5.

*Third*, FINRA's board is not "under the direction and control of federal governmental appointees." *Herron*, 861 F.3d at 167 (quoting *Lebron*, 513 U.S. at 398); *see* Dkt. 25 at 77:24–78:2. FINRA is privately governed by a board of twenty-two directors selected by FINRA's members. *Id.* at 74:18–20; FINRA By-Laws, Composition and Qualifications of the Board, art. VII, § 4; Dkt. 21 ¶¶ 111, 145–46; *Scottsdale*, 2023 WL 3864557, at *2. The government does not have the "permanent authority to appoint" any directors, let alone "a majority" of them. *Lebron*, 513 U.S. at 399. In *Lebron* on the other hand, the president appointed two-thirds (six of nine) of Amtrak's board members. *Id.* at 385. For added measure, unlike Amtrak, which "is . . . dependent on federal financial support" and receives federal subsidies "exceed[ing] $1 billion annually," *Ass'n of Am. R.Rs.*, 575 U.S. at 53, FINRA is "funded by member firm fees—without the support of any taxpayer dollars," FINRA, Financial Reports and Policies (last visited Oct. 4, 2023);[11] *see* Dkt. 25 at 9:10–14.

The Supreme Court's discussion of SROs like FINRA in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), supports the conclusion that FINRA is likely not a state actor. There, the Supreme Court compared the Public Company Accounting Oversight Board's (PCAOB) structure with that of SROs like FINRA. *See id.* at

---

[11] This webpage is available at https://www.finra.org/about/annual-reports.

484.  The Court highlighted that Congress created the PCAOB and that it has "five members, appointed . . . by the [SEC]." *Id.*  The parties agreed the PCAOB "is part of the Government for constitutional purposes," and the Court cited *Lebron* in support.  *Id.* at 486 (cleaned up).  The Court contrasted this model with the structure of SROs.  *See id.* at 484–85.  "*Unlike the self-regulatory organizations*," including the New York Stock Exchange, "the [PCAOB] is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry."  *Id.* at 485 (emphasis added).

*          *          *

Because FINRA is likely not a state actor, Plaintiff's Article II challenges are unlikely to succeed.  Judge Walker's concurring statement cites *Lucia v. SEC*, 138 S. Ct. 2044 (2018), as the basis for Alpine's Appointments Clause challenge and *Free Enterprise Fund* as the basis for its removal power challenge.  *See Alpine*, 2023 WL 4703307, at *3 (Walker, J., concurring).  Further briefing here has illuminated that neither case addressed the threshold question posed by FINRA's structure—whether FINRA hearing officers are employees of a federal government entity or instrumentality in the first instance (*i.e.*, whether the defendant is a state actor).  *Lucia* involved employees of the SEC, so "[t]he sole question" there was "whether the [SEC's] [administrative law judges] are 'Officers of the United States' or simply employees of the Federal Government."  138 S. Ct. at 2051.  And, as noted above, in *Free Enterprise Fund*, "the parties agree[d] that the [PCAOB] is part of the Government for constitutional purposes, and that

its members are 'Officers of the United States.'" 561 U.S. at 486 (cleaned up).[12]  The Court

therefore finds that "*Lebron*—rather than *Lucia*—supplies the appropriate standard, and [that

Plaintiff] fail[s] to prove" a likelihood of success on his "Article II appointments and removal

claims." *Nat'l Horsemen's Benevolent & Protective Ass'n*, 2023 WL 3293298, at *15.  In other

words, if individuals "are not officers of the United States, but instead are some other type of

officer, the Appointments Clause says nothing about them." *Fin. Oversight & Mgmt. Bd. for

P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658 (2020).

    b.  *Whether FINRA Engages in State Action*

   The next question is whether, even if FINRA, a private company, is not a government

actor, FINRA's enforcement work amounts to state *action*.  *See Lebron*, 513 U.S. at 378.  As

noted, *see supra* note 12, the state action theory does not apply to Plaintiff's Article II

Appointments Clause or removal power claims.  But because Plaintiff relies on the state action

---

[12] In *Free Enterprise Fund*, the Court cited *Lebron*—a state *actor* case, *see Lebron*, 513 U.S. at 378—for the undisputed proposition that the PCAOB was "part of the Government," such that its members were subject to Article II's Appointments Clause.  *Free Enter. Fund*, 561 U.S. at 486. Neither the Court nor the parties could find any case suggesting that Article II's Appointments Clause and removal requirements apply to a private entity that is not the government itself under *Lebron* but merely engages in state action in certain circumstances, such as in *Manhattan Community Access Corporation v. Halleck*, 139 S. Ct. 1921, 1926 (2019).  *See* Dkt. 25 at 79:3–80:1, 91:2–22.  That is likely because such a conclusion would yield the "result that a private entity would need to have a privately appointed and removable board and officers governing its private conduct and a separate government-appointed and -removable board and officers governing its state action."  Dkt. 11 at 22.  In *NB ex rel. Peacock v. D.C.*, 794 F.3d 31 (D.C. Cir. 2015), for example, the D.C. Circuit held that Xerox engaged in state action for purposes of the Due Process Clause when it "effected the denial of prescription drug coverage" under Medicaid, *id.* at 43.  But that state action did not make Xerox subject to the Constitution's Appointments Clause or removal requirements.  *See* Dkt. 11 at 21.

theory for his Article II claims, *see* Dkt. 16 at 6–14, the Court addresses it here as an additional reason why these claims are unlikely to succeed.[13]

The Supreme Court has stated "that actions of private entities can sometimes be regarded as governmental action for constitutional purposes." *Lebron*, 513 U.S. at 378. "[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001). The inquiry is "necessarily fact-bound," *Lugar*, 457 U.S. at 939, and the Supreme Court has "identified a host of facts that can bear on the fairness of such an attribution" of state action, *Brentwood*, 531 U.S. at 296.

Under the Supreme Court's state action precedents, "a private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Halleck*, 139 S. Ct. at 1928 (citations omitted); *see also Brentwood*, 531 U.S. at 296. "[A]t bottom[,] the inquiry examines whether 'there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.'" *Budowich v. Pelosi*, 610 F. Supp. 3d 1, 19 (D.D.C. 2022) (quoting *Brentwood*, 531 U.S. at 295).

Plaintiff relies on the three *Halleck* theories of state action, *see* Dkt. 16 at 10–14, but the Court finds that none are likely to succeed on the merits. *First*, FINRA does not "exercise[] a

---

[13] FINRA argues that Plaintiff never pled a state action theory in his complaint and that the Court need only address the *Lebron* state actor issue. *See* Dkt. 11 at 14–15. He arguably did plead this theory, and so the Court addresses it for the sake of completeness.

function 'traditionally exclusively reserved to the State.'"  *Halleck*, 139 S. Ct. at 1926 (quoting

*Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)).  To the contrary, "[s]ecurities industry

self-regulation has a long tradition in the U.S. securities markets."  SEC Concept Release

Concerning Self-Regulation, 69 Fed. Reg. at 71,257; *see supra* Section I.A.1.  Since 1938,

frontline authority over broker-dealers has fallen to *private* entities and *not* the state.  *See* SEC

Concept Release Concerning Self-Regulation, 69 Fed. Reg. at 71,257.

     *Second*, neither the SEC nor any other governmental agency "compels" FINRA "to take a

particular action."  *Halleck*, 139 S. Ct. at 1928.  To the contrary, Plaintiff has conceded and

FINRA has supported the contentions that (1) the government does *not* control FINRA's

enforcement proceedings, Dkt. 25 at 10:1–4, 68:2–16; Dkt. 11 at 24; (2) the government does not

control FINRA's board, Dkt. 25 at 9:21–25; and (3) while FINRA does enforce securities laws,

its enforcement actions also concern violations of its own rules, *id.* at 10:5–11:1, 27:10–12.

     *Third*, the government does not "act[] jointly with" FINRA in its enforcement actions,

*Halleck*, 139 S. Ct. at 1928, just because the SEC provides regulatory oversight.  Plaintiff does

not explain his argument, and, in any event, the fact that the SEC and FINRA each play a role in

regulating securities trading does not mean that they act "jointly."  *Cf., e.g.*, *D.L. Cromwell Invs.,*

*Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 161–62 (2d Cir. 2002) (rejecting argument that

FINRA's predecessor engaged in state action based on its cooperation with federal officials).

FINRA "decides who[m] it will investigate, the tools it will deploy, and the scope of its

discovery demands," and the SEC is not involved in FINRA's enforcement process until the

appellate stage.  Dkt. 2-1 ¶¶ 85, 87.  This case exemplifies FINRA's exercise of its enforcement

discretion.  "At no point in time did the [SEC] ever direct, suggest, or encourage the

investigation" or "initiation of FINRA's enforcement actions against . . . [Plaintiff]."  Dkt. 11-3 ¶

3.  For these reasons, courts in this District and elsewhere have repeatedly rejected arguments that FINRA (or its predecessor entity, NASD) engages in state action.  *See, e.g.*, *McGinn, Smith & Co. v. Fin. Indus. Regul. Auth.*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011); *Marchiano v. Nat'l Ass'n of Sec. Dealers*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001); *Graman v. Nat'l Ass'n of Sec. Dealers*, *Inc.*, No. 97-cv-1556, 1998 WL 294022, at *2–3 (D.D.C. Apr. 27, 1998); *D.L. Cromwell*, 279 F.3d at 162.

### 2.      *Private Nondelegation Claim*

Plaintiff's private nondelegation claim is also unlikely to succeed on the merits. Plaintiff's complaint makes only cursory references to "non-delegation" or "unconstitutional delegation" principles.  Dkt. 2-1, ¶¶ 200, 209, 219–20.[14]  The parties construe the claim as a private nondelegation claim.  *See* Dkt. 11 at 37–39; Dkt. 16 at 14–17.  The Court does as well.

Congress may delegate authority to a private entity if the entity "function[s] subordinately" to a government agency.  *Adkins*, 310 U.S. at 399.  In *Adkins*, for example, the Supreme Court upheld a statutory scheme in which local boards consisting of private coal producers would "propose minimum prices pursuant to prescribed statutory standards" that could "be approved, disapproved, or modified" by a government agency.  *Id.* at 388.  The Court reasoned that private industry members "function[ed] subordinately to the" government agency and that the agency, not the private entities, "determine[d] the prices."  *Id.* at 399.  The agency also had "authority and surveillance over the activities of these" private entities, and "th[e] statutory scheme [was] unquestionably valid" because "law-making [was] not entrusted to the

---

[14] Debate swirls over whether the private nondelegation doctrine is rooted in the Fifth Amendment's Due Process Clause or the Constitution's separation of powers established in the three Vesting Clauses.  *See Oklahoma v. United States*, 62 F.4th 221, 237–39 (6th Cir. 2023) (Cole, J., concurring) (discussing Supreme Court and D.C. Circuit analysis of the distinction).

industry." *Id.*; *see also Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 896 F.3d 539, 545 (D.C. Cir. 2018).  As the D.C. Circuit has highlighted, "a number of arrangements by which regulatory measures were imposed through the joint action of a self-interested group and a government agency [have] passed constitutional muster." *Ass'n of Am. R.Rs.*, 896 F.3d at 545 (cleaned up).

Plaintiff's private nondelegation challenge likely fails because FINRA "function[s] subordinately" to the SEC, which has "authority and surveillance over [FINRA's] activities." *Adkins*, 310 U.S. at 399.  For example, the SEC retains authority to suspend or revoke FINRA's registration or "impose limitations upon [FINRA's] activities, functions, and operations" as "necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]."  15 U.S.C. § 78s(h)(1).  Although FINRA promulgates its own rules and standards, subject to limited exceptions, the SEC must review and approve any rules issued by FINRA.  *See id.* § 78s(b)–(c).[15]  And the SEC may "abrogate, add to, and delete from" a FINRA rule at any time.  *Id.* § 78s(c).  Further, the SEC may review any FINRA adjudication, following an internal appeals process, de novo and sua sponte.  *Id.* § 78s(d)–(e); *see Nat'l Ass'n of Sec. Dealers v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2005).[16]

FINRA's subordinate regulatory structure to the SEC is why "[i]n case after case, the courts have upheld this arrangement" against private nondelegation challenges.  *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023).  They "reason[] that the SEC's ultimate control

---

[15] "The Exchange Act permits three avenues for promulgation of a FINRA rule without the SEC's express approval." *Scottsdale*, 2023 WL 3864557, at *2 n.2 (citing 15 U.S.C. § 78s(b)(3)(A)–(B); *id.* § 78s(b)(2)(D); *id.* § 78s(b)(3)(C)).

[16] Plaintiff argues that although the Exchange Act "theoretically" allows the SEC to review FINRA sanctions and disciplinary actions, the SEC rarely, if ever, does so and "has abandoned its responsibility to actually supervise and control FINRA." Dkt. 16 at 16–17.  But Plaintiff has not adequately developed the argument that how often and whether the SEC exercises its supervisory authority can establish a private nondelegation claim.  And even if he had, more facts would be needed to assess this allegation.

over the rules and their enforcement makes the SROs" like FINRA "permissible aides and advisors." *Id.*; *see Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977); *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 & n.10 (2d Cir. 1952); *see also Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 n.5 (D.C. Cir. 2013) (citing these cases because they "resemble *Adkins* insofar as they approve structures in which private industry members serve in purely advisory or ministerial functions"), *vacated and remanded on other grounds*, 575 U.S. 43 (2015). "The unanimous principle from the circuit decisions—which the Supreme Court has not disturbed despite repeated opportunities to do so—is that so long as the agency retains de novo review of a private entity's enforcement proceedings, there is no unconstitutional delegation of legislative or executive power, even if the agency does not review the private entity's initial decision to bring an enforcement action." *Oklahoma*, 62 F.4th at 243 (Cole., J., concurring). As noted above, if an aggrieved party so requests, the SEC exercises de novo review of FINRA's enforcement proceedings following an internal appeals process. *See* 15 U.S.C. § 78s(d)–(e); *Nat'l Ass'n of Sec. Dealers*, 431 F.3d at 806.

The Court notes that it does not see a tension between holding both (1) that an entity is not a state actor *and* (2) that the same entity does not run afoul of the private nondelegation doctrine. Indeed, Plaintiff concedes that, in some circumstances, such an arrangement can be constitutional. Dkt. 25 at 99:10–16. That is because the level of oversight required to satisfy the nondelegation doctrine is different, both quantitatively and qualitatively, from the level of permanent control required to make a nominally private corporation a state actor. FINRA's structure and work strikes the necessary balance.

For the reasons stated above, the Court finds that Plaintiff's private nondelegation claim is unlikely to succeed on the merits.

### 3.      *First Amendment Claim*

Plaintiff's First Amendment claim is also unlikely to succeed on the merits.  Plaintiff alleges that "[b]y forcing securities professionals to join, fund, and support an SRO, FINRA . . . deprive[s] members and associated persons of their First Amendment rights."  Dkt. 2-1 ¶ 249. The parties and the Court construe Plaintiff's First Amendment claim as a challenge to the Exchange Act's statutory scheme, which means that to succeed, it does not require a finding that FINRA is a state actor or engaged in state action.

The First Amendment protects "[t]he right to eschew association for expressive purposes."  *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).  But this right is not absolute, and "[i]nfringements . . . may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *see Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

Here, Plaintiff does not identify how his associational rights are implicated in any intelligible way.  *See, e.g.*, Dkt. 16 at 19.  None of Plaintiff's allegations—including those that securities professionals are unable to "self-govern their business" and must pay "higher and more arbitrary fees" under FINRA membership, Dkt. 4-1 ¶¶ 238–50—illuminate any "expressive purpose[]" that has caused him to want to "eschew association" with FINRA, *Janus*, 138 S. Ct. at 2463.

In any event, the Exchange Act provides several compelling interests to justify regulation.  SROs like FINRA work "to prevent fraudulent and manipulative acts and practices,

to promote just and equitable principles of trade, to foster cooperation and coordination . . . , to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest."  15 U.S.C. § 78o-3(b)(6).

In *Keller*, the Supreme Court rejected a similar First Amendment challenge to a mandatory state bar, holding that "lawyers admitted to practice in the State may be required to join and pay dues to the State Bar," so long as "the compelled association . . . [is] justified by the State's interest in regulating the legal profession and improving the quality of legal services." 496 U.S. at 4, 13.  A state bar "may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members."  *Id.* at 14.  FINRA's activities are not materially different.

Despite Plaintiff's allegation of "higher and more arbitrary fees," Dkt. 2-1 ¶ 244, he does not explain how those fees are used in a way that is not "germane" to FINRA's mission or how they "fund activities of an ideological nature which fall outside of those areas of" FINRA's compelling interest in regulation.  *Keller*, 496 U.S. at 13–14.  Plaintiff's First Amendment claim is unlikely to succeed on the merits.

### 4.    *Article III, Fifth Amendment, Seventh Amendment, and Sherman Act Claims*

Plaintiff's remaining claims—which allege violations of Article III, the Fifth Amendment, the Seventh Amendment, and the Sherman Act—are unlikely to succeed on the merits for a simple reason.  Plaintiff did not respond to FINRA's argument that this Court lacks jurisdiction under *Axon Enterprise Inc. v. FTC*, 598 U.S. 175 (2023), thus conceding the issue.

FINRA argues that the Court lacks subject matter jurisdiction over these claims because they are subject to the Exchange Act's exclusive review provisions, which provide that a person

aggrieved by a final order from the SEC may obtain review in a court of appeals. *See* 15 U.S.C. § 78y(a)(1); *Axon*, 598 U.S. at 185; Dkt. 11 at 26–31, 41. *Axon*'s exception to the requirement that individuals must exhaust their administrative remedies before seeking judicial review provides district courts with jurisdiction over "far-reaching constitutional claims," 598 U.S. at 185, or "claims that the structure, or even existence, of an agency violates the Constitution" if they are "collateral to any decisions the [SEC] could make in individual enforcement proceedings" and "fall outside the [SEC's] sphere of expertise," *id.* 195–96. Plaintiff offers no response to FINRA's jurisdictional argument.[17] *See* Dkt. 16 at 18–19. "If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded." *Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002). And "[t]he merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (cleaned up).

Therefore, the Court need not address whether *Axon* provides jurisdiction over Plaintiff's Article III, Fifth Amendment, Seventh Amendment, and Sherman Act claims. Instead, it holds that Plaintiff has failed to make any showing, let alone "*a clear showing*," *Mazurek*, 520 U.S. at 972 (cleaned up), that this Court has jurisdiction over these claims and that they are likely to succeed, *see Church v. Biden*, 573 F. Supp. 3d 118, 133 (D.D.C. 2021).[18]

---

[17] Plaintiff's conclusory allegation that he "presents claims that are beyond FINRA's and the SEC's expertise, collateral to any administrative proceeding against [him], and properly heard by this District Court," Dkt. 2-1 ¶ 36, does not resolve the jurisdictional issue.

[18] FINRA contends this Court *has* jurisdiction over Plaintiff's Article II Appointments Clause and removal requirement, First Amendment, and private nondelegation claims. *See* Dkt. 11 at 28. The Court agrees that it has jurisdiction over these claims because they are "far-reaching constitutional claims" about the structure of FINRA and the Exchange Act's statutory scheme— not issues FINRA or the SEC "customarily handle[]" or "can apply distinctive knowledge to." *Axon*, 598 U.S. at 185–86.

### B.       Irreparable Harm

Plaintiff cannot establish that he is likely to face irreparable harm absent preliminary injunctive relief.  He argues that he faces irreparable harm because "his BrokerCheck already tells the whole world that FINRA has accused him of securities fraud, and he will lose his chosen profession on FINRA's whim."  Dkt. 4-3 at 31 (citing *Alpine*, 2023 WL 4703307, at *2 (Walker, J., concurring)).  And he argues that "being forced into an unconstitutional forum is a 'here-and-now injury' that cannot be reversed or remedied after the fact."  *Id.* (quoting *Axon*, 598 U.S. at 191).  FINRA counters that Plaintiff's constitutional harm argument would fail if the Court rejected his likelihood of success on those claims and that in any event, his "claim of urgency and imminent irreparable harm . . . is significantly overstated."  Dkt. 11 at 42.  The Court agrees with FINRA.  Because Plaintiff's claims are unlikely to succeed on the merits, his constitutional arguments do not give rise to irreparable harm.  *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).[19]

Further, Plaintiff does not face the same degree and immediacy of harm as Alpine. *Alpine* involved an expedited enforcement proceeding and the company's attempt to block its "expulsion from FINRA—the so-called 'corporate death penalty.'"  *Alpine*, 2023 WL 4703307, at *1 (Walker, J., concurring).  FINRA was taking "expedited steps to expel the company from the industry" in light of Alpine's "chronic recidivism."  *Scottsdale*, 2023 WL 3864557, at *12. When the district court ruled on Alpine's motion for a preliminary injunction, FINRA's enforcement proceeding was set to potentially conclude soon, *id.*, which could have "stop[ped] Alpine from selling securities," *Alpine*, 2023 WL 4703307, at *1.

---

[19] *Axon*'s holding addressed whether district courts have jurisdiction over constitutional claims, not whether those claims give rise to an irreparable injury for purposes of the preliminary injunction analysis.  *See* 598 U.S. at 195–96; *see also Leachco, Inc. v. Consumer Prod. Safety Comm'n*, No. 22-cv-232, 2023 WL 4934989, at *2 (E.D. Okla. Aug. 2, 2023).

Not here.  This case instead is in the early days.  Plaintiff has not yet filed his answer, which can be bare-bones.  *See* Dkt. 22-1 (sample FINRA answer).  Before the hearing, Plaintiff will participate in a pre-hearing scheduling conference and may be asked to submit documents in addition to his original production.  Dkt. 25 at 36:24–37:22; Dkt. 11-3 ¶ 20.  The enforcement hearing will likely take place in "early to mid-2024."  Dkt. 25 at 37:13–17; *see also* Dkt. 11-3 ¶ 20.  After the hearing, there could be additional briefing.  Dkt. 25 at 38:5–7.  And then, if the hearing panel rules against Plaintiff, the sanction imposed could be stayed pending Plaintiff's appeal in FINRA's internal process.  *See id.* at 40:3–10.

If the hearing panel finds that Plaintiff violated FINRA Rule 2010, he will most likely face only a fine.  *See* Dkt. 11-5 at 15 (requesting monetary sanctions as a form of relief).  At the Court's hearing, FINRA explained that its "enforcement staff is planning to request a fine of $30,000" and disgorgement of about $16,000 in profits.  Dkt. 25 at 92:10–11, 92:20–22.  And FINRA filed declarations confirming that it does not currently seek expulsion and will not seek it "absent intervening misconduct or unforeseen circumstances."  Dkt. 11-2 ¶ 22; Dkt. 25 at 31:4–5.  Notably, FINRA did not expel Plaintiff's firm, National Securities, for its participation in similar charged conduct.  *See* Dkt. 11-3 ¶ 8.

In sum, the circumstances here differ materially from FINRA's "expedited" enforcement action against Alpine that sought "immediate expulsion."  *Scottsdale*, 2023 WL 3864557, at *1.  The requirements that Plaintiff file a bare-bones answer, participate in a pre-hearing conference, and potentially produce additional documents could, of course, constitute some harm.  But the Court does not find that degree of harm sufficient to justify preliminary injunctive relief.

### C.      Balance of Equities and Public Interest

Citing *Alpine* and *Axon*, Plaintiff argues that the equities and public interest prohibit him from being subjected to an unconstitutional or unlawful enforcement proceeding.  Dkt. 4-3 at 32. FINRA disagrees because of its statutory mandate to enforce compliance with its own rules, including FINRA Rule 2010, and the public interest in "trust and honesty in the securities market."  Dkt. 11 at 44.  FINRA also argues that granting injunctive relief here would create a ripple effect in which "every respondent in a FINRA disciplinary proceeding, as well as every disciplinary proceeding commenced by other SROs, . . . need only file a copy-cat suit in federal court to obtain a judicially-imposed stay of the proceeding."  *Id.* at 44–45.  The Court finds that both the equities and public interest weigh against granting Plaintiff preliminary injunctive relief.[20]

### 1.      *Balance of Equities*

The Court finds that the equities favor FINRA.  Enjoining this enforcement proceeding would interfere with FINRA's regulatory mission and ability to enforce its own rules.  *See* Dkt. 22 at 2.  There are currently 19 active complaints before FINRA hearing officers, and 1,452 active investigations.  Dkt. 25 at 95:9–14.  FINRA is aware of at least one other respondent who "moved for a stay of his FINRA disciplinary proceeding based on the constitutional arguments that are at issue here," and, following the hearing officer's denial of the stay, "communicated . . . that he intends to initiate litigation and seek a preliminary injunction."  *Id.* at 48:15–22.[21]  More

---

[20] Because FINRA, not the government, is the opposing party, the Court separates the balance of equities and public interest into two factors, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), but notes that they overlap in many ways.

[21] FINRA confirmed by email to the Court and the other parties that this update was current as of October 4, 2023.

copy-cat suits would inevitably follow if this Court read the *Alpine* order to suggest that each challenged FINRA enforcement action must be stayed pending the *Alpine* merits decision instead of conducting a case-specific analysis. Plaintiff's counsel himself "was hesitant to . . . affirmatively bring" these types of lawsuits prior to the *Alpine* order and Judge Walker's concurring statement. Tr. of Aug. 23, 2023 Status Conference at 10:18–21.

On the other hand, as discussed above, Plaintiff does not face imminent enforcement action or the "corporate death penalty."[22] Nor has Plaintiff acted with alacrity. *Cf. Benisek*, 138 S. Ct. at 1944 (discussing significance of delay). Plaintiff has been on notice of the investigation since at least 2020. *See* Dkt. 11-3 ¶ 6. And in early 2022, Plaintiff's counsel declined to file a submission arguing why FINRA should not bring a disciplinary action. *Id.* ¶¶ 7, 9. Having given up that chance to avoid a hearing altogether, Plaintiff then waited thirty-eight days after FINRA filed its complaint to bring this lawsuit and even longer to request preliminary injunctive relief. Dkt. *id.* ¶ 10; Dkts. 1, 4. These facts, when balanced against the harm to FINRA in this case—and the potential impact on its other cases—counsel against granting preliminary injunctive relief.

### 2. Public Interest

The Court recognizes that the protection of constitutional rights serves the public interest. But the Court does not find that Plaintiff's constitutional claims are likely to succeed. And even

---

[22] The filing of an answer and participation in the pre-hearing conference will alter the status quo, which is defined as "the last uncontested status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (cleaned up) (emphasis omitted). But given that Plaintiff has already produced documents and given sworn testimony, *see* Dkt. 11-3 ¶ 6, the Court does not find that those additional steps significantly alter the status quo. Requiring FINRA to stay its enforcement proceeding would also impact the status quo, arguably even more so than permitting the proceeding to continue.

if they were, under the circumstances in this case, countervailing public interest considerations favor FINRA.

FINRA's ability to effectively enforce its rules and protect the integrity of U.S. securities markets promotes the public interest. *See, e.g.*, *Taseko Mines Ltd. v. Raging River Cap.*, 185 F. Supp. 3d 87, 94 (D.D.C. 2016). FINRA's membership includes roughly 3,400 brokerage firms, 150,000 branch offices, and 624,000 associated persons. Dkt. 2-1 ¶ 62. FINRA and other SROs provide essential first-line level protection in real time, which the SEC lacks the means and resources to replicate. *E.g.*, Dkt. 20 at 21. As amici the Securities Exchanges explain, for example, "the Exchanges can quickly institute trading halts upon the leakage of material news to prevent some market participants from acting upon information that others lack." Dkt. 20 at 21. SROs like FINRA exercise "soft law" authority; "[t]he theory justifying self-regulation is that it is more flexible than government regulation and is based on a superior knowledge of industry practices and capabilities." Roberta S. Karmel & Claire R. Kelly, *The Hardening of Soft Law in Securities Regulation*, 34 Brook. J. Int'l L. 883, 890 (2009); *see also* Dkt. 19 at 16–17 (discussing the public benefits of self-regulation). On the other hand, as history shows, serious problems unfold when the SEC is left with sole oversight responsibility, *see supra* Section I.A.1 and note 3, which is what amici predict would happen again, *see* Dkt. 19 at 16; Dkt. 20 at 20–21.

Suspending FINRA's ability to enforce its own rules would harm investors. As the D.C. Circuit has explained about the FINRA rule at issue in this case, "[t]he high ethical standards enforced by Rule 2010 are vital because customers and firms must be able to trust securities professionals with their money. Trustworthiness and integrity thus are essential to the functioning of the securities industry." *Saad*, 873 F.3d at 299 (cleaned up). Suspending FINRA's enforcement ability would likely interfere with the "efficiency, reliability, and safety"

of U.S. capital markets.  Dkt. 20 at 21; *see also Scottsdale*, 2023 WL 3864557, at \*9 n.8

(discussing potential risks of liquidity and credit problems to stability of U.S. markets).

Investors could be harmed by FINRA's even temporary inability to self-regulate securities

markets.  *See* Dkt. 11 at 45.

Further, Plaintiff's arguments, if accepted, could apply to enjoin other SROs in the

financial industry and elsewhere, which would further upend a long-standing system.  *See, e.g.*,

Dkt. 19 at 10–18 (arguing that granting Plaintiff preliminary injunctive relief could be used to

challenge other SROs).  At least one other litigant with a pending case has raised a similar

constitutional challenge to an SRO—*National Horsemen's Benevolent & Protective Ass'n v.*

*Black*, No. 23-10520 (5th Cir.), cited and discussed above, *see supra* Section III.A.1, involves an

Appointments Clause challenge to the Horseracing Integrity and Safety Authority.  *See* Dkt. 22

at 5 n.4.

*     *     *

Even if the Court were to assume that Plaintiff *has* established a likelihood of success on

the merits and irreparable harm, the Court would still deny Plaintiff's motion because both the

balance of equities and the public interest strongly disfavor the requested relief and would

outweigh even a successful showing on the other two factors.

The Supreme Court has emphasized that preliminary injunctive relief is "never awarded

as of right," and, "[a]s a matter of equitable discretion," it "does not follow as a matter of course

from a plaintiff's showing of a likelihood of success on the merits."  *Benisek*, 138 S. Ct. at 1943–

44 (cleaned up).  Similarly, a court need not issue such relief "even though irreparable injury

may otherwise result to the plaintiff."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)

(cleaned up).  In *Winter*, for example, the Court held that "proper consideration" of the balance

33

of equities and public interest "factors alone [would have] require[d] denial of the requested injunctive relief," "even if [the] plaintiffs [had] shown irreparable injury" and a likelihood of success on the merits.  555 U.S. at 23–24; *accord Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006).

Importantly, this body of case law shows that a court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims.  In *Benisek*, the Supreme Court affirmed the district court's denial of a preliminary injunction against the use of a purportedly gerrymandered electoral map that, the plaintiffs alleged, violated the First Amendment.  138 S. Ct. at 1943–44;[23] *see Benisek v. Lamone*, 266 F. Supp. 3d 799, 801 (D. Md. 2017) (three-judge panel), *aff'd*, 138 S. Ct. 1942.  The Court held that even if it "assume[d] . . . that [the] plaintiffs were likely to succeed on the merits of their claims, the balance of equities and the public interest tilted against their request for a preliminary injunction."[24]  *Benisek*, 138 S. Ct. at 1944.  The Court held that "the public interest in orderly elections" and the fact that a pending appeal in another case "had the potential to shed light on critical questions in th[e] case" supported the district court's denial of interim relief.  *Id.* at 1944–45 (cleaned up).  Similarly, in this case, the public interest in "orderly"

---

[23] *Benisek* was a per curiam opinion.  *See* 138 S. Ct. at 1943.  But no party argues that that fact makes *Benisek* irrelevant.  Decisions of the U.S. Supreme Court are binding on the lower courts.  *See, e.g.*, *United States v. Hillie*, 39 F.4th 674, 683 (D.C. Cir. 2022).  Consistent with that fact, lower courts around the country have relied upon *Benisek*.  *See, e.g.*, *Eggers v. Evnen*, 48 F.4th 561, 567 (5th Cir. 2022); *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–28 (6th Cir. 2019).

[24] The Court did not specifically discuss whether it also assumed the plaintiffs had established irreparable harm.  *See Benisek*, 138 S. Ct. at 1943–44.  But since the case involved a First Amendment claim, and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), its assumption that the plaintiffs had established a likelihood of success implied a corresponding assumption that the plaintiffs had shown irreparable harm.

regulation of the securities sector, *see Taseko Mines*, 185 F. Supp. 3d at 94, and the fact that the

pending *Alpine* appeal will likely soon resolve the merits issues here point toward a strong public

interest in denying Plaintiff's motion.  *Benisek* supports the Court's determination that, "[a]s a

matter of equitable discretion," a preliminary injunction is unwarranted.  138 S. Ct. at 1943.[25]

Multiple recent decisions of this District support such an outcome.  In *Allina Health*

*Services v. Sebelius*, 756 F. Supp. 2d 61 (D.D.C. 2010), for example, decided under the more

plaintiff-friendly sliding scale test, the court held that "[e]ven assuming the [plaintiffs] ha[d]

demonstrated a likelihood of success on the merits," and despite the plaintiffs' having at least

arguably shown irreparable injury, it would "nonetheless deny [their] motion for a preliminary

injunction . . . in light of the imminence of a controlling decision from the D.C. Circuit and the

public interest," *id.* at 67; *see id.* at 67–69, 71 (discussing irreparable injury); *see also, e.g.*,

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 215–23 (D.D.C. 2020) (denying preliminary injunction

based on balance of equities and public interest despite showing of irreparable harm and

likelihood of success on constitutional claim).  The court reasoned that the balance of equities cut

against the plaintiffs' requested injunction, which would have prevented the Secretary of Health

and Human Services from implementing a revised formula for certain Medicare payments, *see*

*id.* at 63–65, and thereby imposed costs on both the Secretary and other Medicare participants,

*see id.* at 69.  That same consideration, as well as the facts that the proposed relief would have

---

[25] D.C. Circuit case law is consistent with this approach.  For example, the Circuit explained in
*League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), that
"likelihood of success on the merits is a strong indicator that a preliminary injunction would
serve the public interest," *id.* at 12.  But the court did not hold that likelihood of success is
*dispositive*, and it instead engaged in a long, fact-specific analysis of the equities in that case.
*See id.* at 12–14.  And although the D.C. Circuit stated in *Archdiocese of Washington* that "were
[the plaintiff] to show a likelihood of success on the merits, it would prevail on the final three
factors," 897 F.3d at 334 (citation omitted), the court did not categorically state that this was true
in every case and again analyzed case-specific facts, *id.* at 335.

created severe disruptions in administering Medicare payments and that the D.C. Circuit would soon issue a "controlling decision on the [relevant] legal issue," meant that the public interest also disfavored an injunction.  *Id.* at 69–71.

Plaintiff here seeks a similarly disruptive remedy, one that would threaten to deregulate a large swathe of the securities sector.  Such relief would impose costs on the public at large through a heightened risk of securities fraud, and the D.C. Circuit's *Alpine* decision will likely clarify whether Plaintiff's constitutional claims have merit in the near term.  As in *Allina Health Services*, the balance of equities and public interest thus would outweigh even a successful showing on the other preliminary injunction factors and render preliminary relief inappropriate. The Court would therefore deny Plaintiff's motion even if it concluded that Plaintiff had shown a likelihood of success on the merits and irreparable harm.

## IV.  CONCLUSION

Plaintiff's Motion for a TRO and Preliminary Injunction, Dkt. 4, is denied.  An order consistent with this memorandum opinion has been entered.

_____

Date:  October 6, 2023                    ANA C. REYES
                                          United States District Judge

36